**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANNA NETREBKO,                                            :
                                                         :
                       Plaintiff,                        :
                                                         :
             v.                                          :        Case No. 1:23-cv-06857-AT
                                                         :
METROPOLITAN OPERA ASSOCIATION,                          :
INC. d/b/a THE METROPOLITAN OPERA                        :
and PETER GELB, in his professional and                  :
individual capacities,                                   :
                                                         :
                       Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>MEMORANDUM IN SUPPORT OF</u><br><u>THE METROPOLITAN OPERA ASSOCIATION, INC. AND PETER GELB'S</u><br><u>MOTION TO DISMISS</u>

PROSKAUER ROSE LLP

Lloyd B. Chinn, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3000
Facsimile: 212.969.2900
lchinn@proskauer.com

*Attorney for Defendants*
*Metropolitan Opera Association, Inc. and*
*Peter Gelb*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

LEGAL STANDARD ..................................................................................................... 2

ARGUMENT ................................................................................................................... 3

I.      Plaintiff Failed To Plausibly Plead How, If At All, Her Termination Was Motivated By Her Sex, National Origin, Or A Combination Of The Two.............................................. 4

        A.      National Origin Discrimination ................................................................ 4

        B.      Intersectional Discrimination .................................................................... 7

        C.      The Derivative Aiding And Abetting Claims Must Be Dismissed..................... 10

        D.      Plaintiff's Discrimination Claims Are Barred By Collateral Estoppel................ 10

II.     Plaintiff's Defamation Claim Is Legally Implausible. ...................................... 13

        A.      The Purportedly Defamatory Statements Are "Substantially True."................... 14

        B.      Mr. Gelb's Statements Are Protected By The Qualified Privilege..................... 16

        C.      Plaintiff Failed To Plausibly Plead Actual Malice. ..................................... 19

        D.      In The Alternative, The Allegedly Defamatory Statements Are Non-Actionable Opinions. .......................................................... 20

        E.      Plaintiff's Defamation Claim Is Barred By Issue Preclusion. ......................... 22

III.    Plaintiff's Breach Of Contract Claim Is Barred By Res Judicata And Section 301 Preemption. ................................................................................. 24

CONCLUSION ............................................................................................................. 27

## <u>TABLE OF AUTHORITES</u>

**Page(s)**

<small>CASES</small>

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001)...................................................................................17, 18

*Anderson v. N.Y.C. Health & Hosps. Corp.*,
   No. 16-CV-1051, 2020 U.S. Dist. LEXIS 36772 (S.D.N.Y. Mar. 2, 2020) .............................8

*Arnold v. 1199 SEIU*,
   No. 09 Civ. 5576, 2009 U.S. Dist. LEXIS 116579 (S.D.N.Y. Dec. 15, 2009).......................26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................3

*Blackman v. Stagno*,
   35 A.D.3d 776 (2nd Dep't 2006) ............................................................................17

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998)..................................................................................14

*Borchers v. DBL Liquidating Trust (In re Drexel Burnham Lambert Grp.)*,
   161 B.R. 902 (S.D.N.Y. 1993)................................................................................11

*Boykin v. KeyCorp*,
   521 F.3d 202 (2d Cir. 2008)..................................................................................10

*Brattis v. Rainbow Advert. Holdings, LLC*,
   No. 99 Civ. 10144, 2000 U.S. Dist. LEXIS 7345 (S.D.N.Y. May 31, 2000).........................17

*Brimelow v. N.Y. Times Co.*,
   No. 21-66-cv, 2021 U.S. App. LEXIS 31672 (2d. Cir. Oct. 21, 2021) ...............................19

*Cardwell v. Davis Polk & Wardwell LLP*,
   No. 1:19-cv-10256, 2020 U.S. Dist. LEXIS 198655 (S.D.N.Y. Oct. 24, 2020)......................6

*Cheung v. Merill Lynch, Pierce, Fenner & Smith*,
   913 F. Supp. 248 (S.D.N.Y. 1996) ...........................................................................4

*Cruz v. SEIU Local 32BJ*,
   No. 19 Civ. 11836, 2021 U.S. Dist. LEXIS 152074 (S.D.N.Y. Aug. 12, 2021) ..................5, 9

*Daniels v. N.Y.C.*,
No. 17 Civ. 9960, 2019 U.S. Dist. LEXIS 8604 (S.D.N.Y. Jan. 17, 2019) ........................6, 9

*Davis v Boeheim*,
24 N.Y.3d 262 (2014) ................................................................................................20

*De La Peña v. Metro. Life Ins. Co.*,
953 F. Supp. 2d 393 (E.D.N.Y. 2013) .......................................................................5

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010).....................................................................................15

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
556 F.2d 113 (2d Cir. 1997)......................................................................................19

*Espinoza v. Farah Mfg. Co.*,
414 U.S. 86 (1973)......................................................................................................4

*Ferring B.V. v. Serenity Pharms., LLC*,
391 F. Supp. 3d 265 (S.D.N.Y. 2019)........................................................................11

*Field Day, LLC v. Cnty. of Suffolk*,
463 F.3d 167 (2d Cir. 2006).......................................................................................2

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)..........................................................................................2

*Gebhardt v. Allspect, Inc.*,
96 F. Supp. 2d 331 (S.D.N.Y. 2000) ...........................................................................3

*Godwin v. Sirva, Inc.*,
291 F. Supp. 3d 245 (E.D.N.Y. 2018) ........................................................................22

*Gottlieb v. Wynne*,
159 A.D.3d 799 (2d Dep't 2018) ........................................................................18, 19

*Hayden v. Cnty. of Nassau*,
180 F.3d 42 (2d Cir.1999)............................................................................................2

*Hollander v. Cayton*,
145 A.D.2d 605 (2nd Dep't 1988) ...............................................................................18

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995)..............................................................................................3

*Jewell v. NYP Holdings, Inc.*,
23 F. Supp.2d 348 (S.D.N.Y. 1998)..............................................................................14

*Karim v. N.Y.C. Health & Hosps. Corp.*,
No.16 Civ. 6888 (AT), 2020 U.S. Dist. LEXIS 98723 (S.D.N.Y. Jun. 4, 2020)......................7

*Konikoff v. Prudential Ins. Co. of Am.*,
234 F.3d 92 (2d Cir. 2000)........................................................................................17

*L.Y.E. Diamonds Ltd. v. Gemological Inst. of Am. Inc.*,
No. 151771/2016, 2017 NY Misc. LEXIS 4747 (Sup. Ct. N.Y. Cnty. Dec. 7,
2017), *aff'd*, 169 A.D.3d 589 (1st Dep't 2019) ........................................................18

*Leah v. McHugh*,
731 F.3d 405 (5th Cir. 2013) ......................................................................................8

*Lobban v. Cromwell Towers Apts., LP*,
345 F. Supp. 3d 334 (S.D.N.Y. 2018)..........................................................................11

*Lynch v. City of N.Y.*,
952 F.3d 67 (2d Cir. 2020).............................................................................................2

*M.J. Woods, Inc. v. Conopco, Inc.*,
271 F. Supp. 2d 576 (S.D.N.Y. 2003)..........................................................................10

*Mann v. Abel*,
10 N.Y.3d, 271 (2008) ................................................................................................20

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002)..............................................................................10, 12

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
No. 17-CV-07568, 2018 U.S. Dist. LEXIS 28026 (S.D.N.Y. Jan. 12, 2018) ........................20

