**BEFORE**
**HOWARD C. EDELMAN**
**ARBITRATOR**

| | | |
|---|---|---|
| AMERICAN GUILD OF MUSICAL ARTISTS, AFL-CIO, | ) | |
| | ) | |
| Union, | ) | |
| | ) | |
| and | ) | Anna Netrebko Grievance |
| | ) | |
| METROPOLITAN OPERA ASSOCIATION, INC., | ) | |
| | ) | |
| Employer. | ) | |

**UNION'S BRIEF TO THE ARBITRATOR**

### I.      Introduction

This case concerns the unilateral and admittedly political termination of Russian soprano Anna Netrebko by the Metropolitan Opera (the Met). The Met's failure to compensate Netrebko for the value of her contracts violates the opera company's obligations under the Pay or Play provision of the Met's Collective Bargaining Agreement (CBA) with the American Guild of Musical Artists (AGMA). *See* Joint Ex. 1 at 27 (Section Two, Fifth(N)). At the October 10 hearing and in its public and private communications, the Met asserted that it terminated Netrebko for her alleged relationship with Russian President Vladimir Putin and her purported public and private political views. *See, e.g.*, Tr. at 14–30. Although it presented evidence and testimony purportedly demonstrating the existence of such a relationship, this evidence in no way undercuts the Met's binding contractual obligation to pay Netrebko the full value of her contracts. Under Pay or Play, while it is the Met's prerogative to remove an artist for any nondiscriminatory reason, including their political beliefs, the Met *must* pay that artist the full

1

value of their contract if it does so.  The present case is therefore a straightforward contractual dispute, and the Arbitrator must conclude that the Met violated the CBA when it failed to make the payments required under the Pay or Play provision of the CBA.

## II.    Statement of the Case

From her debut in 2002 to her termination in 2022, Netrebko was the "reigning prima donna" of the Met Opera.  Met Ex. 8 at 1.  For much of what General Manager Peter Gelb describes as "the largest career of any singer in the opera world," Tr. at 112:15–16, Netrebko made the Met her performing home; the Met, in turn, played "a very significant role[] in establishing [her] reputation."  *Id.* at 112:16–18.  During that same period, media reports have linked Netrebko with Russian President Vladimir Putin, *See generally* Met Ex. 8, though she vigorously denies any such relationship, *see* AGMA Ex. 10 at 4–5.[1]

For years, Netrebko's mutually beneficial relationship with the Met thrived alongside her purported relationship with Putin; yet during that time, the Met raised no concerns about Netrebko's political persona.  As Putin implemented statutes criminalizing homosexuality in 2013, the Met opened its season—even over public protest—with a Russian-themed gala starring Netrebko.  *See* Met Ex. 10.  As Russia pursued military action in Crimea and Ukraine in 2015, the Met, again over public protest, mounted *Iolanta* with Netrebko in the title role.  *See* AGMA Ex. 6.  On these occasions, the Met neither altered its operations nor required that Netrebko or any other Russian artists publicly repudiate Putin; to the contrary, Gelb publicly rejected public pressure to do so.  *See* Met Ex. 10.  In addition to these roles, Netrebko has been guaranteed the

---

[1] For purposes of resolving this grievance, the Arbitrator need not determine the truth or falsity of any allegations regarding Netrebko's political beliefs.  Netrebko's public image has been associated with Putin's regime for some time, concurrently with the growth of Netrebko's operatic career and her career at the Met specifically.

opportunity to sing at the Met in an average of two productions per year since 2006, including in new productions, live streaming in cinemas, a 2020 New Year's Eve gala in her honor, and, in Gelb's words, in "the highest profile projects that [the Met] could think of."  Tr. at 113:17–18.

The Met ended this "dynamic and successful working relationship" in March of 2022.  *Id.* at 114:8–9.  On March 3, shortly after the Russian invasion of Ukraine, the Met publicly severed its ties with Netrebko on the ground that she had "[n]ot compl[ied] with the Met's condition that she repudiate her public support for Vladimir Putin."  Joint Ex. 6.  The Met's termination of the relationship was sudden, unilateral, and permanent: in subsequent correspondence, Gelb clarified that in addition to "ask[ing] for [Netrebko's] withdrawal from" performances scheduled for 2022, the Met was canceling all future contracts with her.  Joint Ex. 7 at 2.  In terminating Netrebko without cause and without compensation, the Met violated the Pay or Play provision of the CBA.

The Union's case in this matter is straightforward: every contract entered into between the Met and a member of AGMA's bargaining unit is subject to Pay or Play.  In making the unilateral decision to terminate Netrebko because her purported political beliefs conflicted with those of the Met's leadership, the Met triggered the Pay-or-Pay clause and is obligated to pay out the full value of the canceled contracts.

The Met seeks to avoid liability under the Pay or Play provision based on four defenses, each of which is unavailing: *First*, the Met asserts that Netrebko withdrew from at least one of her contracts—the 2022 production of *Turandot*—voluntarily.  This assertion is plainly contradicted by the record, which demonstrates that the Met alone made the decision to cancel all the affected contracts.  *Second*, the Met claims that half of the canceled performances were not subject to Pay or Play, as they had yet to be memorialized in an Individual Artist Agreement.

This claim fails too, as these "holds" were binding contracts under New York law; any failure to memorialize the contracts as required by the CBA is a failure of the Met, and a contractual violation on the Met's part cannot excuse their separate violation of Pay or Play.

*Third*, the Met argues that Netrebko's termination is excused under the CBA's Standards of Conduct Clause. This assertion is likewise unfounded, as the Met cannot point to any conduct by Netrebko that falls under the scope of that Clause—not only because holding political views disfavored by Met leadership is not conduct covered by the Clause, but also because the Clause permits the cancelation of an artist's contract only for conduct the Met learns of "following the execution of the Artist's contract." Joint Ex. 4. The Met has been aware of Netrebko's purported relationship with Putin for over a decade, including through protests of Netrebko herself while performing on the Met stage. Yet the Met continued to contract with her— including during periods of Russian military aggression in Ukraine—without expressing any concern that her purported relationships might impact her employment at the Met.

*Finally*, the Met contends that its violation of the CBA is excused by the common-law defenses of impossibility, impracticability, and frustration of purpose. These defenses are meritless. The Met has presented no evidence whatsoever establishing that honoring Netrebko's contracts would have been impossible within the meaning of New York law, and Netrebko continues to maintain a full performance calendar around the world. Additionally, the Met may satisfy its Pay or Play obligation by paying out the value of Netrebko's canceled contracts, yet it has offered no evidence, nor indeed given any indication, that making such a payment would be impossible. Moreover, any frustration of purpose defense is belied by the fact that Netrebko has continued to perform publicly since the termination of her Met contracts.

The Met entered into eight contracts with Netrebko, fully aware of both its obligations under the AGMA CBA and of Netrebko's purported political affiliations.  It chose to terminate these contracts, and its obligation to compensate Netrebko is firmly supported by the terms of the CBA and not excused by common law.  Netrebko is therefore entitled to compensation equal to the full value of her canceled contracts.

### III.      The Met unilaterally terminated Netrebko without compensation, in violation of the Pay or Play provision of the CBA

The facts underlying this case are undisputed: the Met has terminated Netrebko's employment contracts without paying for the value of those contracts.  As discussed *infra*, the Met's conduct violates the Pay or Play provision of the CBA, under which employment of Principal Artists "is not cancelable" and an artist's compensation is guaranteed.  Joint Ex. 1 at 27.  There is no dispute as to the meaning or application of this provision.