*Montana v. U.S.*,
440 U.S. 147 (1979)....................................................................................................11

*Morgan v. NYP Holdings, Inc.*,
58 Misc. 3d 1203(A) (Sup. Ct. Kings Cnty. 2017).........................................................22

*Patriarch Partners, LLC v. Mergermarket (U.S.) Ltd.*,
No. 160379/2016, 2018 N.Y. Misc. LEXIS 1117 (Sup. Ct. N.Y. Cnty. Mar.
26, 2018) ....................................................................................................................21

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)...........................................................................................3

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022).....................................................................18, 20

*Qureshi v. St. Barnabas Hosp. Ctr.*,
    430 F. Supp. 2d 279 (S.D.N.Y. 2006) . Application of the ...................................................18

*Rieger v. Drabinsky (In re Livent Noteholders Sec. Litig.)*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)......................................................................................3

*Scalercio-Isenberg v. Morgan Stanley Servs., Grp.*,
    No. 19-CV-6034, 2019 U.S. Dist. LEXIS 220103 (S.D.N.Y. Dec. 19, 2019) ........................5

*Schwartz v. Nordstrom, Inc.*,
    160 A.D.2d 240 (1st Dep't 1990) ...........................................................................................22

*Sheffield v. Sheriff of the Rockland Cnty. Sheriff Dep't.*,
    393 F. App'x 808 (2d Cir. 2010) ............................................................................................24

*Smith v. Local 819 I.B.T. Pension Plan*,
    291 F.3d 236 (2d Cir. 2002)......................................................................................................3

*Stinnett v. Delta Air Lines, Inc.*,
    No. 18-CV-27014, 2019 U.S. Dist. LEXIS 58145 (E.D.N.Y. Mar. 31, 2019).....................5, 9

*Tagger v. Strauss Grp. Isr.*,
    No. 23-CV-6767, 2023 U.S. Dist. LEXIS 144608 (S.D.N.Y. Aug. 15, 2023).......................25

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017)....................................................................................................14

*TechnoMarine SA v. Giftports, Inc.*,
    758 F.3d 493 (2d Cir. 2014)....................................................................................................10

*Thomas v. Cook Children's Health Care Sys.*,
    No. 4:20-CV-01272, 2021 U.S. Dist. LEXIS 200467 (N.D. Tex. Jun. 28,
    2021) .........................................................................................................................................8

*Toker v. Pollak*,
    44 N.Y.2d 211 (1978) .............................................................................................................17

*United Steelworkers of Am. v. Rawson*,
    495 U.S. 362 (1990)................................................................................................................26

*Vera v. Saks & Co.*,
    335 F.3d 109 (2d Cir. 2003)....................................................................................................26

*Vetere v. Associated Press, Inc.*,
    No. 88 Civ. 4115, 1989 U.S. Dist. LEXIS 3894 (S.D.N.Y. Apr. 17, 1989) .....................14, 15

*Xiaoguang Jiang v. Am. Express Nat'l Bank*,
    No. 22-CV-2272, 2023 U.S. Dist. LEXIS 4318 (E.D.N.Y. Jan. 10, 2023) ............................24

*Yost v. Everyrealm, Inc.*,
    No. 22 Civ. 6549, 2023 U.S. Dist. LEXIS 31246 (S.D.N.Y. Feb. 24, 2023) ........................5, 9

**STATUTES**

Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* (1947)......................................2, 24, 26

New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (1965)......................... passim

New York State Human Rights Law, N.Y. EXEC. LAW § 290 *et seq.* (1945)......................5, 6, 13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 10 ..........................................................................................................................2

Fed. R. Civ. P. 12 ................................................................................................................... passim

U.S. CONST. amend. I........................................................................................................................19

## PRELIMINARY STATEMENT

In the wake of Vladimir Putin's decision to launch a brutal full-scale military invasion of Ukraine, the Metropolitan Opera Association ("the Met") demanded that its star diva Anna Netrebko – well-known as a Putin supporter – renounce Putin and his unprovoked war of aggression against a sovereign state. She refused. And as a result – as an arbitration already determined – the Met terminated her employment.[1] There is no basis for her claims of discrimination, defamation or breach of contract.

As to Netrebko's discrimination claims, the notion that her firing had anything to do with her Russian national origin or gender is preposterous in the extreme – which is why Netrebko cannot support or even articulate a single assertion of anti-Russian or anti-woman bias. If anything, Netrebko concedes that the Met and its General Manager, Peter Gelb, promoted and featured her as a Russian woman. Netrebko rests her entire national origin claim on a conflation of anti-Putin sentiments with anti-Russian bias. But if that's the case, opposing Nazism would render one anti-German. And that clearly cannot be so. Moreover, collateral estoppel applies to Plaintiff's discrimination claims, given that an arbitrator has already specifically concluded that the Met terminated Plaintiff's employment because she refused to disavow Putin in the wake of his full-scale war of aggression.

Netrebko's defamation claim is also meritless. Plaintiff now attempts to paint as defamatory statements that Mr. Gelb made regarding her readily apparent support for Putin. These statements are substantially true on the face of the Amended Complaint ("AC") and otherwise generally well-known. Indeed, Netrebko's own labor union asserted on her behalf that the Met shouldn't have terminated her precisely because she had long been recognized as a Putin

---

[1] While immaterial here, the Met notes that Plaintiff was not its employee, but an independent contractor.

supporter.  And myriad newspaper articles incorporated by reference into the AC further establish the substantial truth of Mr. Gelb's statements.  Moreover, Netrebko has not asserted any facts from which malice could be established to overcome the associated privileges.  Further, the statements at issue constitute non-actionable statements of opinion regarding Netrebko's political views.  Finally, Plaintiff is collaterally estopped from relitigating whether she is a Putin sympathizer, as an arbitrator expressly held as much in the Arbitration Decision and Award ("the Arbitration Award") cited throughout the AC.

Finally, Plaintiff's sanctionable breach of contract claim is precluded by *res judicata* and preempted by Section 301 of the Labor Management Relations Act ("the LMRA").  The very question posed by Plaintiff's breach of contract claim – whether the Met was obligated to pay Plaintiff for "holds" – tentative holding of dates for possible contracting for performances – was expressly decided in the Arbitration Award.  Even if this issue had not been decided, it would, in any event, be preempted by the LMRA.

Consequently, Plaintiff's claims for discrimination, defamation and breach of contract fail as a matter of law.  The Court should dismiss this Action with prejudice.

## **LEGAL STANDARD**

On a Rule 12(b)(6) motion to dismiss, the Court must assume the truth of Plaintiff's factual allegations, but not her legal conclusions or any "unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994).  Similarly, on a motion to dismiss a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of N.Y.*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)); *see*

*In'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)) (finding that, for the purposes of Federal Rule of Civil Procedure 12(b)(6), a court may consider written instruments attached to the complaint, statements or documents incorporated into the complaint by reference, and even "integral" documents not incorporated by reference where the complaint relies heavily upon the integral documents' terms and effect).

To state a valid claim, a plaintiff cannot rely on mere conclusory assertions, but instead must allege "concrete" facts that make her claims "plausible." *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 719 (2d Cir. 2013).  Indeed, conclusory allegations are not entitled to be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-555 (2007)); *see also Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir. 2002) ("legal conclusions masquerading as factual conclusions will not suffice") (quoting *Gebhardt v. Allspect, Inc.,* 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)).  Nor is the Court required to accept contradictory allegations as true. *See Rieger v. Drabinsky (In re Livent Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405–406 (S.D.N.Y. 2001) ("Thus, a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.")