Pay or Play affirmatively contemplates and addresses precisely the situation at issue here. Under Pay or Play, the Met may choose not to have a contracted Artist actually perform.  In such instance, while Pay or Play "does not include any obligation on the part of the Met to afford [an Artist] the opportunity of performance of services," the Artist's compensation "shall not be reduced by the failure of the Met to provide the number of appearances herein specified."  *Id*. This provision functions as a guarantee of compensation: under its terms, an employer retains discretion to remove an artist from any production at any time, so long as the employer pays out the full value of that artist's contract.[2]  *See* Tr. at 32:21–33:2 (testimony of John Ward).

_____

[2] The Pay or Play provision does incorporate exceptions for cases in which an artist fails to appear, or appears unprepared, for rehearsal or performances.  *See* Joint Ex. 1 at 27.  None of the exceptions apply here.

In this instance, the Met terminated eight contracts to employ Anna Netrebko as a Principal Artist, totaling forty performances.  This termination was formalized in a March 28 letter in which Gelb notified Netrebko that he was "ask[ing] for [her] withdrawal from *Turandot* this season and *Don Carlo* next season" and "canceling [her] contracts for the 2023/24 season and all holds for future seasons."  Joint Ex. 7 at 2.  The Met has not paid any compensation for the value of those contracts.

**IV.    The Met's attempts to evade its obligations under Pay or Play fail**

The Met seeks to circumvent the CBA by contending that: (1) Netrebko voluntarily withdrew from at least one of her contracts; (2) her contracts from the 2024/25  and 2025/26 seasons are not enforceable; (3) its violation of Pay or Play is excused under the CBA's Standards of Conduct Clause, and (4), in the alternative, any contractual violation is excused by the common law contract defenses of impossibility and frustration of purpose.  Each of these defenses is unavailing.

**A. Netrebko did not withdraw from *Turandot***

Although the Met does not dispute that it unilaterally terminated virtually all of Netrebko's existing and future contracts,[3] at hearing it attempted to show that Netrebko voluntarily withdrew from one production, *Turandot*, and that that contract is therefore not

---

[3] The contracts are: *Turandot* and *Don Carlo* in 2022, *Forza de Destino* and *Andrea Chenier* in the 2023/24 season, *Tosca* and *Pique Dame* in the 2024/25 season, and *Manon Lescaut* and *Macbeth* in the 2025/26 season.  *See generally* Joint Ex. 12–13; AGMA Ex. 2–5.  All contracts are for five performances.  *See id.*

subject to Pay or Play. This position is unsupported—indeed, is contradicted—by the record, which shows that the decision to end Netrebko's *Turandot* contract was the Met's alone.[4]

As an initial matter, there is clear record evidence of what a voluntary withdrawal by Netrebko looks like, because Netrebko *did* withdraw from a production of *Lohengrin* scheduled for the 2022/23 season. For that production, there is written communication in the record "confirm[ing] in writing" that withdrawal. *See* Joint Ex. 11. No such communication exists regarding *Turandot*, *see* Tr. at 148:16–20, because Netrebko did not withdraw from that production. Despite this lack of confirmation, the Met points to two pieces of evidence as supporting its claim that Netrebko voluntarily withdrew from *Turandot*: a March 29 email from Miguel Esteban, Netrebko's General Manager, and testimony regarding a March 2, 2022 phone call between Netrebko and Gelb. Neither supports the Met's position.

First, the Met points to Esteban's March 29 email, which disputes the termination of Netrebko's contracts "above and beyond the performances for which Anna voluntarily withdrew." Met Ex. 5. The Met contends that by acknowledging the possible existence of withdrawals, Esteban's email confirms that Netrebko withdrew from *Turandot*. It does not. The email does not identify *Turandot* as a performance from which Netrebko withdrew. And the acknowledgement that there were *some* contracts from which Netrebko voluntarily withdrew in no way confirms that she withdrew from any *specific* contract.[5] As Esteban testified, the purpose of the March 29 email was "fact-finding": as he had only recently taken over as Netrebko's

---

[4] It is AGMA's understanding that the Met does not allege *Don Carlo* was a voluntary withdrawal. Should the Met argue as such in briefing, the discussion *infra*, regarding the *Turandot* contract, applies with equal force to *Don Carlo*.

[5] Likewise, the Met points to Netrebko's voluntary withdrawal from European concerts following the invasion of Ukraine. Netrebko does not dispute that she voluntarily withdrew from these contracts, which were neither at the Met nor governed by an AGMA CBA and are not at issue here. See Tr. at 71–72.

manager, he did not have a specific idea of which contracts had been voluntarily withdrawals. Tr. at 70:8–9; *see id.* at 37:15–16. And as the joint exhibits show, Netrebko *had* voluntarily withdrawn from one production: *Lohengrin*. *See* Joint Ex. 7. Esteban's email is therefore properly read as an inquiry and does nothing to establish that Netrebko withdrew from *Turandot*.

Second, the Met attempts to rely on a March 2 phone call between Netrebko and Gelb. According to the Met's counsel, Netrebko, in that call, informed Gelb "that she was withdrawing from Met performances." Tr. at 26:3–4. Gelb's own testimony is to the contrary. *See id.* at 130–131. As Gelb testified, the March 2 call centered around him asking Netrebko to agree to issue a "strong enough" public statement—above those she had already made[6]—condemning the war in Ukraine. *Id.* at 130:20. He testified only that "the gist of the conversation" was Netrebko telling him "I'm sorry. I stand with my country." *Id.* at 130:25, 131:1–2. Gelb did not testify to any statement by Netrebko withdrawing from her existing contracts—a notable omission, given the centrality of the call to the Met's case. Rather than demonstrate that Netrebko withdrew from *Turandot*, this evidence shows that Netrebko was terminated because she declined to comply with a condition—one not contained in the CBA or agreed to by the Union—that the Met placed on her continued employment. *See* Joint Ex. 6.

Gelb's public statements and testimony confirm that the decision to end Netrebko's employment was the Met's alone. The Met's public version of events, set out in a statement issued on March 3, reveals as much: although the language of that statement characterized the severing of the relationship as a withdrawal, its substance shows that Netrebko *could not* have voluntarily performed her *Turandot* contract. As Gelb made explicit in that statement, "there

---

[6] On February 26, Netrebko posted an Instagram story stating that she was "opposed to this war" and that she "want[ed] this war to end and for people to be able to live in peace." Joint Ex. 8. On March 1, the day before her call with Gelb, Netrebko published an Instagram post stating that she was "opposite [sic] to this senseless war of aggression and . . . calling on Russia to end this war right now." Joint Ex. 9.

was no way forward" for Netrebko to perform at the Met.  Joint Ex. 6.  Gelb has echoed this sentiment repeatedly in subsequent statements.  He told the *New York Times* that the Met is "not prepared to change our position," Met Ex. 6 at 2, and that he could not "see any way that we could possibly" allow her to perform.  Met Ex. 8 at 2.  Likewise, *The Guardian* has quoted Gelb as saying that terminating Netrebko "was a painful but obvious decision" that Gelb himself "made . . . on moral grounds."  AGMA Ex. 9 at 4; *see* Tr. at 155:9 (testimony of Peter Gelb confirming that the "decision" referred to in that interview was "[t]he decision of the Met.").

Finally, Gelb's own testimony drives this message home: when asked if there was "any way, other than by issuing a statement that [he was] satisfied with, that Ms. Netrebko could have . . . performed her role in *Turandot*," he responded simply, "No."  *Id.* at 155:10–17.  These repeated statements demonstrate that the Met took responsibility for Netrebko's termination; together with the total lack of evidence of her affirmative withdrawal, it is clear that the Met alone terminated Netrebko's contracts, including for *Turandot*.