## **ARGUMENT**

For myriad reasons, Plaintiff's discrimination, defamation and breach of contract claims fail as a matter of law.  The Court should dismiss this action with prejudice.

# I.    Plaintiff Failed To Plausibly Plead How, If At All, Her Termination Was Motivated By Her Sex, National Origin, Or A Combination Of The Two.

The Court should dismiss Plaintiff's national origin and intersectional discrimination claims.  Plaintiff does not even allege a national origin discrimination claim, she alleges only that she was a victim of anti-Vladimir Putin bias, and anti-Putin bias is not national origin discrimination. In addition, Plaintiff plainly alleges that fellow Russians were *not* terminated pursuant to the anti-Putin policy (ECF No. 9 at ¶ 53), thus conceding that there was no anti-Russian animus at the Met.  Plaintiff's "intersectional discrimination claim," that she was treated less well because she is a Russian woman, also fails.  If she cannot plausibly state a claim for national origin discrimination, which she cannot, then she most certainly cannot state a claim for national-origin-plus-gender discrimination.

## A.    National Origin Discrimination

Plaintiff's standalone national origin discrimination claim is meritless.

National origin discrimination is discrimination based upon the country where a person was born, or, more broadly, the country from which her ancestors came. *Cheung v. Merill Lynch, Pierce, Fenner & Smith*, 913 F. Supp. 248, 252 (S.D.N.Y. 1996) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973)).  Plaintiff has asserted no facts tending to show the Defendants treated her less well because she was born in Russia.  Plaintiff has not, for example, asserted that Mr. Gelb or any other member of the Met's management made a disparaging comment about Russia as a country, Russian culture, or the Russian people.

Indeed, Plaintiff alleges only that the Defendants terminated her employment because of her support for Putin (an indicted war criminal) and because the Defendants supported Ukraine against Russia's invasion. (ECF No. 9 at ¶ 36 ("Gelb and the Met sought to demonstrate to audiences and donors the Met's supposed role on the word stage – not only culturally, but in

geopolitics and diplomacy – by making a dramatic statement about its efforts to oppose Russia and support Ukraine.")).  This alleged motive plainly has nothing to do with Netrebko being Russian.  It is instead a political statement by the Met and Mr. Gelb; indeed, it mirrors the stated policy of the United States government.  Plaintiff has not cited – and presumably cannot cite – any legal authority for the proposition that animus directed at a single political leader constitutes discrimination against those from that political leader's country.  Without any plausible allegations linking anti-Russian animus to Netrebko's separation, her NYCHRL and NYSHRL claims fail. *See Scalercio-Isenberg v. Morgan Stanley Servs., Grp.*, No. 19-CV-6034, 2019 U.S. Dist. LEXIS 220103, at *13 (S.D.N.Y. Dec. 19, 2019) (dismissing NYCHRL claim where there was no "connective tissue" between protected status and challenged employment action).

The few allegations of differential treatment advanced by Netrebko are vague and entirely conclusory, incapable of resisting a Rule 12 motion. *See Yost v. Everyrealm, Inc.*, No. 22-Civ. 6549, 2023 U.S. Dist. LEXIS 31246, at *35 (S.D.N.Y. Feb. 24, 2023) (dismissing, as conclusory, hostile work environment claim); *Stinnett v. Delta Air Lines, Inc.*, No. 18-CV-27014, 2019 U.S. Dist. LEXIS 58145, at *17–23 (E.D.N.Y. Mar. 31, 2019) (dismissing NYCHRL claim as conclusory where plaintiff alleged that she was aware certain unnamed male employees were not terminated under similar circumstances).  Notably, Plaintiff does not identify any non-Russian Putin sympathizers who were not terminated, or otherwise accorded better treatment. *See, e.g., De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 414 (E.D.N.Y. 2013) (proffer of comparators is insufficient to survive a Rule 12(b)(6) motion to dismiss, without "enough facts to support the contention that these employees were so similarly situated to the Plaintiff that treating the Plaintiff differently from [them] was sufficient to raise a plausible inference of disparate treatment . . ."); *Cruz v. SEIU Local 32BJ*, No. 19 Civ. 11836, 2021 U.S. Dist. LEXIS

152074, at *14–15 (S.D.N.Y. Aug. 12, 2021) (dismissing certain NYCHRL and NYSHRL claims under Rule 12 where plaintiff alleged "women workers" were treated less favorably than men, but did not identify the other women workers or their male comparators.); *Daniels v. N.Y.C.*, No. 17 Civ. 9960, 2019 U.S. Dist. LEXIS 8604, at *14 (S.D.N.Y. Jan. 17, 2019) (dismissing NYCHRL claims under Rule 12 where the Complaint lacked "sufficient information to conclude that [the plaintiffs] were treated less well than their alleged comparators because of race.").

Plaintiff's allegation regarding her inability to speak out against Putin's autocratic and intolerant regime plainly has no bearing on the question of whether Defendants were motivated by an unlawful discriminatory motive (although it does provide yet another reason why one might reasonably criticize Putin without being anti-Russian).

Plaintiff's assertions regarding her purported replacements are similarly unavailing. Having failed even to describe a national origin claim, the cherry-picked national origins of certain replacements for Netrebko are irrelevant.  If it is truly Netrebko's Russian national origin that drove her termination, then Plaintiff should be able to identify a comparator who is a non-Russian Putin sympathizer who was not terminated. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 1:19-cv-10256, 2020 U.S. Dist. LEXIS 198655, at *65 (S.D.N.Y. Oct. 24, 2020) (dismissing NYCHRL claim under Rule 12(b)(6) where "[plaintiff's] lone allegation that would support an inference that [defendant] acted because of a discriminatory motive is that his replacement [is] white. That is inadequate because . . . he has not alleged that he was similarly situated to his replacement . . . .").  Instead, what she has done is identify non-Russians who replaced her in certain performances without any reference to those individuals' views of Vladimir Putin.  She has also failed to allege that she was replaced entirely by non-Russians.

(Notwithstanding the foregoing arguments, should this claim survive Defendants' Motion to Dismiss, the evidence will show the Met has regularly hired Russian artists.)[2]

Indeed, Plaintiff has not advanced anything but conclusory allegations that she was treated less well because she is Russian (or because she is a woman).  It is therefore immaterial whether she can plausibly assert "[t]he pretextual nature of the Met's stated reasons [for her termination]." (ECF No. 9 at ¶ 50). *See Karim v. N.Y.C. Health & Hosps. Corp.*, No.16 Civ. 6888 (AT), 2020 U.S. Dist. LEXIS 98723, at *19 (S.D.N.Y. Jun. 4, 2020) (dismissing NYCHRL claim under Rule 12 where "Defendants did not provide Plaintiff access to his file and failed to credit the favorable evidence [he] submitted . . ." because "the mere allegation of mendacity or pretext, without more, is insufficient to state a claim.").

Additionally, Plaintiff herself refers to any number of facts establishing the Defendants' favorable views of Russia, its culture and, indeed of Plaintiff herself. (*See, e.g.,* ECF No. no. 9 at ¶¶ 5 n. 5, 6, 53, 54, and 56(j)).  These admissions undermine any possible inference that Plaintiff was treated less well because she is Russian.