**B.   Netrebko's "holds" for future work are binding contracts subject to the CBA**

**i. The contracts for the 2024/25 and 2025/26 seasons are binding contracts under New York law**

The Met further attempts to evade its liability under Pay or Play by asserting that the contracts for performances scheduled for the 2024/25 and 2025/26 seasons—referred to in the transcript and exhibits as "holds"—are not binding contracts subject to the CBA.  Under New York contract law, this is incorrect.  The parties' communications manifest a clear intent to be

bound to contracts for two productions in the 2024/25 and 2025/26 seasons, respectively: *Manon Lescaut*, *Macbeth, Tosca*, and *Pique Dame*.[7]

Under New York law, a binding contract is established by the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977). Assessing intent to be bound requires determining "whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract," *Express Indus. & Terminal Corp. v. New York State DOT*, 93 N.Y.2d 584, 589–90 (1999), and whether the agreement is "reasonably certain in its material terms," *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989). "Reasonable certainty" can be satisfied even where material terms are not explicit in the parties' communication. Specifically, price "may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties." *Id.* at 483.

New York courts have held that email exchanges regarding employment contracts can establish an objective intent to be bound. *See Kolchins v. Evolution Mkts*., *Inc.*, 31 N.Y.3d 100, 108 (2018). Here, email exchanges between the Met and Judith Neuhoff, Netrebko's manager until March 2022, clearly manifest an intent to be bound to the contracts for four productions in the 2024/25 and 2025/26 seasons. For each of the four productions at issue, the "expressed words and deeds" of the parties establish offer, acceptance, and material terms, resulting a binding contract. *Brown Bros.*, 41 N.Y.2d at 399.

---

[7] This last opera is referred to interchangeably as *Pique Dame*, *Pikovaya Dama*, and *The Queen of Spades*. *See* Tr. at 59; AGMA Ex. 5 at 2–3.

We consider each contract in turn, beginning with *Manon Lescaut*.  In June of 2021, Michael Heaston, Artistic Administrator at the Met, sent Neuhoff an email with the subject line "Anna Netrebko / 2025-26."  AGMA Ex. 3.  That email read:

> May I offer her 5 performances of the title role in MANON LESCAUT in the time period November 24, 2025-January 17, 2026 and 5 performances of Lady Macbeth in MACBETH in the time period March 23-May 2, 2026? I can offer her our top fee of $17,000 per performance for both productions.  *Id.* at 4.

In response, Neuhoff wrote, "Many thanks and Anna is happy to accept the Manon Lescaut and is considering the Macbeth (though I think this will also be a yes.)," to which Heaston replied, "We are delighted Anna is confirmed for the new production of MANON LESCAUT."  *Id.*

This email exchange constitutes a "sufficiently definite offer," acceptance, and material terms on *Manon Lescaut*.  *Express Indus.*, 93 N.Y.2d at 589–90.  In *Kolchins*, the New York Court of Appeals considered a similar set of facts at the summary judgment stage.  That case concerned an email exchange that contained the terms "we 'offer' and 'I accept,' followed by an arguably congratulatory exclamation," but did *not* contain material terms.  31 N.Y.3d at 107. Rather, the offer referred to the "terms of [an] existing contract" that was not included in the communication.  *Id.*  Despite the absence of material terms, the court found that the emails evinced an objective manifestation of an intent to be bound.  *See id.* at 107–08.  Here, the communication goes one step further than the exchange in *Kolchins*, because the Met's offer explicitly sets out the terms of the contract, including dates, fee, and number of performances. *See* AGMA Ex. 3 at 4.  The exchange setting out offer, acceptance, and material terms objectively manifests an intent by both parties to be bound and establishes a binding contract to employ Netrebko for *Manon Lescaut*.

This email exchange likewise establishes a "sufficiently definite offer" on *Macbeth*.  By offering "5 performances of Lady Macbeth in MACBETH" at "our top fee of $17,000 per

performance," Heaston's email establishes material terms and manifests the Met's objective intent to be bound in a contract for *Macbeth*. *Id.* This intent is further underscored by Heaston's July 26 email stating "we thought [Netrebko] had already signed off on" Macbeth and a July 27 email from Gelb stating, "we have only scheduled Macbeth and cast the other roles because we thought Anna was definitely on board." *Id.* at 2–3. This exchange doesn't just "evince" the Met's intent to be bound—it makes that intent explicit.

Although *Netrebko*'s intent to be bound is not contained in this email exchange,[8] it is manifested in Netrebko and Neuhoff's "expressed words and deeds" elsewhere. *Brown Bros.*, 41 N.Y.2d at 399. Neuhoff's correspondence indicated that she would confirm acceptance on *Macbeth* "no later than mid-August" of 2021. AGMA Ex. 3 at 2. A February 2022 performance calendar prepared by Neuhoff shows the *Macbeth* performance dates blocked out in red, the color used by Neuhoff to schedule Netrebko's confirmed performances—in contrast to gray, the color used to indicate tentative contracts. *See* AGMA Ex. 2, at 10; Tr. at 58:7–59:18 (testimony of Miguel Esteban). This calendar objectively manifests Netrebko's intent to be bound to the *Macbeth* contract; together with the Met's detailed offer and repeated expressions of intent to be bound, *see* AGMA Ex. 3 at 2–3, it creates a binding contract.

We next consider *Tosca*. Over an extended time period leading up to February of 2022, Heaston and Neuhoff exchanged a series of emails—on which Gelb was copied—confirming Netrebko's engagement for *Tosca* in the 2024/25 season. Heaston first contacted Neuhoff in December of 2020 asking if specific dates in February and March of 2025 might "be possible for several performances" of Tosca and indicating that he would "come back to you with a formal

---

[8] Heaston's July 26 email references a March 30, 2021 email stating that "Anna was happy with . . . MACBETH in the 25/26 season." AGMA Ex. 3 at 3. That email was not produced in response to AGMA's discovery request for correspondence between the Met and Netrebko and/or Neuhoff related to offers for *Tosca*, *Pique Dame*, *Manon Lescaut*, and *Macbeth*.

offer." AGMA Ex. 4 at 3–4. He followed up more than a year later, asking if it would "be possible to determine if Anna would definitely want to have these performances" and indicating that the Met would move forward with scheduling only "if we know that Anna will join us with complete certainty." *Id.* at 3. Neuhoff responded, "I am pleased to confirm Tosca in 24/25." *Id.* at 2. Heaston next wrote in February of 2022—seven days before the Russian invasion of Ukraine—asking to slightly adjust the *Tosca* engagement period, to February 24–March 22, 2025, and if "we can fully confirm this?" *Id.* Neuhoff responded "I have February 27 - March 22, 2025 firmly held in the diary, yes." *Id.*

This exchange manifests the objective intent of both parties to be bound to an enforceable contract. As with *Macbeth*, Heaston's requests for confirmation, together with its reliance on Netrebko's confirmation in moving forward with scheduling and production matters, evinces the Met's intent that both parties be bound to a contract for *Tosca*. And Neuhoff's responses—"I am pleased to confirm" and "I have [the dates] firmly held in the diary"—manifest the intent of Netrebko's team to enter a binding contract with the Met.

This agreement is likewise "reasonably certain in its material terms." *Cobble Hill Nursing Home*, 74 N.Y.2d at 482. Although the *Tosca* emails do not explicitly contain a price term, that term "can be determined objectively without the need for new expressions by the parties." *Id.* at 483. All Netrebko's individual artist agreements for the 2022/23 and 2023/24 seasons set her fee at $17,000 per performance. *See* Joint Ex. 12–15. This rate is the "top fee" Heaston offered Netrebko to perform *Manon Lescaut* and *Macbeth* in the 2025/26 season. *See* AGMA Ex. 3 at 4. As all Netrebko's contracts scheduled both prior to and after *Tosca* are set at that fee, the maximum fee offered at the Met, and no communication from the Met indicates an

intention to deviate from that pattern, the fee for *Tosca* can therefore "be determined objectively" from the record as $17,000 per performance.