The Court should dismiss Plaintiff's national origin discrimination claim accordingly.

## B.    <u>Intersectional Discrimination</u>

Since Plaintiff fails to plausibly assert her standalone national origin discrimination claim, her intersectional claim too fails. (*See* Section (I)(A) *supra*).  Yet, even ignoring this flaw,

---

[2] Mr. Gelb testified during the arbitration hearing between the Met and the Union that there have been other Russian performers at the Met since Plaintiff's separation, including: three Russian performers in "Lady MacBeth of Mtsensk"; the singer in the title role of "Katerina"; and, the very day that Russia invaded Ukraine, the Met opened a run of "Eugene Onegin" – Tchaikovsky's opera based on the Pushkin poem – and the Met included a Russian in the title role of Onegin. (See Declaration of Howard Robbins ("Robbins Decl.) at Exh. A).   He further testified that the Met "believe[s] [Russian artists] are the innocent hostages of this war, and [the Met is] doing everything [it] can to promote Russian art and Russian artists." (Id.).

Plaintiff's intersectional national origin/gender discrimination claim fails for additional reasons. As with the national origin claim, Plaintiff does not point to a single allegation of anti-woman animus.  She does not allege, for example, that Mr. Gelb or any other member of the Met's management made inappropriate comments about women in the workplace, or women as opera performers.  Indeed, she admits that – with respect to the replacements she identifies – they are all women. (ECF No. 9 at ¶ 50).  Further, Plaintiff has not asserted plausible allegations that she was treated less well because she is Russian and a woman.

Second Circuit precedent addressing "intersectional discrimination" claims is scant. Indeed, Defendants located a single case addressing a plaintiff's burden in such a case. *See Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16-CV-1051, 2020 U.S. Dist. LEXIS 36772, at *34 (S.D.N.Y. Mar. 2, 2020) ("A plaintiff states an intersectional discrimination claim when he or she alleges discrimination on the basis of two protected characteristics (such as sex and race) and shows that the discrimination he or she experienced is attributable, at least in part, to the combination of those protected characteristics.").  To state a claim for intersectional discrimination, Plaintiff must plausibly allege that both her national origin and her gender motivated the termination decision (*i.e.*, neither gender nor national origin discrimination alone will suffice). *See Anderson*, 2020 U.S. Dist. LEXIS 26772, at *34; *Thomas v. Cook Children's Health Care Sys.*, No. 4:20-CV-01272, 2021 U.S. Dist. LEXIS 200467, at *21 (N.D. Tex. Jun. 28, 2021) ("To state a claim for intersectional discrimination, a plaintiff must state a claim for both race and sex discrimination.") (citing *Leah v. McHugh*, 731 F.3d 405, 414–15 (5th Cir. 2013)).  Plaintiff does no such thing here.  Indeed, Plaintiff plainly alleges she was replaced by women.  Therefore, there can be no inference of gender-based animus whatsoever.

Moreover, Plaintiff's assertions regarding alleged differential treatment of women by the Met are far too speculative, conclusory and vague to state a claim under even the NYCHRL. *See Cruz*, 2021 U.S. Dist. LEXIS 152074, at *14–15; *Daniels*, 2019 U.S. Dist. LEXIS, at *14.  And Plaintiff asserts not another word regarding her mistreatment as it relates to her gender.  Thus, even if she is not *required* to identify a similarly situated male comparator who was treated more favorably, her failure to do so here is dispositive.  Indeed, the allegation that Plaintiff was discharged because female opera performers garner more headlines than males is "the epitome of the conclusory statement in a pleading that a court must ignore." *See Yost*, 2023 U.S. Dist. LEXIS 31246, at *35 (dismissing, as conclusory, hostile work environment claim where plaintiff asserted her supervisor's harassment occurred because she "must have believed Yost's bisexuality made her 'an expert on others' sexual orientations.'"); *Stinnett*, 2019 U.S. Dist. LEXIS 58145, at *17–23 (dismissing NYCHRL claim as conclusory where plaintiff alleged that she was aware certain unnamed male employees were not terminated under similar circumstances).  To the extent Plaintiff relies on the purported favorable treatment of male Putin supporters who allegedly were not required to issue a statement against the Russian President, her failure to identify any such person is, once more, fatal to her claim.  Since Plaintiff cannot point to specific facts that would show she was treated less well, at least in part, because of her gender, it is impossible for her to show that she was afforded less favorable treatment because she is a Russian woman.

Further, Plaintiff's attempt to push her claims from possible to plausible by pleading various matters "upon information and belief" reveals the weakness of her claims. (ECF No. 20 at p. 3).  For example, Plaintiff pleaded that "upon information and belief" the Met has relationships with male Russian artists who "according to media reports . . . were publicly

reported" to be Putin sympathizers. (ECF No. 9 at ¶¶ 51 & 53).  Plaintiff mis-cited *Boykin* in support of this claim. *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (permitting *pro se* plaintiff to plead "upon information and belief" where she asserted "the names and records . . . of persons who were not members of the protected classes and were more favorably treated in the loan application process is information particularly within KeyBank's knowledge and control.").  The names of the purported male Putin supporters were allegedly provided, "in media reports" and "publicly reported," thus Plaintiff (represented by counsel) has no excuse for pleading this conclusory allegation on information and belief.

Plaintiff has failed to plausibly assert she was discriminated against because she is a Russian woman, and the Court should dismiss this claim accordingly.

### C.    The Derivative Aiding And Abetting Claims Must Be Dismissed.

To the extent Plaintiff's aiding and abetting claims against Mr. Gelb are derivative of her national origin and intersectional discrimination claims, the Court should dismiss the related aiding and abetting claims. See *Godwin v. Sirva, Inc.*, 291 F. Supp. 3d 245, 254 (E.D.N.Y. 2018) ("[T]he reason section 296(6) requires a primary violation is intuitive – '[w]here there has been no discrimination, there is nothing to aid or abet.'").

### D.    Plaintiff's Discrimination Claims Are Barred By Collateral Estoppel.

Plaintiff's discrimination claims are also barred by the doctrine of collateral estoppel. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498–99 (2d Cir. 2014) (court may rely on issue preclusion in deciding Rule 12 motion).

Collateral estoppel (a/k/a issue preclusion) prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  It is well settled that collateral estoppel applies to issues resolved in arbitration. *M.J. Woods, Inc. v.*

10

*Conopco, Inc.*, 271 F. Supp. 2d 576, 581 (S.D.N.Y. 2003); *Borchers v. DBL Liquidating Trust (In re Drexel Burnham Lambert Grp.)*, 161 B.R. 902, 906–07 (S.D.N.Y. 1993) (applying collateral estoppel to unconfirmed arbitration award and stating "[t]he fact that an arbitration award has been confirmed by a district court does not add significant weight to the validity of the award. Confirmation is necessary only when the losing party to the arbitration fails to abide by the judgement.").  Additionally, "[i]n the context of labor unions and grievances filed on behalf of union members pursuant to [CBAs], the union is in privity with the member provided that the member belonged to the union at all relevant times, and the union was the sole and exclusive collective bargaining representative for its members." *Lobban v. Cromwell Towers Apts., LP*, 345 F. Supp. 3d 334, 345 (S.D.N.Y. 2018) (discussing privity between union member and union in context of *res judicata*).  Plaintiff's AC makes clear that she was a member of the American Guild of Musical Artists ("the Union"), and that the Union pursued an arbitration on her behalf to final award. (ECF No. 9 at ¶¶ 62–67).  Thus, any gateway questions regarding the applicability of collateral estoppel are readily resolved.  Indeed, Plaintiff herself concedes that she was bound by the Arbitration Award in her pre-motion letter to the Court. (ECF No. 20).