Additionally, although Neuhoff's and Heaston's emails from February of this year differ slightly in their account of the relevant dates, a lack of complete agreement does not invalidate the contract. *See Kolchins*, 31 N.Y.3d at 108. The parties contracted for five performances of *Tosca* in February and March of 2025; to the extent that a discrepancy of three days in the dates discussed "reflects a lack of mutual assent . . . that correspondence does not conclusively refute contract formation." *Id.* (citing *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 326 (2002); *Leon v. Martinez,* 84 N.Y.2d 83, 88 (1994)). Rather, by placing the dates of performance within a one-month period, the email exchange stablishes "reasonably certain" terms. This certainty, together with the parties' expressed intent to be bound, creates a binding contract for *Tosca*.

The final contract from which the Met seeks to be released is for *Pique Dame*. In June of 2020, Met Artistic Advisor Jonathan Friend wrote to Neuhoff, copying Gelb, offering "5 performances of Lisa in PIQUE DAME in the time period April 28-June 7, 2025." AGMA Ex. 5 at 3. In December of that year, Neuhoff responded, "Anna is happy to accept the Pique Dame," to which Friend, in turn, responded "Very happy about PIKOVAYA DAMA. Do you think she would also be interested in accepting a few TOSCAs if the period was short?" *Id.* at 2. This offer and acceptance are unequivocal. And, as discussed *supra*, the material price term can be objectively established by the parties' past and future practice. As the Court of Appeals established in *Kolchins*, this pattern—"we 'offer' and 'I accept,' followed by an arguably congratulatory exclamation, coupled with a forward-looking statement about the next stage of the parties' continuing relationship—sufficiently evinces an objective manifestation of an intent to be bound." 31 N.Y.3d at 107–08.

As the record evidence establishes, the "expressed words and deeds" of both the Met an

Netrebko's management contain "objective manifestations of the intent" to be bound to contracts

for *Manon Lescaut*, *Macbeth*, *Tosca*, and *Pique Dame*.  *Brown Bros.*, 41 N.Y.2d at 399.  And

neither the communication of the parties nor the record reflects that the Met "expressly reserved

the right not to be bound except in a formal written document."  *Kolchins*, 31 N.Y.3d at 108.[9]

The Met seeks to avoid being bound by these contracts on the basis of its own failure to timely

memorialize them.  But contracts are formed through actions and intention, not merely through

the formal act of memorialization.  And the objective intent evinced in these communications—

reflected in the offer, acceptance, and reasonable certainty regarding material terms—establishes

these agreements as enforceable contracts.

### ii. The Met's failure to memorialize the "holds" in a Standard Form Contract does not invalidate those agreements

The Met further argues that, even assuming the contracts for the 2024/25 and 2025/26

seasons are enforceable, they are invalid because Netrebko had not been issued a Standard Form

Contract for those contracts, as required by the CBA.  This argument is unavailing.  All

agreements are subject to some variance in when they are memorialized, and the Met cannot be

allowed to benefit from its own failure to timely memorialize agreements to which it plainly was

legally bound.  What's more, allowing the Met to evade its contractual obligations based on its

own failure to memorialize those obligations would significantly undermine the protections of

the collective bargaining agreement.

The CBA requires that contracts between the Met and an AGMA artist be memorialized

in a standardized contract, referred to in the CBA as a "Standard Form Contract."  *See* Joint Ex.

---

[9] We address the Met's contention that the CBA constitutes such a reservation *infra*.

1 at 3 (Section One, Fifth(A)).  Under the terms of the CBA, "[a]ny agreement . . . relating to the employment of any ARTIST by the Met shall be null and void and of no effect unless it is executed" on a standard form contract, provided "that any written agreement between the Met and any PRINCIPAL shall be binding to the full extent provided by law."  *Id.* (Section One, Fifth(E)).  This exception for Principals (a category that includes Netrebko) is limited by the following provisions:

> 1. Nothing contained therein shall be in contradiction of any provision of the AGREEMENT or of the STANDARD PRINCIPALS CONTRACT in effect at the time of execution thereof;
> 2. Such agreement shall contain a provision that its terms shall be incorporated in the STANDARD PRINCIPALS CONTRACT and that it shall be subject to the provisions of the AGREEMENT in effect for the year to which such agreement pertains, and
>
> 3. Such agreement shall be filed with AGMA in accordance with Paragraph A [within seven days of execution].
> 4. The Met shall not be entitled to enforce such agreement unless it tenders to PRINCIPALS a STANDARD PRINCIPALS CONTRACT, in accordance with the terms of such agreement, prior to the date when PRINCIPALS' services are to begin. Any such agreement made during the term of this AGREEMENT shall be enforceable against either PRINCIPALS or the Met only to the extent as would an agreement made on the STANDARD PRINCIPALS CONTRACT form at the same time.  *Id.*

The Met contends that this provision invalidates Netrebko's contracts for the 2024/25 and 2025/26 seasons, because those contracts had not yet been memorialized on Standard Form Contracts at the time of her termination.  *See* Tr. at 27:2–11.  This reading misconstrues the purpose of the CBA provision, which is designed to prevent the Met from employing artists off-card and is intended to be enforced against the Met, not the affected artist.

As an initial matter, it is undisputed that Netrebko's contracts for the 2024/25 and 2025/26 seasons were agreements for which both parties anticipated that a Standard Form Contract would be issued.  As Met counsel stated at hearing, opera singers of Netrebko's caliber

are "booked years in advance." Tr. at 26:15–16. Gelb confirmed this in his testimony, further clarifying that the Met plans its programming around these top bookings. Because "some roles are so difficult to sing that only, literally, one or two singers in the world can sing them," the Met will program those roles only if they "know [they] have the right singer to sing the opera." *Id.* at 138:25–139:6. As a result, the Met typically programs those roles "four to five years in advance" of the planned production. *Id.* 7:8. It is for this reason that Gelb testified that it was "necessary . . . to replace [Netrebko] in those contracts" for future seasons—because it would be "almost impossible" to recast her existing contracts "unless we set to work on it right away." *Id.* at 139:12–15.

When these contracts translate into executed agreements, however, varies. While booking occurs four to five years before the planned production, the Standard Form Contracts in the record were issued between one and three years before the date of performance. *See, e.g.*, Joint Ex. 12–15.[10] Despite this delay in issuing formal contracts, the record shows that both parties consider themselves to be bound in the period between the formation of the contract and the issuance of the Standard Form Agreement. Netrebko's professional calendar shows that her management considered the engagements for the 2024/25 and 2025/26 seasons to be confirmed contracts, *see* AGMA Ex. 2, and Esteban testified that Netrebko's contracts with the Met are treated as "sacrosanct." Tr. at 53:19. In his view, the issuance of the written contract is "a formality because the terms are known and nonnegotiable," as every contract is eventually memorialized on a Standard Form Agreement. Tr. at 54:1–2. Esteban further testified that, during the period between the formation of a contract and the issuance of an agreement, an artist

---

[10] Two of these contracts were issued on the same day as each other, suggesting that the timing of the Standard Form Contract has less to do with the date of contracting and production, and more to do with the date when the Met's contracting office decides to issue the contracts. See Joint Ex. 12, 15.

"will not consider any proposals that would conflict" with the planned engagement, nor would they propose or accept any changes to the engagement without negotiation.  *See id.* at 56:4–18.

The correspondence between the Met and Neuhoff reflects that the Met likewise considered itself to be bound to its contracts for the 2024/25 and 2025/26 seasons.  In a July 2021, Gelb told Neuhoff that the Met "only scheduled Macbeth and cast the other roles" because it understood Netrebko to be committed to the production.  AGMA Ex. 3 at 2.  Likewise, correspondence between Heaston and Neuhoff from February of this year shows that the Met intended to rearrange other artists' contracts to accommodate Netrebko's planned dates for *Tosca*.  AGMA Ex. 4 at 2.  And, as Gelb testified, it would be untenable for the Met to proceed with its programming for those seasons without firm casting for top roles.  *See generally* Tr. at 138–39.  At the time of hearing, Gelb testified that the Met was "putting on the final touches" to the 2025/26 season, presumably having finalized its plans for the 2024/25 season.  *Id.* at 139:7–11.  With this degree of advance planning and the Met's practice of building productions around top stars, it strains credulity to conclude that the Met did not consider Netrebko's contracts for those seasons to be binding commitments for which a Standard Form Contract would be issued in due course.