Collateral estoppel applies here, even though the arbitration did not consider a discrimination claim as such. *See Ferring B.V. v. Serenity Pharms., LLC*, 391 F. Supp. 3d 265, 283 (S.D.N.Y. 2019) ("'Under collateral estoppel, once an issue is actually and necessarily determined . . . that determination is conclusive in subsequent suits based on different causes of action . . . .'") (quoting *Montana v. U.S.*, 440 U.S. 147, 154 (1979)). Specifically, collateral estoppel applies when:

> (1) the identical issue was raised in a previous proceeding; (2) the
> issue was actually litigated and decided in the previous proceeding;
> (3) the party had a full and fair opportunity to litigate the issue; and

(4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Marvel*, 310 F.3d at 288–89 (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 719–20 (2d Cir. 1998)).

First, the identical issue – whether Plaintiff's employment was terminated for her refusal to repudiate Vladimir Putin – was raised in arbitration. (Robbins Decl. at Exh. B).  Indeed, the third issue decided by the arbitrator, whether Plaintiff violated the "Standards of Conduct"/"Morals" clause in her contract with the Met such that the Opera could terminate its contracts with her, focused on this very question. (Exh. B at p. 17). Specifically, when determining whether the Met could terminate its relationship with Plaintiff, the arbitrator inquired as to the Met's rational for terminating her.  And the arbitrator specifically found that the Met terminated Plaintiff because of "what [she] <u>did not do</u> – repudiate Putin." (Exh. B at p. 22 (emphasis in original)).  The arbitrator even discussed Mr. Gelb's motives. Indeed, the arbitrator found that as a condition of continuing to put Netrebko on stage:

> Gelb asked Netrebko repeatedly to disavow Putin. He spoke to her and her manager. Ultimately, she told him, "I'm sorry. I stand with my country" . . . [Plaintiff's] failure to go as far as Gelb wanted [in repudiating Putin], does not rise to the level of culpability required by the morals clause . . . *This determination should not be misconstrued as a condemnation of Gelb's interactions with [Plaintiff]. Far from it. As General Manager [Gelb] had an obligation to consider potential harm to the Met's reputation.*

(Id. at pp. 23–24) (emphasis added).

Second and third, the issue of whether Plaintiff's employment was terminated for her refusal to repudiate Putin was actually, fully and fairly litigated by the Union.  Indeed, the Met specifically argued that it "terminat[ed] the services of [Plaintiff] who refused to condemn [the Russian] President." (Id. at p. 23), which the arbitrator characterized as the Met requiring

Plaintiff to comply with a "'reverse loyalty oath'" to avoid separation. (Id. at p. 24). Thus, the rationale for the Met's termination decision was at the heart of the arbitration.

Finally, resolution of the issue was necessary to support a valid and final judgment.  The Arbitration Award specifically relied on the reason for Netrebko's termination in determining that her termination was improper under the "Standards of Conduct"/"Morals" clause. (Exh. B at pp. 20–23).

Accordingly, the Met has already established that it terminated Plaintiff for legitimate, non-discriminatory reasons, and Plaintiff does not allege anything beyond conclusory assertions of pretext, particularly in light of the fact that the arbitrator also held (as discussed below) she was a Putin supporter.

The Court should dismiss Plaintiff's NYCHRL and NYSHRL claims.

## II.   <u>Plaintiff's Defamation Claim Is Legally Implausible.</u>

Plaintiff's defamation claim is based on indisputably true and otherwise legally inconsequential statements.  Indeed, not only does New York precedent render Plaintiff's defamation claim implausible, but the factual findings from the Arbitration Award – cited throughout Plaintiff's AC – indisputably establish that the alleged statements are "substantially true" and, therefore, not actionable.

Plaintiff identifies six allegedly defamatory statements by Mr. Gelb: (1) "[He] was always aware [Plaintiff] was, you know, a huge Putin supporter . . . The fact is she put herself in this awful position by being Putin's political acolyte and fan club member over a period of many years, which I had witnessed.'"; (2) "When the war is over, Putin has been defeated, he's no longer in office, [Plaintiff is] demonstrating genuine remorse.  Maybe that's when we can consider [rehiring her]. . . But I would say there's a very small chance of that happening."; (3) "[Plaintiff] is inextricably associated with Putin . . . She has ideologically and in action

demonstrated that over a period of years."; (4) "[Plaintiff] has demonstrated over a period of many years that she was kind of in lockstep politically and ideologically with Putin."; (5) "[Discharging Plaintiff is] a small price to pay . . . To be on the side of right was what's important. I wouldn't be able to look at myself in the mirror and have known Putin supporters performing on our stage."; and, (6) "Although [the Met's] contracts are 'pay or play,' we didn't think it was morally right to pay [Plaintiff] anything considering her close association with Putin . . . It's an artistic loss for the Met not having her singing here. But there's no way that either the Met or the majority of its audience would tolerate her presence." (ECF No. 9 at ¶¶ 56(e)–(j))

   None of the alleged statements are defamatory as a matter of law.

### A.    The Purportedly Defamatory Statements Are "Substantially True."

   First, the six purportedly defamatory statements are "substantially true," and therefore cannot form the basis of a viable defamation claim. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247–248 (2d Cir. 2017) (the question of "substantial truth" is properly adjudicated on a Rule 12 motion).  Indeed, admissions on the face of Plaintiff's AC (*See, e.g.,* ECF No. 9 at ¶¶ 34 (Netrebko has met Putin "a handful of times"), 59(c) (same), 59(e)–(f) (Netrebko was photographed with a pro-Russian separatist holding an associated flag), and 59(g) (Netrebko appeared on a list of Putin supporters)) support Mr. Gelb's statements regarding her connections to and support for Vladimir Putin. *See Tannerite*, 864 F.3d at 242 ("'[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (citation omitted)); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 369 (S.D.N.Y. 1998) (statements that Richard Jewell was the "prime" and "main" suspect in the bombing of the Atlanta Olympics were "substantially true" where Jewell pleaded that he was "a" suspect in the bombing); *Vetere v. Associated Press, Inc.*, No. 88 Civ. 4115, 1989 U.S. Dist. LEXIS 3894, at *5 (S.D.N.Y. Apr. 17, 1989).

14

In *Vetere*, the defendant published a statement that the plaintiff was "'a former member of the American Nazi Party.'" *Vetere*, 1989 U.S. Dist. LEXIS 3894, at *1.  The plaintiff denied ever being a member of that party. *Id.* at *2.  However, he admitted that he had applied for a permit to distribute literature on behalf of a group associated with that party, distributed such literature, and that members of the associated group were commonly understood to be Nazis. *Id.* Moreover, while the plaintiff denied ever being a probationary member of the associated group, he admitted that he marched with the group, and was ultimately suspended from the same. *Id.* at **2–3.  Based on these facts, the court found that the purportedly defamatory statement was "substantially true." *Id.* at *3.  Although a summary judgment opinion, *Vetere* applies with equal force here given the admissions on the face of the AC.