Thus, any failure to timely issue a Standard Form Contract is a failure on the Met's part to comply with the terms of the CBA, not an invalidation of those contracts.  Indeed, if the Met truly believed that its contracts were not binding commitments until memorialized on Standard Form Contracts, it is unlikely—given the long lead time on productions and the demanding needs of the Met's programming—that it would tolerate the degree of variance in memorialization that is reflected in the record.  *Compare* Tr. at 139:7–11 *with* Joint Ex. 12–15.  Additionally, and most importantly, to the extent the Met's failure to issue Standard Form

Contracts to Netrebko constituted a breach of its obligations under the CBA, it should not be allowed to benefit from that breach by escaping its contractual obligations entirely.

The terms of Section One, Fifth underscore that compliance is the province of the Met alone. They require that Standard Form Contracts "be delivered to AGMA *by the Met*," Joint Ex. 1 at 3 (Section One, Fifth(A)) (emphasis added), because the Met is the only party with knowledge of when it actually enters into agreement with individual artists.[11] As the Union becomes aware of individual artist contracts *only when* those contracts are filed in accordance with Section One, Fifth of the CBA, the Union is incapable of effectively enforcing that provision. Accordingly, it is the Met *alone* that is barred from enforcing an individual artist agreement should the company to comply with the other requirements of the provision. *See id*. at 4 (Section One, Fifth(E)(4)).

What's more, to allow the Met to now benefit from its breach of Section One, Fifth by avoiding its contractual obligations under Pay or Play would undermine one of the core protections of the CBA. As AGMA has no way of knowing when the Met's contracts with principal artists are *actually formed*, the Met could contract with artists informally but delay the issuance of a Standard Form Contract until the last possible minute, thus reserving as long as possible the option to terminate those artists without compensation—just as it attempts to do

---

[11] The CBA likewise requires that any agreement to *terminate* a Principal Artist contract be filed with AGMA. Joint Ex. 1 (Section One, Fifth(B)). Netrebko's *Lohengrin* contract was filed with AGMA on a Standard Form Contract and later terminated via email exchange between Heaston and Neuhoff. *See* Joint Ex. 11, 15. To the best of AGMA's knowledge, no amended contract was issued nor notice given. Yet the Met does not contend that the CBA renders Netrebko's withdrawal from *Lohengrin* invalid. Likewise, the Met asserts that Netrebko voluntarily withdrew from her contract for *Turandot* in the 2022 season. Yet, again, no written record of this withdrawal exists, nor was any notice of termination filed with AGMA. *See* Tr. at 148 16:18. To the extent the terms of Section One, Fifth should be read as a barrier to contract formation, so, too must they be read as a barrier to contract dissolution. Should the Arbitrator find that filing with AGMA is a necessary element of contracting, he should also find that the parties did not properly dissolve their contract for *Lohengrin*, valued at $82,277.48.

here.  It cannot possibly have been the intent of the parties that Section One, Fifth should debilitate one of the foundational principles of the CBA.  Nor should the Met benefit in this instance from its own failure to timely notify the Union of its contracts.  The record establishes that both Netrebko and the Met considered themselves to be bound to four contracts at five performances each for the 2024/25 and 2025/26 seasons.  The Met's failure to memorialize those contracts on a Standard Form Contract does not lessen the binding force of those agreements.

### C. The Met's termination of Netrebko's contracts is not permitted by the Standards of Conduct Clause

The Met maintains that, although it has violated the Pay or Play provision of the CBA by terminating Netrebko without compensation, this violation is permitted by the CBA's Standards of Conduct Clause.  *See* Tr. at 29:5–11.  That Clause, which was added to the CBA in the 2021 negotiations, permits uncompensated termination of an artist if, "following execution of the Artist's contract, the Metropolitan Opera becomes aware of serious conduct or substantiated allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal, including but not limited to sexual assault or harassment, criminal convictions . . . or acts of moral turpitude."  Joint Ex. 4.  The Standards of Conduct Clause does not permit the Met to terminate Netrebko's contracts in this case, both because the Met knew of the purported conduct well before the execution of the contracts at issue and because it is not the type of conduct covered by the Clause.

### i. The Standards of Conduct Clause applies only to conduct that the Met became aware of after the execution of an Artist's contracts, and the Met has been aware of Netrebko's alleged political affiliations for decades

The Met cannot rely on the Standards of Conduct Clause to avoid liability for canceling Netrebko's contracts because the Clause applies only to conduct that an Employer becomes aware of "following the execution of the Artist's contract." Joint Ex. 4. The Met's communications prior to this grievance do not invoke the Standards of Conduct Clause and its subsequent communications do not clearly describe what conduct the Met believes is covered by the Clause. The only alleged conduct AGMA can discern is Netrebko's purported association with Putin. In his March 28 termination notice, Gelb stated that he was canceling Netrebko's contracts "[b]ecause you have so closely aligned yourself with Putin." Joint Ex. 7. At hearing, the Met likewise attributed the termination of her contracts to Netrebko's "long-standing support of Putin." Tr. at 18:14–17. In these communications, the Met effectively concedes the Standards of Conduct Clause is inapplicable here because that Clause, by its terms, is limited to conduct of which the employer *was not aware* at the time of contracting.

In this case, the Met does not dispute—in fact, repeatedly affirms—that it was aware of Netrebko's alleged political affiliations well before it entered into the contracts at issue.[12] Gelb's testimony and public statements on this point are unequivocal. In August, he told the *Sunday Times* that he "was always aware [Netrebko] was . . . a huge Putin supporter." AGMA Ex. 10 a 5; *see also* Tr. at 160:20–22 (testimony of Peter Gelb (confirming the accuracy of this quotation)). Elsewhere, he has stated that he understood Netrebko to have taken "a public stance over a period of years," AGMA Ex. 9 at 5, and that "[s]he is inextricably associated with Putin,"

---

[12] The contracts for which individual artist agreements were issued are dated January 31, 2019 and March 9, 2021. Joint Ex. 12–15. The offers and acceptances on the held contracts are dated between December 2020 and February of 2022. AGMA Ex. 3–5.

Met Ex. 8 at 3.  At the hearing, Gelb pinpointed his awareness to a specific time, testifying that

he came to "fully understand . . . just how in lockstep she was with Putin" during a 2012

conversation in which Netrebko purportedly expressed support for the imprisonment of Russian

protest group Pussy Riot.  Tr. at 114:25–16:6.  Gelb also testified that he was "aware of several

instances involving her posting [on social media] in support of Putin."  *Id.* At 117:1–3.

Additionally, Netrebko's alleged affiliation with Putin had direct consequences for the

Met well before the execution of the contracts at issue.  During a 2015 production of *Iolanta*, in

which Netrebko played the title role, a protester disrupted curtain call by jumping onstage with a

sign that bore the Ukrainian flag and identified Netrebko as an "[a]ctive contributor[] to Putin's

war against Ukraine."  AGMA Ex. 6; Tr. at 94:7–10.  This incident directly targeted Netrebko,

on the Met stage, for precisely the conduct—alleged support of Putin during a period of Russian

military aggression in Ukraine—that the Met now alleges makes her employment impossible.[13]

In light of this incident, the Met cannot credibly claim that it was unaware of Netrebko's alleged

political views.  Yet this protest did not deter the Met from continuing to employ, celebrate, and

honor Netrebko for more than six years.  In fact, he 2020 New Year's Eve Gala was dedicated to

her.  Tr. at 98:25–99:2.  And the Met continued to feature her, again and again, for an average of

two productions per year—until March of 2022.