Plaintiff admits she has met Putin "a handful of times," was photographed with a pro-Russian separatist holding a pro-separatist flag and appeared on a list of Putin supporters. (ECF No. 9 at ¶¶ 34 (Netrebko has met Putin "a handful of times"), 59(c) (same), 59(e)–(f) (Netrebko was photographed with a pro-Russian separatist holding an associated flag), and 59(g) (Netrebko appeared on a list of Putin supporters)).  Given these admissions, there can be no question as to the substantial truth of Mr. Gelb's statements.  The Court, following *Vetere*, should dismiss Plaintiff's defamation claim.

Moreover, Plaintiff's AC establishes on its face the substantial truth of Mr. Gelb's statements by incorporating numerous newspaper articles reflecting the widely held understanding that Plaintiff was a fervent Putin supporter. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) ("Because DiFolco referred in her complaint to her e-mails to Kaplan . . . the District Court could deem them incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the complaint.").  Indeed, in an article

cited by Netrebko, the New York Times described Plaintiff as "the Russian diva whose

international career recently fell apart because of her past support of President Vladimir V. Putin

of Russia . . . ." (ECF No. 9 at ¶ 35, n. 12).  That article also stated that "[Plaintiff] shared a text

that used an expletive in reference to her Western critics, and said they were 'as evil as blind

aggressors.' She remained silent about Mr. Putin." (Id.).  In a separate article, the New York

Times stated that Plaintiff, in regard to her relationship with Putin, had "faced protests in several

. . . cities." (Id. at ¶ 38, n. 14).  Another Times article – also cited by Plaintiff – provided that

"[she] had endorsed [Putin's] re-election and was photographed in 2014 holding a flag used by

Russian-backed separatists in Ukraine." (Id. at ¶ 51, n. 15).  Another Times article cited by

Netrebko states that she, "has ties to Mr. Putin." (Id. at ¶ 56(a), n. 20).  Likewise, an article in the

Guardian cited by Netrebko explains that she:

> has been pictured on occasion with Putin, such as in 2008 when she
> was awarded an honorary title by [Putin] . . . [H]er name was on a
> list of cultural figures who endorsed Putin's election run in 2012,
> and in 2014, she donated money to the Donetsk opera house in
> Ukraine when the territory was controlled by Russian forces . . .
> [and] [Plaintiff] posed with a separatist politician and flag when
> making the donation . . . .

(Id. at ¶ 56(g), n. 26).  Another cited article quoted from the Arbitration Award as follows,

"'there is no doubt [Plaintiff] was a Putin supporter, as she had a right to be.'" (Id. at ¶ 56(j), n.

29).  There can thus be no doubt as to the "substantial truth" of the alleged defamatory

statements, given Plaintiff's very own admissions on the face of the AC.

Since the alleged defamatory statements are "substantially true," the Court should dismiss

Plaintiff's defamation claim.

**B.     Mr. Gelb's Statements Are Protected By The Qualified Privilege.**

The Court should also dismiss the defamation claims on qualified privilege grounds.  A

statement is subject to a qualified privilege when "it is fairly made by a person in the discharge

of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is concerned." *Toker v. Pollak,* 44 N.Y.2d 211, 219 (1978).  The qualified privilege has long been recognized in the employment setting. S*ee Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege."); *Brattis v. Rainbow Advert. Holdings, LLC*, No. 99 Civ. 10144, 2000 U.S. Dist. LEXIS 7345, at *15 (S.D.N.Y. May 30, 2000) ("'New York courts have not been hesitant to invoke qualified privilege to protect an employer's statements made in an employment context.'" (citation omitted)).  Indeed, the privilege has been extended to cover speech made in the speaker's legitimate interest. *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 98 (2d Cir. 2000) (noting "a similar, albeit less developed, privilege covering a speaker's communications designed to protect the speaker's own legitimate interests.").

Here, all of the alleged defamatory statements were made by Mr. Gelb – Netrebko's former supervisor, concerning the reasons for the termination of her employment by the Met, and were reasonably made to protect her former employer's reputation following Plaintiff's public statements regarding Putin, the "West," and Russian's unlawful war on Ukraine.  (ECF No. 9 at ¶¶ 4, 15, 16, 56(e)–(j)).  They are thus protected by the qualified privilege. *See Toker,* 44 N.Y.2d at 219 (A statement is subject to a qualified privilege when "it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is concerned."); *see also Blackman v. Stagno*, 35 A.D.3d 776 (2nd Dep't 2006) (affirming summary judgment on qualified privilege grounds where defendant's counsel sent letter to plaintiff's employer that contained certain allegedly defamatory statements

and requested that employer stop plaintiff from harassing defendant); *Albert*, 239 F.3d at 272 ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege."); *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 284, 291 (S.D.N.Y. 2006) (finding statement by doctor in medical residency program to resident's father that the resident was feeling sad and needed therapy subject to qualified privilege).  Application of the qualified privilege is particularly obvious here, where Mr. Gelb's initial February 27, 2022 statement came in direct response to Plaintiff's February 26, 2022 social media posts, which included a post where "[Plaintiff] shared a text that used an expletive in reference to her Western critics, and said they were 'as evil as blind aggressors.' She remained silent about Mr. Putin." (ECF No. 9 at ¶¶ 27, 29 & 35, n. 12).

   To overcome a qualified privilege, the burden lies with the plaintiff to allege facts showing that the statements were published with either common law or actual malice.  Common law malice is defined as "personal spite, ill will or culpable recklessness or negligence." *Hollander v. Cayton*, 145 A.D.2d 605, 606 (2nd Dep't 1988); *L.Y.E. Diamonds Ltd. v. Gemological Inst. of Am. Inc.*, No. 151771/2016, 2017 Misc. LEXIS 4747, at *6 (Sup. Ct. N.Y. Cnty. Dec. 7, 2017), *aff'd*, 169 A.D.3d 589 (1st Dep't 2019).  Actual malice is defined as "knowledge of the falsehood of a statement or reckless disregard for the truth." *Gottlieb v. Wynne*, 159 A.D.3d 799, 800 (2d Dep't 2018).  Plaintiff has not asserted anything but conclusory assertions of common law or actual malice.  Indeed, the mere fact that some of Mr. Gelb's statements followed Plaintiff's alleged repudiation of Putin does not render the statements any less true, let alone do they represent any indicia of malice. *Prince v. Intercept*, 634 F. Supp. 3d

114, 141 (S.D.N.Y. 2022) (dismissing defamation claims pursuant to Rule 12(b)(6) Motion)

(citing *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1997) (stating that

actual malice "cannot be predicated on mere denials, however vehement; such denials are so

commonplace in the world of polemical charge and countercharge that, in themselves, they

hardly alert the conscientious reporter to the likelihood of error.")).  Indeed, Plaintiff admits on

the face of her AC that, until she refused to satisfactorily disavow her relationship with Putin, the

Defendants publicly and privately supported and promoted her career. (ECF No. 9 at ¶¶ 17, 18,

23, 29–31, 56(j)).  Accordingly, she not only fails to plausibly assert any allegations of malice,

she pleads the very opposite.  Moreover, in light of the "substantial truth" of the alleged

statements on the face of the AC, she cannot plausibly allege malice.

Her defamation claim thus fails on this ground as well.

## C. Plaintiff Failed To Plausibly Plead Actual Malice.

Even if Plaintiff's defamation claim did not fail on substantial truth and qualified

privilege grounds, her failure to plausibly plead actual malice is also fatal to her claim.