The uncontroverted record evidence demonstrates that the Met did not "become aware"

of Netrebko's alleged support of Putin "following the execution of" the contracts at issue.  Joint

Ex. 4.  To the contrary, even assuming Netrebko's alleged conduct is the *type* of conduct that

---

[13] There is no dispute that the Met was aware of this incident, which was memorialized in a Performance Report circulated to members of Met management including Gelb.  *See* AGMA Ex. 7; Tr. at 94–96; *see also* AGMA Ex. 8.

falls under the Clause—which, as discussed *infra*, it is not—the Met's awareness of her conduct precludes them from now relying on the Clause to invalidate its validly entered contracts.

In 2021, following the #MeToo movement and its reverberations at the Met, the Union agreed to consider a "morals clause" provision in the CBA. *See generally* Tr. at 80–83. As Met AGMA committee chair Ned Hanlon testified, a shared goal of AGMA and the Met during 2021 bargaining was to ensure "that the Met hire people who were not going to endanger the safety of [its] artists," especially in the wake of #MeToo. Tr. at 84:9–12. But AGMA was *not* willing to allow the Met to hire known abusers, only to later terminate those abusers when the relationship no longer served the Met. As such, the Union sought to limit the temporal scope of the Clause, to ensure that hiring decisions "be based upon what [the Met] know[s] about the artist, not . . . what the whole world knows or the whole world pressures them to do." *Id.* at 85:6–10. In other words, the Clause was carefully crafted to allow the Met to terminate artists *only* if, after signing a contract, it became aware of harmful conduct it had not previously known about—*not* simply when public pressure forced them to end relationships that were otherwise beneficial to them.

The argument the Met now makes was anticipated and specifically addressed at bargaining. At hearing, the Met's counsel, as part of the Met's affirmative case, brought up several instances of Netrebko's conduct purportedly demonstrating her association with Putin, including statements she made to the press in 2011, support for his Presidential campaign in 2012, and a donation to an opera house in separatist Ukraine in 2014. *See* Tr. at 21–23. All these sensational examples undermine, rather than support, the Met's case, because they underscore that the Met was fully aware of Netrebko's alleged association with Putin yet continued to actively contract with her up to *nine days* before Russia's 2022 invasion of Ukraine.

*See* AGMA Ex. 4 at 2 (February 15, 2022 email from Michael Heaston regarding scheduling for 2025 performances of *Tosca*).

Indeed, the Met's evidence of Netrebko's alleged insupportable conduct contains just one entry from *after* the formation of Netrebko's contracts: in opening, the Met's counsel pointed to a statement by Netrebko allegedly referring to "despicable people from the West" [sic][14] as "human shits."  Yet this specific statement attacking purported hypocrisy from Western commentators—the only alleged conduct that could plausibly fall under the temporal scope of the Clause—appears nowhere in Met leadership's communication or testimony regarding Netrebko's termination.  Rather, that communication attributes the termination to Netrebko's general alleged "public support for" and "close[] align[ment]" with Vladimir Putin, Joint Ex. 6, 7—conduct that, as discussed *supra*, was well known to the Met long before it entered into the contracts at issue here.

### ii.  An Artist's expressed political views or allegiances are not covered by the Standards of Conduct Clause

Both the text and bargaining history of the CBA show that the mere support of a political leader or expression of disfavored political opinions is not the type of conduct that is covered by the Standards of Conduct Clause.

First, political expression, unlike other specific conduct, is not referenced in the agreement's text.  The Standards of Conduct Clause enumerates several examples of the type of

---

[14] The statement itself is not in the record.  However, Met Ex. 3, a news article, quotes Netrebko as follows:

> Forcing artists . . . to voice their political opinions in public and to denounce their homeland is not right.  *It's* especially despicable *from* people from the West, seated comfortably in their home, not fearing for their lives, to pretend to be brave and pretending to 'fight' by putting in trouble artists who asked for nothing. Met Ex. 3 at 5 (emphasis added).

"serious conduct or substantiated allegations" to which it applies, "including but not limited to sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude."  Joint Ex. 4.

Applying the principle of *ejusdem generis*, this enumeration does not include political beliefs or affiliations.  *See Met. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438 (1994) (stating that *ejusdem generis* applies to the interpretation of contracts under New York law). Under that principle, when a contract term includes both "general words" and "an enumeration of particulars," *Vandermulen v. Vandermulen*, 108 N.Y. 195, 203 (1888), "the general words are restricted to those of the same kind" as the specifically enumerated examples, *Bers v. Erie RR Co.*, 225 N.Y. 543, 546 (1919).  This principle applies even when the list is explicitly non-exhaustive.  Although the Standards of Conduct Clause states that the covered conduct is "not limited to" the examples listed, New York courts have found that "including but not limited to" language "must be read in context with" the examples given.  *Holy Angels Academ. v. Hartford Ins. Grp.*, 487 N.Y.S.2d 1006–07 (N.Y. Sup. Ct. 1985).

Thus, while the Standards of Conduct Clause's general terms—allowing the termination of an artist's contract following "serious conduct or substantiated allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal," Joint Ex. 4—may appear broad, those terms are limited by the specific examples that follow: "sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude."  Joint Ex. 4.  And these examples are all of criminal,[15] tortious, or quasi-criminal

---

[15] The explicit exclusion of criminal convictions for drug possession with no intent to distribute underscores the intended scope of the provision by limiting the Met's authority to terminate an artist *even on the grounds of criminal conviction*, where that conviction is for a crime that caused no harm to others.

harmful conduct.[16]  Association with or support of a political leader is simply not "the same kind" of conduct as those listed in the CBA.  *Bers*, 225 N.Y. at 546.

The agreement's bargaining history illuminates the intent behind the Clause and the type of conduct the Clause was intended to cover.  As discussed *supra,* the Standards of Conduct Clause was bargained into the Met CBA in the aftermath of the #MeToo movement, including after several highly publicized scandals in the opera world and at the Met.  As AGMA Committee Chair Ned Hanlon testified, discussions about the Clause at bargaining centered on conduct that "made it unsafe for a performer to be performing with other artists on the stage," Tr. at 82:12–19, and especially on "sexual harassment, issues of racism, and serious crimes," *id*. at 83:17–18.  The centrality of sexual harm to the Clause's history is illustrated by the parties' repeated references to Placido Domingo, the world-famous tenor who has ceased performing in major U.S. houses, including the Met, following multiple credible accusations of sexual misconduct.  *See id.* at 83.[17]

This type of conduct criminal and quasi-criminal, directly addressed in the Clause's text and bargaining history, is in stark contrast to the conduct the Met now seeks to sweep under the Clause's scope.  Crucially, the Met does not contend that Netrebko has perpetrated any harmful acts against others, nor that allowing her to perform at the Met would place her fellow artists in danger.  Rather, the Met argues that its decision to terminate Netrebko's contracts is justified

---

[16] "[A]cts of moral turpitude" is not defined in the CBA, but nor should it be understood as a catch-all. Rather, "moral turpitude" is a legal term of art referring to conduct that is "contrary to justice, honesty, or morality . . . such as fraud or breach of trust."  Blacks Law Dictionary (11th ed., 2019).

[17] As Gelb testified, the Met has sought to invoke the Clause in defense of its termination of Russian soprano Hibla Gerzmava.  Tr. at 136:3–13.  This termination is the subject of an active grievance between AGMA and the Met.  *Id.* at 164:2–8.

solely by her political expression and beliefs.  That expression and those beliefs—not even *conduct*—were they subject to state action, would be protected under the First Amendment.