According to the AC, Plaintiff is a public figure. (ECF No. 9 at ¶ 2).  Thus, the First

Amendment requires that she plausibly allege that the purportedly false statements were made

with actual malice. *See Brimelow v. N.Y. Times Co.*, No. 21-66-cv, 2021 U.S. App. LEXIS

31672, at *3–4 (2d. Cir. Oct. 21, 2021).  As described above, Plaintiff's admissions establish that

the alleged statements were/are at least substantially true, and thus cannot have been made with

actual malice. *See Gottlieb*, 159 A.D.3d at 800 (defining "actual malice" as "knowledge of the

falsehood of a statement or reckless disregard for the truth.").  Further, to the extent Plaintiff

points to her public statements purportedly denying her association with Putin (and her

backtracking of her public support of Russia's invasion of Ukraine (ECF No. 9 at ¶¶ 59(e)–(f)),

"such denials without more are insufficient to support a plausible claim of actual malice." *See Prince*, 634 F. Supp. 3d at 141.

 As Plaintiff has not plausibly pleaded malice, her defamation claim must be dismissed.

 **D. In The Alternative, The Allegedly Defamatory Statements Are Non-Actionable Opinions.**

 In the alternative, the allegedly defamatory statements relied upon by Netrebko are non-actionable statements of opinion that cannot give rise to a defamation claim.

 The determination of whether a statement is fact or opinion is "a question of law for the courts." *Davis v Boeheim*, 24 N.Y.3d 262, 269 (2014).  In determining whether a statement is an opinion, New York courts consider the following factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to  signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Davis*, 24 N.Y.3d at 270 (citing *Mann v. Abel*, 10 N.Y.3d, 271, 276 (2008)).

 Certain of the allegedly defamatory statements are so plainly opinions that they require little analysis.  "When the war is over, Putin has been defeated, he's no longer in office, she's demonstrating genuine remorse. Maybe that's when we can consider it . . . But I would say there's a very small chance of that happening." (ECF No. 9 at ¶ 56(f)) – is Mr. Gelb's description of the circumstances under which he would consider rehiring Plaintiff.  A hypothetical question is a classic statement of opinion. *See, e.g., MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17-CV-07568, 2018 U.S. Dist. LEXIS 28026, at *16–17 (S.D.N.Y. Jan. 12, 2018) (statements that "this is definitely a revenue fraud situation" which "could be a jailable offense for the CEO" and that "th[e] situation will end up with some MiMedx employees being dragged away in

handcuffs" were opinion, even if deprecating to the plaintiff); *Patriarch Partners, LLC v. Mergermarket (U.S.) Ltd.*, No. 160379/2016, 2018 N.Y. Misc. LEXIS 1117, at *17 (Sup. Ct. N.Y. Cnty. Mar. 26, 2018) ("[B]oth comments are opinions about unspecified, speculative and vague implications, and either hypothetical, or mere prediction about potential future events . . . Such supposition . . . falls into the category of nonactionable opinion.").

The second statement – "It's a small price to pay . . . To be on the side of right was what's important. I wouldn't be able to look at myself in the mirror and have known Putin supporters performing on our stage." (ECF No. 9 at ¶ 56(i)) – merely describes Mr. Gelb's thought process in deciding to separate Plaintiff and, more broadly, his feelings about the situation. Such a statement does not have any precise meaning, is incapable of being proven true or false, and would be interpreted by audiences as Mr. Gelb the Met's political opinions. Such a statement is non-actionable.

The third – "Although our contracts are 'pay or play,' we didn't think it was morally right to pay Netrebko anything considering her close association with Putin . . . It's an artistic loss for the Met not having her singing here. But there's no way that either the Met or the majority of its audience would tolerate her presence." (ECF No. 9 at ¶ 56(j)) – similarly describes Mr. Gelb and the Met's opinions about separating from Plaintiff. The statement that "there's no way that . . . the majority of [the Met's] audience would tolerate [Plaintiff's] presence" is a textbook statement of opinion (about the anticipated opinions of others). It has no precise meaning, is incapable of being proven true or false (short of polling the Met's "audience", assuming the results were accurate), and could not be read as anything but Mr. Gelb's prediction regarding opera fan reaction to Plaintiff. This statement, too, is non-actionable opinion.

The remaining purportedly defamatory statements – that Netrebko is a huge Putin supporter, a Putin fan club member, inextricably associated with Putin, and is in political and ideological lockstep with Putin (ECF No. 9 at ¶¶ 56(e), (g), and (h)) – likewise reflect Mr. Gelb's opinions regarding Netrebko's political views.  New York courts have held that accusing a person of being a Nazi is a statement of opinion. *See Schwartz v. Nordstrom, Inc.*, 160 A.D.2d 240, 241 (1st Dep't 1990) (dismissing defamation claim because, *inter alia*, accusation by defendants that plaintiff was "a Nazi" is a statement of opinion); *Morgan v. NYP Holdings, Inc.*, 58 Misc. 3d 1203(A) (Sup. Ct. Kings Cnty. 2017) (stating that New York courts have consistently held that accusing a person of being a Nazi is an expression of opinion, and in *Morgan*, because it was also rhetorical hyperbole) (collecting cases on the same).  Indeed, Mr. Gelb did not make specific factual statements about Plaintiff's support for Putin, *e.g.*, that Plaintiff waved a Ukrainian separatist flag while posing for a photograph with a pro-Russian separatist or that Plaintiff signed onto a list of Putin supporters.  He merely stated (in somewhat varying formulations) that he viewed Netrebkko as being aligned with Putin.  Accordingly, these are non-actionable statements of opinion.

All of the alleged statements reflect Mr. Gelb's interpretation of facts and/or opinion. The Court should dismiss Plaintiff's defamation claims because they are, as a matter of law, statements of opinion.

### E.     Plaintiff's Defamation Claim Is Barred By Issue Preclusion.

Finally, similar to her discrimination claims, Plaintiff's defamation claim is also barred by the doctrine of issue preclusion. (See Section I.D *supra*).

First, the identical issue – whether Plaintiff sympathizes with the autocratic Russian President – was raised in arbitration. (Exh. B).  The issue was so critical to the arbitration that it was featured in the second paragraph of the thirty-five-page Arbitration Award: "Prior to this

dispute, Netrebko was known as a supporter of Russian President Vladimir Putin. Numerous

public communications from her attest to her views." (Id. at p. 2).  Moreover, the third issue

decided by the arbitrator, whether Plaintiff violated the "Standards of Conduct"/"Morals" clause

in her contract with the Met such that the Opera could terminate its contract with her, hinged on

this very issue. (Id. at p. 17).  In asking that question, the arbitrator inquired whether Plaintiff's

conduct "tend[ed] to threaten or actually tarnish[ed] the Met with scandal or disrepute?" (Id. at p.

19).  In answering it, the arbitrator stated:

> [The Met] was attempting to negate a belief Netrebko held. There is
> no doubt [Plaintiff] was a Putin supporter, as she had a right to be.
> By requiring she issue a statement condemning Putin, she was being
> asked to lie about her allegiance to the dictator. Though most people
> in the world have different views from Netrebko's, what she was
> being asked to do was fundamentally not to take corrective action
> but to disavow a strongly felt personal opinion.