Even more significantly, the Met argues that the termination is justified by Netrebko's *failure* to speak to the Met's satisfaction.  Netrebko has never expressed support for the war in Ukraine.  At the time of her termination, she had issued two public statements *opposing* the war. *See* Joint Ex. 8, 9.  These statements were followed by a statement "expressly condemn[ing]" Russia's military action in Ukraine.  Joint Ex. 10**.**  But, as the Met asserted at hearing, she failed to meet an arbitrary extracontractual condition, set by Gelb alone, to issue a "statement that was strong enough," in Gelb's opinion, "to enable the Met to put her on the stage."  Tr. at 25; *see id.* at 155.

Netrebko's failure to issue a political statement that met Peter Gelb's personal standard is simply not the type of conduct that justifies her termination under the Standards of Conduct Clause.  Expanding the Clause to permit such a termination would set a dangerous precedent, permitting the termination of artists in any instance in which their political beliefs do not align with those the Met finds acceptable.  It would also leave AGMA and its members without the certainty provided by a collective bargaining agreement; any contract could risk being canceled if an Artist held a belief that the Met decided was unacceptable, even if it had tolerated that same belief in the past. This reading is counter to the Clause's express text and bargaining history.[18]

---

[18] Moreover, this reading is counter to the Met's own stated position regarding the opera company's role on the political stage.  In 2013 the Met faced significant pressure to take a stand against Putin's efforts to criminalize homosexuality.  *See generally* Met Ex. 10.  In response to protests of the Met's Russian-themed season opener, Gelb stated that while "many members of our company join me in personally deploring the tyranny of Russia's new antigay laws," and while "[w]e respect the right of activists to picket," it would be inappropriate to make the opera company a vehicle for activism.  *Id.* at 2.  These statements demonstrate that the Met itself—the party that proposed the Standards of Conduct Clause—does not consider political expression to be the type of conduct to which the company's programming and artistic choices should be responsive.

**D. The Met's violation of the CBA is not excused by common law defenses**

At the hearing, the Met asserted it did not violate the CBA due to the common law doctrines of impossibility and frustration of purpose.[19]  Tr. at 30:24–31:1.  Neither has merit.  As an initial matter, it is essential to underscore that the Met may satisfy its Pay or Play obligation in one of two ways: it may use Netrebko's services for the agreed upon fee, or it may opt not to have her perform and instead pay her that fee as consideration for the reservation of her time and preparation for the role.  Either way, the Met is obligated to pay the contractually agreed upon fee.  It is under no obligation to put Netrebko on its stage so long as it pays the value of her individual contracts; if it does not pay her, it has breached those contracts.  Any application of the common law defenses the Met asserts must therefore account for payment as the Met's only method of satisfaction.  As the Met has offered no plausible argument that its failure to pay Netrebko is excused under the common law, its reliance on the common law defenses of impossibility and frustration of purpose fails.

**i.   The Met cannot show that performance would be impossible**

Under New York law, the common law defense of impossibility is applied "only in extreme circumstances," *Kel Kim Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 902 (1987), where "destruction of the means of performance by an act of God . . . or by law," *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281 (1968), "makes performance

---

[19] The Met stated it would avail itself of the defenses of "impossibility and impracticability and frustration of purpose."  Tr. at 31:25–31:1.  Impossibility and impracticability are the same defense, not separate defenses or separate degrees of the same idea.  *See* Restatement (Second) of Contracts § 261 cmt. d (Am. L. Inst. 1981), and New York courts treat the terms as interchangeable.  *See Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 237 (S.D.N.Y. 2021) (quoting *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018).

*objectively impossible*."  *Kel Kim*, 70 N.Y.2d at 902 (1987)).  Moreover, destruction of the

means of performance must be caused by "an unanticipated event that could not have been

foreseen or guarded against in the contract."  *Id*.  Finally, where a contract contemplates multiple

methods of satisfaction, "the fact that one of them becomes impossible of performance does not

relieve the promisor from performing the other."  *Int'l Ass'n. of Machinists & Aerospace

Workers v. Nw. Airlines Corp.*, 9 Misc. 3d 1129(A) at *5 (N.Y. Sup. Ct. 2005) (ellipses omitted)

(quoting *Yankton Sioux Tribe of Indians v. United States*, 272 U.S. 351, 358 (1926)).

 Here, the Met has not presented any evidence that the means of performance have been

destroyed, either factually or legally.  *See 407 E. 61st Garage*, 23 N.Y.2d at 281.  Performance

remains literally possible, and both parties have continued to perform similar contracts during the

course of this arbitration.  *See* Tr. at 64:17–18.  Even assuming the Met could demonstrate that it

would be impossible to put Netrebko *on stage*—which it cannot—the Met has made no assertion

that it would be impossible to pay her the value of her contracts.[20]  Nor would such an assertion

help the Met's position, as, under New York law, "where performance is possible, albeit

unprofitable, the legal excuse of impossibility is not available." *Warner v. Kaplan*, 892 N.Y.S.2d

311, 314 (N.Y. App. Div. 2009).[21]

---

[20] At hearing, Gelb contended that employing Netrebko could cause the Met financial harm due to the
Met's significant reliance on donations and the possibility of negative donor sentiment regarding
Netrebko.  *See* Tr. 137:18–24; *see also* AGMA Ex. 9 at 3 (quoting Gelb as asserting that audiences
"wouldn't allow" Netrebko to perform).  But the Met presented no evidence to support this assertion.

[21] The Met's testimony and past statements suggest that it believes there is a separate impossibility
defense at issue here—a sort of "moral impossibility."  *See, e.g.*, Met Ex. 8 at 2; Tr. at 18:23–25.  While
the Met maintains its prerogative to worry whether it might be "unpatriotic" to employ Netrebko, Tr. vol.
1, 29:12–13, a party's changing moral stance does not support an impossibility defense, which depends
on *objective* impossibility.  *See Kel Kim Corp.*, 519 N.E.2d at 296.  Gelb has as much as acknowledged
this when he told the *New York Times* that "[i]f other opera companies can find some equivocation or
rationalization [for presenting Netrebko] . . . that's their problem." Met Ex. 8 at 5. The very idea that a
personal ideological calculation could be the source of impossibility is out of the question; it is the perfect
expression of "I cannot do it" rather than "it cannot be done."  *Dresser-Rand Co. v. Petroleós de*

Nor have the means of performance been destroyed by operation of law. AGMA's research found only two cases from the last half century in which New York courts found legal impossibility: in both cases, a judicial determination legally barred the parties from performing. *See Kolodin v. Valenti*, 979 N.Y.S.2d 587, 589 (N.Y. App. Div. 2014); *Chateau Rive Corp. v. Enclave Dev. Assocs.*, 802 N.Y.S.2d 211, 212 (N.Y. App. Div. 2005). Here, the Met does not contend any judicial or legal order prohibits it from paying Netrebko's contracted fees. To the contrary, at hearing Gelb he readily admitted no law or government policy currently prevents the Met from performing its contractual duty. *See* Tr. at 165:24–166:2.

Moreover, even if the Met *could* demonstrate that performance would be impossible, its impossibility defense would still fail, because the reputational harm the Met points to was both foreseen and contracted around in the CBA through the inclusion of the Standards of Conduct Clause and the Pay or Play provision. *See Kel Kim*, 70 N.Y.2d at 902. As Gelb has stated repeatedly in the press and during his testimony, he and the Met have been aware of Netrebko's alleged support for Putin for at least twenty years. *See* Tr. 116:3–4. This alleged allegiance was public knowledge, *see id.* at 120:24–121:3, and has been the subject of public protest at the Met, *see* Met. Ex. 10; AGMA Ex. 6–8. And in addition to being factually foreseeable, the reputational harm that the Met points to as allegedly making performance impossible is precisely the type of harm the Met sought to contract around in the Standards of Conduct Clause. As New York courts consistently find that an event is foreseeable where parties have a contract provision addressing it, *see, e.g., Warner*, 892 N.Y.S.2d at 314; *GE v. Metals Res. Grp. Ltd.*, 741 N.Y.S.2d 218, 220 (N.Y. App. Div. 2002), the Met's assertion of the impossibility defense is foreclosed.