(Id. at p. 20).  Moreover, the Union's principal argument on this score was as follows: "[The

Union] points out that the prohibited behavior [of supporting Putin] must have been unknown to

the Met before the contract was executed. Here, AGMA insists, [Plaintiff's] political views were

open and notorious for at least ten years prior to February 2022. The Met conceded this point at

the hearing." (Id. at p. 10).  The arbitrator even agreed with the Union's argument, noting that

Plaintiff: (i) Wore a pro-Russian aggression badge in 2010; (ii) praised Putin in 2011 as "a 'very

attractive man'"; (iii) signed on as one of Putin's "499 trusted people" in 2012; (iv) held up a

separatist Ukrainian flag in 2014 at a press conference; and, (v) posted praise for Putin in 2015

after the deadly terrorist attack on Metrojet Flight 9268. (Id. at p. 20).  The arbitrator also noted

that Plaintiff posted on Instagram on February 26, 2022 characterizing "those from the West who

criticized Putin as 'despicable,' 'human shits' and 'evil as blind aggression." (Id. at p. 21).

(Certain other of Plaintiff's pro-Putin remarks were cited as exhibits during the arbitration

hearing. (See, e.g., Exh. C (Netrebko stated, in regard to Putin, "I'd love to have been [his lover],

but when?  We only met twice.  Officially and briefly.  But he's a very attractive man.  Such a strong, male energy.")).  The arbitrator even relied on Plaintiff's Instagram post describing the West as "human shits" in docking her pay for two performances. (Exh. B at pp. 33–34 ("I have determined that [Plaintiff's] February 26, 2022 post on Instagram ('human shits') was highly inappropriate. She clearly crossed the line by heaping invective upon 'despicable people from the West,' some of whom were surely opera lovers and Met donors . . . I find that some reduction in the compensation due her is justified [based on her 'human shits' post]. In my view, a reasonably penalty is a loss of pay for two performances.")).  Plaintiff cannot evade her own Union's argument and the Arbitration Award in this lawsuit.

Second and third, the issue of whether Plaintiff was a known Putin sympathizer was actually, fully and fairly litigated by the Union.  Indeed it was the Union's express position – contrary to that now taken by Plaintiff – that Plaintiff had been a known Putin supporter for many years. (Exh. B at pp. 20–21).

Finally, resolution of the issue was necessary to support a valid and final judgment.  As discussed above, the arbitrator specifically focused on the extent to which the Met knew Plaintiff was a Putin supporter, and the degree to which she was one, when determining whether the Met could terminate her contract for breach of the Standards of Conduct/Morals clause.

Relying on collateral estoppel, there can be no doubt that the purportedly defamatory statements are not false, and the Court should dismiss Plaintiff's defamation claim.

### III.   Plaintiff's Breach Of Contract Claim Is Barred By Res Judicata And Section 301 Preemption.

Plaintiff's breach of a contract claim is frivolous as it has already been adjudicated and is thus precluded by the doctrine of *res judicata*. *Sheffield v. Sheriff of the Rockland Cnty. Sheriff Dep't.*, 393 F. App'x 808, 811 (2d Cir. 2010); *see also Xiaoguang Jiang v. Am. Express Nat'l*

*Bank*, No. 22-CV-2272, 2023 U.S. Dist. LEXIS 4318 at *15 (E.D.N.Y. Jan. 10, 2023) (an arbitration award is an adjudication on the merits).

Claim preclusion applies if: "'(i) an earlier action resulted in an adjudication on the merits; (ii) that earlier action involved the same counterparty or those in privity with them; and (iii) the claim sought to be precluded was raised, or could have been raised, in that earlier action.'" *Tagger v. Strauss Grp. Isr.*, No. 23-CV-6767, 2023 U.S. Dist. LEXIS 144608, at *6 (S.D.N.Y. Aug. 15, 2023).  Plaintiff's breach of contract claim asserted here – seeking recovery for "holds" – not binding contracts but just tentative holding of dates – has already been addressed and resolved through arbitration.

The Arbitrator expressly addressed the claim advanced here, stating: "On the holds question, I find that the Met did have the authority to cancel them." (Exh. B at p. 26). Based on that authority, the Arbitrator held, "the Met is not obligated to pay Netrebko for holds." (Id. at p. 30).  The Arbitrator also acknowledged that arguments regarding enforceability had been made by the Union but determined the argument that "the holds . . . are binding contracts under New York Law" was "misplaced," because the language of the Collective Bargaining Agreement precluded any such claim.  (Id. at pp. 28–29).  Plaintiff had no contracts, verbal or written, other than those agreed to pursuant to the CBA, and the arbitrator previously determined that she was not entitled to remuneration for the "holds."  The Court should not allow Plaintiff to relitigate her breach of contract claim in this forum.

Even if Plaintiff's claim regarding holds had not already been decided by the arbitrator, such a claim would nonetheless be preempted by Section 301 of the Labor Management Relations Act. Section 301 "not only provides the federal courts with jurisdiction over controversies involving collective-bargaining agreements but also authorizes the courts to

fashion a body of federal law for the enforcement of these collective bargaining agreements." *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 368 (1990) (quotation omitted).  Courts must, therefore, apply that federal law in resolving controversies involving collective-bargaining agreements, and "any state-law cause of action for violation of collective-bargaining agreements is entirely displaced by federal law." *Id.*; *see also Vera v. Saks & Co.*, 335 F.3d 109, 115 (2d Cir. 2003) (finding plaintiff's NYLL claims preempted by LMRA where plaintiff asserted that "section 193 'creates state rights that are independent of the CBA . . . [plaintiff] can establish defendant's liability . . . without any analysis of the terms of the CBA."). Any breach of contract claim by an employee (such as Plaintiff) whose employment was governed by a collective bargaining agreement ("CBA") may be decided only through the CBA's grievance-arbitration procedure. (Exh. D).  Indeed, the CBA required that Plaintiff initiate any disputes with the Met by filing a grievance, and if the grievance could not be resolved by the Grievance Committee, then it had to be resolved by arbitration. (Id. at §§ Eleventh & Twelfth).  Further, the CBA expressly provided that every contract between Plaintiff and the Met must prescribe that "[a]ny dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined by arbitration." (Id. at § Twelfth).  Accordingly, the question of whether a hold concerning Plaintiff constituted a binding agreement and was breached is not a question of New York law but is an issue between the collective bargaining parties and is preempted. *See Arnold v. 1199 SEIU*, No. 09 Civ. 5576, 2009 U.S. Dist. LEXIS 116579, at *19 (S.D.N.Y. Dec. 15, 2009) ("Because the complaint could only reasonably be construed to allege that the Union violated the CBA, and not any other contract, plaintiff's separate state-law claim for breach of contract is preempted and must be dismissed."). Plaintiff is expressly asking the Court to act in direct contravention of this well-established

doctrine and decide a question under New York law separate and apart from the applicable CBA.

(ECF No. 9 at ¶¶ 66–67). This the Court cannot do.

## <u>CONCLUSION</u>

Based on the arguments set forth above, the Court should dismiss this action with

prejudice.

Dated:  New York, New York
        November 1, 2023

Respectfully submitted,

*/s/ Lloyd B. Chinn*
Lloyd B. Chinn, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3000
Facsimile: 212.969.2900
lchinn@proskauer.com

*Attorney for Defendants*
*Metropolitan Opera Association, Inc. and*
*Peter Gelb*