---

*Venezuela, S.A.*, 574 F. Supp. 3d 217, 223 (S.D.N.Y. 2021) (describing the difference between objective and subjective impossibility).
.

Finally, a party asserting impossibility must show that it has taken "virtually every action within its powers to perform its duties under the contract." *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975). The Met has not done so here. Although Gelb testified that he "worked very hard to try to find a way that [Netrebko] could perform," Tr. at 146:2–3, the efforts to which Gelb refers are steps the Met took to attempt to get Netrebko to meet its extracontractual condition of repudiating Putin to his satisfaction. The Met has taken no steps to fulfill its obligations under Pay or Play.

As the means of performance have not been destroyed, *407 E. 61st Garage*, 23 N.Y.2d at 281, the harm alleged by the Met was foreseeable, *Kel Kim Corp.*, 70 N.Y.2d at 902, and the Met has made no efforts to perform, *Kama Rippa Music*, 510 F.2d at 842, the Met's impossibility defense fails at every step.

### ii. The Met cannot show that the purposes of the agreements were frustrated

The Met's frustration of purpose defense likewise fails. Frustration of purpose occurs only where "a change in circumstances makes one party's performance *virtually worthless* to the other." *PPF Safeguard, LLC v. BCR Safeguard Holding, LLC*, 924 N.Y.S.2d 391, 394 (N.Y. App. Div. 2011) (quoting Restatement (Second) of Contracts § 265 cmt. a). Frustration must be "substantial," *Rockland Dev. Assocs. v. Richlou Auto Body*, 570 N.Y.S.2d 343, 344 (N.Y. App. Div. 1991)), and must have as its cause "a virtually cataclysmic, wholly unforeseeable event," *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)).

Neither prong of the defense—frustration of purpose and unforeseeability—is satisfied here. First, the purpose of the contracts—in the words of the Met's counsel, "to bring music to the Met's audience," Tr. vol. 1, 30:4–5—has not been substantially frustrated. For a contract's

purpose to be frustrated, the party invoking the defense must have been "completely deprived of the benefit of its bargain." *Ctr. for Specialty Care, Inc. v. CSC Acquisition I, LLC*, 127 N.Y.S.3d 6, 14 (N.Y. App. Div. 2020). The Met has made no showing that Netrebko's services were rendered completely worthless for the 2021/22 season, let alone for all of her contracts through 2026; Netrebko remains able to bring music to audiences at an exceptionally high level and has continued to do so throughout this year. *See* Tr. at 64:17–18, 67:7–16. Second, even if the purpose of the Met's contracts with Netrebko had been frustrated by Netrebko's alleged relationship with Putin, any such frustration was both foreseeable and contracted around. An event is considered foreseeable when parties have a contract provision addressing it. *See, e.g., Warner*, 892 N.Y.S.2d at 314. Moreover, the Pay or Play provision of the CBA addresses a scenario in which the Met no longer derives benefit from allowing an artist to perform—and allocates the risk of that scenario to the Met. *See* Joint Ex. 1 at 27 (Section Two, Fifth(N)).

All told, the Met cannot satisfy the elements of a frustration of purpose defense. No legal or indeed practical restriction prevents the parties from performing their duties. And to the extent the bargain is no longer advantageous to the Met, this possibility was both foreseen by and contracted around in the CBA. As Gelb has stated publicly, the decision to terminate Netrebko's contracts was a "moral" one. Met Ex. 8 at 2. Under Pay or Play, the Met may remove Netrebko from its productions for any reason, moral or otherwise. But it cannot now invoke common law defenses escape its obligation to pay Netrebko the value of her contracts.

## V.     Scope of Damages

As the Met has terminated Netrebko's employment without cause, Netrebko is entitled to the full value of her cancelled contracts. *See* Joint Ex. 1 at 26 ("[T]he compensation due Principal hereunder shall not be reduced by the failure of the Met to provide the number of

appearances herein specified.").  Under the combined terms of the individual contracts at issue

and the CBA, the total value of those contracts comes to $634,986.38.

The Met canceled eight contracts with Netrebko.  Each contract was for five

performances per production, for a total of forty performances at a rate of $17,000 per

performance.  *See* Joint Ex. 12–15; AGMA Ex. 3–5; *see also* Joint Ex. 11 (noting Netrebko's

withdrawal from *Lohengrin*).  The full amount of the fees for Netrebko's cancelled

performances as initially contracted therefore totals $680,000.  During the 2021 Met-AGMA

negotiations, however, in response to the significant financial impact of the Covid-19 pandemic,

the parties agreed to reduce fees for top-earning soloists by 12.65% for the period between April

30, 2021 and July 31, 2025.  *See* Joint Ex. 3, at 3.  Because six of the eight cancelled contracts—

*Turandot*, *Don Carlo*, *Forza de Destino*, *Andrea Chenier*, *Tosca*, *Pique Dame*—were for

performances within that period, thirty of the forty cancelled performances are subject to a

reduced performance fee of $14,849.50.  *See* Joint Ex. 12–15; *see also* AGMA Ex. 2 (Netrebko

performance calendar), 3–5.  The resulting total of Netrebko's contracted performance fees

(thirty at $14,849.50 and ten at $17,000) is therefore $615,485.

In addition to the agreed-upon performance fees, Netrebko's contracts typically include

some number of rehearsal weeks.  The proposed rehearsal period for Netrebko's 20-2024/25 and

2025/26 contracts was not articulated in the email exchanges between Neuhoff and the met.  The

contracts for which there are Standard Form Contracts in the record, however, include eight and

one-half rehearsal weeks to be compensated at the "applicable amount as stipulated in" the CBA.

These contracts include one and one-half rehearsal weeks for *Turandot*, *see* Joint Ex. 13–14, two

for *Don Carlo*, Joint Ex. 15, and five weeks total for *Forza de Destino* and *Andrea Chenier*, Joint

Ex. 12.  For artists with more than five years of seniority—which Netrebko, with over twenty

years' experience at the Met, had attained—the base weekly rehearsal rate is $2,626.54,[22] subject

to the Principal fee reduction set out in the 2021 Memorandum of Agreement.  *See* Joint Ex. 3.

The rehearsal rate for Netrebko for the 2022–2025 seasons is therefore $2,294.28, for a total of

$19,501.38 for eight and one-half contracted rehearsal weeks.  The total value of Netrebko's

terminated contracts is therefore $634,986.38.[23]

## VI.    Conclusion

For the foregoing reasons, AGMA respectfully urges the Arbitrator to issue and opinion and

award making Netrebko whole for the full value of her terminated contracts.

Respectfully Submitted

/s/

Annie R. Hollister
Eastern Counsel
American Guild of Musical Artists, AFL-CIO
ahollister@musicalartists.org
(646) 519-8443

---

[22] This rate is not set out explicitly in the record.  The last integrated CBA, from 2014, set the weekly rehearsal rate at $2,528.10.  Joint Ex. 1 at 22 (Section Two, Fifth).  All wage rates in that CBA were reduced by a net of four percent between 2014 and 2018.  *See* Joint Ex. 1 at 18 (Section One, Twenty-Third).  These rates were raised by three percent in each of the first two years of the 2018–2021 MOA, and one percent each in the third and fourth years of that agreement.  *See* Joint Ex. 2 at 1 (B: Wages).

[23] Due to a miscalculation of the applicable rehearsal rate, AGMA's counsel misstated the damages amount at hearing as $644,527.64.