# THE METROPOLITAN OPERA - AGMA

# BASIC AGREEMENT

AGREEMENT made as of the 18th day of August 2014 for the period commencing the 1st day of August 2014 and ending the 31st day of July 2018, by and between AMERICAN GUILD OF MUSICAL ARTISTS, INC. ("AGMA"), having its principal office at 1430 Broadway, 14th floor, New York, New York, and THE METROPOLITAN OPERA (the "Met"), having its principal place of business at The Metropolitan Opera House, Lincoln Center, New York, New York.

In consideration of the mutual covenants and obligations herein contained, the parties agree as follows:

# SECTION ONE

## FIRST:  COVERAGE

### A.  INCLUSIONS

1. The Met hereby recognizes AGMA as the exclusive collective bargaining agent for, and this BASIC AGREEMENT ( "AGREEMENT") shall cover, all "ARTISTS" engaged by the Met solely in connection with the performance by ARTISTS of services rendered in the preparation of, or in connection with the giving of, live performances by ARTISTS for paying audiences in theaters in which such performances are given, and, in addition, any recording or reproduction by mechanical, electronic or other means of such performances.  This AGREEMENT does not cover any group of ARTISTS engaged by the Met which performs independently of the regular Metropolitan Opera Company.

2. The term "ARTISTS" shall mean and shall include the following

   (a)  Solo Singers

   (b)  Staff Stage Directors, Stage Directors and Assistant Stage Directors

   (c)  Stage Managers and Assistant Stage Managers (any of the foregoing being sometimes herein referred to as PRINCIPALS)

   (d)  Choristers (all members of the Met's Chorus, including extra Choristers)

   (e)  Dancers (all members of the Met's Corps de Ballet, including extra Dancers)

   (f)  Principal Dancers (dancers engaged exclusively for solo dancing roles)

   (g)  Choreographers

3. AGMA warrants and the Met acknowledges that AGMA represents, for collective bargaining purposes, a majority of ARTISTS.

### B.  EXCLUSIONS

Notwithstanding anything contained in Paragraph A, AGMA acknowledges the right of the Met to engage child choristers for choral parts which the composer has indicated are to be sung by children.  Such child choristers are excluded from the coverage of this AGREEMENT.

## SECOND:  UNION SECURITY AND UNION VISITATION

A. Until and unless the union security provisions of the Labor Management Relations Act, 1947, as amended, are repealed or amended so as to permit a stricter union security clause, the following provisions shall apply:

"The Met shall employ and maintain in its employment only such persons covered by this AGREEMENT as are members of AGMA in good standing or as shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder or the date of execution of this AGREEMENT, whichever is the later, and thereafter maintain such membership in good standing as a condition of employment."

In the event said Act is repealed or amended so as to permit a stricter union security clause, the above provision shall be deemed amended accordingly.  The provisions of this paragraph are subject to said Act.

B.   AGMA agrees that it is and will continue to be an open union and will keep its membership rolls open and will admit to membership all ARTISTS engaged by the Met and will not impose unreasonable entrance fees or dues upon its members provided, however, that nothing contained in this AGREEMENT shall be deemed to limit the right of AGMA to suspend, expel, otherwise discipline or to refuse to admit to membership or readmit a member pursuant to the rules, regulations, Constitution and By-Laws of AGMA, and provided, further, that nothing contained herein shall require the Met to discharge or refuse to engage any ARTIST by reason of any action of AGMA which is in violation of the said Labor Management Relations Act.

C.   Any officer or other duly authorized representative of AGMA shall be admitted at all reasonable times to the premises of the Met or such other place where the Company is working, for the purpose of conducting official business of AGMA; and the Met will cooperate with such representative in connection therewith.


## THIRD:  QUALIFICATIONS OF EMPLOYMENT AND ANTI-DISCRIMINATION

A.   Subject to the provisions of this AGREEMENT, the Met acknowledges that ARTISTS' obligations to it under any contract or otherwise are subject to ARTISTS' prior obligations under the Constitution, By-Laws, rules and regulations of AGMA now in force or as the same may be amended from time to time, and the Met agrees that its obligations hereunder and pursuant to individual contracts of employment with ARTISTS are subject to such prior obligations.  AGMA agrees that nothing contained in said Constitution, By-Laws, rules and regulations now in force or as the same may be amended from time to time shall affect the rights of the Met as set forth in this AGREEMENT.

B.   AGMA recognizes that the Met shall have the sole right, except as otherwise provided, to determine the artistic qualifications of ARTISTS, now or hereafter employed by it, and the right to employ or to continue to employ such ARTISTS, and that the number of ARTISTS deemed necessary by it for the production of operatic performances shall be determined by the Met.

C.   The Met will not discriminate against any AGMA member because of such member's activities on behalf of AGMA, nor shall it discriminate against any ARTIST based on ARTIST's race, color, age, sex, sexual orientation, national origin, marital status, citizenship, religion, disability, military status, creed or any other trait or characteristic protected by law.  No ARTIST will be required to appear in any theater or other place of performance which discriminates in any manner against an ARTIST or patron on the basis of the aforementioned criteria.  Nothing herein, however, shall require the Met to employ any ARTIST who is not legally authorized to be in or work in the United States.


## FOURTH:  SUPERVISORY PERSONNEL

AGMA acknowledges that Staff Stage Directors, Stage Directors, Assistant Stage Directors, Stage Managers, Assistant Stage Managers and Choreographers are representatives of the Met in the carrying out of their supervisory and executive duties (as distinguished from their artistic services) for the Met with respect to other ARTISTS.  Accordingly, AGMA agrees not to censure or take any disciplinary action against such ARTISTS, or subject them to any intra-union hearings, by reason of any statement or action made or taken in connection with the carrying out of such supervisory and executive duties for the Met.  Any claim or dispute or alleged Grievance by any ARTIST or ARTISTS or AGMA against such ARTISTS by reason of any statement or action whatsoever made or taken by such ARTISTS in connection with the performance by such ARTISTS of their supervisory and executive work for the Met, shall be subject exclusively to the Grievance and Arbitration Procedures set forth in Articles ELEVENTH and TWELFTH of this SECTION ONE in the same manner as an "arbitrable grievance" asserted against the Met.  Nothing contained herein shall prevent AGMA from its right of censure or other

disciplinary action against such ARTISTS in the event that AGMA claims that the manner in which any such ARTIST carries out his/her supervisory and executive duties for the Met is improper, provided, that the Met in such case shall have the right (i) to demand that any proposed action by AGMA against such an ARTIST be subjected to Grievance and Arbitration Procedures and (ii) in such event, such action by AGMA shall be held in abeyance pending determination of the Grievance and/or Arbitration Procedures.

**FIFTH:  ARTISTS' CONTRACTS**

A.  All contracts or agreements by the Met with ARTISTS shall be in the respective forms annexed hereto as:

Exhibit A1  -  PRINCIPALS CONTRACT (Per Performance)
Exhibit A2  -  PRINCIPALS CONTRACT (Weekly)
Exhibit A3  -  PRINCIPALS CONTRACT (Plan)
Exhibit A4  -  PRINCIPALS CONTRACT (Standard Contractor's Agreement)
Exhibit B   -  DANCERS CONTRACT
Exhibit C   -  CHORISTERS CONTRACT

which forms (hereinafter referred to as "STANDARD FORM CONTRACT") have been agreed to between the Met and AGMA.  Said form shall be executed in triplicate original:  one copy for the ARTIST, one for the Met and one to be delivered to AGMA by the Met not later than seven (7) days after the signing of the contract.  AGMA's original of the contract shall be kept confidential and shall be available only (1) to the Executive Director or other officer having an equivalent position, or (2) when a dispute arises under the contract.

B.  The minimum terms and conditions governing employment of ARTISTS by the Met are contained herein; and the Met shall not enter into any contract with or employ any ARTIST upon terms and conditions less favorable to the ARTIST than those contained herein.  No STANDARD FORM CONTRACT containing any additions or modifications shall be binding upon ARTIST or the Met unless the same has been approved by AGMA.  The Met shall not request any ARTIST to waive any provisions of this AGREEMENT or of a STANDARD FORM CONTRACT unless such request has first been submitted to AGMA in writing and has been approved by AGMA and in the event any such addition or modification constitutes a waiver of the provision of this AGREEMENT or STANDARD FORM CONTRACT, the same shall be deemed null and void at the option of AGMA or ARTIST unless the Met has complied with the provisions of this Paragraph B.  Nothing contained in this Paragraph B shall require approval by AGMA of a written agreement entered into between the Met and any PRINCIPAL terminating such contract.  A copy of any such termination agreement shall be sent to AGMA.

C.  A copy of any executed STANDARD FORM CONTRACT (and any addition to or modification thereto) or any waiver request pursuant to Paragraph B shall be deemed approved by AGMA if delivered by the Met to AGMA and if within fourteen (14) days thereafter (excluding Saturdays and Sundays) AGMA shall not have returned said copy marked "Disapproved", with reason for the disapproval set forth.

D.  Nothing contained herein shall prevent ARTISTS from negotiating terms and conditions better than those provided in this AGREEMENT or in the applicable STANDARD FORM CONTRACT and with respect to such terms and conditions, the provisions of Paragraphs A, B and C shall not be applicable.

E.  Any agreement (including options) relating to the employment of any ARTIST by the Met shall be null and void and of no effect unless it is executed by ARTIST and the Met on a STANDARD FORM CONTRACT, provided, however, that any written agreement between the Met and any PRINCIPAL shall be binding to the full extent provided by law, provided:

1.  Nothing contained therein shall be in contradiction of any provision of the AGREEMENT or of the STANDARD PRINCIPALS CONTRACT in effect at the time of execution thereof;

2.  Such agreement shall contain a provision that its terms shall be incorporated in the STANDARD PRINCIPALS CONTRACT and that it shall be subject to the provisions of the AGREEMENT in effect for the year to which such agreement pertains, and

3.  Such agreement shall be filed with AGMA in accordance with Paragraph A.

4.  The Met shall not be entitled to enforce such agreement unless it tenders to PRINCIPALS a

STANDARD PRINCIPALS CONTRACT, in accordance with the terms of such agreement, prior to the date when PRINCIPALS' services are to begin.  Any such agreement made during the term of this AGREEMENT shall be enforceable against either PRINCIPALS or the Met only to the extent as would an agreement made on the STANDARD PRINCIPALS CONTRACT form at the same time.

F.  Any ARTIST presently under contract with the Met shall receive the benefits of this AGREEMENT commencing as of August 1, 2014, and all provisions of existing contracts with ARTISTS less favorable to ARTIST than the terms of this AGREEMENT are hereby modified to the extent required to conform with this AGREEMENT.  To the extent that ARTIST enjoys better conditions than those provided for herein, the Met shall maintain such conditions.

G.  No STANDARD FORM CONTRACT may be assigned or transferred except to a third party which, by reason of merger, consolidation, reorganization, sale, assignment, transfer or the like, shall succeed to the business of the Met.


## SIXTH:  TRANSPORTATION

A.  Whenever performances are held by the Met outside the City of New York, the Met shall (in addition to ARTIST'S compensation) provide, at its own expense, all ARTIST'S transportation by railroad and/or air both to such point and return.  Except in the case of Philadelphia, or any other city within one hundred (100) miles from the City of New York, if such transportation takes place between the hours of midnight and 8:00 a.m., the Met shall furnish an individual Pullman sleeping berth and/or air accommodation for ARTIST, or in lieu thereof, the difference between the railroad fare actually paid by the Met for ARTIST and the cost of such individual sleeping berth.  The Met shall also provide at no cost to ARTIST flight insurance in the amount of one hundred thousand ($100,000) dollars, when the Met requires ARTIST to use air transportation.

B.  In all instances in which the Met furnishes transportation pursuant to Paragraph A, ARTIST shall use such transportation unless the Met shall give its written consent to an alternate mode of transportation.  If ARTIST shall use transportation different from that furnished or consented to by the Met, then the failure of ARTIST to appear in a rehearsal or performance as scheduled by reason of any failure or delay caused by such unauthorized transportation shall not be considered a case of force majeure, and ARTIST shall be deemed in breach of his/her contract.

C.  The Met shall not oblige any ARTIST to leave the City of New York for work outside said city unless the Met provides the transportation referred to in Paragraph A required in connection with ARTIST'S services outside the City of New York, including return transportation thereto.


## SEVENTH:  PAYMENTS

A.  All ARTISTS shall be paid by the Met on or before Thursday of the week following the week in which such payment is earned, except that PRINCIPALS engaged on a "per performance" basis shall be paid within twenty-four (24) hours following each such performance.

B.  All payments required to be made by the Met to ARTISTS shall be made in legal tender of the United States, irrespective of whether or not any performances are rendered outside of the United States.  All ARTISTS may be paid in cash or check provided:

1.  While on tour, Choristers and Dancers, and such PRINCIPALS who shall give written notice not less than one week prior to the tour to the Met of their election, shall receive their full per diem and not less than one hundred dollars ($100) of their weekly road compensation in legal tender and the balance by check.


## EIGHTH:  DEDUCTIONS FROM COMPENSATION, FEES, COMMISSIONS, ETC.

A.  The Met agrees that it will deduct (check-off) from the gross compensation earned and to be earned by each ARTIST covered under this AGREEMENT, for whom there shall be filed with the Met a written assignment in accordance with Section 302 of the Labor Management Relations Act, 1947, the applicable "Working Dues" as certified by AGMA to be then in effect.  For purposes of such deduction, travel

expenses, meal money, per diem (to the extent provided for in this AGREEMENT), and any compensation earned under the jurisdiction of any union other than AGMA shall not be considered a part of "gross compensation" and shall not be subject to such deduction.  The Met shall commence making such deductions with the first wage payment to be made to such ARTIST following the date of the filing of his/her said written assignment, and such deductions shall continue thereafter with respect to each and every subsequent wage payment to be made to each such ARTIST during the effective term of said written assignment.

On or before the fifteenth (15th) of each month, the Met shall remit to AGMA, by check drawn to the order of American Guild of Musical Artists, the total amount of all deductions made during the said period for all such ARTISTS.  At the time of such remittance, and together therewith, the Met shall also furnish to AGMA a record certifying the names, Social Security numbers and total wages and deduction for the pay period of the ARTISTS on whose account such deductions were made.  The Met will not be liable for failure to make a deduction or deductions; however, the Met will use reasonable care in making deductions.

The Met agrees that a written assignment in the following form (which may be contained in the ARTIST's individual contract with the Met) will be acceptable for the purpose of this Paragraph:

"[Principal/Chorister/Dancer] hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner.  Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by [Principal/Dancer/Chorister] by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met."

In the event any ARTIST shall assert a claim against the Met arising out of any check-off of monies which have been remitted to AGMA, and provided the Met has promptly notified AGMA of such claim, AGMA shall defend such claim on behalf of the Met as if such claim were asserted against AGMA, at no expense to the Met (whether or not such claim is also asserted against AGMA), and shall indemnify and hold the Met harmless with respect to any judgment or award which may be rendered against the Met as a result of such claim.

B.   Provided ARTIST shall have previously so authorized in writing pursuant to Paragraph A above, the Met agrees that, upon the written request of AGMA, delinquent dues and initiation fees payable to AGMA shall be deducted from the compensation of ARTIST and paid by the Met to AGMA.

C.   No deduction other than as provided in Paragraph A or B shall be made from the compensation of ARTIST except taxes or withholdings as provided by law, or reimbursement to the Met for advances to ARTIST or for an agreed indebtedness (without interest) to the Met for materials or cost of services furnished to ARTIST by the Met at ARTIST'S written request.

D.   The Met agrees that no contributions for its maintenance or its operating funds will be solicited as a condition of employment from any ARTIST unless the written consent of AGMA shall have first been obtained.

E.   No person who either:

   1.   Occupies a paid supervisory or a paid executive position with the Met, or

   2.   Receives compensation from the Met and participates in the engaging, casting or discharging of ARTISTS, or

   3.   Occupies a paid supervisory or a paid executive position with AGMA shall

    (a)  be permitted to act as a manager, agent, or personal representative of any ARTIST in the employ of the Met, or

    (b)  receive any fee, commission or other consideration of any kind for services of such character from any ARTIST in the employ of the Met, or

    (c)  if such person occupies a paid supervisory or paid executive position with AGMA, be permitted to remain in the employ of the Met.

## NINTH:  SOCIAL SECURITY, UNEMPLOYMENT INSURANCE AND WORKER'S COMPENSATION

So long as and to the extent permitted by law, the Met shall make the payments required to be made by it to maintain New York State Unemployment Insurance benefits, Federal Social Security benefits and Workers' Compensation coverage for all ARTISTS in conjunction with the performance by them of services for the Met.

## TENTH:   MEDIA

### A.  MEDIA PAYMENTS

Media payments to ARTISTS shall be as specified in SECTION TWO, Article FIFTH (I) (1); SECTION THREE, Article THIRD (G) (1) and Article FIFTH (C) (1); and SECTION FOUR, Article THIRD (F) (1) and Article FIFTH (C) (1).

### B.  REVENUE SHARING

(1) The Met will create a "Pool" equal to 60% of net revenues received from all exploitations.  "Net revenues" shall be calculated in accordance with the definitions in paragraph B (9) below..

(2) (a)   With respect to each production captured prior to August 1, 2011 (including archival productions), the  Met will pay to AGMA members (excluding solo singers, principal dancers, and AGMA members of the creative production team) a revenue share amount equal in total to 24.0% of the Pool to be distributed among Met employees represented by AGMA.  Each employee's share will be determined based upon a "point" system similar to that used in the past.

(b)  With respect to each production captured on or after August 1, 2011 and during the term of this Agreement (August 1, 2014 to July 31, 2018), the Met will create a "fund" equal in total to 45.6% of the Pool for such production. The Met will then divide such fund among (i) such Met employees represented by Local 802 as are entitled to a portion of net revenues from such production, and (ii) such Met employees represented by AGMA (except those who share in the "Principals Pool", as set forth in subparagraph (3) below as are entitled to a portion of net revenues from such production, all on a point system similar to that used in the past. No participant in the 45.6% pool from either Union will receive a greater percentage than that received by a Regular Orchestra Musician and Regular Chorister.

(3) Solo singers (including plan artists), principal dancers, and AGMA members of the creative production team shall receive revenue sharing as participants in a separate Principals revenue sharing group which will share in 28.7% of the Pool based on performance and weekly fees.  The Principals group will include, in addition to AGMA members, conductors and production designers.

(4) With respect to Metropolitan Opera Orchestra concerts, the Met will pay a revenue share amount equal to 83% of the Pool if the only revenue sharing participants are conductor(s), soloist(s) and Met employees represented by Local 802.  If persons represented by AGMA, other than soloists, participate in any such concert, then revenue share payments shall be dependent upon numbers of AGMA participants, but shall not total more than 41.5% of the Pool.

(5) AGMA members (including those who were Met employees represented by AGMA at the time the material was captured including extra AGMA employees) will continue to receive the revenue prescribed under any already existing agreements with media companies under their existing terms until those agreements expire.

(6)  Revenue sharing guaranteed payments to AGMA members shall be as specified in SECTION TWO, Article FIFTH (I) (2); SECTION THREE, Article THIRD (G) (2) and Article FIFTH (C) (2); and SECTION FOUR, Article THIRD (F) (2) and Article FIFTH (C) (2).

(7)  Guarantees, plus net revenues above the guarantees in any year (including net revenues from exploitation of productions covered by the 2006-11 media provisions received on and after August 1, 2011), will be recoupable against guarantees and net revenue payments from any other year (including net revenues from exploitation of productions covered by the 2006-11 media provisions received on and after August 1, 2011), including into any future collective bargaining agreement(s) that provide for revenue sharing. Net revenues and guarantees paid for the period beginning August 1, 2010 and ending July 31, 2011 shall not be taken into account for purposes of these computations. The calculations to each such person will be made on a cumulative basis beginning August 1, 2011, and will compare cumulative net revenues (including net revenues from exploitation of productions covered by the 2006-2011 and subsequent media provisions received on or after August 1, 2011, and cumulative guarantees and amounts paid for previous post-August 1, 2011 accounting periods, and will carry forward into media provisions after the term of this Agreement.

(8)  Calculations for materials captured as well as archival materials exploited under the 2006 AGMA Media Agreement continue and are carried forward into the term of this (and future) collective bargaining agreements.

(9)  ARCHIVAL MATERIAL

Payments due under this Paragraph B from the exploitation of archival material -- "archival" is defined for the purposes of this Agreement as material captured prior to August 1, 2006 -- shall be made to those who were Met employees represented by AGMA at the time the material was captured (including extra AGMA employees who performed in the captured material). In the case of any such AGMA employee who is deceased, the payment due to that employee will be made to the employee's beneficiary. If an AGMA member (or a beneficiary of a deceased member) cannot be located by the Met or AGMA after a reasonable period of time, then the amount due will be divided equally among the retired Met AGMA members (and beneficiaries, if located, of those deceased) at the time payment is made.

(10) INSTANT CDS AND DIGITAL DOWNLOADS

For instant CDs, digital downloads and comparably permanent products as described in Paragraph C (2) (c):

(a) For productions captured prior to August 1, 2011, an amount equal to 24.0% of 60% of all of the Met's actual receipts from sales of such units of the applicable performance from the first unit sold without deduction of any production costs paid by the Met in connection with said performance will be paid to the participants in the AGMA Pool as described in Article TENTH, Paragraph B (2) (a).

(b)  For productions captured on or after August 1, 2011, an amount equal to 45.6% of 60% of all of the Met's actual receipts from sales of such units of the applicable performance from the first unit sold without deduction of any production costs paid by the Met in connection with said performance shall be paid to the participants in the AGMA/Local 802 Pool as described in Article TENTH, Paragraph B (2) (b).

(c)  An amount equal to 28.7% of 60% of all of the Met's actual receipts from sales of such units of the applicable performance from the first unit sold without deduction of any production costs paid by the Met in connection with said performance shall be paid to participants in the Principal Pool as described in Article TENTH, Paragraph B (3).

Such payments will be made no later than November 30 of the year following the applicable payment year, and will not be charged against the guaranteed payments specified in SECTION TWO, Article FIFTH (I) (2); SECTION THREE, Article THIRD (G) (2) and Article FIFTH (C) (2); and SECTION FOUR, Article THIRD (G) (2) and Article FIFTH (C) (2).

(11) R̲e̲v̲e̲n̲u̲e̲ S̲h̲a̲r̲i̲n̲g̲ C̲a̲l̲c̲u̲l̲a̲t̲i̲o̲n̲ D̲e̲f̲i̲n̲i̲t̲i̲o̲n̲s̲

**Net Revenues**:  Net revenues are gross revenues less distribution costs and fees and less production costs.

**Gross Revenues**:  Gross revenues are all revenues received by the Met from the exploitation of the covered productions, including without limitation amounts received by the Met from DVD and CD sales, theatrical distribution, worldwide television exploitation, theatrical exploitation, income from licensing new radio formats such as satellite distribution, digital distribution of audio and audio-visual recordings and other new technologies now known or hereafter devised, such as podcasts and ringtones.  A covered production is a new production which is made pursuant to the terms of the new media agreement.

**Production Costs**:  Production costs are all sums customarily included as part of the production budget of an audio or audio-visual production in the film, television, internet, radio and new technology worlds, which sums are actually spent by the Met. Deductible production costs, for purposes of calculating net revenues, will not include the costs of production of the Saturday afternoon live radio broadcasts, but only the costs of "enhancements" and incremental costs of production to develop, produce and deliver the audio-visual elements and other material required to deliver DVD, CD and other materials derived from these Saturday radio broadcasts. Deductible production costs will also not include Media Salary payments to Local 802 members, or like payments to other union employees.  If the Met produces an audio or audio-visual work which is not an enhancement of a Saturday afternoon radio broadcast, then all production costs will be part of recoupable production costs, unless otherwise specifically provided.  Production costs include an overhead fee of 10% of the production costs spent by the Met, in lieu of an allocation of costs of Met staff members.

**Distribution Costs and Fees**:  Distribution costs are the actual costs of distributing the productions, and include the creation and shipment of delivery materials; advertising, promotion and publicity costs; contingent payments, such as payments to music publishers, composers, librettists and translators with respect to copyrighted music, and contingent compensation (e.g., to a film director); costs of creating special versions (e.g., subtitled versions); and costs of manufacturing materials for distribution.  The Met will not double deduct any distribution cost in calculating net revenue.  The Met will deduct a distribution fee of 20% of gross revenues of the Met; provided, however, the Met agrees that the all-in distribution fee, inclusive of fees to a third party distributor(s), will not exceed 40% of the gross revenues of the applicable distributor(s).

**Compilations**:  For any compilation product (audio or audiovisual) embodying any materials other than (A) archival performance and (B) the performances described in Paragraph C.(2)(a) and (b) below, a payment equal to the following: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

By way of illustration, if the Met authorizes a "Greatest Moments of Opera" DVD embodying materials from two archival productions; 31 audiovisual captures under Paragraph C.(2)(a) from Year 1 (i.e., one capture in excess of the 30 capture limitation specified in Paragraph C.(2)(a); and three audiovisual captures under Paragraph D.(2)(a) from Year 2, the Met would be obligated to pay such amount because the number of captures from Year 1 exceeds the allowed limit of 30.

**No Cross-Collateralization Among New Productions**:  The Met will not cross-collateralize among new productions.  Thus, net revenues from one production would not be applied to recoup a production deficit on another production, although costs within a production would all be crossed (so income from DVD exploitation would be applied against unrecouped theatrical expenses, and so on).

(12) R̲e̲v̲e̲n̲u̲e̲ S̲h̲a̲r̲i̲n̲g̲ A̲c̲c̲o̲u̲n̲t̲i̲n̲g̲s̲

(a) The Met will calculate revenue sharing payments after the close of each fiscal year, and send to all revenue sharing participants a statement of revenue sharing earnings and a payment for their share by November 30 of the following year.  The Met shall provide to AGMA Committee a copy of said statement together with revenue sharing reports showing revenues and expenses for each production.

(b)  If the revenue sharing payments due to any current or former employee or his/her designated beneficiary total less than $10 for any year, no payment shall be made to that employee for such period.  Instead, the total due shall be carried forward to each successive year until the accumulated revenue sharing payments due that employee are equal to or greater than $10.

(c)  The Union shall have the right to examine and copy at the Union's expense the books and records of the Met relating to the calculation of "net revenues" underlying the earnings statements issued in any year no more than once a year and no more than once with respect to any statement. Any such examination shall be conducted at the office of the Met on no less than 30 days written notice to the General Manager with a copy to the General Counsel. Such examination by the Union shall be binding upon all Met employees with a copy to employees represented by AGMA and may be conducted no later than two years after the date of issuance of the applicable earnings statements.

## C.  CAPTURE AND EXPLOITATION

(1)  The Met shall have the right, subject to the restrictions in paragraph C (2) below, to tape, film, photograph and otherwise record by any means all performances and other activities (e.g., Met performances, rehearsals, parks, Carnegie Hall and other concerts, and other presentations) for simultaneous or future worldwide exploitation by any means now or hereafter known, as well as the right to exploit any archived material and previously exploited material for which third party rights have expired, by any and all means and media. The Met will own all copyrights and all other rights. Rehearsals may only be captured and exploited for promotional and documentary purposes and the purposes of the provisions of paragraph C (2) (a) below.

(2)  The Met agrees to limit its rights described in paragraph C (1) as follows, unless additional payments are made as hereinafter described:

(a)  The Met will limit its capture of complete audiovisual productions in which Met employees represented by AGMA participate (e.g., a complete opera or gala program) to thirty (30) during each year of this Agreement.

With respect to the foregoing, the Met will have the right to film, tape or otherwise record, for use in such audiovisual productions, one final or dress rehearsal (which might extend over several days) and two performances of the applicable production, it being understood that such productions will in some, but not all cases, correspond to Saturday afternoon live radio broadcasts).

(b)  Except for audio exploitation of the relays referred to in subparagraph (2) (c) below, the Met will limit its media exploitations of complete performances recorded during the term of the Agreement to thirty (30) per year including the productions specified in subparagraph 2 (a) above.  By way of illustration, if in Year 1 the Met broadcasts 21 performances over the Metropolitan Opera International Radio Network and nine (9) of those performances are also released as audiovisual productions, the Met may exploit these performances, as well as nine (9) other performances that take place that year, as it may elect by any and all media means in that year without additional payment.

(c)  The Met will limit its live radio relays of complete audio performances in which Met employees represented by AGMA participate (e.g., a complete opera or other program) to 4 (four) performances per week. With respect to these 4 (four) performances, except for the Saturday afternoon live radio broadcasts and other performances described in paragraph C (2) (b), the Met will not distribute them by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network.  The Met will have the right to exploit such audio materials as follows:

(i)  by all other radio and similar means (including but not limited to internet, satellite, podcast, broadband radio) directly and pursuant to license agreements entered into during the term of the Agreement (it being understood that the duration of rights under such license agreements may extend beyond the term of this Agreement), and

(ii)  by "instant CDs" and digital downloads and similar means of exploitation.  Except for the

Saturday afternoon live radio broadcasts and other performances described in paragraph C (2) (b) with respect to which the Met's rights shall not be limited, the Met may exploit units of each of such relay performances as follows: (I) digital downloads or comparable products must be ordered by not later than 72 hours from the point of availability (which will be the then current industry usual and customary availabilities, if any), but in no case later than 30 days after the conclusion of the applicable performance, and (II) instant CDs or comparable products must be ordered no later than 72 hours after the conclusion of the applicable performance. With respect to the exploitation of such units (one instant CD or digital download of a performance will each count as a unit) of any such live radio relay performances, the provisions of paragraph B (8) above shall apply.

(iii) Each year, the Met may designate up to five (5) live radio relays that were/are originally relayed between August 1, 2006 and July 31, 2018. The Met may exploit such relays and excerpts thereof in any and all audio media now or hereafter known (including CDs, downloads) during the same exploitation period that applies to productions, without additional payment other than a net revenue participation. Such relays shall be in addition to Saturday afternoon radio broadcasts and other audio visual productions and shall not be subject to any additional payments other than net revenues or any restrictions under subparagraph (ii) above.

(d) In addition to the media exploitations referred to in subparagraphs (2) (a) through (c) above, the Met will have the right to exploit and license archival materials, materials produced hereunder, and elements of the foregoing for inclusion in audiovisual productions, whether film or television productions or commercials and other audiovisual works; no additional remuneration shall be due to AGMA members, other than their revenue sharing participation, if the productions include the Met on screen, as itself.  For the purpose of the Media Agreement only, archival material shall mean material captured prior to August 1, 2006 which was previously subject to the AFTRA Agreement.   If such materials are used in other audiovisual productions, then the Met shall pay AGMA participants (in lieu of any other payments otherwise applicable hereunder) at the rates paid to Local 802 participants to the extent applicable.  With approval of the AGMA Committee, such payments may be charged against the revenue sharing guarantees paid to individual participants.

(e) Notwithstanding anything to the contrary in this Article TENTH, the Met may license after the term of this Agreement new rights to productions described in subparagraphs C (2) (a) through (c), or to productions in excess of the limits specified in such subparagraphs for which the Met has, during the term of this Agreement, paid the additional sums as specified in SECTION TWO, Article FIFTH (I) (3); SECTION THREE, Article THIRD (G) (3) and Article FIFTH (C) (3); and SECTION FOUR, Article THIRD (F) (3) and Article FIFTH (C) (3), for a term of not more than 99 years following the date of execution of the new license.  Further, the parties acknowledge that, notwithstanding anything to the contrary contained herein, the Met may exploit archival material as it may elect in its sole discretion during the term of this Agreement (including under license agreements the duration of which may extend beyond the term of the Agreement), but the Met may not enter into new license agreements for the exploitation of such archival material after the expiration of the term of this Agreement.  Following the term hereof, the Met shall not have rights other than those granted herein unless embodied in another agreement.

(f) The Met will use all reasonable efforts to maintain ownership of all rights related to any of the material to be exploited pursuant to the provisions hereof and to license such material for the shortest term it can, provided that doing either of the foregoing does not compromise the Met's ability to make deals that it considers, in its sole discretion, the most advantageous at the time. Notwithstanding anything to the contrary contained herein, it is understood that the Met will have the right to determine if and when it wishes to exploit Met material and the terms of any exploitation arrangements in its sole discretion.

## D. **PROMOTIONAL USE**

The Met may use any new or archival audio and audiovisual materials without restriction and without payment for the promotional purposes described in Appendix **attached to this Agreement, and for other promotional uses which are substantially the same as those described in Appendix G. If the Met wishes to use such materials for other promotional purposes, the Union will have the right to approve such use, which approval shall not be unreasonably withheld and shall occur as expeditiously as

possible.  If any revenues are earned by the Met from such materials, they will be part of the revenue sharing.

### E.  SYMPHONIC PATCH SESSIONS

The Met shall have the right to patch sessions following an orchestral concert performance and will pay additional sums to the participating AGMA members at the rates paid to Local 802 participants to the extent applicable.

The Met may call a special patch session at a time other than immediately after a concert of the recorded program (including a special patch session to make corrections in an archived recording), provided that there is AGMA Committee approval of the scheduling of the session.  Such patch sessions shall be paid at the rates paid to Local 802 participants to the extent applicable.

### F.  USE OF WORKING TAPES

The Met may use all audio and video tapes for internal working purposes and may provide these tapes as aids to outside parties provided that the outside parties use such material solely for their own working purposes (e.g. for acting, directing, restoring sets or costumes, etc.) and are not permitted to make any further distribution of said tape. If any such tape is exploited by anyone beyond that permitted herein and in a manner that would require payment to AGMA members under any of the other provisions herein, the Met will be responsible for making such payment.

### G.  DISCIPLINARY ACTIONS

The Met may not use any of its recordings made under the terms of this Agreement for disciplinary action against an AGMA member.

### H.  INFORMATIONAL MEETINGS

The AGMA Committee and the General Manager shall meet approximately every 2 months to discuss media plans, status and activities, and any other subjects of mutual interest.

### I.  TERMINATION

At the end of two (2) years after the initial sale of an instant CD, a digital download or comparably permanent product of a performance described in paragraph C (2) (c), either the Met or the Union will have the right to terminate the digital download, instant CD and comparably permanent product rights for all additional relays (not part of the 30 broadcasts specified in C (2) (b)). If either party wishes to terminate these rights, the terminating party will provide the other party with written notice on or before 60 days prior to the end of the two-year period.


## ELEVENTH:  GRIEVANCE PROCEDURE

A.  **DEFINITION**:  A "Grievance" shall mean:

   1.  Any claim or dispute which may be the subject of an arbitration pursuant to the provisions of Article TWELFTH of this SECTION ONE (hereinafter sometimes referred to as an "Arbitrable Grievance"); or

   2.  Any claimed grievance of any ARTIST or ARTISTS or of AGMA against the Met or by the Met against AGMA, or any ARTIST or ARTISTS arising out of, or relating to, any condition of employment of such ARTIST or ARTISTS whether or not the same shall be included in subparagraph 1 above.

B.  **PROCEDURE**:  It is the intention of both parties that an orderly procedure for the handling of all Grievances be established.  Unless AGMA and the Met shall agree to waive the Grievance Procedure, no Arbitrable Grievance shall be arbitrated without first having been made the subject of the Grievance Procedure provided in this Article.  To this end, AGMA and the Met further agree:

   1.  Any grievance shall be promptly submitted to a Grievance Committee consisting of representatives designated by the Met and by AGMA.  If the grievance cannot be resolved within thirty (30) days after

submission to the Grievance Committee, either party shall have the right to submit the dispute to arbitration in accordance with the provisions of Article TWELFTH.

    (a) No grievance shall be submitted to the Grievance Committee unless and until an appropriate delegate of AGMA has fully investigated the circumstances of the grievance, evaluated its merits and shall have attempted to resolve the grievance with appropriate representatives of the Met. The Grievance Committee shall have no power to amend or modify the provisions of this AGREEMENT or of any STANDARD FORM CONTRACT or to bind either the Met or AGMA.

2.    Notwithstanding anything herein contained, it is agreed that the procedure herein outlined is not intended to prevent the prior utilization of other informal methods of settling any Grievance; nor shall the provisions of this article be deemed to prevent any ARTIST from discussing ARTIST's individual Grievance with the Met, nor from taking any matter to arbitration after consideration of the Grievance by the Grievance Committee.

C.    This Article shall not apply to the discontinuance by the Met of a Chorister or the non-reengagement by the Met of a Dancer, in which instances the procedures set forth in SECTION THREE, Article NINTH, and SECTION FOUR, Article NINTH, shall govern exclusively.


**TWELFTH:  ARBITRATION**

A.    Every contract entered into between the Met and any ARTIST during the term of this AGREEMENT shall be deemed to contain the following provisions:

"Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined by arbitration before a single arbitrator, subject, however, to the prior requirements of Article ELEVENTH (Grievance Procedure) of this AGREEMENT, in accordance with the Voluntary Labor Arbitration rules, then obtaining, of the American Arbitration Association subject, however, to the following procedures:

"1.    An arbitration may be instituted by either party (hereinafter referred to as the 'initiating party') by serving a written demand (herein referred to as the 'Demand') therefore upon the other party and upon the American Arbitration Association.  Such Demand shall set forth, clearly and concisely:

    (a) The question or questions at issue.

    (b) The specific provisions of the contract which it is claimed govern the determination of the issues to be arbitrated.

    (c) The contentions of the party demanding arbitration with respect to the issues to be arbitrated.

    (d) The relief sought on the arbitration.

    Such demand shall be delivered by the initiating party to the other party and, if delivered to the Met, to the attention of its General Counsel; if delivered to AGMA, to the attention of its Executive Director.

"2.    Within twenty (20) days after receipt by the other party (hereinafter referred to as the 'responding party') of the Demand, the responding party shall serve its written Answer thereto upon the initiating party and upon the American Arbitration Association.  Such Answer shall set forth the same matters as are required for the Demand.  In the event that the responding party shall challenge the arbitrability of any issue or issues set forth in the Demand, the question of arbitrability shall be determined in the manner prescribed by Article 75 of the Civil Practice Law and Rules of the State of New York.

"3.    The award of the arbitrator shall be binding upon all parties to the arbitration and judgment upon such award may be entered by any such party in the highest court of a forum, state or federal, having jurisdiction.

"4.    AGMA may appear as <u>amicus curiae</u> in any such arbitration with all rights of a party thereto and agrees to aid the enforcement of any award or awards against its members by appropriate disciplinary action.

"5.   Notwithstanding anything in this paragraph contained, either party to this contract shall be entitled to seek injunctive relief in any appropriate court for any breach of this contract for which such relief would be available absent the provisions of this paragraph."

B.   Any dispute as to the interpretation, application or alleged violation or breach of this AGREEMENT shall be determined in the same manner as provided in Paragraph A above.

C.   The members of AGMA collectively shall not refuse to carry out the terms of this AGREEMENT or the terms of their employment agreements with the Met, nor will they collectively participate in strikes, walkouts, picketing, stoppage of work, retarding of work or boycott, whether primary or secondary, or any other interference of whatsoever nature with the conduct or operation of the Met's business except in the event that the Met shall fail to comply with Article ELEVENTH, or with Paragraph A or B of this Article, or any confirmed award rendered in accordance therewith, or with Paragraph D of this Article.

D.   The Met agrees during the term of this AGREEMENT that it will not discriminate against AGMA or its members nor shall it lock out members of AGMA except in the event that AGMA fails to comply with Article ELEVENTH, or with Paragraph A or B hereof or any confirmed award rendered in accordance therewith, or with Paragraph C of this Article.

E.   Nothing contained in this AGREEMENT shall be deemed to derogate from the Met's right to terminate any ARTIST's employment by reason of the failure of ARTIST to fulfill ARTIST's obligations under ARTIST's contract or under this AGREEMENT, it being understood, however:

1.   that the Met will notify AGMA immediately of any such termination of employment and the specific grounds therefore, and

2.   that AGMA and/or the ARTIST shall have the right to arbitrate the propriety of said dismissal as provided in Paragraphs A and B hereof, provided that Demand therefore is filed not more than three (3) weeks after the date of said dismissal and shall be served upon the Met, and

3.   that in the event that the arbitrator shall find such dismissal unjustified, he/she shall be entitled to make such award as he/she shall deem fit, including, without limitation, the reinstatement to his/her prior position of ARTIST with pay retroactive to the date of dismissal.

F.   The provisions of this Article shall not apply to the discontinuance of any Chorister pursuant to SECTION THREE, Article NINTH, or to the non-reengagement of any Dancer pursuant to SECTION FOUR, Article NINTH, the provisions of which shall apply and are not subject to arbitration.

G.   If with respect to any demand for arbitration made by AGMA under this AGREEMENT, the Met takes the position that AGMA has failed to fulfill any time limitation set forth in any provision of this AGREEMENT (SECTIONS ONE, TWO, THREE and/or FOUR) and that, therefore, AGMA has waived its rights and no arbitration can be allowed, and if the Met nevertheless must participate in such an arbitration, AGMA shall pay all costs and expenses, including attorney's fees, incurred by the Met in connection with such arbitration if the Met is the prevailing party.

## THIRTEENTH:  METROPOLITAN OPERA ASSOCIATION RETIREMENT PLAN

A.   The provisions of the Metropolitan Opera Association Retirement Plan, as amended, and the Metropolitan Opera Corps de Ballet Savings Plan are incorporated herein with the same force and effect as though fully set forth. Copies of such Plans shall be provided by the Met upon request.  Each such Plan shall be funded under a Trust agreement and a copy of each such Trust agreement shall be provided by the Met upon request.  The provisions of such Trust agreements are also incorporated herein with the same force and effect as though fully set forth.

B.    Any AGMA covered employee who retires under the term of this Agreement shall be grandfathered if there is a pension benefit increase in the next agreement.

C.    Annual compensation, for purposes of the Metropolitan Opera Association Retirement Plan only, shall include either (a) media earnings in 2002-03 or 2003-04 or (b) the 2008-09 "Media Salary" and additional payments specified in SECTION TWO, Article FIFTH (I) (1), (3) and (4); SECTION THREE, Article THIRD (G) (1), (3) and (4) and Article FIFTH (C) (1), (3) and (4); and SECTION FOUR, Article THIRD (F) (1), (3) and (4) and Article FIFTH (C) (1), (3) and (4) and the guaranteed revenue sharing amounts specified in

SECTION TWO, Article FIFTH (I) (2) (a); SECTION THREE, Article THIRD (G) (2); and SECTION FOUR, Article THIRD (F) (1), (3) and (4), whichever is greater.  The total will be included in the applicable base year for pension calculation purposes.

D.  **PENSION FUND CONCERT**

    (a)  The Met shall have the right, each year, to schedule a Pension Fund Concert (which may take place on a Sunday and shall be in addition to Sunday Concerts as provided for in SECTION THREE, Article SEVENTH (A)(2).  PRINCIPALS who are members of the Plan and CHORISTERS shall rehearse and perform without compensation.  The concert performance shall be no more than two and one-half (2-1/2) hours in duration, with a rehearsal not to exceed two and one-half (2-1/2) hours.  The foregoing shall be contingent upon a similar contribution of services by other groups in the House who are covered by the Metropolitan Opera Association Retirement Plan and an equitable allocation of funds to the cost of the Plan.

    (b)  Performance overtime shall be paid to Stage Directors and Stage Managers who work during a Pension Fund Concert, for time worked in excess of two and one-half (2-1/2) hours.  Such overtime shall be paid at a rate of one and one-half (1-1/2) times the applicable hourly performance rate, paid in half-hour segments.

E.  At least one member of the Committee of the Retirement Plan shall be an officer or other duly authorized representative of AGMA to be designated by AGMA.

F.  Any PRINCIPAL engaged on a per performance basis who renders services for ten (10) or more performances in any season, and who receives the per performance rate specified in SECTION TWO, Article SIXTEENTH (A)(2) or less, shall have the right to elect to be covered by the Retirement Plan in lieu of the severance provided for in SECTION TWO, Article SIXTEENTH, provided such PRINCIPAL gives notice to the Met in writing of election to be covered by the Retirement Plan in lieu of severance.  Such coverage shall commence on the date such written notice is received by the Met, but in no event prior to July 1, 1962.


**FOURTEENTH:  EXPANDED NEW YORK SEASON**

If a "dark" week (a week without performances or rehearsals) is scheduled between the first week and last week of the regular New York season, plan artists, staff stage directors, staff stage managers, assistant staff stage managers, and members of the regular Chorus and Corps de Ballet shall have that week off with pay.  However, if the presence of plan artists, stage directors, stage managers, and/or assistant stage managers is required for technical, new commission, or other rehearsals of a similar nature, they shall work but be afforded a different week off during the season.


**FIFTEENTH: MATERNITY LEAVE**

A plan artist, staff stage director, staff stage manager, assistant staff stage manager, or member of the regular Chorus or regular Corps de Ballet who gives birth shall be entitled to eight (8) weeks paid maternity leave in addition to any unused earned vacation that year.  Sick leave may be taken upon expiration of such maternity leave if disability is present, subject to the provisions on Sick Leave in SECTIONS TWO, THREE or FOUR, as respectively applicable, of this AGREEMENT.


**SIXTEENTH:  FORCE MAJEURE**

A.  This AGREEMENT and every contract entered into between the Met and any ARTIST shall be deemed to contain the following provisions:

"It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a `condition of force majeure'), the Met

may notify ARTIST thereof, in writing, and thereafter ARTIST (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to the ARTIST, either party may, during said period of continuance, terminate this CONTRACT.

The foregoing shall apply to any contract whether or not ARTIST's services there under have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event that the Company is out of town at the time."

B.  In the event that any scheduled performance or rehearsal during off-season is required to be canceled by reason of rain, such scheduled performance or rehearsal may by canceled without any payment or credit therefor provided proper notice of cancellation is given by appropriate means to ARTIST no later than two (2) hours prior to the scheduled commencement time of such performance or rehearsal. Announcement over a local radio station or, when out of town, its equivalent is to be deemed timely notice. In the event of cancellation, the performance or rehearsal canceled may be re-scheduled on any of the three (3) subsequent days, Sunday included.

## SEVENTEENTH:  SUPPLEMENTARY BENEFITS

A.  In addition to the guarantee of employment specified in SECTIONS TWO, THREE, and FOUR, each Plan Artist, steady extra Chorister, and regular Dancer (hereinafter collectively referred to as "ARTIST" or "ARTISTS") agrees to be available to the Met for an additional number of weeks of employment as also specified in SECTION TWO, Article THIRD (A) (2); SECTION THREE, Articles FOURTH (B) and SIXTH (B); and SECTION FOUR, Article FOURTH (B); respectively.

1.  During such additional weeks such ARTIST shall perform for the Met if requested, whether on tour or otherwise, provided ARTIST receives reasonable notice (60 days) of such employment and provided that such employment is for a minimum of one (1) week.  In no event shall an ARTIST be entitled to a supplementary benefit if the Met is able to provide additional employment.

B.  If the Met shall not require the services of such ARTIST during all or a portion of such additional weeks, ARTIST shall not be deemed to be employed by the Met and shall have the right to obtain other employment; however, in such event, the Met shall pay each eligible ARTIST a supplementary benefit in an amount equal to fifty (50%) percent of such ARTIST's then-current weekly salary (i.e., the applicable basic weekly compensation plus overscale, if any, in effect during the period for which such benefit is claimed) subject to the provisions of Paragraphs C (1), (2), (3), and (4) below.

C.  The purpose of this supplementary benefit program is to assist an ARTIST who has actually lost employment due to the Met's shortened season and it is expected that ARTISTS who have in the past regularly requested releases for outside employment shall continue such outside employment.  The Met shall use its best efforts to obtain employment for ARTISTS during such additional weeks including additional pre-season rehearsal employment.  An ARTIST shall be eligible for such supplementary benefit only upon the following conditions:

1.  Subject to the provisions of subparagraph 2, the Met shall be credited with all outside earnings, if any, received by ARTIST during any period for which a supplementary benefit is claimed.  In computing the benefit, all such earnings shall be deducted from the amount of such ARTIST's then-current weekly salary and the Met shall then pay fifty (50%) percent of the balance, i.e., if an ARTIST's weekly salary is $1500 and ARTIST's outside earnings during the period for which such benefit is claimed are $1300, then the supplementary benefit shall be fifty (50%) percent of $200, or $100. In no event shall any ARTIST be entitled to a benefit if said ARTIST's cumulative outside earnings during the week or weeks for which benefits are claimed are equal to or greater than the amount of ARTIST's total weekly salary during such week or weeks.

2.  ARTIST shall report all outside earnings in the manner specified in subparagraph 4, but shall not be required to report compensation received for private teaching.  In addition, the Met shall not be entitled to a credit for outside earnings received by such ARTIST during the week or weeks for which a benefit is claimed provided ARTIST can prove to the reasonable satisfaction of the Met that (i) ARTIST had regularly obtained such outside employment during comparable weeks in previous years

and (ii) such outside employment does not consist of new employment which ARTIST had not taken, on a regular basis, in prior years.  In the event of any dispute, ARTIST shall furnish to the Met such records as may be reasonably necessary to show a pattern of such prior employment and if ARTIST shall establish such pattern, then the Met shall be required to demonstrate that it is entitled to a credit for such outside employment.

3.  An ARTIST who is not available for employment by the Met during such additional weeks shall not be entitled to a supplementary benefit during any week such ARTIST is not available.

4.  Any ARTIST who claims entitlement to a supplementary benefit shall prepare and furnish the Met with a signed application on a form to be furnished by the Met.  Such form shall include a representation and warranty by ARTIST that during any week or weeks for which such benefit is claimed ARTIST was unemployed or, if employed, the name of the employer or employers and total compensation received from outside employment, including the outside employment referred to in subparagraph 2, above.  An ARTIST shall not be required to report compensation received for private teaching.  A willful misstatement by an ARTIST regarding eligibility for a benefit, including failure to disclose outside employment or the amount of total compensation received therefrom shall constitute grounds for immediate discharge, subject to the Grievance and Arbitration Procedures specified in Articles ELEVENTH and TWELFTH of this SECTION ONE.


**EIGHTEENTH:  PROVISIONS RELATED TO 7:30 P.M. CURTAIN**

On Monday through Friday during the New York Season, the Met may, in its sole discretion, schedule the standard curtain time of performances that season to be 7:30 p.m.. In such event, the Met may schedule all standard rehearsals that season to begin at 10:30 a.m., and all other applicable provisions in this Agreement shall be modified accordingly (i.e. adjusted by thirty [30] minutes), regardless of the curtain time of any performance on any particular night. If the Met schedules the standard curtain or performances in a future season to be 8:00 p.m. on Monday through Friday, then this provision shall not apply.


**NINETEENTH:  HEALTH & SAFETY**

A Safety negotiating sub-committee consisting of AGMA designated employees and representatives from Met management has been established and shall meet to reach an agreement on safety issues and concerns.


**TWENTIETH:  TERM OF AGREEMENT**

A.  The term of this AGREEMENT shall commence August 1, 2014, and shall terminate at midnight, July 31, 2018, provided that all contracts with ARTISTS which expire after July 31, 2018, shall, for the balance of the term thereof, be deemed subject to such new agreement as may be entered into by AGMA and the Met for the next and succeeding years.

B.  If the Met and AGMA shall fail to enter into contractual relations on or before July 31, 2018, then all contracts made by the Met with ARTISTS, whether made before or after such date, may, not less than thirty (30) days after such date, be terminated by the Met, ARTIST, or AGMA; provided that at the time of the giving of notice of such termination there is no collective bargaining agreement between AGMA and the Met.


**TWENTY-FIRST:  NOTICE**

A.  Any notice, consent, or approval to be given by either of the parties hereto to the other shall be in writing, and shall be deemed sufficiently given if the same is sent by mail in a postpaid wrapper addressed to the party for whom it is intended at its address hereinabove set forth.

B.  Any notice, consent, or approval to be furnished by the Met to any ARTIST under the provisions of this AGREEMENT, or under the provisions of any STANDARD FORM CONTRACT, shall, unless other provision is specifically made with respect thereto, be deemed sufficiently given, if given in one of the following ways:

1. If sent in writing in a postpaid wrapper or by telegram or cable addressed (a) to ARTIST at the last address furnished in writing by ARTIST to the Met, or (b) to ARTIST's agent, provided written notice is also sent to ARTIST.

2. If delivered in writing personally to ARTIST or in the case of a Chorister or Dancer, if personally delivered in writing to the AGMA delegate of the Chorus or Corps de Ballet respectively.

## TWENTY-SECOND:  MISCELLANEOUS

A. This AGREEMENT:

1. Shall be binding upon and shall insure to the benefit of AGMA and the Met and of any party who may succeed to the business of either of them by reason of merger, consolidation, reorganization, sale, assignment, transfer or the like;

2. Shall be interpreted in accordance with and governed by the procedural and substantive laws of the State of New York;

3. Shall not be modified except in a writing executed by the duly authorized representatives of both parties hereto.

B. The Met agrees that any subsidiary or wholly controlled affiliated company will negotiate in good faith with AGMA with a view to arriving at a Collective Bargaining Agreement with respect to the matters referred in Article FIRST (A) (1) of this SECTION ONE: provided that it is engaged in giving live performances of opera in the United States; and that AGMA has jurisdiction over the kind of opera so to be produced.

C. The Met will post security in form acceptable to AGMA in the amount of Fifteen Thousand ($15,000.00) dollars for the fulfillment of its obligations under this AGREEMENT.

D. AGMA agrees that it will submit to the Met its demands for the next proposed collective bargaining agreement not later than February 15, 2018.  The Met agrees that it will submit counter-proposals not later than March 1, 2018.  Both parties agree that negotiations with respect to such demands shall be conducted with a view to completion of said negotiations on or before June 30, 2018.

## TWENTY-THIRD:   WAGES

The equivalent of all wages (including but not limited to media salary (but not revenue sharing) and costume penalty) will be reduced 3.5% on August 31, 2014, and an additional 3.5% on March 1, 2015, subject to the provisions of article Twenty-Fourth, *infra*, and with the contractual source of the reduction to be determined by AGMA within 48 hours of the signing of this Agreement subject to the Met's agreement as to its feasibility, which will not unreasonably be denied. This Agreement will preserve the historic differential between the Orchestra and Chorus weekly base. All wages will be increased 3% (calculated in the same way as the reduction) effective February 1, 2018.

## TWENTY-FOURTH:     PENSION, HEALTH, WORK RULES

There will be no changes to the Pension, Health, and Work Rule provisions of the collective bargaining agreement subject to any mutually agreed-upon changes pursuant to the procedures provided herein. The parties agree to expeditiously establish joint task forces to review and analyze potential changes to these provisions and will determine within six months of the Effective Date of this Agreement whether they can reach agreement on potential changes, including but not limited to changes which, subject to the agreement of the parties, could be substituted for all or part of the reduction pursuant to SECTION ONE, Article TWENTY-THIRD would otherwise go into effect six months from the Effective Date. In the absence of mutual agreement to any changes there will be no changes to the Pension, Health, and Work Rule provisions of the collective bargaining agreement.

**TWENTY-FIFTH:    OTHER PROVISIONS (EQUALITY OF SACRIFICE)**

The Continuing Role of the Independent Financial Analyst, Equality of Sacrifice, Investment Return Bonus, and Performance Bonus provisions as stated in the Memorandum of Agreement between the Met and AGMA dated August 18, 2014 are attached hereto as Exhibit G.

**TWENTY-SIXTH:  INCORPORATION**

The terms and conditions set forth in SECTIONS TWO, THREE AND FOUR respecting PRINCIPALS, CHORISTERS and DANCERS are incorporated herein and made part of this AGREEMENT.  Execution of this AGREEMENT by both parties shall serve to validate the entirety of this AGREEMENT including this SECTION and all subsequent SECTIONS hereof, exhibits annexed thereto, and AGMA STANDARD FORMS OF EMPLOYMENT CONTRACT referred to in Article FIFTH (A) of this SECTION ONE.  To the extent any of the provisions contained in SECTIONS TWO, THREE, and/or FOUR may be construed to conflict with any provisions contained in this SECTION ONE, the provisions of SECTIONS TWO, THREE and/or FOUR shall control.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT as of the date first above set forth.

THE METROPOLITAN OPERA

Peter Gelb
General Manager

Date of Execution: November 23, 2020

AMERICAN GUILD OF MUSICAL ARTISTS, INC.

Leonard Egert
Executive Director

Date of Execution:  11.20.20

## SECTION TWO:  PRINCIPALS

### FIRST:  INCORPORATION OF SECTION ONE

    A.   The provisions of SECTION ONE of this AGREEMENT are incorporated herein.   To the extent any of the provisions herein may be interpreted to conflict with provisions in SECTION ONE, the provisions herein shall control.

    B.   The Met recognizes that the Metropolitan Opera is and shall remain a predominantly American organization.  All non-major roles shall be assigned to American artists unless for extraordinary artistic reasons the Met finds it necessary to assign such a role to a foreign artist.  The Met shall continue to have the right to engage foreign artists of proven distinguished merit and ability for major roles.  The term 'foreign artists' as used herein shall mean only a non-resident alien.  AGMA agrees that nationality shall not be a criterion for eligibility for membership in AGMA in the case of ARTISTS employed pursuant to the provisions of this Article FIRST.

### SECOND:  MISCELLANEOUS DEFINITIONS

Unless otherwise specifically provided in this SECTION TWO:

**Year**:  The term 'year' and shall mean the following periods:

> 2014-15  –  August 1, 2014 through July 31, 2015
> 2015-16  –  August 1, 2015 through July 31, 2016
> 2016-17  –  August 1, 2016 through July 31, 2017
> 2017-18  –  August 1, 2017 through July 31, 2018

**Week**:  The term 'week' shall mean seven (7) consecutive days beginning on Sunday and ending the following Saturday.

**Stage Rehearsal**:  The term 'stage rehearsal' shall mean a rehearsal held on the main stage only.

**Performance**:  A 'performance' shall be considered, for purposes of this AGREEMENT, as only one (1) 'performance' even though it may consist of two (2) or more works.

**Pre-Season**:  The term 'Pre-Season' shall mean rehearsal weeks immediately preceding the regular New York subscription season or any festival season or series of staged performances at the Metropolitan Opera House.

**New York Season**:  The term 'New York Season' shall mean:

    A.   the regular New York subscription season;

    B.   any festival season or series of staged performances at the Metropolitan Opera House

**Tour**:  The term 'Tour' shall mean:

    A.   <u>Regular Tour</u>:  All performance weeks outside New York City but restricted to Continental U.S.A. and Canada.

    B.   <u>Mid-Winter Tour</u>:  Special mid-winter performance weeks outside Continental U.S.A. and Canada (e.g., Caribbean area, Mexico, etc.).  Special conditions attendant to mid-winter and international tours, i.e., per diem, passports, shots, etc. will be discussed and agreed to with AGMA prior to any such tour.

    C.   <u>International Tour</u>:  Special performance weeks in South America and/or the Eastern

Hemisphere (e.g., Europe, Asia, etc.).

    D.  <u>Unit Tours</u>:  Any performance weeks outside New York City of any individual unit or combination of units of the Metropolitan Opera (i.e., Ballet, Chorus, Principals).

**Off Season**:  The term 'Off-Season' shall mean any weeks outside of the Regular Season in which performances are given in New York City and environs and preparation therefor (e.g., parks, Long Island, Metropolitan Opera House, etc.) other than a festival season or series of staged performances at the Metropolitan Opera House.  This shall not include, however, any summer or fall tour such as Garden State, Wolf Trap Farm, etc.

**Principal**:  The term 'Principal' shall mean the following ARTISTS:  Solo Singers, Stage and Assistant Stage Directors, Stage and Assistant Stage Managers.

**Plan Artist**:  The term 'Plan Artist' shall mean any Principal engaged on a weekly basis who is offered employment as a Plan Artist and who accepts such employment and makes himself/herself available to the Met for the required number of weeks specified in Article THIRD (A) and who earns the following weekly amount or less, excluding any above-scale compensation negotiated under the provisions of Article FIFTH (E): $3,175.45 per week, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

**Minimum Number of Solo Singer Plan Artists**:  The Met shall engage no less than ten (10) Solo Singers as 'Plan Artists' in each year of this AGREEMENT.

**Plan**:  The term 'Plan' shall mean those provisions of this AGREEMENT which are applicable only to a 'Plan Artist'.

**Weekly Artist**:  The term 'Weekly Artist' shall mean any Principal engaged on a weekly basis who is not a Plan Artist.  There shall be no limitation on the number of Principals to whom the Met may offer engagement as a Weekly Artist or on the length of such engagement.

## <u>THIRD:   GUARANTEED EMPLOYMENT FOR PLAN ARTISTS, VACATION, AND LEAVES OF ABSENCE</u>

    A.  **MINIMUM PERIODS OF GUARANTEED EMPLOYMENT**

        1.  The Met shall offer to all Principals whom it wishes to engage as Plan Artists the following number of weeks of guaranteed employment in a year, such weeks to include five (5) vacation weeks during which no services shall be required:  Solo Singers — forty (40) weeks; all other Principals — forty three (43) weeks.

        2.  Each Plan Artist agrees to be available to the Met for additional weeks of employment in each year, in accordance with Article SEVENTEENTH of SECTION ONE, as follows:

            (a)  Solo Singers:  an additional twelve (12) weeks during each year of this AGREEMENT.

            (b)  All other Principals:  an additional nine (9) weeks during each year of this AGREEMENT.

    B.  **VACATION**

        1.  Each Principal employed as a Plan Artist shall be entitled to five (5) weeks of vacation.

        2.  Except as provided in subparagraph 3, each Principal employed as a Weekly Artist shall be entitled to one (1) week of vacation for each ten (10) weeks of engagement by the Met, and forty (40) or more weeks of engagement shall entitle such Principal to a maximum of five (5) weeks of vacation.  Vacation Weeks [in units of no less than one (1) week] shall be scheduled by the Met, provided that at least two (2) weeks shall be consecutive.

        3.  Each Stage Director and Assistant Stage Director employed as a Weekly Artist for a minimum of ten (10) weeks and a maximum of thirty nine (39) weeks of engagement in a year

shall receive vacation payment in accordance with the formula specified in subparagraph 2 on a pro-rata basis in such year.  For example, an Assistant Stage Director employed as a Weekly Artist for 14 weeks shall receive 1.4 vacation weeks, and such Principal employed for 36 weeks shall receive 3.6 vacation weeks.  Forty (40) or more weeks of engagement shall entitle such Principal to a maximum of five (5) weeks of vacation.

C.  **LEAVES OF ABSENCE**

1.  Solo Singer Plan Artists who have five (5) or more years of seniority (determined in accordance with regulations of Metropolitan Opera Association Retirement Plan) shall be entitled to leaves of absence for a period of up to one (1) year provided:

    Any request must be made to the Met at least one (1) year in advance and no more than three (3) Plan Artists shall receive leaves of absence during a period of two (2) years and no more than one (1) male and one (1) female Plan Artist shall receive a leave of absence in any year during such period.  If more than the maximum permitted number of leaves of absence are requested, priority during such two (2) year period shall be determined (a) for one (1) leave of absence, by seniority, and (b) for the remaining two (2) leaves of absence, by lot.

2.  The Met shall consider a request for a leave of absence for a period of up to one (1) year from a member of Stage Management who has been a Plan Artist for a minimum of five (5) years. Any such request shall not be unreasonably denied; however, Union acknowledges (a) that the professional nature of the employment makes replacement of Stage Managers extremely difficult, (b) that the Met will take into account a number of considerations including but not limited to the length of the proposed leave, repertoire to be performed during the proposed period of leave, and the amount of time between the request and the proposed leave; and (c) that any agreement to such request shall be contingent upon assuring adequate coverage of departmental responsibilities.

**FOURTH:  RIGHT OF CERTAIN WEEKLY PRINCIPALS TO REFUSE INCREASES**

No Principal whose 2013-14 salary was $3,175.45 per week or less, excluding any above-scale compensation negotiated under the provisions of Article FIFTH (E), shall be required to accept an increase from the Met, it being understood that all such Principals, if offered an increase that would result in a weekly amount greater than the applicable maximum specified in Article SECOND (definition of "Plan Artist"), shall have the right to determine whether to accept such increase and be ineligible for the Plan, or whether to refuse same and remain eligible for the Plan.  The foregoing provisions shall apply to all weekly Principals subsequently engaged during the term hereof, provided any such Principal during the previous year of his/her engagement was eligible for the Plan.  The provisions of this Article FOURTH shall apply only to Principals engaged by the Met on a weekly basis and shall apply only to offers of engagement on a weekly basis.  The Met shall have the right to offer any Principal (whether or not heretofore engaged on a weekly basis) engagement on a per performance basis.

**FIFTH:  MINIMUM RATES OF COMPENSATION**

A.  **SOLO SINGERS \***

1.  The minimum rates of compensation for Solo Singers employed on a weekly basis shall be as follows:

    | Seniority | |
    |---|---|
    | 1 | $1,966.31 |
    | 2 | 2,106.76 |
    | 3 | 2,247.22 |
    | 4 | 2,387.60 |
    | 5 | 2,528.10 |

    Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*\* A Solo Singer's years of seniority shall be set forth in such Solo Singer's Standard Form Contract.*

B. **EMPLOYMENT ON A WEEKLY BASIS – STAFF STAGE DIRECTORS, STAGE DIRECTORS AND ASSISTANT STAGE DIRECTORS**

    1.   The minimum rates of compensation for Staff Stage Directors and Stage Directors employed on a weekly basis shall be as follows:

| | |
|---|---|
| Staff Stage Director | $2,783.59 |
| Weekly Stage Director | 2,662.49 |

            Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    2.   The minimum rates of compensation for Assistant Stage Directors employed on a weekly basis shall be as follows:

| Seniority | |
|---|---|
| 1 | $2,008.41 |
| 2 | 2,151.87 |
| 3 | 2,295.33 |
| 4 | 2,438.72 |
| 5 | 2,582.23 |

            Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    3.   Upon achieving the sixth (6th) year of seniority as a Plan Artist, an Assistant Stage Director shall be entitled 'Staff Stage Director', which title shall not in any way change the duties or working conditions of such Principal, except as specified in Paragraph B (4) below.

    4.   The minimum rates of compensation specified in this Paragraph B for Staff Stage Directors include a premium in lieu of penalty payments for invasion of Free Days, work on Sundays [except as provided in Article SEVENTH (Q) (1) (b) (ii)], and work before 10:00 a.m. and after 6:00 p.m.

C. **EMPLOYMENT ON A WEEKLY BASIS – STAGE MANAGERS AND ASSISTANT STAGE MANAGERS**

The minimum rates of compensation for Stage Managers and Assistant Stage Managers employed on a weekly basis shall be as follows:

| | |
|---|---|
| Stage Manager | $2,662.49 |
| Asst. Stage Manager | 2,183.24 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

D. **EMPLOYMENT ON A PER PERFORMANCE BASIS – ALL PRINCIPALS**

| Per Performance | |
|---|---|
| Principal | $1,685.28 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

E. **PLAN ARTISTS – ABOVE-SCALE COMPENSATION**

At the request of any Plan Artist, the Met shall engage in good faith negotiations with such Artist with regard to above-scale compensation when he/she believes that assigned responsibilities may be required to exceed traditional responsibilities.

F. **STAGE DIRECTORS**

1. A Principal who is employed as a Stage Director shall receive a minimum of not less than two (2) weeks' Minimum Base Salary as provided in Paragraph B of this Article FIFTH for each opera to which he/she is assigned as Stage Director.

2. A Principal who is employed as an Assistant Stage Director and who is assigned to a production as the Stage Director shall receive weekly compensation at the Stage Director rate specified in Paragraph B (1) above, in lieu of the weekly rate otherwise applicable for such artist's engagement as Assistant Stage Director, for each week in which such Assistant Stage Director performs rehearsal and/or performance work as the Stage Director of such production.

3. A non-staff Stage Director shall receive a preparation fee of $3,000.00 when directing an opera for his/her first time, except that the fee shall be $2,000.00 if the opera is one on which he/she previously assisted.

4. At the request of any Stage Director, the Met shall engage in good faith negotiations with such Stage Director with regard to above-scale compensation.

G. **REHEARSAL PAY**

1. A Solo Singer employed on a weekly basis at the following amount per week or less: $3,175.45, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

   shall receive his/her weekly rate during each of his/her rehearsal weeks.

2. A Solo Singer employed on a per performance basis at the following per performance amount or less: $3,175.45, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

   shall receive his/her salary for a single performance during each of his/her rehearsal weeks.

3. All other Solo Singers shall receive the applicable minimum weekly salary specified for such Solo Singer's seniority category, as set forth in Paragraph A, during each of his/her rehearsal weeks.

H. **MINIMUMS**

The rates specified herein are minimum compensation only and nothing contained herein shall prevent a Principal and the Met from agreeing to a higher rate.

I. **MEDIA**

1. Media Salary

   (a) Each year, the Met will guarantee to each Plan Artist Stage Manager, Plan Artist Assistant Stage Manager, and Plan Artist Solo Singer a "Media Salary" as follows, payable on a weekly basis, commencing with the week of the first transmission and/or capture of a performance provided for hereunder and ending with the final week of the New York Season: $8,323.20, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) Stage Managers and Assistant Stage Managers who are not Plan Artists, and solo Dancers engaged on a weekly basis who participate in a media service shall receive Media Salary payments as follows:

    (i) For a week in which a Metropolitan Opera International Radio Broadcast ("radio broadcast") is worked but no other performance involving media activity is worked: $386.16, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    (ii) For a week in which a radio broadcast is worked and one (1) to four (4) additional performances involving media activity are worked: $451.19, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    (iii) Per media performance for a week in which a radio broadcast is not worked, but one (1) or more additional performances involving media activity are worked: $65.03, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(c) Stage Directors and Assistant Stage Directors who worked on the direction of the production that is the media service, Solo Singers engaged on a weekly basis who are not Plan Artists, and Solo Singers engaged on a per performance basis who perform in a media service shall receive a Media Salary as follows:

For a radio broadcast: $618.60, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

For each additional media service: $65.03, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Stage Directors and Assistant Stage Directors who worked on the direction of a production that becomes an audiovisual release shall receive the applicable media salary regardless of whether they are under contract when the audiovisual production is released.

(d) Stage Directors and Assistant Stage Directors who worked on the direction of the production that is a media service, which is also an HD transmission, shall receive a Media Salary of $800.00, subject to provisions of SECTION ONE, Article TWENTY-THIRD, instead of the rate set forth in I.1.(c) above.

2. REVENUE SHARING GUARANTEE

(a) Plan Artist Stage Managers, Plan Artist Assistant Stage Managers, and Plan Artist Solo Singers shall be guaranteed $5,000 in revenue sharing per annum.

(b) Solo Singers engaged on a weekly basis who are not Plan Artists, Stage Managers and Assistant Stage Managers who are not Plan Artists, Stage Directors and Assistant Stage Directors who worked on the direction of the production that is the media service, and solo Dancers engaged on a weekly basis shall be guaranteed $39.06 in revenue sharing for each media service performed.

3. ADDITIONAL PAYMENTS

(a) In addition to Media Salary and revenue sharing payments, Plan Artist Stage Managers, Plan Artist Assistant Stage Managers, and Plan Artist Solo Singers shall receive the more favorable of the following rates in effect during either the capture or initial release of:

    (i) any compilation product (audio or audiovisual) embodying any materials other than (A) archival performances and (B) the performances described in Section ONE, Article TENTH (C),

      (ii)   performances other than those described in Section ONE, Article TENTH (C) released by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network, or by means of a physical CD released as part of normal catalogue product by a major record distribution company (with the understanding that any version of a production-- e.g., a highlights record, a 3-disc CD-- is considered part of the same performance) or a comparably permanent product, and

      (iii)  performances described in Section ONE, Article TENTH (C) released by means of exploitation beyond that permitted by that paragraph: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) Stage Managers and Assistant Stage Managers who are not Plan Artists, and Stage Directors and Assistant Stage Directors shall receive the payments specified in sub-paragraph (3) (a) above if they were a participant in a media performance that results in such payments and did not work a radio broadcast in the same week.

(c) Except with the consent of the Union, the Met may not acquire the rights described in this paragraph (3) by payment, after the term of this Agreement, of the applicable sums.

(d) The payments in this paragraph (3) are one-time payments per project, with the applicable sum due within 30 days following the first exploitation beyond the applicable restriction or limitation on the Met.

    4.   STAGE DIRECTORS ASSIGNED TO WORK WITH THE AUDIOVISUAL PRODUCTION TEAM

(a) A Stage Director who is assigned to work with the audiovisual production team shall receive a one-time payment of $1,750, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) A Stage Director who is assigned to work as an assistant with the audiovisual production team shall receive a one-time payment of $875, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    5.   A Stage Director (not an originating director) who is given credit on the outside cover of an HD DVD shall receive a one-time fee of $250, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

## J.  **PER DIEM**

Per Diem shall be paid as additional compensation and is not included in the compensation specified in Paragraphs A, B, C, or D but shall not be paid for performances within New York City limits.

1. If a Principal is required to be absent from New York City less than a full day, partial per diem as a percentage of the applicable food allowance specified in (2) (a) below, shall be paid in accordance with the hour of arrival in New York or departure from New York:

(a) arrival in New York after 9:00 A.M. or departure prior to 8:00 A.M. —  breakfast (15%) shall be paid;

(b) arrival in New York after 1:00 P.M. or departure prior to 12:00 noon —  lunch (35%) shall be paid;

(c) arrival in New York after 7:00 P.M. or departure prior to 6:00 P.M. – dinner (50%) shall be paid.

2. The minimum compensation of any Principal who is engaged for the Met's Tour shall be equal to the total of such Principal's weekly or per performance compensation (as the case

may be) for the immediately preceding Regular Season and a per diem allowance for each day during such period in which Principal is on tour with the Company, pursuant to Principal's engagement, which shall be composed of a food allowance and a hotel allowance as follows:

(a)  The food allowance shall be: $98.75, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b)  If the Met does not provide hotel rooms for Principals, the hotel allowance in each year of the AGREEMENT shall be determined by the following method and shall be added to the food allowance in order to arrive at the total per diem:

On March 1st of each year, an average (single room) hotel rate, including local hotel tax, if any, will be determined for each city on the Tour.  These applicable city averages shall be weighted by the number of days spent in the respective cities in order to arrive at the average hotel rate.

3.  The per diem for tours other than the regular continental Tour in the United States shall be negotiated prior to such tours.

K.  **LANGUAGE STUDY**

Each Plan Artist Stage Director and Assistant Stage Director (including Staff Stage Directors) shall each year receive an allowance of nine hundred ($900) dollars towards the study of languages, such sum to be paid at the beginning of the regular New York season.

L.  **PREPARATION ALLOWANCE**

Each Plan Artist Stage Manager and Assistant Stage Manager, and each Plan Artist Solo Singer, shall each year receive an allowance of nine hundred ($900) dollars towards preparation, such sum to be paid at the beginning of the regular New York season.

M.  **PRINCIPAL'S RIGHT TO CLAIM FULL PAYMENT**

The acceptance by Principal of cash, checks or other forms of payment, or the deposit or retaining of cash, checks, or other forms of payment, with or without notations on such checks that the same are in full payment or the like, shall in no way affect the right of Principal or of AGMA to insist upon full payment under this contract.

N.  **PAY OR PLAY CONTRACT**

Except as otherwise provided in this contract, the employment of Principal hereunder is not cancelable, and the compensation is "pay or play".  The obligation of the Met to pay Principal does not include any obligation on the part of the Met to afford Principal the opportunity of performance services for the number of appearances herein specified.  However, the compensation due Principal hereunder shall not be reduced by the failure of the Met to provide the number of appearances herein specified, except as provided in Articles SEVENTH (J) and (K) of SECTION TWO and Articles SIXTEENTH and TWENTIETH of SECTION ONE.


**SIXTH:  REHEARSAL WEEKS AND TOUR (NON-PLAN ARTISTS)**

A.  **TOUR**

1.  Guaranteed Number of Weeks

Any Tour option for a Solo Singer employed on a weekly basis shall be exercised for not less than three (3) weeks of consecutive employment except as follows:

(a)  Such weeks need not be consecutive if Principal shall agree thereto; and

(b)  Such Tour option may be exercised either for the first Tour week or for the first two Tour weeks if specified in the individual STANDARD PRINCIPAL'S CONTRACT.

2.  GUARANTEED MINIMUM FOR PER PERFORMANCE PRINCIPAL

A Solo Singer or Principal Dancer engaged on a per performance basis shall be guaranteed the equivalent of one (1) performance fee as per such Principal's individual contract for each week of availability during the Tour required by the Met.

B.  The provisions of this Article SIXTH shall not apply to any Plan Artist.


**SEVENTH:  PRINCIPAL'S SERVICES AND VARIOUS WORKING CONDITIONS**

A.  **MAXIMUM NUMBER OF PERFORMANCES PER WEEK**

The weekly base salary of a Solo Singer shall be paid for any of the following combinations of performances or first covers, but no Solo Singer shall be required to cover more than four (4) major roles in any week.

| Performance | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| First Cover | 5 | 4 | 3 | 1 |

For the purpose of this subparagraph 1 only, service as a first cover shall be counted as a performance in the following cases:

(a)  the Singer has performed in another performance on the same day; or

(b)  the Singer was designated as first cover, another Singer was substituted for the scheduled performer within 48 hours of the performance and the designated first cover does not actually perform because of such substitution.  This subparagraph (b) shall not be applicable where the designated first cover does not actually perform upon his/her request or because of his/her unavailability due to illness or assignment to another role.

2.  Stage Directors and Assistant Stage Directors ........................................................... 4

3.  All other Principals ........................................................................................................ 7

B.  **MAXIMUM NUMBER OF PERFORMANCES PER DAY**

1.  Stage Director, Assistant Stage Director, Stage Manager, and Assistant Stage Manager ................................................................. 2

2.  All other Principals ......................................................................................................... 1

C.  **TOUR**

1.  The regular Spring Tour shall not exceed eight (8) weeks.

2.  The Met shall have the right concerning the length of its regular Spring Tour to schedule, within a single week, a combination of (a) staged performances in a tour city, and (b) parks performances and/or outside events in the New York metropolitan area.  During such combination week, ARTISTS' services shall be in accordance with Article SEVENTH (A) above and ARTISTS shall be engaged on a weekly basis.

D.  **ADDITIONAL PERFORMANCES  –  PLAN ARTISTS AND WEEKLY ARTISTS**

1.  If a Solo Singer engaged on a weekly basis is required to perform or be first cover in a greater number of performances than required in Paragraphs A or B hereof, or to perform during a free period as provided in Article SEVENTH (Q), then such Solo Singer shall be paid

forty (40%) percent of his/her weekly salary for each such performance or first cover.

2. If a Principal engaged on a weekly basis, other than a Solo Singer, is required to take part in a greater number of performances than required in Paragraphs A or B hereof, then such Principal shall be paid one and one-half times his/her pro rata performance rate for each additional performance.

3. If a Principal engaged on a weekly basis, other than a Solo Singer or Staff Stage Director, is required to perform (or rehearse) during a free period as provided in Article SEVENTH (Q), then such Principal shall be paid one and one-half times his/her pro rata performance rate for each such performance (or rehearsal).

E. **AUDIENCE DEVELOPMENT PERFORMANCES**

1. The Met shall have the right to schedule up to four (4) "Audience Development" performances per week on Monday through Friday to be held between 11 a.m. and 3:30 p.m.

2. No more than one (1) Audience Development performance may be held on any one (1) day.

   (a)  For Principals (Stage Directors and Stage Managers, excluding Solo Singer Plan and Weekly Artists), Audience Development performances shall be included in performance counts. Audience Development rehearsals shall not be included in rehearsal counts for any purpose but shall be included for purposes of length-of-day calculations.

   (b)  For Solo Singer Plan and Weekly Artists, Audience Development performances and rehearsals shall be included in the performance and rehearsal counts.

F. **ADDITIONAL PERFORMANCES  –  STAGE MANAGERS AND ASSISTANT STAGE MANAGERS**

1. <u>Seventh Performance in a Week</u>

   If a Stage Manager or an Assistant Stage Manager is required to and actually does work a seventh (7th) performance in a week, then such Principal shall be paid an additional twenty (20%) percent of his/her weekly salary for such performance.

2. <u>Average Performances in a Week During New York Season</u>

   If a Stage Manager or an Assistant Stage Manager is required to and actually does work performances during the New York Season greater than an average of 4.5 per week, then such Stage Manager or Assistant Stage Manager shall be paid an additional twenty (20%) percent of his/her weekly salary for each performance worked above 4.5.  Seventh (7th) performances already paid under sub-paragraph (1) above shall be excluded in the calculation of the total number of performances worked.

3. <u>Work on a Saturday during the Pre-Season</u>

   If the aggregate number of days worked by a Stage Manager during a Pre-Season of eight (8) weeks exceeds forty (40) days (with evening rehearsals counted as a day), such Stage Manager shall be compensated for work on a Saturday during the Pre-Season at the rate of $500 per day. If the aggregate number of days worked by a Stage Manager during a Pre-Season of eight (8) weeks (with evening rehearsals counted as a day) does not exceed forty (40) days, he/she shall receive no additional compensation for work on a Saturday in the Pre-Season. This provision shall (1) apply on a pro-rata basis to a Stage Manager engaged for more than or less than eight (8) weeks in the Pre-Season, and (2) be adjusted to take into account a Pre-Season of fewer or greater than eight (8) weeks, on a five (5) day per week basis.

4. <u>Work between 7:30 and 8:30 A.M./8:00 and 9:00 A.M.</u>

If a Stage Manager works between 8:00 and 9:00 A.M. during the Pre-Season and the New York Season (or between 7:30 and 8:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.), he/she shall be compensated for work during that hour at a rate of one-fourth (1/4) of one-sixth (1/6) of his/her weekly compensation.

5. <u>Work between 11:30 P.M. and 7:30 A.M./12:00 and 8:00 A.M.</u>

(a) During the Pre-Season, in the event a Stage Manager works between 12:00 and 8:00 A.M., he/she shall be compensated at double (2x) his/her hourly rate for each hour worked.

(b) During the New York Season, in the event a Stage Manager or Assistant Stage Manager works between 12:00 and 8:00 A.M. (or between 11:30 P.M. and 7:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.), which work is unrelated to the performance, he/she shall receive double (2x) his/her hourly rate for each hour worked.

G. **EVENING REHEARSALS**

The Met shall have the right to substitute rehearsals in lieu of evening performances.   During the New York Season, for performance count purposes, an evening  rehearsal in lieu of a performance shall count as a performance for Stage Managers and Stage Directors.

H. **GUARANTEED MINIMUM FOR PER PERFORMANCE PRINCIPALS**

A Solo Singer engaged on a per performance basis shall be guaranteed the equivalent of one (1) performance fee at Minimum Base Salary as provided in Article FIFTH (D) of this SECTION TWO for each week of availability during any New York subscription season which week is not released by the Met on or before October 15 immediately preceding said season.

I. **LOCATION**

Performances under the sole auspices of the Met shall take place at the Metropolitan Opera House, New York, New York, or at such other places as may be designated by the Met.

J. **PREPARATION**

Principal shall be prepared to perform in the roles and languages for which such Principal has been contracted, and in such other roles and languages mutually agreed upon by the parties, provided that the Met shall be responsible for all staging preparation.  If Principal shall not be prepared as of the time of Principal's first scheduled staging rehearsal therein (the same to be determined if the issue of preparation is in dispute by the unanimous vote of all Principals and Metropolitan Opera members of the Grievance Committee participating in a meeting of the Grievance Committee considering the same) to perform any role in which Principal has been scheduled to appear or to cover, either in this contract or by written notice to Principal no less than six (6) weeks prior to Principal's first staging rehearsal, then:

1. The Met may elect to prepare Principal in said role or roles, in which event Principal shall pay the Met ten dollars ($10.00) for each coaching session of one hour or more as may be necessary to prepare Principal (such monies to be placed in Metropolitan Opera Employees Benevolent Fund); or

2. The Met may elect to withdraw Principal from the performance of such role or roles, and in such event:

(a) In the case of a per performance Principal, the Met may reduce the number of guaranteed performances by the number of performances of each such role which Principal was scheduled to perform.  In the event that such Principal shall not have been

scheduled to perform such role or roles, the number of guaranteed performances of such Principal may be reduced by one (1) performance for each such role or roles.

(b) In the case of a weekly Principal, the Met may reduce Principal's total compensation by an amount equal to one-fourth (1/4) of such Principal's weekly compensation multiplied by the number of performances of such role or roles which such Principal was scheduled to perform, according to the records of Artistic Administrator.

K.  **APPEARANCE AT REHEARSAL AND PERFORMANCE**

1.  Principal will appear regularly and punctually at all rehearsals and performances, and when required by the Met will appear at all rehearsals and performances in proper costume and make-up.

2.  FAILURE TO APPEAR AT SCHEDULED REHEARSAL:  If Principal shall willfully or negligently fail to appear for a full day for any scheduled rehearsal or after an off-period of one (1) week or more for which Principal is to be available pursuant to this contract, then:

(a) In the case of a weekly Principal (in addition to the right of the Met to deduct from Principal's weekly compensation the appropriate pro rata amount thereof for each such day of rehearsal in which Principal fails to appear), Principal shall be liable to the Met in an amount equal to ten (10%) percent of Principal's performance week salary.

(b) In the case of a per performance Principal, Principal shall be liable to the Met in an amount equal to twenty (20%) percent of Principal's per performance fee.

3.  FAILURE TO APPEAR AT SCHEDULED PERFORMANCE:  If Principal shall willfully or negligently fail to appear at any scheduled performance, Principal shall be liable to the Met in an amount equal to one-fourth (1/4) of Principal's weekly compensation (in the case of a weekly Principal) or in the amount equal to Principal's per performance fee (in the case of a per performance Principal).

4.  TERMINATION OF EMPLOYMENT BY REASON OF FAILURE TO APPEAR AND DAMAGES:  It is expressly understood that the services of Principal are unique and that the willful failure of such Principal to appear, except by reason of verified illness or disability or events beyond his/her control, will cause the Met irreparable damage.  Accordingly, it is agreed that time is of the essence of this AGREEMENT and in the event that any Principal shall willfully fail to appear on the date specified for the commencement of services, except as hereinbefore specified, or shall fail to appear for a full day for any scheduled rehearsal or for any scheduled performance, said Principal shall be deemed in breach of this AGREEMENT and the Met shall have the right to terminate the employment of such Principal.  Any Principal who shall fail to appear at any scheduled rehearsal or performance by reason of alleged illness or disability, and who shall perform for any third party, or on his/her own behalf, on the same day of said alleged illness or disability without the Met's consent given on the same day, shall be deemed in breach of his/her agreement and the Met shall have the right to terminate the employment of such Principal.  Any termination hereunder shall be subject to arbitration in accordance with the provisions of SECTION ONE, Article TWELFTH (E), and in the event of any claim of damage by the Met against Principal, the Arbitrator shall be entitled in measuring such damage to grant liquidated damages to the Met in an amount equal to the applicable amount provided in subparagraphs 2 or 3 of this Paragraph K.

5.  In all instances in which the Met furnishes transportation pursuant to Article SIXTH of SECTION ONE of this AGREEMENT, Principal shall use such transportation unless the Met shall give its written consent to an alternate mode of transportation.  If Principal shall use transportation different from that furnished or consented to by the Met, then any failure by Principal to appear in a rehearsal or performance as scheduled by reason of any failure or delay of such unauthorized transportation shall not be considered a case of force majeure, and Principal shall be deemed in breach of his/her contract.

L.   **COSTUMES AND WIGS**

The Met shall furnish all costumes, including gloves, feathers, jewelry, wigs, tights, boots and shoes, required for roles in which Principal shall appear.  It is understood that the Met shall not be required to furnish any wig unless the costume design includes a wig as part of the costume, and all costumes and wigs furnished by it shall remain its property.

M.   **MAKE-UP**

Each Principal shall provide at his/her expense all make-up required by the Met to be worn for performances and rehearsals, and shall wear make-up according to the standards and specific instructions of the Met.

N.   **HOUSE RULES**

Principals shall strictly comply with all reasonable rules and regulations of the Met as posted from time to time in the Opera House.

O.   **PHOTO CALLS**

Any Principal may be required to participate in a photo call at no additional compensation.  the Met, however, agrees that it will use its best efforts to assure that Principal is identified in the caption of any resulting photo which may be published.

P.   **REHEARSALS**

1.   REHEARSAL LIMITATIONS

(a)   There shall be no rehearsal for a Solo Singer on the day he/she performs a major role or is first cover of a major role except with the consent of the Solo Singer and notice to AGMA, which shall be prior to the rehearsal whenever possible.

(b)   A Solo Singer scheduled to perform a non-major role shall not be required to rehearse within three (3) hours of the call time for a performance.

(c)   There shall be no rehearsals after 6 P.M. (or after 5:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) except for stage rehearsals held in lieu of an evening performance or when the rehearsal is at an ARTIST's request.

(d)   No Solo Singer shall be required to rehearse in excess of seven (7) hours in a day.

(e)   The period of time between the commencement of a Solo Singer's first rehearsal, which commencement shall be defined as one-half (1/2) hour prior to the rehearsal start time on any day when the Singer is required to be in costume and/or make-up for such rehearsal, and the end of his/her last rehearsal in a day shall not exceed eight (8) hours.

2.   A Solo Singer shall receive an additional ten percent (10%) of his/her weekly salary for any day in which:

(a)   he/she is required to rehearse in excess of five (5) hours in the day; or

(b)   the period of time between the commencement of his/her first rehearsal, which commencement shall be defined as one-half (1/2) hour prior to the rehearsal start time on any day when the Singer is required to be in costume and/or make-up for such rehearsal, and the end of his/her last rehearsal exceeds six (6) hours.

3.   A Solo Singer who is required to rehearse after 3 P.M. (or after 2:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) on a day in which he/she is scheduled to perform a non-major role shall receive an

additional ten percent (10%) of his/her weekly salary.

4. Each Solo Singer shall receive a one-half (1/2) hour lunch break between 11:30 A.M. and 2:30 P.M. (or between 11:00 A.M. and 2:00 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) on any day of rehearsal. A Solo Singer not receiving such lunch break shall receive an additional ten percent (10%) of his/her weekly salary.

5. Notwithstanding any other provision herein, it is understood that in no event shall there be any pyramiding of payments, i.e., pay upon pay. In the event that compensation in excess of weekly compensation shall be payable hereunder, only the higher rate shall apply and no additional compensation shall be payable.

Q. **FREE PERIODS**

1. SUNDAY

(a) Sunday shall be a free day except in the following cases:

(i) a performance on New Year's Eve;

(ii) a performance replacing a canceled or postponed performance;

(iii) a pension fund or similar gala performance;

(iv) for Principals other than Solo Singers - a safety rehearsal on the main stage which is held for the protection of ARTISTS and which involves equipment or activity which may create a physical hazard for the ARTISTS; for Solo Singers - a rehearsal on the main stage or in the room;

(v) a performance during parks weeks or similar non-New York Season activity in which event one (1) other day shall be designated as a free day for that week. The Met will give AGMA prior notice of its intention to schedule a performance or rehearsal in accordance with the above on a Sunday and prior approval of AGMA will be required in the case of a pension fund or similar gala performance on Sunday.

(b) The provisions of subparagraph 1 (a) of this Paragraph Q notwithstanding:

(i) a Stage Manager or an Assistant Stage Manager who is required to participate in a rehearsal and/or performance(s) on Sunday shall receive an additional two-sixths (2/6ths) of his/her weekly salary.

(ii) a Staff Stage Director who is required to participate in a rehearsal on Sunday shall receive an additional two-sixths (2/6ths) of his/her weekly salary for such work if: he/she has participated during the year in three (3) Sunday rehearsals for which he/she received no additional compensation; or, the rehearsal is the third consecutive Sunday rehearsal in which he/she participates.

(iii) a Per-Performance Solo Singer whose weekly compensation is $2,500 or less who is required to participate in a rehearsal on Sunday shall receive for such Sunday rehearsal an additional ten percent (10%) of his/her weekly compensation.

2. ADDITIONAL FREE PERIOD

Each Solo Singer who is a Plan or Weekly Artist shall be entitled to one (1) day, other than Sunday, in every two (2) week period of the year, other than during Pre-Season, during which he/she shall not be assigned to perform and/or rehearse prior to 6:00 P.M. (or prior to 5:30 P.M. Monday through Friday during a season in which the standard curtain time is 7:30 P.M.). Such day shall be a Monday unless:

(a) Thanksgiving, Christmas, New Year's or Good Friday falls within the two-week period

and the Met elects to use such holiday as a substitute;

(b) a dress rehearsal for a Wednesday or Thursday premiere is scheduled for Monday;

(c) a full ensemble cannot be assembled for rehearsal on a day other than Monday.

(d) For 6:00 P.M. performances of HANSEL AND GRETEL scheduled for Christmas and/or New Year's Day, a 5:30 P.M. call shall not be subject to penalty payments incurred for invasion of a free day.

Notice of such day shall be given to the Solo Singer by no later than Friday of the week preceding the week in which such day is scheduled.  The above notwithstanding, a Solo Singer required to rehearse on such day or on Sunday shall be paid twenty percent (20%) of his/her weekly salary for the first five (5) hours of rehearsal and an additional ten percent (10%) of his/her weekly salary if he/she rehearses in excess of five (5) hours or if the period of time between the commencement of his/her first rehearsal, which commencement shall be defined as one-half (1/2) hour prior to the rehearsal start time on any day when the Singer is required to be in costume and/or make-up for such rehearsal, and the end of his/her last rehearsal on such day exceeds six (6) hours.

3. Religious Holidays

Any Principal who is prevented by the rules of his/her religion from participating in a rehearsal and/or performance on the first day of each of the Jewish High Holy Days and Good Friday shall be excused without loss of any portion of his/her weekly compensation.  It is further understood that any Principal wishing to be excused for professional as opposed to religious reasons to participate in another engagement during these Holy Days must apply for a release, and that if the release can be granted, any missed services will be deducted from the Principal's weekly compensation on a pro rata basis.


**EIGHTH:  PRINCIPAL'S PERFORMANCE FOR OTHERS THAN THE MET**

Anything in this contract to the contrary notwithstanding:

A. **RELEASES**

1. Principal, whether engaged on a weekly or per performance basis, may perform services for third parties, provided such services shall neither interfere with Principal's ability or availability to render the services required by this contract including, without limitation, performances, rehearsals, or coverage for other Principals.

2. Principal agrees during any period or periods referred to in this contract under the heading "Period of Engagement", not to perform any services for third parties or absent himself/herself from New York City unless Principal shall have made application to the Met and shall have received from the Met a written release therefor.  The Met agrees to grant any application for such release promptly, provided written application shall be made not less than seventy-two (72) hours prior to the date for which such release is requested, unless in its reasonable opinion said performance for third parties would conflict with Principal's obligations as set forth in subparagraph 1 of this Paragraph A or with the provisions of Paragraph B hereof, or unless Principal's travel outside of the City of New York might reasonably prevent his/her return thereto twenty-four (24) hours before Principal may be required to perform services hereunder. Non-"Marquee" artists (as determined by the Met) may apply to the Met for a release from the provisions of this Article EIGHTH (A) (2), which application shall not be unreasonably denied.

3. The provisions of this Paragraph A shall not be applicable to any per performance Principal who has not received the two (2) weeks' notice required by Article NINTH or to covers.  The Met shall grant to any Principal who has not received such two (2) weeks' notice the release referred to in subparagraph 2 of this Paragraph A provided Principal shall furnish the Met with the written application required by subparagraph 2 hereof.  Nothing contained herein shall be

deemed to affect any rights granted to the Met pursuant to Paragraphs B, C and D of this Article EIGHTH.

B. **CONSENTS**

Notwithstanding anything contained in Paragraph A of this Article or otherwise in this contract, Principal shall not sing or otherwise perform as described below, either for compensation or gratuitously, for the account of Principal or under the management of any corporation, association, or any other organization or individual, <u>without the written consent of the Met</u>. Please note that the provisions of this Paragraph B shall not be applicable to covers.

1. LIVE OPERA:

   Within any city and a radius of fifty (50) miles therefrom in which city the Met is scheduled to perform, during the entirety of the period commencing six (6) weeks prior to the Met's first performance in such city, and terminating two (2) weeks subsequent to the Met's last performance in such city, as follows:

   (a) In New York City:  In any live performance before an audience of staged opera (whether complete, abridged, or condensed); or

   In any live performance before an audience of a concert version of an opera (whether complete, abridged, or condensed), if the same be in the Met's then-current season's repertory.

   (b) In any city other than New York:  In any live performance before an audience of any staged opera or of any concert version of an opera (whether complete, abridged, or condensed).

2. RADIO BROADCASTS:

   In any radio broadcast, live or by transcription, if the latter be especially prepared for the original broadcast, of any opera (whether complete, abridged, or condensed) which shall be broadcast in any city (said term to include the primary service area of any transmitter broadcasting the same) concurrently with the broadcast in said city of opera produced by the Met.

3. TELEVISION:

   In any telecast (whether transmitted by wire or wireless) which shall take place within a period commencing six (6) weeks prior to the Met's New York Season, Tour and Off-Season and terminating two (2) weeks after the Met's New York Season, Tour and during any week outside of the New York Season when the Metropolitan Opera Company (as distinguished from a unit thereof) is performing:

   (a) Of any performance of opera (whether complete, abridged, or condensed) or of any excerpts therefrom during any televised program, if the total time of the operatic portion or portions of such program shall exceed fifteen (15) minutes during the entirety thereof; and,

   If more than two (2) Principals on the Met's roster shall perform in opera on said program; or

   If more than one (1) opera or excerpts from more than one (1) opera shall be performed on said program; or

   (b) Of any performance of opera (whether complete, abridged, or condensed), regardless of duration or of the other participants therein, if such performance is sufficient in dramatic and/or musical continuity to convey the basic story of the opera.  Operatic performances of thirty (30) minutes or less shall not be considered under the provisions of this subparagraph (b).

C. **CONDITIONS OF CONSENT OR RELEASE**

1. No release given pursuant to the provisions of Paragraph A hereof shall be deemed a consent
if such consent is required under the provisions of Paragraph B hereof.

2. The Met shall have the right:

   (a) In connection with the granting of any release to make inquiry of Principal or any third party for whom Principal proposes to render services solely for the purpose of ascertaining whether or not the services to be performed are subject to the provisions of Paragraph B of this Article EIGHTH.

   (b) To insert as a specific condition of any release or consent the applicable provisions of Paragraph B of this Article or specific understandings solely to assure the protection of the Met's rights under the provisions of Paragraph B of this Article; provided, however:

3. The Met shall not request or exact any payment or other consideration from Principal or from any third party as a condition of granting Principal any release pursuant to Paragraph A or consent pursuant to Paragraph B of this Article EIGHTH; however, the Met shall have the right to request and/or receive any payment or other consideration from such third party for any services the Met may perform or rights it may grant to such third party other than the mere furnishing of a release or consent to Principal and no such payment or consideration or any part thereof requested or received by the Met from any such third party for such services or rights shall be deemed a payment or other consideration for any such release or consent.

D. **EXCLUSIVITY**

1. During the period commencing with the date of execution of this AGREEMENT and ending on the termination of this AGREEMENT or on July 31 following the end of the year to which this AGREEMENT or any renewal thereof is applicable (whichever is later), Principal shall not enter into any contract which would prohibit Principal's appearance in televised opera (including any condensed or abridged version thereof or excerpts therefrom) (herein referred to as an exclusive contract) produced by or for the account of the Met unless Principal shall have notified the Met in writing of the terms thereof ten (10) days before the execution of any such contract by or on behalf of Principal.  Principal  agrees to negotiate with the Met any counter-proposals of the Met during said ten (10) day period.  In the event that Principal and the Met shall fail to reach any agreement, Principal shall be free to sign such an exclusive contract with a third party; provided, however, that the term of such exclusive contract together with any extended term pursuant to renewal options contained therein shall not extend beyond June 1 following the first December 1 occurring during the effective period of said exclusive contract.

2. Notwithstanding anything contained in subparagraph 1 hereof, Principal may renew such exclusive contract for an additional period ending on July 31 of the following year only if the renewal be for the same television program and only if Principal shall give the Met notice of Principal's intention to renew and shall negotiate thereon in the same manner as provided in subparagraph 1 of this Paragraph D.

3. Nothing contained in this Paragraph D shall be deemed to affect Principal's obligations or the Met's rights as set forth in Paragraphs A through C of this Article, and this Paragraph D shall not be applicable if the Met shall have previously notified Principal that it does not intend to offer him re-engagement for the following season or that negotiations for the following season are canceled.

**NINTH:  NOTICE TO PERFORMANCE PRINCIPALS**

Any Principal engaged on a performance basis shall be notified at least two (2) weeks prior to any performance scheduled for that Principal.  Such notification shall constitute an engagement for that

performance.  The failure to notify such Principal of a scheduled performance as aforesaid shall release Principal to accept any other engagement during the said two (2) week period next ensuing.

## TENTH:  PRINCIPAL'S INABILITY TO PERFORM BY REASON OF ILLNESS

A.  Except as may otherwise be provided in Article ELEVENTH of this SECTION TWO of this AGREEMENT:

   1.  If a performance Principal shall fail to appear in any performance for which his/her services are engaged and for which Principal has been specifically cast and notified thereof, owing to illness or other disability, or if Principal shall present himself/herself in a condition vocally or physically unfit for performance in the judgment of the Met, Principal shall not be compensated for such performance.

   2.  If weekly Principal, because of illness or other disability is unable to render his/her services to the Met, the Met may deduct a pro rata amount of his/her salary for each performance for which he/she is unable to render such services.  Such pro rata amount shall be based on the maximum number of performances per week which he/she may be required to perform under the provisions of Article SEVENTH (A) hereof.

B.  An illness or other disability shall be deemed to commence on the day when Principal fails to present himself/herself at any rehearsal or performance at which he/she is required to appear, and to end on the day when he/she informs the Met of his/her ability to resume his/her duties and is in fact able to resume them.

C.  In no event shall the illness or disability of any Principal covered by Article ELEVENTH of this SECTION TWO, for a period of less than four (4) weeks, be deemed sufficient cause for termination by the Met of said Principal's contract.

## ELEVENTH:  SICK LEAVE

A.  Every Plan Artist engaged by the Met shall be entitled to sick leave for illness or disability during any year as specified in the following table, provided, however, that no such ARTIST shall be entitled to sick leave for illness or disability during the first two (2) days of such illness or disability.  No such ARTIST shall be entitled to sick leave as a matter of right—i.e., sick leave can only be taken by a Plan Artist who is actually ill or disabled.  In connection therewith, the Met may require such ARTIST to furnish a doctor's certificate verifying alleged illness or disability.  In addition to such certificate, the Met may, from time to time, require such ARTIST to subject himself to examination by a doctor designated and paid by the Met to verify such illness or disability.  Sick leave shall be based upon number of years of service.  However, in no event shall any period of sick leave extend beyond fifty-two (52) consecutive weeks, and in no event shall any period of sick leave extend beyond the term of the Plan Artist's contract.

| Years of Service | Sick Leave |
| --- | --- |
| 0-1 | 2 weeks |
| 2 | 4 weeks |
| 3 | 8 weeks |
| 4 | 12 weeks |
| 5 | 20 weeks |
| 6 | 28 weeks |
| 8 | 36 weeks |
| 10 and over | 52 weeks |

A week of sick leave shall be the equivalent of six (6) non-consecutive working days.  If a Plan Artist has more than one call in any day and misses a portion of those calls, then one-half (1/2) day of sick leave shall be credited for the day and one-half (1/2) for the evening portion of the day.

B.  Any Principal (other than a Plan Artist) engaged on a weekly basis for a minimum of ten (10)

weeks during each year, shall be entitled to sick leave based upon the number of years of service specified in Paragraph A.  The applicable period of sick leave to which any such Principal is entitled shall be either (a) one-half (1/2) the period specified for a Plan Artist, or (b) such ARTIST's contract term, whichever is less.  Such Principal's compensation during any period of sick leave shall be the minimum rate of compensation applicable to such Principal as set forth in Article FIFTH (A), (B) or (C) for each week of disability.  Except as provided in this Paragraph B, all the other provisions of this Article ELEVENTH shall be applicable to such Principals.

## C.  TERMINATION OF EMPLOYMENT BY REASON OF ILLNESS

During his/her first season of employment, the Met shall have the right to terminate the employment of any Principal engaged on a weekly basis if by reason of illness or disability such Principal is unable to appear for more than one-half (1/2) of the scheduled professional services required during the first two (2) months of employment.


## TWELFTH:  HEALTH INSURANCE,  LIFE INSURANCE AND OTHER BENEFITS

### A.  PLAN ARTISTS

1.  Health and Life Insurance

All Plan Artists engaged for thirty-four (34) or more weeks shall receive Comprehensive Medical, Vision, and Dental Insurance and a Life Insurance policy at no expense to such ARTISTS.  Life Insurance shall be an amount equal to two (2) times such Plan Artist's annual salary for the prior year, as shown on his/her W-2 form for such year, or one hundred four (104) times such Plan Artist's regular weekly compensation of the prior year, whichever is greater, except that in no event shall the benefit exceed two hundred thousand dollars ($200,000).  In the event a Plan Artist is making contributions towards a deferred annuity, the amount of such contribution shall, nevertheless, be considered as compensation for the purpose of determining Life Insurance. Summary Plan Descriptions of each of the Plans shall be available upon request from the Met's Human Resources Department.  It is understood that the Met obligates itself to furnish coverage only and not monies in lieu of coverage.

2.  Transit and Parking Benefits

Plan Artists engaged for thirty-four (34) or more weeks shall be eligible to participate in the Met's  transit program.  Such employees shall also be eligible to participate in a program under which parking can be paid in pre-tax dollars as permitted by the Internal Revenue Service.  The terms and conditions of such programs must be in accordance with then-current Internal Revenue Service regulations.

### B.  ALL WEEKLY PRINCIPALS OTHER THAN PLAN ARTISTS

1.  All Principals (other than Plan Artists) engaged on a weekly basis for a minimum of ten (10) weeks during any year shall be entitled to the benefits of any medical insurance provided by the Met to Plan Artists, provided (a) that any such Principal shall pay one-half (1/2) the cost of any such insurance, and (b) such Principal shall sign and return the application form furnished by the Met within thirty (30) days after the application is furnished to Principal.  It is understood that no refunds will be made.

2.  All Solo Singers (other than Plan Artists) engaged during any year on a weekly basis for a minimum number of weeks equal to the length of the regular New York season in such year and whose weekly compensation for such year does not exceed the applicable amount specified in Article SECOND for a Plan Artist, shall receive the benefits of any medical insurance provided by the Met to Plan Artists, at no cost, for such year.

3.  STAGE DIRECTORS – 20+ WEEKS:

(a)  The Met shall provide health insurance coverage under the AGMA Health Fund A to a

Stage Director or Assistant Stage Director who is not a Plan Artist and who is engaged for a minimum of twenty (20) weeks in any year and elects to receive such coverage. Such coverage shall be on an annual basis, September 1 through August 31, for which the Met shall make contributions on behalf of each such Stage Director or Assistant Stage Director up to a maximum annual amount of $4,400.  In the event the annual premium for the AGMA Health Plan A becomes greater than $4,400, the Met will pay 50% of the amount over $4,400.

(b)  A Stage Director or Assistant Stage Director who qualifies for coverage as specified in sub-paragraph (a) shall have the option of participating in the AGMA Health Plan B in lieu of AGMA Health Plan A.  Such coverage shall be on an annual basis, September 1 through August 31, for which the Met shall make contributions on behalf of each such Stage Director or Assistant Stage Director up to a maximum annual amount of $4,400.

(c)  A Stage Director or Assistant Stage Director who qualifies for coverage as specified in subparagraph (a) shall have the option of participating in the Met's medical insurance plan as specified in Article TWELFTH (B) (1) in lieu of AGMA coverage under Health Plan A or B.

(d)  In the event the Met's contribution to the AGMA Health Fund A is insufficient to provide a full year's coverage thereunder, AGMA agrees to continue the individual Stage Director's or Assistant Stage Director's coverage for such year, subject to receiving the balance of the required contribution directly from such individual.

4.  <u>STAGE DIRECTORS – 25+ WEEKS</u>

(a)  The Met shall provide health insurance coverage under the AGMA Health Fund A to a Stage Director or Assistant Stage Director who is not a Plan Artist and who is engaged for a minimum of twenty-five (25) weeks in any year and elects to receive such coverage. Such coverage shall be on an annual basis, September 1 through August 31, for which the Met shall pay the full amount required for AGMA Health Plan A single or family coverage, as the case may be.

(b)  A Stage Director or Assistant Stage Director who qualifies for coverage as specified in sub-paragraph (a) shall have the option of participating in the AGMA Health Plan B in lieu of AGMA Health Plan A. Such coverage shall be on an annual basis, September 1 through August 31, for which the Met shall make contributions in the amount as set forth in subparagraph (a).

(c)  A Stage Director or Assistant Stage Director who qualifies for coverage as specified in subparagraph (a) shall have the option of participating in the Met's medical insurance plan as specified in Article TWELFTH (B) (1) in lieu of AGMA coverage under Health Plan A or B.

5.  <u>AGMA HEALTH PLAN B</u>:

The Met shall make an annual contribution to the AGMA Health Plan B in the amount equal to three percent (3%) of gross earnings, up to a maximum contribution of $2,000 per fiscal year, for each (1) Stage Director or Assistant Stage Director who is not a Plan Artist and who does not qualify for AGMA Health Plan A or B contributions under sub-paragraphs (3) (a) and (b) above, (2) Solo Singer engaged on a weekly basis who is not a Plan Artist, and (3) Per Performance Solo Singer whose performance rate of pay is less than $3,000.

The Met shall make an annual contribution, up to a maximum of $2,000, to the AGMA Health Plan B in the amount of one-and-one-half percent (1.5%) of gross earnings for each Per Performance Cover who does not perform and whose cover rate of pay is less than three thousand dollars ($3,000). Gross earnings for the purposes of calculating AGMA Health Plan B contributions shall include Media Salary.

In lieu of the above, effective August 1, 2014 and continuing until both parties agree to an alternate arrangement, the Met shall pay the above identified Artists, as taxable wages, an

amount equal to the Plan B percentage contribution that the Met otherwise would be making on their behalf in order to assist them with purchasing health insurance on the exchange or through another venue, or to offset medical expenses that were incurred. Such payments shall be made at the end of each New York Season and will include a summary statement of earnings against the percentage contribution. The Met will likewise provide to AGMA a summary statement of all eligible Artists, their gross earnings for the New York Season and the amount of the contribution tendered to the Artist.

6.   A Stage Director who participates in the Met's medical insurance plan shall have the option of participating in the Met's Flexible Spending Account program, subject to the provisions of that program.


## THIRTEENTH:  USE OF PRINCIPAL'S NAME AND BROADCAST, TELECAST, SIMULCAST RIGHTS

A.   **USE OF PRINCIPAL'S NAME**

The Met shall have the right to use Principal's name or likeness in connection with Principal's performances for the Met and the broadcasts, telecasts, simulcasts of performances, or publicity relating thereto.  The Met shall have the further right to grant permission for similar use to any other person, firm or corporation, sponsoring or having any connection with such broadcasts, but in no event shall the name or likeness of Principal be used to sponsor any product or service, without the written consent of Principal.


B.   **PRIOR CONTRACT EXCLUSIONS**

The rights of the Met with respect to radio broadcasts under this Article THIRTEENTH are subject to any contracts made by Principal prior to the making of this contract and Principal simultaneously shall furnish the Met with copies of any provisions of any contracts which will in anyway restrict the Met's rights hereunder.


## FOURTEENTH:  USE OF METROPOLITAN OPERA'S NAME BY PRINCIPAL

A.   Principal shall not consent to or permit the use of the name "Metropolitan", "the Met", or any variant thereof in connection with the endorsement by Principal of any product or service. A provision in any contract entered into by Principal for such endorsement specifically negating the right to any such use of the Metropolitan Opera's name shall be deemed full compliance with the provisions of this Paragraph A.

B.   So long as Principal remains on the Metropolitan Opera roster, Principal shall not use, consent to, or within Principal's reasonable control permit the use of the name "Metropolitan", "the Met", or any variant thereof, except as descriptive of Principal's individual status as a Metropolitan Opera Principal in billings, advertising, announcements, three-sheets, press releases, and similar material issued by or on behalf of Principal solely in connection with Principal's recitals, concert performances, or operatic performances; it being understood that nothing herein contained shall derogate from the provision of Article EIGHTH of this contract.

C.   Principal agrees that if at any time Principal shall cease to be on the Metropolitan Opera roster, Principal will not use the Metropolitan Opera name except as provided in Paragraph B of this Article; provided further, however, that Principal's use thereof shall not be of such a character (whether by affirmative statement or by omission) as to indicate to the public or to purchasers of talent that Principal is currently associated with the Met.  To have fulfilled the requirements of this paragraph, in all literature furnished by or on behalf of Principal in which the Metropolitan Opera name shall appear in any way, language such as "formerly of" or "formerly associated with" or "former artist of" shall be used.


## FIFTEENTH:  REENGAGEMENT

A. Each Weekly Artist (except Principal Dancers) with whom the Met has not entered into negotiations for reengagement for the succeeding year prior to the last day of February shall be notified on or before that date whether or not the Met intends to offer such Principal reengagement provided, however, that:

    1. In no event shall such notification be deemed a binding commitment on either party.

    3. Any Weekly Artist whose first performance during the season shall take place later than February 15 shall be given the notification as to the succeeding year within fifteen (15) days after such first performance.

B. AGMA shall be furnished, within the time provided for in Paragraph A above, with the names of those Principals referred to in said Paragraph A.

C. Each Plan Artist with more than one year of service shall be notified no later than the end of the regular New York season if the Met does not intend to offer such Plan Artist reengagement. Such notice of non-reengagement, however, shall not become effective until the conclusion of the season immediately following such notice of non-reengagement, except in the case of a Solo Singer Plan Artist covered by subparagraph E 2 below. Such notice shall state the reason or reasons for non-reengagement.

D. Nothing contained herein shall limit the Met's right to give notice of non-reengagement to any Plan Artist who, as of the date of said notice has been in the employ of the Met for less than one regular season. Neither shall anything contained herein require the Met to offer reengagement to any Plan Artist who shall have been discharged for cause, by reason of the failure of such ARTIST to fulfill his/her obligations under ARTIST's STANDARD FORM CONTRACT or under this AGREEMENT or who shall have become mentally or physically incapacitated in such manner as to be incapable of properly performing his/her professional duties.

E. A Solo Singer Plan Artist with a minimum of five (5) years of consecutive service as of the date of notification of non-reengagement shall be entitled to the following:

    1. Such Plan Artist shall be entitled to a written warning specifying the nature of such ARTIST's problem(s) and such warning shall be given to such ARTIST at least sixty (60) days prior to notice of non-reengagement. Upon receipt of such warning, such Artist shall have the right to meet with those members of the Artistic Direction who are involved in such decision to discuss the ARTIST's problems, but final decision as to whether to issue a notice of non-reengagement shall remain solely within the discretion of the Met. However, if a Plan Artist's problems are solely vocal in nature and if such Plan Artist requests, he/she shall be entitled to an audition by members of the Artistic Direction selected by the Met and such audition shall be held within sixty (60) days from the date of notification of non-reengagement. No later than sixty (60) days after the audition, following due consideration, the Met shall notify such ARTIST and AGMA in writing of its decision, which decision shall be final and binding upon such Plan Artist and shall not be subject to arbitration, provided, however that in the event the Met fails to give timely notice of non-reengagement, ARTIST shall have the right to arbitrate solely the question of whether or not such notice was timely. Nothing contained in this subparagraph 1 shall in any way limit the Met's right to notify such ARTIST of non-reengagement.

    2. In the event that the Met determines not to rescind such notice of non-reengagement, it shall become effective upon the conclusion of the second season immediately following such notice of non-reengagement. During such second season, the Met shall have the right to reduce the employment of such ARTIST based upon a formula which takes into account (i) the number of weeks such ARTIST was under contract during the preceding season which shall be (ii) equated to the number of such ARTIST's consecutive years of service as follows:

| Years of consecutive Service | Percentage of number of weeks ARTIST under contract during preceding season |
|---|---|
| 5 years | 50% |
| 8 years | 60% |
| 12 or more years | 70% |

**SIXTEENTH:  SEVERANCE**

A.  The terms and provisions of this Article SIXTEENTH shall be applicable only to the following:

   1.  All Principals engaged on a per performance basis receiving more than the following amounts per performance: $3,175.45, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

     and

   2.  All Principals engaged on a per performance basis receiving the following per performance rate or less who elect in writing to the Met to be covered by this Article SIXTEENTH in lieu of the Metropolitan Opera Association Retirement Plan: $3,175.45, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

     and

   3.  All Principals engaged on a weekly basis not eligible for coverage under the Metropolitan Opera Association Retirement Plan.

It is understood that no Principal shall accrue benefits under the provisions of this Article SIXTEENTH and under the Metropolitan Opera Association Retirement Plan for the same period of said Principal's engagement.

B.  If the Met shall fail to offer any Principal referred to in Paragraph A, a contract or contracts for each Regular Season following that in which such Principal has qualified for severance (such season being hereinafter referred to as the "qualifying season"), which contract or contracts shall guarantee to such Principal an aggregate amount for such following season equal to at least one-half (1/2) the aggregate amount guaranteed in such Principal's contract for the qualifying season or any of the two preceding seasons, whichever is greater, then, in such event, such Principal may elect to retire and shall thereupon be entitled to the severance allowance set forth in Paragraph D.  It is understood that such election may not be exercised unless the Met shall have failed to offer the contract referred to in this paragraph prior to July 15 of the year in which Principal elects to retire.  Notice of such election must be given to the Met, in writing, on or before August 15 of such year.

C.  A Principal shall be deemed to have completed a qualifying season and to qualify for a severance allowance if Principal shall have furnished his/her services to the Met as a Principal for not less than thirteen (13) "service seasons" (as hereinafter defined) within not more than sixteen (16) consecutive performance seasons of the Met, the thirteenth such "service season" being the qualifying season.  A Principal shall be deemed to have furnished services for one (1) "service season" if he or she shall during any performance season render services for ten (10) or more weeks if engaged on a weekly basis, or for ten (10) or more performances if engaged on a single performance basis.  A Principal shall be deemed to have furnished services for one-half (1/2) of a "service season" if he or she shall during any performance season render services for less than ten (10) weeks if engaged on a weekly basis, or for less than ten (10) performances if engaged on a single performance basis.

D.  In the event that a Principal qualified for severance, as provided in Paragraph C, shall elect to retire in accordance with the provisions of Paragraph B, and in the event that the Met shall give a season commencing in the year of the effective date of retirement, the Met shall pay to such Principal a severance allowance in an amount equal to the sum of two hundred ($200) dollars, subject to the provisions of SECTION ONE, Article TWENTY-THIRD. multiplied by each "service

season" as computed in accordance with the provisions of Paragraph C up to twenty (20) such seasons, plus the sum of one hundred ($100) dollars, subject to the provisions of SECTION ONE, Article TWENTY-THIRD. multiplied by each such "service season" in excess of twenty (20) but in no event in excess of five thousand ($5,000) dollars, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

E.   Subject to the provisions of this Paragraph E, a Principal who has prior to the July 15 following any season in which he or she has rendered services to the Met (the effective date of retirement):

1.   qualified for severance under the provisions of Paragraph C hereof; and

3.   shall have furnished his/her services to the Met as a Principal for a minimum of twenty (20) "service seasons" as computed in accordance with the provisions of said Paragraph C; and

3.   has attained the age of forty-five (45) years

may file notice of retirement, as provided in Paragraph B hereof provided that such notice shall be given in the manner required in Article TWENTY-FIRST of SECTION ONE of the AGREEMENT and not less than two (2) weeks prior to such effective date of retirement.

F.   In the event of filing of the notice referred to in Paragraph E, and in the further event that the Met shall give a season commencing in the year of the effective date of retirement, then the Met shall be obligated to pay such retiring Principal a severance allowance computed in the same manner as referred to in Paragraph D, such allowance to be payable in the full amount or in equal installments within a twelve (12) month period at Principal's option.

G.   Notwithstanding anything contained in Paragraphs E and F, no more than three (3) Principals shall be permitted to retire as of the same effective date.  In the event that more than three such Principals shall apply for retirement as of the same effective date of retirement, then AGMA and the Met shall agree as to which three (3) applicants shall be so retired.

H.   Should a retired Principal die during the period of installment payments referred to in Paragraph F, then the balance of the payments due shall be paid in the same manner as provided in Paragraphs I and J.

I.   1.   If as of the time of a Principal's death, Principal shall have qualified for severance, as provided in Paragraph C hereof, and if such Principal shall leave surviving a wife, husband, minor children or other legal dependents for or to whom such Principal has been providing regular support and concerning whom such Principal has claimed dependency exemption in his/her last Federal income tax return, then, in such event, the Met shall pay the severance allowance as computed in accordance with the provisions of Paragraph D to or for the benefit of said wife, husband, minor children or other dependents, or any or all of them, said allowance to be paid in the full amount or in equal installments within a twelve (12) month period, as provided in Paragraph J.

2.   In the event that there shall be no recipients of the class referred to above, the Met shall make such payments to any person who had paid on behalf of such deceased Principal reasonable medical expenses in connection with any final illness and/or burial expenses and who shall submit satisfactory proof thereof to the Met.  The Met shall make such payments only to the extent of its obligation hereunder or to the extent of the amount of such expenses, whichever is less.

J.   Notwithstanding anything herein contained, in the event that any payments are to be made pursuant to the provisions of Paragraphs H and I (1), the Met shall be entitled to make such payments to the personal representatives, administrators, executors, trustees, widow, widower, minor children, or other legal dependents of such Principal, or to some or any or all of them, in such proportions as it shall in its sole discretion, after consultation with the representatives of AGMA, determine.

K.   The various severance allowances provided in Paragraphs C-D, E-H, and I, respectively, are

mutually exclusive.  No person shall be entitled to make claim for any severance allowance herein provided unless:

1.  such person is a Principal claiming such severance, or his/her executor, administrator or personal representative, or any person referred to in Paragraph I (2), hereof, and

2.  such claim has been submitted to AGMA in writing at least ninety (90) days before presenting it to the Met, and shall have set forth the facts upon which said claim is based, and

3.  AGMA shall have made a determination concerning the validity of said claim prior to the presenting of any such claim to the Met, a copy of said determination shall be furnished together with said claim to the Met.  Failure or refusal by AGMA to pass upon such claim to the Met and any determination by AGMA shall not in itself be final or binding upon the Met or claimant if in fact in derogation of any of the provisions of this Article,

4.  AGMA undertakes to use its best efforts to make a determination concerning the validity of claims presented hereunder with a view to obtaining the orderly presentation of claims and to avoid a presentation of claims based upon a misconception either of fact or of contractual obligation on the part of claimant.

L.  It is understood that when a severance allowance has actually become payable and such allowance is payable in installments, the continued payment of such installments shall remain a permanent obligation of the Met.

M.  Notwithstanding anything herein contained:

No Principal may elect to retire and receive severance under the foregoing provisions of this Article if at the time of any attempted exercise of such election, he/she shall have been in substantial breach of such Principal's last contract with the Met.  If any dispute shall arise as to whether or not the conduct of any Principal constituted a substantial breach of contract for the purposes of barring the aforesaid attempted exercise of such election, it shall be subject to arbitration in accordance with the provisions of this AGREEMENT.

N.  In the event that any Principal entitled to severance shall elect to retire and shall in fact accept payment of such Principal's severance allowance, and if subsequently such Principal shall accept any engagement with the Met, this fact shall not entitle such Principal to any increase in the aforesaid severance allowance as theretofore computed.

O.  In the event that the Met is entitled to make payment of severance in installments, with the consent of Principal, such installments may be made quarterly or semi-annually.  Such arrangement shall be confirmed in writing, and no change shall be made therein except with the written consent of both parties.

## SEVENTEENTH:  MAXIMUM TERM OF PRINCIPAL'S CONTRACT

A.  The term of any Principal's contract, including options, shall not exceed three (3) years.

B.  The Met will set forth in Schedule A of each Solo Singer's STANDARD PRINCIPAL'S CONTRACT, which contains option(s) for subsequent season(s), the consideration of whatsoever nature given Principal in return for the option(s).

## EIGHTEENTH:  UNION MEMBERSHIP AND AUTHORIZATION FOR DEDUCTIONS

Each Principal's contract shall include the following language: "Principal hereby warrants that he/she is a member of AGMA in good standing, or will become a member in good standing prior to performing in any rehearsals or performances, and that he/she will remain in good standing with AGMA for the duration of this contract."

**NINETEENTH:  ARBITRATION**

Any dispute as to the interpretation, application, or alleged violation or breach of this AGREEMENT shall be determined in the manner set forth in Articles ELEVENTH and TWELFTH of SECTION ONE, except as expressly provided otherwise in the AGREEMENT.


**TWENTIETH:  COMMITTEES**

A.  The Met agrees to meet regularly during the New York season and otherwise as necessary with a small committee of Principals to discuss anticipated problems affecting the Principals, such as classification of roles as major and non-major, rehearsal schedule, etc.  Such committee of Principals shall also attend the weekly meeting of the Artistic Administration and the Maestri and will be invited to attend all stage plan meetings.

B.  Members of the negotiating and grievance committees who are requested to participate in meetings with the Met at a time when they would otherwise be participating in a rehearsal or performance shall suffer no loss in compensation as a result of participation in such meetings.


**TWENTY-FIRST:  MISCELLANEOUS**

A.  **NOTICE**

Any notice, consent, or approval to be furnished by the Met to any Principal under the provisions of this AGREEMENT, or under the provisions of the AGREEMENT between AGMA and the Met shall be deemed properly given, if sent in writing in a postpaid wrapper or by telegram or cable addressed (a) to Principal at the last address furnished in writing by Principal to the Met, or (b) to Principal's agent, provided written notice is also sent to Principal; or (c) if delivered in writing personally to Principal unless other provision is specifically made with respect thereto.

B.  **ADDITIONAL PROVISIONS**

Additional provisions not set forth in the printed portion of this contract may be set forth under Schedule A and any terms so set forth are hereby made a part of this contract, the foregoing being subject however to the provisions of Article FIFTH (A) and (B) of SECTION ONE of the AGREEMENT; terms may not be set forth therein which are less favorable to Principal than (1) the printed provisions of this contract; or (2) the provision of the AGREEMENT.

C.  Any question as to the validity, construction, or performance of this AGREEMENT shall be construed in accordance with and governed by the procedural and substantive laws of the State of New York.


**TWENTY-SECOND:  CAPTIONS**

Headings and captions inserted in this SECTION TWO are for convenience only and shall not be considered for any purpose as a part of this AGREEMENT.


**TWENTY-THIRD:   NOTIFICATION OF EMPLOYMENT FOR STAGE DIRECTORS**

The Met intends to explore the possibility of providing earlier notice, e.g. during the month of January, to Stage Directors and Assistant Stage Directors regarding employment in the following season.

**SECTION THREE:  CHORISTERS**

**FIRST:  INCORPORATION OF SECTION ONE**

The provisions of SECTION ONE of this AGREEMENT are incorporated herein. To the extent any of the provisions herein may be interpreted to conflict with provisions in SECTION ONE, the provisions herein shall control.

**SECOND:  MISCELLANEOUS DEFINITIONS**

Unless otherwise specifically provided in this SECTION THREE:

**Year**:  The term 'year' and shall mean the following periods:

> 2014-15  –  August 1, 2014 through July 31, 2015
> 2015-16  –  August 1, 2015 through July 31, 2016
> 2016-17  –  August 1, 2016 through July 31, 2017
> 2017-18  –  August 1, 2017 through July 31, 2018

**Week**:  The term 'week' shall mean seven (7) consecutive days beginning on Sunday and ending the following Saturday.

**Stage Rehearsal**:  The term 'stage rehearsal' shall mean a rehearsal held on the main stage only.

**Combined Staging Rehearsal**:  The term 'combined staging rehearsal' shall mean a rehearsal held on other than the main stage in which members of other Performing Groups participate.

**Studio Rehearsal**:  The term 'studio rehearsal' shall mean any musical rehearsal other than a sitzprobe or any rehearsal held on other than the main stage.

**Solo Rehearsal**:  The term 'solo rehearsal' shall mean any rehearsal for a non-chorus part and/or one (1) voice to a line, either on stage or in a studio.

**Solo Part**:  The term 'solo part' shall mean any solo part performed:  Solo Singer; Principal, Intermediate, or Minor Part; or one voice to a line.

**Sitzprobe**:  The term 'sitzprobe' shall mean a seated musical rehearsal in which the orchestra participates.

**Room Rehearsal**:  The term 'room rehearsal' shall mean a studio rehearsal, sitzprobe, or solo rehearsal.

**Performance**:  A 'performance' shall be considered, for purposes of this AGREEMENT, as only one (1) 'performance' even though it may consist of two (2) or more works.

**Pre-Season**:  The term 'Pre-Season' shall mean rehearsal weeks immediately preceding the New York Season or any festival season or series of staged performances at the Metropolitan Opera House.

**New York Season**:  The term 'New York Season' shall mean:

A.  the regular New York subscription season; and

B.  any festival season or series of staged performances at the Metropolitan Opera House.

**Tour**:  The term 'Tour' shall mean:

A.  <u>Regular Tour</u>:  All performance weeks outside New York City but restricted to Continental U.S.A. and Canada.

B.  <u>Mid-Winter Tour</u>:  Special mid-winter performance weeks outside Continental U.S.A. and Canada

(e.g., Caribbean area, Mexico, etc.).  Special conditions attendant to mid-winter and international tours, i.e., per diem, passports, shots, etc., will be discussed and agreed to with AGMA prior to any such tour.

C.  <u>International Tour</u>:  Special performance weeks in South America and/or the Eastern Hemisphere (e.g., Europe, Asia, etc.).

<u>Unit Tours</u>:  Any performance weeks outside New York City of any individual unit or combination of units of the Metropolitan Opera (i.e., Ballet, Chorus, Principals).

**Off Season**:  The term 'Off-Season' shall mean any weeks outside of the Regular Season in which performances are given in New York City and environs and preparation therefor (e.g., parks, Long Island, Metropolitan Opera House, etc.) other than a festival season or series of staged performances at the Metropolitan Opera House.  This shall not include, however, any summer or fall tour such as Garden State, Wolf Trap Farm, etc.

## THIRD:  RATES OF COMPENSATION  –  EMPLOYMENT ON A WEEKLY BASIS

### A-1.   WEEKLY COMPENSATION – CHORISTERS HIRED PRIOR TO AUGUST 1, 2011

All Choristers hired prior to August 1, 2011 and employed on a weekly basis shall receive as weekly compensation, based on seniority, the following:

| <u>Seniority*</u> | |
|---|---|
| <u>1</u> | <u>$1,585.50</u> |
| <u>2</u> | <u>$1,717.62</u> |
| <u>3</u> | <u>$1,849.75</u> |
| <u>4</u> | <u>$1,981.87</u> |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*\* Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of the Metropolitan Opera Association Retirement Plan.*

### A-2.   WEEKLY COMPENSATION – CHORISTERS HIRED ON OR AFTER AUGUST 1, 2011

All Choristers hired on or after August 1, 2011 shall receive as weekly compensation, based on seniority, the following:

| <u>Seniority*</u> | |
|---|---|
| <u>1, 2 & 3</u> | <u>$1,585.50</u> |
| <u>4</u> | <u>$1,981.87</u> |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*\* Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of the Metropolitan Opera Association Retirement Plan.*

### B.  PROFESSIONAL SERVICES COVERED BY WEEKLY COMPENSATION

The weekly compensation is based on the following professional services (excluding all 'overtime services', body make-up, rehearsal for solo parts, broadcasts, and telecasts for which additional compensation is paid) rendered by Choristers:

1.  PRE-SEASON

During Pre-Season, up to twenty-seven and one-half (27-1/2) hours of rehearsals, fittings, and photo calls per week, no more than eighteen (18) hours of which shall be studio rehearsals.

2.  U<small>NDER</small> N<small>EW</small> Y<small>ORK</small> S<small>EASON</small>

2.  N<small>EW</small> Y<small>ORK</small> S<small>EASON</small>

During the New York Season, up to four (4) performances per week.  Dressing and undressing before and after a performance shall be included in the services for which the weekly compensation is paid, subject to the provisions of Article THIRD (C) (5).

3.  T<small>OUR</small>

(a)  During the Tour, up to four (4) performances per week.  Dressing and undressing before and after a performance shall be included in the services for which the weekly compensation is paid, subject to the provisions of Article THIRD (C) (5).

(b)  The regular Spring Tour shall not exceed eight (8) weeks.

(c)  The Met shall have the right concerning the length of its regular Spring Tour to schedule, within a single week, a combination of (a) staged performances in a tour city, (b) parks performances in the New York metropolitan area and (c) outside events.  During such combination week, Choristers shall perform up to four (4) performances plus a rain date and shall be engaged on a weekly basis.

4.  O<small>FF</small>-S<small>EASON</small>

During the Off-Season, up to four (4) performances per week, each of no more than two and one-half (2-1/2) hours' duration.  In instances where, as in the past, the Met presents a series comprising four (4) performances of two (2) operas during a week, weekly compensation shall also cover one (1) rehearsal in the first week of up to 3-1/2 hours.

C.  **CONDITIONS APPLICABLE TO PERFORMANCES DURING NEW YORK SEASON AND TOUR**

1.  S<small>TANDARD</small> P<small>ERFORMANCE</small> W<small>EEK</small>

(a)  New York Season

The standard performance week during the New York Season shall be up to four (4) performances per week.

(b)  Tour

The standard performance week during the Tour shall be up to four (4) performances per week.

2.  P<small>ERFORMANCE</small> R<small>ATE OF</small> P<small>AY</small>

A Chorister's regular performance rate of pay (hereinafter referred to as 'performance rate') shall be one-sixth (1/6th) of his/her weekly compensation.  A Chorister's regular hourly rate of pay for performance time (hereinafter referred to as 'hourly performance rate') shall be one-fourth (1/4) of his/her performance rate.

3.  A<small>DDITIONAL</small> P<small>ERFORMANCES</small>

(a)  Any Chorister who performs in more than four (4) performances in a week shall, in addition to his/her weekly compensation, receive compensation as follows:

(i)  Any Chorister hired before August 1, 2011 who performs in a fifth (5th) performance in a week shall receive for such performance:

| <u>Seniority*</u> | |
|---|---|
| <u>1</u> | <u>$394.26</u> |
| <u>2</u> | <u>427.11</u> |
| <u>3</u> | <u>459.97</u> |
| <u>4</u> | <u> 492.83</u> |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

The above rates are calculated based upon the per performance rate multiplied by 1.492.

*\* Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of the Metropolitan Opera Association Retirement Plan.*

(ii)  Any Chorister hired on or after August 1, 2011 who performs in a fifth performance in a week shall receive for such performance:

| Seniority\* | |
|---|---|
| 1, 2 & 3 | $394.26 |
| 4 | 492.83 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*\* Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of the Metropolitan Opera Association Retirement Plan.*

(iii)  Any Chorister who performs in a sixth (6th) performance in a week shall receive one and one-half (1-1/2) times his/her performance rate for such performance, and any Chorister who performs in a seventh (7th) performance in a week shall receive double (2) times his/her performance rate for such performance.

(b)  The maximum number of consecutive weeks in which a Chorister may be required to work seven (7) performances shall be three (3), with the understanding that the Met may request from a Chorister a waiver of this limitation, such waiver not to be unreasonably withheld.

(c)  Fifth (5th) performances in a vocal category shall be distributed as equitably as possible among the Choristers in such category during the course of any year.

4.  PERFORMANCE ON SUNDAY OR A FREE PERIOD

Any Chorister who performs on a Sunday or during a free period as specified in Article SEVENTH hereof shall, in addition to his/her weekly compensation, receive double (2 times) his/her performance rate for each such performance.

5.  PERFORMANCE OVERTIME

(a)  Performance in Excess of Four Hours

Any Chorister who performs in excess of four (4) hours [inclusive of thirty (30) minutes for dressing, but exclusive of undressing] shall, in addition to his/her weekly compensation, be paid at the rate of one and one-half (1-1/2) times his/her hourly performance rate for such excess time.

(b)  Performance Extending Beyond 11:30 p.m. or Midnight

Any Chorister who performs beyond midnight (or beyond 11:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.), exclusive of dressing and undressing, shall, in addition to his/her weekly performance, be paid at the rate of double (2 times) his/her hourly performance rate for such excess time.

(c)  In Excess of Seven and One-Half Hours in Any Day

Any Chorister whose service [whether rehearsal or performance or a combination thereof, including thirty (30) minutes for dressing before a performance but excluding undressing after a performance] is in excess of a total of seven and one-half (7-1/2) hours of work

III - 4

between 10:30 A.M. and midnight in any day (or between 10:00 A.M. and 11:30 P.M. Monday through Friday during the New York Season during a season in which the standard curtain time is 7:30 P.M.) shall, in addition to his/her weekly compensation, be paid at the rate of one and one-half (1-1/2) times his/her hourly performance rate for such excess time.

For this purpose, the term 'hours of work' shall include the full period of any minimum call, whether worked or not.  However, only actual time worked shall be counted for any hour, or segment thereof, which is paid at a premium rate.

(d) On any day when the premium to which a Chorister who works two services and is entitled according to (c) above (for services in excess of the maximum number of hours per day) equals or exceeds the premium to which a Chorister who works only the evening performance is entitled, the Chorister who is entitled to premium pay according to (c) shall receive an additional one-half (1/2) times his/her-applicable regular hourly rate for that portion of his/her premium time that is the same as for the Chorister who works only the evening performance.  Article THIRD (J) shall not apply to the application of this subparagraph.

(e) Compensation for performance overtime shall be paid in segments of thirty (30) minutes for each thirty (30) minutes or less of work.

6. PERFORMANCE EXTRAS

(a) A Chorister shall, in addition to his/her weekly compensation, be paid a fee for the following performance services:

| | |
|---|---|
| Principal Solo* | $395.46 |
| Intermediate Part* | 263.62 |
| Minor Part* | 131.74 |
| Body Make-up | 77.30 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*As specified in the Appendix annexed to this SECTION THREE of the AGREEMENT.*

(b) A Chorister required to use body make-up (i.e., make-up required on any part of the body below the neck, above the elbow, or above the knee) shall be paid a fee of: $77.30, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(c) A Chorister who replaces a Solo Singer in a performance of a role not listed in the Appendix shall, in addition to his/her weekly compensation, be paid a fee of: $603.97, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(d) A Chorister who is designated as a first cover for a Solo Singer in a performance of a role not listed in the Appendix and who performs as a member of the Chorus and covers such role in the same performance shall, in addition to his/her weekly compensation, be paid a fee of: $120.81, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(e) Acting Roles, either created by the Stage Director or indicated in the score, shall be classified according to Principal Solo, Intermediate, or Minor Parts and shall be compensated in accordance with this Paragraph C (6) (a). (f) Choristers asked to super on tour shall be compensated at the same rate as the New York super or at the following rate, whichever is higher: $54.90, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

7. CREDIT FOR PERFORMANCES OR COVERS

(a) If a Chorister is required to participate in or attend a performance in any capacity, it shall be counted as one (1) performance in that week.

(b) A Chorister who is designated a first cover but is not required to attend the performance for which he/she is covering shall receive credit for one-half (1/2) a performance.

(c) A Chorister who is designated as a first cover for a Valkyrie or a Meister or a role in any opera in which the Chorister is not involved and who is required to attend the performance for which such Chorister is first cover shall, in addition to his/her weekly compensation and the appropriate performance credit receive the following:

  (i) if the Chorister has actually performed during the week in fewer than the applicable number of performances covered by the weekly compensation, as specified in Article THIRD (B): $82.35, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

  (ii) if the Chorister has actually performed during the week in the number of performances covered by the weekly compensation as specified in Article THIRD (B): $164.74, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

D. **CONDITIONS APPLICABLE TO REHEARSALS DURING THE PRE-SEASON, NEW YORK SEASON AND TOUR**

1. MINIMUM CALLS

(a) The minimum call for a rehearsal, fitting, photo call or any combination thereof, shall be two and one-half (2-1/2) hours, except that the minimum call shall be one (1) hour for a separate rehearsal call scheduled within one (1) hour prior to a Chorister's performance call, which separate call shall pertain to the immediately following performance.

(b) A fitting preceding or following a rehearsal and the rehearsal shall be treated as a single call. If a fitting outside the Metropolitan Opera House precedes or follows a rehearsal, time from or to the costumer, as the case may be, shall be counted as time worked.

(c) The minimum call for a photo call following an evening performance shall be two (2) hours.

2. REHEARSAL PERIOD

(a) Except as provided herein, a Chorister's rehearsal shall consist of the time intervening between his/her rehearsal call and the time of his/her dismissal from the rehearsal. For a room rehearsal, a Chorister shall receive the applicable compensation for all time between the Chorister's call for such rehearsal and the approximate stop time posted in the daily schedule for such rehearsal.

(b) If the period between dismissal from one rehearsal and the call for a subsequent rehearsal shall be less than one (1) hour, or if Chorister is required to remain in costume between such calls, then there shall be deemed to be only one (1) call therefor and the rehearsal period shall be deemed continuous from the beginning of the first rehearsal to the end of the subsequent rehearsal. If the interval between dismissal from one rehearsal and the call for a subsequent rehearsal shall be more than two (2) hours, the call for the subsequent rehearsal shall be deemed to begin at the end of said two (2) hour interval or, at the option of the Met, the rehearsal period shall be deemed continuous from the beginning of the first rehearsal to the end of the subsequent rehearsal. The interval between the end of the first rehearsal call and the beginning of the second rehearsal call which are deemed to be a single rehearsal call shall be paid at the hourly rehearsal rate unless such interval occurs at a time of the day for which a premium rate is payable or on a day requiring the payment of

III - 6

premium rates.

(c) If more than two (2) rehearsal calls are made in any one (1) day, the second rehearsal period shall consist of all time from Chorister's second rehearsal call to the time of his/her dismissal from the final rehearsal of the day except for a rehearsal call within one (1) hour before Chorister's performance call.

3.   REHEARSAL LIMITATIONS

(a) Starting time – Except as set forth in subparagraph (b) below

    (i)   No rehearsal (including dressing) shall commence prior to 10:30 A.M., except for a rehearsal for a Principal Solo, Intermediate or Minor Part which rehearsal shall not commence prior to 10:00 A.M.;

    (ii)   No sitzprobe shall commence prior to 11:00 A.M.;

    (iii)   No combined staging rehearsal limited to the Chorus and/or Ballet will commence prior to 11:00 A.M.;

    (iv)   No studio rehearsal, other than a rehearsal in which a Chorister sings a Principal Solo, Intermediate or Minor Part, will commence prior to 12:00 Noon, unless such studio rehearsal is preceded by a stage rehearsal, except that a studio rehearsal that involves staging may commence at 11:00 A.M.;

    (v)   No rehearsal shall commence prior to 12:00 noon on the day of or the day after a performance in which Chorister appears given in a city other than New York during the New York Season;

    (vi)   No rehearsal shall commence at or after 6:00 P.M. except a stage rehearsal in lieu of a performance as provided for in Article THIRD (D) (7).

(b) Starting time – 7:30 P.M. standard curtain

Notwithstanding subparagraph (a) above, Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M:

    (i)   No rehearsals (including dressing) shall commence prior to 10:00 A.M., except for a rehearsal for a Principal Solo, Intermediate or Minor Part which rehearsal shall not commence prior to 9:30 A.M.

    (ii)   No sitzprobe shall commence prior to 10:30 A.M.;

    (iii)   No combined staging rehearsal limited to the Chorus and/or Ballet will commence prior to 10:30 A.M.;

    (iv)   No studio rehearsal, other than a rehearsal in which a Chorister sings a Principal Solo, Intermediate or Minor Part, will commence prior to 11:30 A.M., unless such studio rehearsal is preceded by a stage rehearsal, except that a studio rehearsal that involves staging may commence at 10:30 A.M.;

    (v)   No rehearsal shall commence prior to 11:30 A.M. on the day of or the day after a performance in which Chorister appears given in a city other than New York during the New York Season;

    (vi)   No rehearsal shall commence at or after 5:30 P.M. except a stage rehearsal in lieu of a performance as provided for in Article THIRD (D) (7).

(c) There will be no studio rehearsal, combined staging rehearsal or sitzprobe after 6:00 P.M. (or after 5:30 P.M. Monday through Friday during the New York Season in a season in which

which the standard curtain time is 7:30 P.M.) or within two (2) hours prior to the scheduled commencement time of any performance in which Chorister is scheduled to appear except for essential run-throughs as provided in Article THIRD (D) (6).

(d) During the New York Season, no Chorister will be required to participate in studio rehearsals exceeding a total of twelve (12) hours in a week or on more than four (4) days in a week.

(e) There will be no rehearsal during the New York Season on Saturday or on any day in which a Chorister is scheduled to perform in a matinee except in the case of an emergency and then only if such rehearsal is for an opera being performed on that day or night.

(f) There will be no rehearsal on Labor Day, Thanksgiving Day, Christmas Day, New Year's Day or the Fourth of July.

(g) A Chorister participating in a dress rehearsal or performance shall not be required to rehearse for any other opera during the dress rehearsal or performance.

(h) No rehearsal will be held during the regular Spring Tour except in the case of an emergency relating to an opera being performed on the Tour.

(i) A room rehearsal may commence immediately after a stage rehearsal once the applicable break is granted. The room rehearsal shall be no longer than the originally scheduled length of time and shall be paid in accordance with the length of the scheduled rehearsal time.

4. REHEARSAL COMPENSATION

(a) Regular Rehearsal Rate

The regular hourly rate for all rehearsals, fittings, and photo calls (herein referred to as 'hourly rehearsal rate'), other than as specifically provided in (b) and (c) below, shall be as follows: $85.02, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation for rehearsals, fittings and photo calls shall be in segments of fifteen (15) minutes or less.

(b) Time and one-half

$127.53, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation at one and one-half (1-1/2) times the hourly rehearsal rate shall be paid for each segment of fifteen (15) minutes or less of the following:

(i) any rehearsal after 11:00 A.M. (or after 10:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) for a solo part;

(ii) any combined staging or stage rehearsal between 10:30 A.M. and 11:00 A.M. (or between 10:00 and 10:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.), provided that dressing during such period for a stage rehearsal shall be paid at the hourly rehearsal rate;

(iii) the first half-hour of any combined staging, sitzprobe or studio rehearsal within four and one-half (4-1/2) hours prior to the scheduled commencement time of any performance in which Chorister appears [except for essential run-throughs as provided in Article THIRD (D) (6), or on a day when the Chorister has not worked a minimum call of two and one-half (2-1/2) hours], unless such period is otherwise payable according to (c) (iii) below;

(iv)　the first half-hour of any stage rehearsal within four and one-half (4-1/2) hours prior to the scheduled commencement time of a performance if Chorister's sign-in time for that performance is by the scheduled curtain time or earlier [except for essential run-throughs as provided in Article THIRD (D) (6), or on a day when the Chorister has not worked a minimum call of two and one-half (2-1/2) hours], unless such period is otherwise payable according to (c) (iii) below;

(v)　any sitzprobe between 11:00 A.M. and 12:00 noon (or between 10:30 and 11:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.);

(vi)　any rehearsal hours in excess of twenty-seven and one-half (27-1/2) hours in a week during Pre-Season.

(vii)　any studio rehearsal hours in excess of eighteen (18) hours in a week during Pre-Season.

(viii)　any rehearsal during the regular Spring Tour.

(c)　<u>Double Time</u>

$170.04, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation at double (2 times) the hourly rehearsal rate shall be paid for each segment of fifteen (15) minutes or less of the following:

(i)　any studio rehearsal in excess of three (3) hours in a day;

(ii)　any stage rehearsal within three (3) hours prior to the scheduled commencement time of any performance in which Chorister appears [except for essential run-throughs as provided in Article THIRD (D) (6)];

(iii)　any combined staging, sitzprobe or studio rehearsal within four (4) hours prior to the scheduled commencement time of any performance in which Chorister appears [except for essential run-throughs as provided in Article THIRD (D) (6)];

(iv)　any stage rehearsal within four (4) hours prior to the scheduled commencement time of the performance if Chorister's sign-in time for that performance is by the scheduled curtain time or earlier [except for essential run-throughs as provided in Article THIRD (D) (6)];

(v)　any rehearsal on a Saturday during the New York Season;

(vi)　any rehearsal on a day in which Chorister is scheduled in a matinee;

(vii)　any rehearsal on a Sunday, as specified in Article SEVENTH (A);

(viii)　any rehearsal during a free period as specified in Article SEVENTH;

(ix)　any photo call following an evening performance;

(x)　any rehearsal for a solo part between 10:00 A.M. and 11:00 A.M. (or between 9:30 and 10:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.);

(xi)　any rehearsal after 6:00 P.M. during Pre-Season;

(xii)　any rehearsal after 4:00 P.M. Monday through Friday (or after 3:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain

time is 7:30 P.M.) when the Chorus does not participate in the evening performance

(xiii)   any evening stage rehearsal as provided in Article THIRD (D) (7).

(d)   A Chorister required to use body make-up during a rehearsal shall, in addition to his/her rehearsal compensation, be paid a fee of: $77.30, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(e)   Saturday Rehearsals in Pre-Season

If a Chorister is called to rehearse on a Saturday during Pre-Season, he/she shall be paid at a premium rate for such rehearsal.  The applicable hourly premium rate shall be one and one-half (1.5) times the Chorister's individual weekly base compensation divided by twenty-seven and one-half (27.5).  Time paid pursuant to this subparagraph shall not be counted towards the twenty-seven and one-half (27.5) hours in a week of Pre-Season (after which overtime is paid).

5.   REHEARSALS FOR PRINCIPAL SOLO, INTERMEDIATE OR MINOR PARTS

(a)   If a Chorister is called to rehearse a solo part in any capacity on a day when such Chorister is not scheduled to rehearse with the Chorus, he/she shall be paid at the applicable solo rehearsal rate for a minimum of two and one-half (2-1/2) hours.

(b)   If a Chorister is called to rehearse a solo part in any capacity on a day when such Chorister is scheduled to rehearse with the Chorus, then he/she shall be paid at one and one-half (1-1/2) times the applicable rehearsal rate for the time actually worked only, but in no event less than one (1) hour, and the balance, if any, of the minimum call shall be paid at the hourly rehearsal rate.

(c)   A first cover is to be designated for Chorus solo parts.

(d)   A minimum of one (1) hour's rehearsal time is to be given a Chorister assigned to perform or cover a solo part.

6.   ESSENTIAL RUN-THROUGHS

(a)   If any Chorister substitutes for another Chorister in any scene, he/she and up to four (4) other Choristers with whom he/she directly participates in any particular stage business may, without rehearsal compensation, be called in costume and make-up within the twenty (20) minute period prior to the performance or to any act or scene in which they are to appear in order to run through such stage business.

(b)   If the set-up of scenery in any city is different from the set-up on the New York stage, then any Chorister participating in that scene may, without rehearsal compensation, be required to be available on stage in costume and make-up ten (10) minutes prior to any act or scene in which the different scenery set-up is being used, both for artistic reasons and to assure safety of Choristers.

(c)   Notwithstanding anything to the contrary contained in this Article THIRD (D), Chorister may be required, during a performance in which he/she appears, to run through any routine in the main stage or dressing room area for safety or artistic reasons (i.e., a duel or a carry with a new artist) without payment of rehearsal compensation therefor.

7.   EVENING REHEARSALS

The Met shall have the right to schedule rehearsals in lieu of evening performances ("Evening Rehearsals").  Evening rehearsals shall be compensated at double (2 times) the hourly rehearsal rate specified in paragraph Article THIRD (D) (4) (c).

8. <u>REST PERIODS</u>

   (a) <u>Stage Rehearsals, Combined Staging Rehearsals and Sitzproben</u>

   Except as provided in (b) below, each Chorister will be allowed a twenty-five (25) minute rest period within the first two (2) hours of a two and one-half (2-1/2) hour call for a stage rehearsal, combined staging rehearsal or sitzprobe and a thirty (30) minute rest period within the first two (2) hours of a three (3) hour call.  There will be an additional ten (10) minute rest period approximately at the beginning of each subsequent hour or five (5) minutes at the beginning of each subsequent half-hour.

   (b) <u>New York Season Stage Rehearsals and Combined Staging Rehearsals</u>

   (i)   A three and one-half (3-1/2) hour Stage Rehearsal or Combined Staging Rehearsal during the New York Season may consist of two segments, one of a maximum of ninety (90) minutes and the other of a maximum of eighty (80) minutes with a rest period of forty (40) minutes between the two segments which may occur in either order.  When the first segment of such rehearsal extends longer than eighty (80) minutes, such segment shall be considered the ninety (90) minute segment and the second segment shall be a maximum of eighty (80) minutes in duration.  In the case of a Stage Rehearsal with Orchestra of longer than three and one-half (3-1/2) hours, upon advance notice to the Chorus prior to or during the rehearsal, following the first break of thirty (30) minutes which may take place no later than ninety (90) minutes after the start of the rehearsal (except as otherwise provided in subparagraph (b)(ii) below), the breaks may be scheduled to coincide with the breaks required by the Orchestra under the collective bargaining agreement between the Met and Local 802 of the A.F. of M. in effect at the time, provided that the total amount of rest period required in the rehearsal by this AGREEMENT, i.e., no less than five (5) minutes for each half-hour of rehearsal call, is not reduced and that no break is less than fifteen (15) minutes in duration.

   (ii)  In a stage rehearsal with Orchestra during the New York Season, other than as provided for in (b) (i) above, each Chorister will be allowed a thirty (30) minute rest period within the first two (2) hours of a three (3) hour call, except as specified herein. When the first act being rehearsed in a day is "long" [a minimum of sixty (60) minutes], each Chorister will be allowed a break of no less than fifteen (15) minutes within the first hour and one-half (1-1/2) of the rehearsal, scheduled to permit the first act to be completed before the "long break."  Such "long break" shall be no less than twenty-five (25) minutes in length, given upon completion of the first act, and shall begin approximately two (2) hours after the start of the rehearsal call.  Nothing in this provision shall reduce the required amount of rest period in the complete stagerehearsal, i.e., no less than five (5) minutes for each half-hour of rehearsal call.

   (c) <u>Studio Rehearsals</u>

   Each Chorister will be allowed a rest period of ten (10) minutes within each hour of a studio rehearsal and a rest period of five (5) minutes in the final rehearsal half-hour, if any.  Any two (2) rest periods may be combined so long as no studio rehearsal continues longer than fifty (50) minutes without a rest period.

   (d) <u>Transit</u>

   If, during a rehearsal, any Chorister shall be required to go from room or stage on one level to room or stage on another level, he/she shall be given a ten (10) minute interval for transit which shall not be charged to earned rest periods.

9. <u>REHEARSAL SCHEDULE AND NOTICE OF CHANGE</u>

   Rehearsal schedules, containing approximate stop times, shall be posted by Friday of each week for rehearsals in the succeeding week subject to change no later than 6:00 P.M. (or no later than 5:30 P.M. Monday through Friday during the New York Season in a season in which

the standard curtain time is 7:30 P.M.) on the day before the scheduled rehearsal. If such schedule shall be subsequently altered, then, if such alteration represents a postponement or cancellation of a rehearsal call, any Chorister who is not performing in the house at the time of notice of such alteration, or who is not notified by telephone, telegram or electronic mail prior to 10:00 P.M. (or prior to 9:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.)  on the day immediately preceding the changed rehearsal, and who appears for rehearsal in accordance with the original notice, shall be credited with the minimum rehearsal call, or with the interval between the call specified in the original notice and the time of the postponed call, whichever is shorter.  The Met shall continue to make every effort to give as early notice as possible to extra Choristers of the upcoming rehearsal schedule.

E. **CONDITIONS APPLICABLE TO PERFORMANCE AND REHEARSAL DURING OFF-SEASON**

1. ADDITIONAL PERFORMANCES

A Chorister who appears in a fifth (5) performance in a week shall, in addition to his/her weekly compensation, receive a sum equal to one-fifth (1/5) of his/her weekly compensation.  In no event shall there be more than five (5) performances in a week.

2. PERFORMANCE OVERTIME

A Chorister who performs in excess of two and one-half (2-1/2) hours shall, in addition to his/her weekly compensation, receive a sum equal to one-twenty-fifth (1/25) of his/her weekly compensation for each segment of thirty (30) minutes of such excess.

3. REHEARSAL RESTRICTION

During Parks weeks and other off-season events, rehearsals shall be held only on days that performances are scheduled. Rehearsals shall be limited to operas being performed during the then-current summer season (i.e., Parks, Garden State, Wolf Trap Farm, etc.).

4. ADDITIONAL REHEARSALS

During a series of Parks and/or off-season performances, one rehearsal in the first week of up to 3-1/2 hours shall be covered by weekly compensation. A Chorister who participates in any additional rehearsals during such series shall receive a sum equal to one eighth (1/8) of his/her weekly compensation for each such rehearsal in addition to his/her weekly compensation.

5. REHEARSAL OVERTIME

A Chorister who rehearses in excess of three and one-half (3-1/2) hours, during a Parks and/or off-season event rehearsal covered by weekly compensation, or two and one-half (2-1/2) hours during any other rehearsal shall, in addition to his/her weekly compensation, receive a sum equal to one-eightieth (1/80) of his/her weekly compensation for each segment of fifteen (15) minutes of such excess.

6. REST PERIODS

There shall be a rest period of twenty-five (25) minutes during each two and one-half (2-1/2) hour rehearsal and a further rest period of five (5) minutes for each additional one-half (1/2) hour of rehearsal.

7. CANCELLATION BECAUSE OF RAIN

The Met may cancel a scheduled performance in the event of rain, provided notice of cancellation is given to Choristers not later than two (2) hours prior to the scheduled commencement time of the performance.  Announcement over a local radio station or, when out of town, its equivalent is to be deemed timely notice.  If the aforesaid notice of cancellation is not given, the canceled performance shall be considered to have been played and if re-scheduled for another day shall be compensated for as an extra performance.

F.  **AUDIENCE DEVELOPMENT PERFORMANCES**

1.  The Met shall have the right to schedule up to four (4) "Audience Development" performances per week on Monday through Friday to be held between 11 a.m. and 3:30 p.m.

2.  No more than one (1) Audience Development performance may be held on any one (1) day.

3.  For an Audience Development performance of up to two (2) hours (exclusive of dressing and undressing), a participating Chorister shall be paid a fee of: $396.38, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

4.  Any Chorister who performs in excess of two (2) hours (exclusive of dressing and undressing) during an Audience Development performance shall be paid at the rate of 80% of the Chorister's regular hourly per-performance rate.  Compensation for such performance overtime shall be paid in segments of fifteen (15) minutes for each fifteen (15) minutes or less of work.

5.  Audience Development performances and rehearsals shall not be included in performance and rehearsal counts for any purpose except for the length-of-day provisions in Article THIRD (C) (5) (c).

G.  **MEDIA**

1.  MEDIA SALARY

    The Met will guarantee to each Regular Chorister a "Media Salary" each year in the following amounts: $8,323.20, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    These annual amounts will be payable on a weekly basis, but will not be included in any rate calculations, commencing with the week of the first transmission and/or capture of a performance provided for hereunder and ending with the final week of the New York Season. Such Media Salary may be included in annual compensation calculations for purposes of the Metropolitan Opera Association Retirement Plan, as set forth in Section ONE, Article THIRTEENTH (C).

2.  REVENUE SHARING GUARANTEE

    Regular Choristers shall be guaranteed $5,000 in revenue sharing per annum which will be applied against the revenue sharing calculations described in Section I, Article TENTH (B).

    Such guaranteed revenue sharing amounts may be included in annual compensation calculations for purposes of the Metropolitan Opera Association Retirement Plan, as set forth in Section ONE, Article THIRTEENTH (C).

3.  ADDITIONAL PAYMENTS

    (a)  In addition to Media Salary and revenue sharing payments, Regular Choristers shall receive the more favorable of the following rates in effect during either the capture or initial release of

    (i)   any compilation product (audio or audiovisual) embodying any materials other than (a) archival performances and (b) the performances described in Section ONE, Article TENTH (C),

    (ii)  performances other than those described in Section ONE, Article TENTH (C) released by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network, or by means of a physical CD released as part of normal catalogue product by a major record distribution company (with the understanding

that any version of a production— e.g., a highlights record, a 3-disc CD—is considered part of the same performance) or a comparably permanent product, and

(iii) performances described in Section ONE, Article TENTH (C) released by means of exploitation beyond that permitted by that paragraph: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) Except with the consent of the Union, the Met may not acquire the rights described in this paragraph (3) by payment, after the term of this Agreement, of the applicable sums.

(c) The payments in this paragraph (3) are one-time payments per project, with the applicable sum due within 30 days following the first exploitation beyond the applicable restriction or limitation on the Met.

4. SOLO FEES

A Chorister who performs a solo part for a Metropolitan Opera International Radio Network broadcast or audio-visual capture shall be paid as follows:

| | |
|---|---|
| Principal Solo | $404.29 |
| Intermediate Part | 228.99 |
| Minor Part | 170.49 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Such solo part fees shall be in addition to the Performance Extras fees set forth in this Section THREE, Article THIRD, Paragraph C (6) (a).

## H. PER DIEM

Per Diem shall be paid as additional compensation and is not included in the weekly compensation specified in Paragraph A, but shall not be paid for performances within New York City limits.

1. If a member of the Chorus is required to be absent from New York City less than a full day, partial per diem as a percentage of the applicable food allowance specified in (2) (a) below, shall be paid in accordance with the hour of arrival in New York or departure from New York:

(a) arrival in New York after 9:00 A.M. or departure prior to 8:00 A.M. — breakfast (15%) shall be paid;

(b) arrival in New York after 1:00 P.M. or departure prior to 12:00 noon — lunch (35%) shall be paid;

(c) arrival in New York after 7:00 P.M. or departure prior to 6:00 P.M. — dinner (50%) shall be paid.

2. If a Chorister is required to remain outside the New York City limits overnight following the last performance of the day, the per diem shall be comprised of a food allowance and a hotel allowance as follows:

(a) The food allowance shall be: $98.75, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) If the Met does not provide hotel rooms for Choristers, the hotel allowance in each year of the AGREEMENT shall be determined by the following method and shall be added to the food allowance in order to arrive at the total per diem:

On March 1st of each year, an average (single room) hotel rate, including local hotel tax, if any, shall be determined for each city on the Tour.  These applicable city averages shall be weighted by the number of days spent in the respective cities in order to arrive at the average hotel rate.

3. Per Diem for Mid-Winter or International Tour or festival outside New York City shall be negotiated with AGMA prior to each such engagement.

## I. VOCAL ALLOWANCE

Each regular and steady extra Chorister shall receive each year a $900 vocal allowance, such sum to be paid at the beginning of the New York Season.

## J. PYRAMIDING OF PAYMENTS

It is understood that in no event shall there be any pyramiding of payments, i.e., pay upon pay.  In the event that compensation in excess of weekly compensation shall be payable hereunder, only the higher rate shall apply and no additional compensation shall be payable.

## FOURTH:  GUARANTEED EMPLOYMENT

### A. EMPLOYMENT OF EIGHTY CHORISTERS

During the term of this AGREEMENT, the regular Chorus shall consist of a minimum of eighty (80) Choristers, incorporating the former two steady extra Chorister positions.  The foregoing notwithstanding, if any regular Chorister is released at his/her request for any period less than a full year, the Met shall not be required to replace such Chorister with a regular Chorister for the period of the release.  The Met is under no obligation to replace the two steady extra Choristers.  Nor shall incorporation of the two steady extra Choristers into the regular Chorus limit the Met's right to employ persons as steady extra Choristers in any way.

### B. MINIMUM PERIOD OF GUARANTEED EMPLOYMENT

The Met shall offer to all regular Choristers, and each Chorister shall accept, fifty-two (52) weeks of guaranteed employment in a year (such weeks to include a maximum of five (5) vacation weeks during which no services shall be required).  The Met shall designate vacation weeks no later than November 1st of each year during the term of this AGREEMENT.

### C. RELEASES

Any Chorister who wishes to be released from one or more weeks of his/her engagement period (e.g., Parks weeks) may request such a release in writing, as in the past.  The Met agrees to consider any application for such release promptly, taking into account artistic and other considerations, and the Met may, in its sole discretion, refuse to grant certain individual requests.

### D. PERSONS ENGAGED AFTER AUGUST 1

It is understood that, notwithstanding anything contained in Paragraph A of this Article FOURTH, the minimum guaranteed number of weeks shall not be applicable to Choristers engaged after the beginning of any year for employment during that year.

### E. VACATION

1. REGULAR CHORISTERS

A Chorister who is employed as a regular member of the Chorus and receives pay for no fewer than the minimum number of work weeks in any year shall receive five (5) weeks of vacation in such year. The minimum number of work weeks shall be six (6) weeks less than the total number of weeks of employment in any year.  All other regular Choristers shall receive vacation on a pro-rata basis.  Vacation weeks shall be selected by the Met and shall be consecutive except when additional weeks of employment require otherwise, in which case no less than three (3) weeks shall be consecutive.

2. STEADY EXTRA CHORISTERS

A steady extra Chorister whose actual employment includes the entire period of pre-season and regular New York Season in any year shall receive four (4) weeks of vacation in such year. All other steady extra Choristers shall receive one (1) week of vacation for each ten (10) weeks of actual employment by the Met. Notwithstanding anything contained herein, a steady extra Chorister whose actual employment is at least forty (40) weeks in any year shall receive five (5) weeks of vacation.

F. **COMPENSATORY TIME**

1. Except as specified in F. 2. below, each regular Chorister who is eligible for the full vacation benefit specified in E. 1. above shall receive two (2) weeks of compensatory time off ("CTO") in each year, in lieu of paid holidays and additional personal days off, such weeks to occur as designated by the Met. A Chorister shall receive his/her regular weekly salary for each such week. All other regular Choristers shall receive CTO on a pro-rata basis, according to their vacation eligibility.

2. In addition to the weeks of CTO specified in F. 1. above, the Met shall guarantee eight (8) additional weeks of CTO during the period August 1, 2014 through July 31, 2018. Any such additional weeks may be combined in one or more years, and all weeks of additional CTO shall be compensated at the Chorister's then-applicable regular weekly salary. Chorus agrees to perform work on audio recordings during any such weeks of additional CTO. Any such recording work shall be subject to the terms as negotiated and approved by AGMA.

G. **LEAVES OF ABSENCE**

Choristers who have five (5) or more years of seniority* (based upon full-time employment with the Met) shall be entitled to leaves of absence for a period of up to one (1) year provided:

1. No more than one (1) Chorister shall receive a leave of absence in any one year, and

2. No Chorister shall receive more than one leave of absence during the term of this AGREEMENT.

*Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of the Metropolitan Opera Association Retirement Plan.*

H. **CONSIDERATION OF REGULAR CHORISTER AS STEADY EXTRA CHORISTER**

The Met agrees that in the event of an opening in the Steady Extra Chorus, first consideration shall be given to regular Choristers in order of seniority in the vocal category concerned.

**FIFTH: CONDITIONS APPLICABLE TO EMPLOYMENT ON A PER PERFORMANCE BASIS**

A. **PERFORMANCES**

1. RATES PER PERFORMANCE

$331.74, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

The foregoing per performance compensation includes the following amount paid in lieu of any fringe benefits: $27.97, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

2. CONDITIONS APPLICABLE TO PERFORMANCES

The provisions of Article THIRD (C) (5), (C) (6), and (E) shall be applicable to performances by Choristers engaged on a per performance basis.

3. AUDIENCE DEVELOPMENT PERFORMANCES

(a) The provisions of Article THIRD (F) (1), (2), (4) and (5) shall be applicable to Audience Development performances by Choristers engaged on a per performance basis.

(b)   For an Audience Development performance of up to two (2) hours (exclusive of dressing and undressing), a participating Chorister engaged on a per performance basis shall be paid a fee of: $396.38, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*Rates are calculated by dividing the weekly base for the highest seniority level by four and then multiplying by 80%.*

## B.   REHEARSALS

The provisions of Article THIRD (D), (E) and (F) (5) shall be applicable to rehearsals of Chorister engaged on a per performance basis except as follows:

1.   Notwithstanding Article THIRD (D) (3) (a) (iv), a studio rehearsal may commence at 10:00 A.M. (or 9:30 A.M. Monday through Friday during the New York Season  in a season in which the standard curtain time is 7:30 P.M.) and will be paid at the applicable hourly rehearsal rate specified in Article THIRD (D) (4) (a), unless the Chorister has performed the previous evening, in which event compensation will be at one and one-half (1-1/2) times the hourly rehearsal rate specified in Article THIRD (D) (4) (a) for time between 10:00 A.M. and 12:00 noon (or 9:30 and 11:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.).

2.   Notwithstanding Article THIRD (D) (4) (b) (iii), a sitzprobe between 11:00 A.M. and 12:00 noon (or between 10:30 A.M. and 11:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) shall be compensated at the applicable hourly rehearsal rate specified in Article THIRD (D) (4) (a) unless the Chorister has performed the previous evening, in which event compensation will be at one and one-half (1-1/2) times the hourly rehearsal rate specified in Article THIRD (D) (4) (a).

3.   Notwithstanding Article THIRD (E) (4) and (5), rehearsals during the Off-Season shall be compensated at the applicable hourly rehearsal rate.

4.   Notwithstanding Article THIRD (D) (8), notice of rehearsals (including rehearsal changes) shall be posted no later than seventy-two (72) hours in advance.  Once such notice is given, the rehearsal call may not be canceled.  A Chorister shall be given individual notice of a rehearsal call in the event that such Chorister is not scheduled for a rehearsal or performance during the seventy-two (72) hour period immediately preceding such call.

5.   The Met shall make best efforts to provide Choristers engaged on a per performance basis a tentative weekly rehearsal schedule two (2) weeks in advance.

6.   Chorister shall receive payment for the entire rehearsal as called in the event Chorister is dismissed early.

## C.   MEDIA

1.   MEDIA SALARY

Extra Choristers who participate in a media service shall receive Media Salary payments as follows:

(a)   For a week in which a Metropolitan Opera International Radio Broadcast ("radio broadcast") is worked but no other performance involving media activity is worked: $386.16, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b)   For a week in which a radio broadcast is worked and one (1) to four (4) additional performances involving media activity are worked: $451.19, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(c) Per media performance for a week in which a radio broadcast is not worked, but one (1) or more additional performances involving media activity are worked: $65.03, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

2. REVENUE SHARING GUARANTEE

Extra Choristers shall be guaranteed $39.06 in revenue sharing for each media service performed.

3. ADDITIONAL PAYMENTS

(a) In addition to Media Salary and revenue sharing payments, Extra Choristers who are participants in a media event as described below, and did not work the Saturday radio broadcast in the same week, shall receive the more favorable of the following rates in effect during either the capture or initial release of:

(i) any compilation product (audio or audiovisual) embodying any materials other than (A) archival performances and (B) the performances described in Section ONE, Article TENTH C (2) (a) and (b),

(ii) performances other than those described in Section ONE, Article TENTH C (2) (b) released by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network, or by means of a physical CD released as part of normal catalogue product by a major record distribution company (with the understanding that any version of a production - e.g., a highlights record, a 3-disc CD - is considered part of the same performance) or a comparably permanent product,

(iii) performances described in Section ONE, Article TENTH C (2) (c) released by means of exploitation beyond that permitted by that paragraph: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) Except with the consent of the Union, the Met may not acquire the rights described in this paragraph (3) by payment, after the term of this Agreement, of the applicable sums.

(c) The payments in this paragraph (3) are one-time payments per project, with the applicable sum due within 30 days following the first exploitation beyond the applicable restriction or limitation on the Met.

4. SOLO FEES

A Chorister who performs a solo part for a Metropolitan Opera International Radio Network broadcast or audio-visual service shall be paid as follows:

| | |
|---|---|
| Principal Solo | $404.29 |
| Intermediate Part | 228.99 |
| Minor Part | 170.49 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Such solo part fees shall be in addition to the Performance Extras fees set forth in this Section THREE, Article THIRD, Paragraph C.(6).(a)

D. **PER DIEM**

As in Article THIRD (H).

E. **STUDENT PERFORMANCE**

In the event that the Met engages Choristers on a per performance basis for a production of an opera, and that a student performance of such production is given, then and in such case all Choristers engaged on a per performance basis for the production shall be guaranteed a performance call for such student performance.

F. **SICK LEAVE**

An extra Chorister who has been engaged for a minimum of one (1) prior year and who is actually ill or disabled shall be eligible for one (1) performance of paid sick leave for every ten (10) performances for which such Chorister is contracted in the year.

G. **MEDICAL**

The Met shall make an annual contribution to the AGMA Health Plan B for each extra Chorister in the amount equal to three percent (3%) of an extra Chorister's gross earnings, up to a maximum contribution of $2,000 per fiscal year.  Gross earnings for the purposes of calculating AGMA Health Plan B contributions shall include Media Salary.

In lieu of the above, effective August 1, 2014 and continuing until both parties agree to an alternate arrangement, the Met shall pay the above identified extra Chorister as taxable wages, an amount equal to the Plan B percentage contribution that the Met otherwise would be making on their behalf in order to assist them with purchasing health insurance on the exchange or through another venue, or to offset medical expenses that were incurred. Such payments shall be made at the end of each New York Season and will include a summary statement of earnings against the percentage contribution. The Met will likewise provide to AGMA a summary statement of all eligible extra Choristers, their gross earnings for the New York Season and the amount of the contribution tendered to the extra Chorister.

H. **REENGAGEMENT AS AN EXTRA CHORISTER**

1.  The Met agrees to continue its current practice regarding reengagement of an extra Chorister. The Met shall audition all extra Choristers on an annual basis and shall give first consideration for reengagement for the revival of an opera in which extra Choristers were used in the most recent run of performances to an extra Chorister who appeared in such performances.

    An extra Chorister who is not offered reengagement for the revival of an opera in which such Chorister appeared in the most recent run of performances is entitled to know, upon request, the reason(s) that an offer of reengagement was not made.  It is understood that the Met's reengagement of an extra Chorister in any year for one or more operas in which such Chorister performed in the past does not require the Met to reengage the Chorister for all operas produced in such year for which extra Choristers are engaged and for which the Chorister has been engaged in previous years.

2.  An extra Chorister who is engaged for any year and who has performed during four (4) of the preceding seven (7) years shall be entitled to request and receive a one-half (1/2) hour coaching session with the Chorus Master for the purpose of obtaining the Chorus Master's evaluation of such Chorister's singing prior to the auditions for the subsequent year's engagement.  Such evaluation shall not be limited, however, to the various aspects of the vocal performance and may include the Chorus Master's comments on all dimensions of job performance.  In consideration of the foregoing, the Chorus Master may require any such Chorister to attend one such coaching session in any year, which may be in addition to that requested by the Chorister.

I. **CONSIDERATION OF EXTRA CHORISTER AS REGULAR OR STEADY EXTRA CHORISTER**

1.  The Met agrees that in the event of an opening in the Regular Chorus, extra Choristers shall receive first consideration after steady extra Choristers.  In the event of an opening in the Steady Extra Chorus, extra Choristers shall receive first consideration after regular Choristers.

An extra Chorister who is not engaged to fill an opening as a Regular or steady extra Chorister is entitled to know, upon request, the reason(s) that an offer of engagement was not made.

2.  The Met agrees that (a) auditions for openings in the Regular Chorus shall be scheduled on more than one day, or (b) if such auditions are scheduled for a single day and an extra Chorister is unable to audition on such day because of illness, such extra Chorister shall be given an opportunity to audition at a later date (to be re-scheduled as soon as possible at the mutual convenience of the Chorus Master and the extra Chorister.)

## J.  ENGAGEMENT IN REGULAR CHORUS

In the event that an extra Chorister is engaged for the Regular Chorus and Steady Extra Chorus, he/she will be considered as having one (1) year of Seniority by virtue of his/her experience with the Company, provided that the Chorister has performed at least one-third (1/3) of the extra Chorus operas which have been presented within the preceding two (2) years.

## K.  PENSION

1.  The Met shall make an annual contribution to the AGMA Pension Fund in an amount equal to eight percent (8%) of the gross earnings (excluding media earnings) of each extra Chorister.

2.  The Met shall make an annual contribution to the AGMA Pension Fund in an amount equal to eleven percent (11%) of Media Salary of each extra Chorister.

## L.  VOCAL ALLOWANCE

In each year, an extra Chorister shall receive a vocal allowance of $50 for each opera for which such Chorister is engaged and in which such Chorister actually performs, up to a maximum of $200. Such allowance shall be payable at the conclusion of the regular New York Season to help defray the cost of private lessons, vocal coachings, etc.

## M.  TOURS

In any year in which an opera produced during the regular New York Season is taken on tour, the Met agrees that if extra Choristers are engaged to be taken from New York for such tour, such Choristers shall be engaged from among the extra Choristers who performed in such opera during the immediately preceding season. Nothing contained herein shall require the Met to take extra Choristers on tour in any production, or to use in a tour production of an opera the same number of extra Choristers as were used in such opera in the Metropolitan Opera House.

## N.  PROGRAM CREDIT

The Met agrees to include the names of extra Choristers in the Metropolitan Opera House performance program. The list of such Choristers shall be prepared once each season for inclusion beginning with the Opening Night program (according to the timetables normally established for closing this program), and shall include all extra Choristers whose contracts for such season have been executed by that time.

## SIXTH:  CONDITIONS APPLICABLE TO STEADY EXTRA CHORISTERS

## A.  DEFINITION

An extra Chorister engaged for one hundred twenty-five (125) or more performances in any year shall be considered a steady extra Chorister.

## B.  GUARANTEED EMPLOYMENT

A steady extra Chorister shall be offered engagement for the entire regular New York subscription season. The Met may offer engagement for such Pre-Season weeks as the Met may deem necessary.

C.   **SUPPLEMENTARY BENEFITS**

In accordance with Article SEVENTEENTH of SECTION ONE, each steady extra Chorister shall receive one (1) week of supplementary benefits in each year of this AGREEMENT, for the week of employment lost by reduction of the New York season.   However, this benefit shall not be applicable in the event that a steady extra Chorister is called in for an additional week of pre-season rehearsals.   The provisions of Article SEVENTEENTH of SECTION ONE shall apply to any claim by a steady extra Chorister for supplementary benefits.

D.   **COMPENSATION AND WORKING CONDITIONS**

All provisions of Article THIRD shall be applicable to a steady extra Chorister for all weeks for which he/she is engaged and steady extra Choristers shall receive the same sick leave as regular Choristers.

E.   **VACATION**

Steady extra Choristers shall be entitled to vacation with pay as provided in Article FOURTH (E) (2).

F.   **HEALTH, LIFE, AND DISABILITY INSURANCE**

Anything to the contrary contained in Article FOURTEENTH notwithstanding, the Met will furnish at its own expense Medical coverage under what is known as Met Medical Plan B with Prescription Drug Coverage as well as Vision, Dental, Life and Long-term Disability Insurance as provided in Article FOURTEENTH to any steady extra Chorister who is engaged for the entire New York Season.

G.   **CONSIDERATION OF STEADY EXTRA CHORISTER AS REGULAR CHORISTER**

The Met agrees that in the event of an opening in the regular Chorus, first consideration shall be given to steady extra Choristers in order of seniority in the vocal category concerned.


**SEVENTH:  FREE PERIODS**

A.   **SUNDAY**

1.   Sunday shall be a free day except for:

(a)   a performance on New Year's Eve;

(b)   a performance replacing a canceled or postponed performance;

(c)   a pension fund or similar gala performance;

(d)   a safety rehearsal on the main stage which is held for the protection of ARTISTS and which involves equipment or activity which may create a physical hazard for the ARTISTS;

(e)   a performance scheduled on a Sunday during Off-Season in which event one other day shall be designated as the free day for that week;

(f)   a concert performance as specified in subparagraph 2.

Any Chorister who performs on Sunday under (a), (b), (c) or (d) above shall, in addition to his/her weekly compensation, receive double (2 times) his/her performance rate for each such performance.   A performance on Sunday under (e) above shall be treated as if it is not a performance on Sunday or a free day.   The Met will give AGMA prior notice of its intention to schedule a performance or rehearsal in accordance with the above on a Sunday and prior approval of AGMA will be required in the event of a pension fund or similar gala performance on Sunday.

2. The Chorus may be required to perform up to three (3) Sunday concert performances per year, the Met to determine when these performances shall take place. Concert performances shall be no more than two and one-half (2-1/2) hours in duration. If Choristers are required to perform in a Sunday concert performance, such Choristers who perform shall be paid at double (2 times) their performance rate, and performance overtime shall be paid, to Choristers who perform only, for time in excess of two and one-half (2-1/2) hours. Choristers shall be compensated for any such overtime, in addition to their concert performance pay, for each segment of thirty (30) minutes or less of such excess time, at their hourly concert performance rate of pay, which rate shall be their concert performance rate divided by two and one-half (2-1/2). Choristers not required to perform or attend such concert performance shall, in addition to their weekly compensation, receive their regular performance rate for such performance. The Met shall have the right to schedule rehearsals for such concert performances as required, on Sunday or during the week, payment to be made at the appropriate rehearsal rate.

B. **PRE-SEASON**

During Pre-Season weeks in which there are no stage rehearsals, Saturday shall also be a free day except in those weeks containing the Jewish High Holy Days. In such weeks, the first day of each of the Jewish High Holy Days (other than when they fall on Saturday or Sunday) shall be a free day instead of Saturday.

C. **ADDITIONAL FREE PERIOD**

1. Each Chorister shall be entitled to one (1) day other than Sunday, in every two (2) week segment of the New York Season during which he/she shall not be assigned to perform and/or rehearse prior to 6:00 P.M. (or prior to 5:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) Such day shall be a Monday unless:

   (a) Thanksgiving, Christmas, New Year's or Good Friday falls within the two (2) week period and the Met elects to use such holiday as a substitute for Monday;

   (b) a dress rehearsal for a Wednesday or Thursday premiere is scheduled for Monday;

   (c) a full ensemble cannot be assembled for rehearsal on a day other than Monday.

   (d) No such Monday substitution shall be permitted for Labor Day.

   Notice of such day shall be given to the Chorister by no later than Friday of the week preceding the week in which such day is scheduled. During the term of this AGREEMENT, the Met agrees to schedule a minimum of fifteen (15) free days in a 30-week season and sixteen (16) free days in a 32-week season.

2. In an effort to increase the free period available to Choristers, a subcommittee (to include Chorus Delegates, the Chorus Master, and the Company Manager) will meet prior to the beginning of each season to consider ways in which this may be done within that season's schedule.

D. **RELIGIOUS HOLIDAYS**

Any Chorister who is prevented by the rules of his/her religion from participating in a rehearsal and/or performance on the first day of each of the Jewish High Holy Days and Good Friday shall be excused without loss of any portion of his/her weekly compensation. It is further understood that any Chorister wishing to be excused for professional as opposed to religious reasons to participate in another engagement during these Holy Days must apply for a release, and that if the release can be granted, any missed services will be deducted from the Chorister's weekly compensation on a pro-rata basis.

E. **PERSONAL TIME OFF**

1. Each regular and steady extra Chorister shall be entitled to a total of three (3) personal performances off (with pay) during the New York Season. Any such performance off shall be considered a performance worked for purposes of compensation for additional performances during a week, but shall not be considered a performance worked for purposes of overtime compensation or gap penalties.

2. During the Pre-Season and New York Season, each regular Chorister and steady extra Chorister shall be entitled to be released (without pay) from a total of three (3) rehearsals.

   (a) If a Chorister requests to be released from a base salary rehearsal in the Pre-Season, his/her base salary shall be reduced by 1/27.5 for each hour of rehearsal missed. On any given day, any rehearsals (or portion thereof) not attended by a Chorister shall be charged as one full rehearsal against the three (3) rehearsal entitlement.

   (b) If the Chorister does not wish to have his/her pay reduced pursuant to (a) above, he/she may elect to be charged a personal performance off during the New York Season.

3. Any personal performance and rehearsal off shall be taken upon reasonable notice to, and the approval of, the Chorus Master, such approval of preferred dates to be based upon scheduling and artistic requirements and not to be unreasonably withheld.

4. Upon request of a Chorister and approval of the Chorus Manager, a Chorister may take personal performance(s) off outside of the New York Season, e.g., during weeks of Parks concerts.

5. The benefit of "personal performances off" of this Paragraph E is unrelated to other benefits resulting in paid or unpaid time off (e.g., bereavement leave, leave of absence, sick leave, and short-term release from contract).

F. **BEREAVEMENT LEAVE**

In the event of a death in the immediate family (parent, grandparent, brother, sister, spouse, domestic partner, child or grandchild) of a regular or steady extra Chorister, such Chorister shall be granted leave with pay for a maximum of three (3) days, beginning with the day after death through the day of burial.

**EIGHTH:  COSTUMES, WIGS AND MAKE-UP**

A. **COSTUMES AND WIGS**

All costumes and wigs, including any incidentals which any Chorister is required by the Met to wear at any rehearsal or performance, shall be furnished at the expense of the Met, and shall be worn by said Chorister.  The Met shall maintain all costumes, shoes, and wigs in proper and wearable manner and shall replace them as required.  All costumes shall have linings or be otherwise finished so as to prevent discomfort, skin irritation, or other abnormal reaction of the Chorister wearing the same.  All costumes and wigs shall be cleaned before being used for the first time in any season.  Costumes, including shoes and wigs, assigned to be worn by more than one Chorister shall be thoroughly sanitized before each change of Chorister unless the change in Chorister results from an emergency too late for cleaning to be accomplished and the role is essential to the production.  No Chorister will be required to wear the shoes of another Chorister and every new Chorister will be provided with new 'stock' shoes, as follows:

1. Male Chorister: one pair each of boleros, Wellingtons, and sandals;
2. Female Chorister: one pair each of character shoes, ballet flats, and sandals.

B. **FITTINGS**

Any Chorister may be required to attend fittings inside or outside of the Opera House for shoes, costumes and/or wigs, as may be deemed necessary by the Met.

C. **CHANGING INTO AND OUT OF COSTUME**

1. Any Chorister required to be in 'full' costume for any rehearsal shall be allocated one-half (1/2) hour for dressing and one-half (1/2) hour for undressing and shall receive compensation at the applicable rehearsal rate specified in Article THIRD (D), except that compensation for undressing after a rehearsal in costume finishing at or before 6:00 P.M. (or before 5:30 P.M. Monday through Friday during the New York Season in  a season in which the standard curtain time is 7:30 P.M.) shall be at the hourly rehearsal rate.

2. The time for dressing and undressing referred to in subparagraph 1 hereof shall not be included in computing rehearsal time for which rest periods must be given.

3. Any Chorister required to be in less than 'full' costume for any rehearsal shall be given the necessary period for dressing and undressing during his/her regular rehearsal period.

4. If the Chorister shall be given time to dress subsequent to his/her first service in a rehearsal or to undress prior to his/her last service in a rehearsal, no additional compensation shall be due such Chorister.

5. A Chorister shall receive a $45 lunch penalty for all rehearsals in which he/she is required to wear "full costume."

D. **MAKE-UP**

1. Each Chorister shall provide, at his/her own expense, all make-up required by the Met to be worn for performances and rehearsals and shall wear make-up according to the standards and specific instructions of the Met.  The Met shall furnish, however, at its expense, any individual 'special effect' make-up, such as all-over body paint and clown make-up.

2. Any Chorister required to appear in body make-up in any rehearsal or performance shall receive compensation according to Article THIRD (C) (6) (b) and (D) (4) (d), as applicable.

3. If there are no hot and cold water showers immediately accessible to the dressing rooms for a performance on tour, then no Chorister shall be required to use body make-up for such performance.

E. **QUICK CHANGE ON STAGE**

A sheltered area shall be provided for any costume change which must take place on stage.

**NINTH:  AUDITIONS, ENGAGEMENT, DISCONTINUANCE AND REENGAGEMENT**

A. **AUDITIONS AND ENGAGEMENT**

1. Upon at least twenty-one (21) days' notice to AGMA, the Met will hold auditions of Choristers to fill vacancies (weekly or per performance) prior to the commencement of each season.  Any Chorister designated by AGMA or the Met may participate.  A representative of AGMA may be present and may express opinions to the Met; however, the Met shall have the right to fill each position with any available Chorister who, in its sole discretion, is qualified.  In the event the qualifications as above established of available Choristers are in the opinion of the Met equal, preference shall be given first to members of AGMA.  In the event, however, that no available AGMA members properly qualified in the opinion of the Met shall be available, it is understood that in such event the Met shall have the right to fill the position with any Chorister who in its sole discretion is properly qualified.

2. If auditions are held for solo parts, all regular and steady extra Choristers shall be given two weeks' notice of such auditions and be permitted to audition.  Such auditions shall be held in a proper acoustical hall (such as List Hall) and an appropriate number of the judges shall consist of members of the Met's musical staff.  Covers will also be assigned on the basis of these auditions.  Only regular and steady extra Choristers who have been engaged as such for a minimum of one (1) year may be assigned solo parts and covers on the basis of auditions.

B. **DISCONTINUANCE**

1. Except for cause, the Met agrees that it shall not give notice of discontinuance to more than four (4) Choristers during the term of this AGREEMENT.  In computing such number of Choristers to whom notice of discontinuance may be given, such number shall not in any way be reduced by reason of death, resignation or discharge for cause of any Chorister.

   Nothing herein contained shall require the Met to offer reemployment to any Chorister who shall have been discharged by reason of the failure of such Chorister to fulfill his/her obligations under STANDARD CHORISTERS CONTRACT or under this AGREEMENT or who shall have become mentally or physically incapacitated in such manner as to be incapable of properly performing his/her professional duties.

2. Nothing contained in Paragraph 1 shall limit the Met's right to give notice of discontinuance to any Chorister who, as of the date of said notice, has been in the employ of the Met for less than two (2) years (considered the "probationary" period).  If the Met wishes to discontinue the services of any such Chorister, it shall notify the Chorister in writing of the specific vocal or other deficiencies no later than the conclusion of the first year of the Chorister's employment (July 31).  If the Chorister is unable to remedy the problems satisfactorily and the Met decides to discontinue the Chorister's services, it shall give notice in writing no later than fifteen (15) weeks from the commencement of the New York Season and such notice shall include the reason for discontinuance.  Such notice of discontinuance shall become effective upon the conclusion of the season in which notice is given.  Any such discontinuance shall not be subject to arbitration, and the notice procedures specified in this paragraph shall be final and binding.  The Met agrees that prior to giving any such notice of discontinuance, there shall be no less than one (1) conference between the Chorus Master and the Chorister who has received a letter of warning.

   (a) The Chorus Committee shall have the right to meet with representatives of the Met to discuss the probationary status of any Chorister.

3. The discontinuance of employment of a Chorister with more than two (2) years of service for vocal deterioration shall not be considered for "cause" and shall be subject to the following procedures:

   (a) If the Met wishes to discontinue the services of a Chorister for vocal deterioration, it shall give a letter of warning specifying the vocal deficiencies six (6) months prior to any notice of discontinuance and the Chorister shall have an opportunity to correct such deficiencies to the satisfaction of the Met.

   (b) If the Met wishes to proceed with the discontinuance, it shall give notice in writing no later than the end of the New York Season and such notice shall include the reason for discontinuance.  Such notice of discontinuance shall not become effective until the conclusion of the season immediately following such notice of discontinuance.  Such written notice shall be sent to Chorister with a copy to AGMA.  Upon receipt of such notice, AGMA shall have the right to challenge the discontinuance by sending written notice to the Met within 20 days of receipt.  The right to any challenge is limited to the procedure specified in subparagraph (c) below and pursuant to the time restrictions therein, and no other means may be used.

   (c) No later than the beginning of the season the matter shall be submitted to a review committee established by AGMA and the Met.  The committee shall consist of three (3) voice teachers or other qualified experts, one of whom shall be chosen by AGMA, and one by the Met.  The third expert shall be selected mutually by AGMA and the Met from the

agreed-upon list (Exhibit D to this AGREEMENT).  The three experts shall hear the Chorister audition at the same time, and each shall submit to both AGMA and the Met his/her determination as to whether the Chorister has the range of vocal abilities, technical skills, and quality of vocal production required to perform the responsibilities of a regular member of the Met's Chorus.  This determination shall be submitted by checking the appropriate box on the Ballot shown below, a copy of which will be submitted to each expert prior to the audition, and no elaboration of the determination thereon by any expert shall be permitted.  The committee shall meet and audition the Chorister within 60 days of the beginning of the New York season and shall submit the executed Ballots within 24 hours of the time the Chorister is auditioned.  The majority opinion of the committee shall be final and binding and not subject to arbitration for any reason whatsoever or to any further review of any kind.

(d)  The review procedure specified above shall be the sole method by which AGMA or a Chorister may challenge discontinuance for vocal deterioration, notwithstanding any other provisions of this AGREEMENT.  A determination by the majority of the review committee that a Chorister can perform as required shall require the Met to reengage that Chorister for an additional season.  If a Chorister does not participate in the audition specified in subparagraph (c) above and within the specified time limits, such Chorister shall be deemed to have accepted his/her discontinuance.  Nothing herein shall prevent the Met from giving notice of discontinuance to the same Chorister by the end of the season following that in which a prior notice of discontinuance was given, in which case the procedures specified in subparagraphs (b) and (c) above shall again be followed.

---

**CHORISTER BALLOT**


**Does [Chorister] have the range of vocal abilities, technical skills, and quality of vocal production required to perform the responsibilities of a regular member of the Metropolitan Opera's Chorus?**



\_\_\_\_  **Yes**


\_\_\_\_  **No**


_____            _____
         **Signature of Expert**                                   **Date**

---

4.  No public announcement of the discontinuance of a Chorister shall be made, it being understood for such purposes that the Chorister shall be considered to have resigned.

6.  No Chorister, including a Chorister returning from a year's leave of absence, shall be changed from one voice category to another voice category without prior consultation with Chorister. Final decision, however, is solely at the discretion of the Met.

C. **TENDER OF REENGAGEMENT**

The Met shall tender to any Chorister who has been reengaged for a subsequent season the applicable STANDARD FORM CONTRACT, such tender to be made prior to the commencement of that season.  A Chorister may accept reengagement by executing such STANDARD FORM CONTRACT within two weeks after the tender or by March 31 of the same year in which it was tendered, whichever is later.  If no acceptance is received within the two-week period or by March 31, whichever is applicable, the tender shall be considered declined.  Notwithstanding anything herein contained, the tender is subject to the existence of a collective bargaining agreement between the Met and AGMA for the next succeeding New York Season and the presentation of its New York Season by the Met.

## TENTH:  ENGAGEMENT AND REENGAGEMENT (PER PERFORMANCE BASIS)

A. **ENGAGEMENT**

A Chorister engaged on a per performance basis shall be engaged for the maximum number of scheduled performances of each opera per New York season for which he/she is engaged, provided that if up to two (2) of the performances of an opera for which a per performance Chorister is engaged are canceled, the Met shall not be liable for payment to such Chorister for such canceled performances.  The Met shall notify such Choristers of their performance dates at the beginning of each eight (8) week period of the New York Season and Choristers shall be bound to perform on these dates.

The Met shall have the right to change performance dates at any time.  However, if after receipt of the eight-week schedule and prior to notice of such change any Chorister shall have accepted other employment for a date to which a performance is so changed, such Chorister shall not be required to perform on such changed date.

B. **REENGAGEMENT**

The Met shall give each per performance Chorister written notice of its intention to reengage such Chorister by June 30 of the year preceding the year for which such Chorister is to be reengaged, provided that such notice shall not be binding on the Met if there is any subsequent change in repertoire which affects operas for which the per performance Chorister is reengaged.  The Met shall give written notice by June 30 to each per performance Chorister to whom reengagement for the following year is not being offered.

## ELEVENTH:  EXCLUSIVITY

A. No Chorister shall accept engagements to render any service to a third party during the period of his/her contract with the Met which shall interfere with his/her ability to render the services called for under his/her contract with the Met.  The Met shall provide as much scheduling information pertaining to any year as possible when offering a contract to an extra Chorister for such year.

B. No regular or steady extra Chorister without the written consent of the Met shall perform in any company or ensemble using the name 'Metropolitan', 'the Met', or any variant thereof either in the name or in the description of such company, ensemble, or the over-all cast thereof, or any of the choral members thereof during or following the period of this contract.

C. No regular or steady extra Chorister shall during the period of his/her contract with the Met (unless he/she shall have resigned or been given notice of discontinuance), without the written consent of the Met, perform in any chorus participating in performance of opera or excerpts therefrom if fifty percent (50%) or more of the personnel of any such chorus consists of members of the Met's Chorus.

**TWELFTH:  SICK LEAVE**

A.  Every regular Chorister engaged by the Met on a weekly basis and every steady extra Chorister shall be entitled to sick leave for illness or disability during any year as specified in Paragraph B, provided, however, that no such Chorister shall be entitled to sick leave for illness or disability during the first two (2) days of such illness or disability.  No person shall be entitled to sick leave as a matter of right—i.e., sick leave can only be taken by a person who is actually ill or disabled.  In connection therewith the Met may require such Chorister to furnish a doctor's certificate verifying illness or disability.  In addition to such certificate, the Met may, from time to time, require Chorister to submit to examination by a doctor designated and paid by the Met to verify such illness or disability.  Sick leave shall be based upon number of years of service.  However, in no event shall any period of sick leave extend beyond fifty-two (52) weeks and in no event shall any period of sick leave extend beyond the time of the Chorister's contract:

B.
| Years of Service (completed) | Sick Leave |
| --- | --- |
| less than 2 | 2 weeks |
| 2 | 4 weeks |
| 3 | 8 weeks |
| 4 | 12 weeks |
| 5 | 20 weeks |
| 6 | 28 weeks |
| 8 | 36 weeks |
| 10 and over | 52 weeks |

Sick leave shall be charged against only those services covered by the weekly compensation.  A week of sick leave shall be the equivalent of six (6) non-consecutive working days.  If a Chorister has more than one (1) call in any day and misses a portion of those calls, then one-half (1/2) day of sick leave shall be charged for the day and one-half (1/2) for the evening portion of that day.

C.  The Met shall have the right to terminate the employment of any Chorister engaged on a weekly basis during his/her first season of employment if by reason of illness or disability such Chorister is unable to appear for more than one-half (1/2) of the scheduled professional services required during the first two (2) months of employment.

**THIRTEENTH:  TERMINATION OF EMPLOYMENT FOR WILLFUL FAILURE TO APPEAR**

It is expressly understood that the services of any Chorister are unique and that the willful failure of such Chorister to appear, except by reason of verified illness or disability or events beyond his/her  control, will cause the Met damage.  Accordingly, it is agreed that time is of the essence of this AGREEMENT and in the event that any Chorister shall willfully fail to appear (except for the reasons herein specified, i.e., verified illness, etc.) on the date specified for the commencement of services or shall willfully fail to appear for a full day for any scheduled rehearsal or performance, said Chorister shall be deemed in breach of his/her agreement and the Met shall have the right to terminate the employment of such Chorister.  Any Chorister who shall fail to appear at any scheduled rehearsal or performance by reason of alleged illness or disability, and who shall perform for any third party or on his/her own behalf on the same day of said alleged illness or disability without the Met's consent given on the same day, shall be deemed in breach of his/her agreement and the Met shall have the right to terminate employment of such Chorister.  Any termination hereunder shall be subject to arbitration in accordance with Article TWELFTH (E) of SECTION ONE of this AGREEMENT.

**FOURTEENTH:  HEALTH, LIFE AND DISABILITY INSURANCE, AND OTHER BENEFITS**

A.  Health, Life and Disability Insurance

1.  The Met shall furnish at its own expense in accordance with the provisions of this Article

FOURTEENTH:  Comprehensive Medical insurance under what is known as Met Medical Plan B with Prescription Drug Coverage, Vision, and Dental Insurance, a Life Insurance policy, and a Long-term Disability Insurance policy to 'full time' Choristers and all such Choristers must participate.  As used herein the term 'full time' means a Chorister engaged on a weekly basis and who actually works thirty-four (34) or more weeks.  Vacations are not included in such minimum period of thirty-four (34) weeks.

(a) Life Insurance shall be an amount equal to two (2) times such Chorister's annual salary for the prior year, as shown on his/her W-2 form for such year, or one hundred four (104) times such Chorister's regular weekly compensation of the prior year, whichever is greater, except that in no event shall such benefit exceed two hundred thousand dollars ($200,000).  In the event a Chorister is making contributions towards a deferred annuity, the amount of such contribution shall, nevertheless, be considered as compensation for the purpose of determining Life Insurance.

(b) Long-term Disability Insurance shall provide benefits after utilization of applicable sick leave, as provided in Article TWELFTH, for such Chorister who, during a period of verified illness or other total disability, is unable to sing and otherwise perform his/her functions as a member of the Chorus.  Such benefit shall be based on actual gross earnings, including rehearsal pay and performance overtime. Annual compensation shall include media salary and guaranteed revenue sharing amounts. Such benefit shall be based on an amount equal to fifty-two (52) times the individual Chorister's regular weekly salary at the time of total disability, or his/her total annual salary for the last full year preceding total disability, whichever is greater.

(c) Summary Plan Descriptions for Comprehensive Medical, Vision, Dental, Life Insurance, and Long-term Disability Insurance shall be furnished upon request by the Met's Human Resources Department.

2.  It is understood that the Met obligates itself to furnish coverage only and not monies in lieu of coverage.

B.  <u>Transit and Parking Benefits</u>

Regular Choristers shall be eligible to participate in the Met's  transit program.  Such employees shall also be eligible to participate in a program under which parking can be paid in pre-tax dollars as permitted by the Internal Revenue Service.  The terms and conditions of such programs must be in accordance with then-current Internal Revenue Service regulations.


**FIFTEENTH:  COMMITTEES**

A.  The Met agrees to meet regularly during the New York Season and otherwise as necessary with a small committee of the Chorus to discuss anticipated problems affecting the Chorus.  Such committee shall also be invited to attend all stage plan meetings and shall meet from time to time with representatives of the Met to try to work out a nights-off schedule for each year of this contract.

B.  Representatives of the Chorus shall be invited to see designs and staging plans (including preliminary sketches, ground plans, models and fabric selections) of new productions in order to anticipate and avoid, where possible, conditions which might result in 'hardship' -- including such considerations as fabric weight, built-up body heat, constriction of throat and hearing.  Representatives shall submit their comments in writing to the Met.  The Met shall further arrange for such representatives to try on sample costumes to insure that design, fabric selection or any other problems previously discussed were remedied in the actual construction of the costumes.  Should problems still exist, the Chorus representatives shall submit their further comments in writing to the Met.  In recognition of the fact that the costumes worn by the Choristers affect their well-being as well as the quality of their performances, the Met shall use its best efforts to alleviate these problems within the context of the artistic requirements of each production.  Existing productions shall also be reviewed for revision of 'hardship' conditions where practicable.

C.  Members of the negotiating and grievance committees who are requested to participate in meetings

with the Met at a time when they would otherwise be participating in a rehearsal or performance shall suffer no loss in compensation as a result of participation in such meetings.

## SIXTEENTH:  MISCELLANEOUS

This AGREEMENT shall be construed in accordance with and governed by the procedural and substantive laws of the State of New York and shall not be modified or discharged except by a writing signed by the parties.  Captions and headings are inserted for convenience only and shall in no event be deemed a part of this AGREEMENT.

## SECTION FOUR:  DANCERS

### FIRST:  INCORPORATION OF SECTION ONE

The provisions of SECTION ONE of this AGREEMENT are incorporated herein. To the extent any of the provisions herein may be interpreted to conflict with provisions in SECTION ONE, the provisions herein shall control.

### SECOND:  MISCELLANEOUS DEFINITIONS

Unless otherwise specifically provided in this SECTION FOUR:

**Year**:  The term 'year' and shall mean the following periods:

> 2014-15 – August 1, 2014 through July 31, 2015
> 2015-16 – August 1, 2015 through July 31, 2016
> 2016-17 – August 1, 2016 through July 31, 2017
> 2017-18 – August 1, 2017 through July 31, 2018

**Week**:  The term 'week' shall mean seven (7) consecutive days beginning on Sunday and ending the following Saturday.

**Stage Rehearsal**:  The term 'stage rehearsal' shall mean a rehearsal held on the main stage only.

**Combined Staging Rehearsal**:  The term 'combined staging rehearsal' shall mean a rehearsal held on other than the main stage in which members of other performing groups participate.

**Studio Rehearsal**:  The term 'studio rehearsal' shall mean a rehearsal held on other than the main stage.

**Performance**:  A 'performance' shall be considered, for purposes of this AGREEMENT, as only one (1) 'performance' even though it may consist of two (2) or more works.

**Pre-Season**:  The term 'Pre-Season' shall mean rehearsal weeks immediately preceding the New York Season or any festival season or series of staged performances at the Metropolitan Opera House.

**New York Season**:  The term 'New York Season' shall mean:

A.   The regular New York subscription season; and

B.   any festival season or series of staged performances at the Metropolitan Opera House.

**Tour**:  The term 'Tour' shall mean:

A.   Regular Tour:  All performance weeks outside New York City but restricted to Continental U.S.A. and Canada.

B.   Mid-Winter Tour:  Special mid-winter performance weeks outside Continental U.S.A. and Canada (e.g., Caribbean area, Mexico, etc.).  Special conditions attendant to mid-winter and international tours, i.e., per diem, passports, shots, etc. will be discussed and agreed to with AGMA prior to any such tour.

C.   International Tour:  Special performance weeks in South America and/or the Eastern Hemisphere (e.g., Europe, Asia, etc.).

D.   Unit Tours:  Any performance weeks outside New York City of any individual unit or combination of units of the Metropolitan Opera (i.e., Ballet, Chorus, Principals).

**Off Season**:  The term 'Off-Season' shall mean any weeks outside of the Regular Season in which performances are given in New York City and environs and preparation therefor (e.g., parks, Long Island,

Metropolitan Opera House, etc.) other than a festival season or series of staged performances at the Metropolitan Opera House.  The Met agrees that the prior practice of not requiring Dancers to rehearse or to perform any service during Parks weeks shall be continued.  Dancers shall perform services during Off-Season weeks under the same terms and conditions as those specified for the Regular Season.

### THIRD:  RATES OF COMPENSATION - EMPLOYMENT ON A WEEKLY BASIS

A. **WEEKLY COMPENSATION**

All Dancers employed on a weekly basis shall receive as weekly compensation (hereinafter called 'weekly compensation'), based on seniority, the following:

| Seniority* | |
|---|---|
| 1 | $1,188.98 |
| 2 | 1,382.51 |
| 3 | 1,417.27 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*\* Based upon the number of years of full-time employment with the Met computed in accordance with the provisions of Metropolitan Opera Corps de Ballet Savings Plan.*

B. **PROFESSIONAL SERVICES COVERED BY WEEKLY COMPENSATION**

1. The weekly compensation is based on professional services of any kind rendered by Dancers for a maximum of twenty-five (25) hours per week.  The hours of professional services rendered by Dancers which are counted toward the maximum hours covered by weekly compensation shall not include any hours of service for which additional compensation is paid pursuant to this Article THIRD other than fees paid pursuant to Article THIRD (C) (7) nor shall it include 'essential run-throughs' referred to in Article THIRD (D) (6).

2. The regular Spring Tour shall not exceed eight (8) weeks. The Met shall have the right concerning the length of its regular Spring Tour to schedule, within a single week, a combination of (a) staged performances in a tour city, (b) parks performances in the New York metropolitan area, and (c) outside events.  During such combination week, Dancers shall perform up to five (5) performances plus a rain date and shall be engaged on a weekly basis.

C. **CONDITIONS APPLICABLE TO PERFORMANCES**

1. STANDARD PERFORMANCE WEEK

The standard performance week shall be up to five (5) performances per week.

2. PERFORMANCE RATE OF PAY

A Dancer's regular performance rate of pay (hereinafter referred to as 'performance rate') shall be one-seventh (1/7th) of his/her weekly compensation.  A Dancer's regular hourly rate of pay for performance time (hereinafter referred to as 'hourly performance rate') shall be one-fourth (1/4th) of his/her performance rate.

3. HOURLY CREDIT AND MINIMUM CALL FOR PERFORMANCES

(a) A Dancer shall be credited with actual time worked in performances provided that the minimum call (including hourly credit for dressing and undressing) for the first five (5) performances in a week shall be three (3) hours.

(b) Dressing and Undressing

(i) A Dancer shall be credited or compensated for one-half (1/2) hour for dressing and one-half (1/2) hour for undressing before and after the first five (5) performances in a week.

IV - 2

(ii)   There shall be no credit or compensation for dressing and undressing before or after any performance in excess of five (5) in a week or any performance on Sunday or during a free period (as specified in Article SEVENTH).

4.   ADDITIONAL PERFORMANCES

Any Dancer who performs in more than five (5) performances in a week shall receive, in addition to his/her weekly compensation, one and one-half (1-1/2) times his/her performance rate for the sixth (6th) performance in a week and double (2 times) his/her performance rate for the seventh (7th) and any subsequent performance in a week.

5.   PERFORMANCE ON SUNDAY OR A FREE PERIOD

Any Dancer who performs on a Sunday or during a free period (as specified in Article SEVENTH) shall, in addition to his/her weekly compensation, receive double (2 times) his/her performance rate for each such performance.

6.   PERFORMANCE OVERTIME

(a)   Performance in Excess of Four Hours

Any Dancer who performs in excess of four (4) hours shall, in addition to his/her weekly compensation, be paid at the rate of one and one-half (1-1/2) times his/her hourly performance rate for such excess time.  For the purpose of this subparagraph (a), the word 'perform' shall include undressing after any of the first five (5) performances in a week but shall not include dressing before any performance.

(b)   Performance Extending Beyond Midnight/11:30 P.M.

Any Dancer who performs beyond midnight (or beyond 11:30 P.M. Monday through Friday during the New York Season during a season in which the standard curtain time is 7:30 P.M.) shall, in addition to his/her weekly compensation, be paid at the rate of double (2 times) his/her hourly performance rate for such excess time.  For the purpose of this subparagraph (b), the word 'perform' shall include undressing after any of the first five (5) performances in a week.

(c)   In Excess of Eight Hours in Any Day

Any Dancer whose service (whether rehearsal or performance or a combination thereof) is in excess of a total of eight (8) hours of work between 10:30 A.M. and midnight (or between 10:00 A.M. and 11:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) in any day shall, in addition to his/her weekly compensation, be paid at the rate of double (2 times) his/her hourly performance rate for such excess time.  For the purpose of this subparagraph (c), the term 'hours of work' shall include the full period of any minimum call, whether worked or not.  However, only actual time worked shall be counted for any hour, or segment thereof, which is credited or paid at a premium rate.

(d)   Compensation for performance overtime shall be paid in segments of thirty (30) minutes for each thirty (30) minutes or less of work.

7. <u>PERFORMANCE EXTRAS</u>

(a)  A Dancer shall, in addition to his/her weekly compensation, be paid a minimum fee for the following performance services:

| | |
|---|---|
| Principal Solo Part* | $395.46 |
| Intermediate Part* | 263.62 |
| Minor Part* | 131.74 |
| Chorus Singing | 131.74 |
| Spoken Solo Lines | 131.74 |
| Body Make-up | 77.30 |
| Hazard Pay (Flying, etc.) [1] | 263.62 |
| Hazard Pay (1st cover) [1] | 131.74 |
| Heavy Carries | 77.30 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

*The classification of parts as Principal Solo, Intermediate, Minor and Mute shall be determined by the Met in consultation with the Ballet Delegates prior to the first performance.*

[1] *Hazard pay shall be paid at the contractual rate only and shall not be credited towards length-of-day calculation.*

(b)  <u>Mute Parts</u>

(i)  Mute Parts shall be defined as parts which require special characterization or acting ability, ability to react to musical cues, and/or a type of stylized or physically demanding movement requiring special training or experience.

(ii)  The performance of a Mute Part by a Dancer shall be included in the professional services covered by weekly compensation.

(c)  <u>Supering</u>

(i)  Supering by a Dancer shall be defined as the Dancer's participation in an opera performance in any capacity other than dancing or performing a Mute Part.

(ii)  Supering by a Dancer shall be included in the professional services covered by weekly compensation.

(d)  <u>Body Make-up</u>

Body make-up shall be defined as make-up required on any part of the body below the neck or above the elbow.

(e)  <u>Heavy Carries</u>

Heavy carries shall be defined to exclude carries and/or lifts of a Dancer.

(f)  <u>Principal Solo Parts</u>

(i)  A Dancer performing a Principal Solo Part shall not be required to perform in the Corps de Ballet during the same performance.

(ii)  Any regular Dancer who wishes to be considered for a Solo Part shall be auditioned. A schedule for auditions will be announced at least one (1) week prior to time of audition.

(iii)  Non-operatic Ballet:  In a non-operatic ballet work, the Met has the right to engage, for Principal Solo Parts, outside soloists whose stature as principal dancers in their

specialized form(s) of dance is well established.  In a revival of a non-operatic ballet work, members of the Corps de Ballet shall have the right to audition for Principal Solo Parts prior to the engagement of outside soloists.

(iv)   Operatic Ballet:  In an operatic ballet, members of the Corps de Ballet or extra Dancers engaged for the production shall perform all Solo Parts, with the understanding that the Met may request a waiver in an appropriate case, which waiver shall not be unreasonably withheld.

(v)   Performance in Replacement of Outside Soloist:  In the event a Dancer performs a Solo Part in replacement of an outside soloist who was contracted and scheduled to perform such part, such Dancer shall receive, in addition to his/her weekly compensation, a fee of: $593.19, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Such fee equals one and one-half (1-1/2) times the fee specified in Article THIRD (C) (7) (a) for a Principal Solo Part.

(vi)   Covers:  All covers shall be members of the Corps de Ballet, with the understanding that the Met may request a waiver in an appropriate case, which waiver shall not be unreasonably withheld.

(vii)   Covering an Outside Soloist:  A Dancer who is designated the First Cover for an outside soloist for a performance shall receive, in addition to his/her weekly compensation, a fee of: $126.04, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(viii)   Covering a Member of the Corps de Ballet:  A Dancer who is designated the First Cover for a Principal Solo Part not performed by an outside soloist shall receive, in addition to his/her weekly compensation, a fee of: $83.97, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(ix)   A committee of Dancers shall meet with representatives of the Met during Pre-Season to schedule rehearsal times for Dancers assigned to perform or cover Principal or Intermediate Solo Parts.  The Met will make best efforts to provide stage rehearsal time for such parts.

8.   CREDIT FOR PERFORMANCE OR COVERS

(a)   If a Dancer participates in a performance or attends a performance as a first cover, it shall be counted as one (1) performance in that week.

(b)   If a Dancer is designated a first cover for a Principal Solo Part but does not attend the performance for which he/she is covering, his/her service shall be counted as one-half (1/2) a performance.

## D.  **CONDITIONS APPLICABLE TO REHEARSALS**

1.   MINIMUM CALLS

(a)   The minimum call for a rehearsal, fitting, photo call or any combination thereof, shall be two (2) hours, except that the minimum call shall be one (1) hour for a separate rehearsal call scheduled within one (1) hour prior to a Dancer's performance call.

(b)   A fitting preceding or following a rehearsal and the rehearsal shall be treated as a single call.  If a fitting outside the Metropolitan Opera House precedes or follows a rehearsal, time from or to the costumer, as the case may be, shall be counted as time worked; and the Met shall reimburse the Dancer for any expenses in connection with travel between the Opera House and the costumer.

(c)   Credit for rehearsals, fittings or photo calls in excess of the minimum call shall be in segments of fifteen (15) minutes.

2.   REHEARSAL PERIOD

(a)   A Dancer's rehearsal shall consist of the time intervening between his/her rehearsal call and the time of his/her dismissal from the rehearsal.

(b)   If the period between dismissal from one rehearsal and the call for a subsequent rehearsal shall be less than one (1) hour, or if Dancer is required to remain in costume between such calls, then there shall be deemed to be only one (1) call therefor and the rehearsal period shall be deemed continuous from the beginning of the first rehearsal to the end of the subsequent rehearsal.  If the interval between dismissal from one rehearsal and the call for a subsequent rehearsal shall be more than two (2) hours, the call for the subsequent rehearsal shall be deemed to begin at the end of the said two (2) hour interval, or at the option of the Met, the rehearsal period shall be deemed continuous from the beginning of the first rehearsal to the end of the subsequent rehearsal.  The interval between the end of the first rehearsal call and the beginning of the second rehearsal call which are deemed to be a single rehearsal call shall be paid at the hourly rehearsal rate unless such interval occurs at a time of the day for which a premium rate is payable or on a day requiring the payment of premium rates.

(c)   If more than two (2) rehearsal calls are made in any one (1) day, the second rehearsal period shall consist of all time from Dancer's second rehearsal call to the time of his/her dismissal from the final rehearsal of the day except for a rehearsal call within one (1) hour before Dancer's performance call.

3-A.   REHEARSAL LIMITATIONS (EXCEPT AS SET FORTH IN 3-B BELOW)

(a)   Starting Time

(i)   No rehearsal (including dressing) shall commence prior to 10:30 A.M., except for a rehearsal prior to an independent ballet performance on the same morning and on the same stage which rehearsal shall not commence prior to 9:00 A.M.;

(ii)   No combined staging rehearsal limited to the Chorus and/or Ballet will commence prior to 11:00 A.M.;

(iii)   No studio rehearsal, other than a rehearsal in which a Dancer performs a Principal Solo, Intermediate or Minor Part, will commence prior to 12:00 Noon, unless such studio rehearsal is preceded by a stage rehearsal, except that a studio rehearsal that involves only staging may commence at 11:00 A.M. in which event it is understood by all parties that sufficient time for warm-up will be available to the Dancers prior to any subsequent rehearsals.

(iv)   No rehearsal shall commence at or after 6:00 P.M. except a stage rehearsal in lieu of a performance as provided for in Article THIRD (D) (7).

(b)   There will be no studio or combined staging rehearsal after 6:00 P.M., except for a studio rehearsal for an independent ballet performance and then only with the consent of all the participants.

(c)   There will be no rehearsal after 3:00 P.M. on any day in which a Dancer performs a Principal Solo Part in the evening performance except in case of emergency.

(d)   There shall be no studio rehearsals of more than five (5) hours in any day.

(e)   There shall be no studio rehearsal within three (3) hours prior to the performance call time for a performance in which a Dancer appears except for essential run-throughs as provided in Article THIRD (D) (6).

(f)   There will be no rehearsal on Saturday during non-performance weeks except that there

may be a rehearsal on Saturday during stage rehearsal weeks if another day is substituted as a free day for Saturday and notice is given by Friday preceding the week in which the substitution takes place.

(g)  There will be no rehearsal on Labor Day, Thanksgiving Day, Christmas Day, New Year's Day or the Fourth of July.

(h)  No rehearsal will be held on the Spring Tour unless:

    (i)  it is required because of a change from normal setting or a prior unsatisfactory performance that cannot be satisfactorily corrected by notes or by review on set immediately before the act; and

    (ii)  it is on stage in proper set (even if this must be immediately before the performance or act), provided that, if the stage cannot be made available, then a studio may be used except if working conditions in the studio would prevent the rehearsal from serving a useful purpose (i.e., polished ballroom floor, studio too small, etc.).

3-B.  <u>REHEARSAL LIMITATIONS – 7:30 P.M. STANDARD CURTAIN</u>

Notwithstanding Paragraph 3-A above, Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M., the following rehearsal limitations shall apply:

(a)  <u>Starting Time</u>

    (i)  No rehearsal (including dressing) shall commence prior to 10:00 A.M., except for a rehearsal prior to an independent ballet performance on the same morning and on the same stage which rehearsal shall not commence prior to 8:30 A.M.;

    (ii)  No combined staging rehearsal limited to the Chorus and/or Ballet will commence prior to 10:30 A.M.;

    (iii)  No studio rehearsal, other than a rehearsal in which a Dancer performs a Principal Solo, Intermediate or Minor Part, will commence prior to 11:30 A.M., unless such studio rehearsal is preceded by a stage rehearsal, except that a studio rehearsal that involves only staging may commence at 10:30 A.M. in which event it is understood by all parties that sufficient time for warm-up will be available to the Dancers prior to any subsequent rehearsals.

    (iv)  No rehearsal shall commence at or after 5:30 P.M. except a stage rehearsal in lieu of a performance as provided for in Article THIRD (D) (7).

(b)  There will be no studio or combined staging rehearsal after 5:30 P.M. except for a studio rehearsal for an independent ballet performance and then only with the consent of all the participants.

(c)  There will be no rehearsal after 2:30 P.M. on any day in which a Dancer performs a Principal Solo Part in the evening performance except in case of emergency.

(d)  There shall be no studio rehearsals of more than five (5) hours in any day.

(e)  There shall be no studio rehearsals within three (3) hours prior to the performance call time for a performance in which a Dancer appears except for essential run-throughs as provided in Article THIRD (D) (6).

(f)  There will be no rehearsal on Saturday during non-performance weeks except that there may be a rehearsal on Saturday during stage rehearsal weeks if another day is substituted as a free day for Saturday and notice is given by Friday preceding the week in which the substitution takes place.

(g)  There will be no rehearsal on Labor Day, Thanksgiving Day, Christmas Day, New Year's Day

or the Fourth of July.

(h) No rehearsal will be held on the Spring Tour unless:

    (i) it is required because of a change from normal setting or a prior unsatisfactory performance that cannot be satisfactorily corrected by notes or by review on set immediately before the act; and

    (ii) it is on stage in proper set (even if this must be immediately before the performance or act), provided that, if the stage cannot be made available, then a studio may be used except if working conditions in the studio would prevent the rehearsal from serving a useful purpose (i.e., polished ballroom floor, studio too small, etc.).

4. REHEARSAL COMPENSATION

(a) Regular Rehearsal Rate

The regular hourly rate (herein referred to as 'hourly rehearsal rate') for the first five (5) hours of rehearsals, fittings and photo calls which are in excess of the maximum hours per week compensated by weekly compensation as provided in Article THIRD (B) shall be: $60.12, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation for rehearsals, fittings and photo calls shall be in segments of fifteen (15) minutes or less.

(b) Time and One-half

$90.18, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation at one and one-half (1-1/2) times the hourly rehearsal rate shall be paid for each segment of fifteen (15) minutes or less of the following:

    (i) Except as set forth in subparagraph (ii) below:

        a. any combined staging or stage rehearsal between 10:30 A.M. and 11:00 A.M., provided that dressing during such period for a stage rehearsal shall be paid at the hourly rehearsal rate;

        b. any rehearsal between 9:00 A.M. and 10:30 A.M. prior to an independent ballet performance on the same morning and on the same stage;

        c. any emergency rehearsal after 3:00 P.M. on the day in which a Dancer performs a Principal Solo Part in the evening performance;

    (ii) Notwithstanding subparagraph (i) above, Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.:

        a. any combined staging or stage rehearsal between 10:00 A.M. and 10:30 A.M., provided that dressing during such period for a stage rehearsal shall be paid at the hourly rehearsal rate;

        b. any rehearsal between 8:30 A.M. and 10:00 A.M. prior to an independent ballet performance on the same morning and on the same stage;

        c. any emergency rehearsal after 2:30 P.M. on the day when which a Dancer performs a Principal Solo Part in the evening performance.

    (iii) any rehearsal after 6:00 P.M. during Pre-Season;

    (iv) any rehearsal hours in excess of five (5) hours in a day;

(v)  any sixth (or segment thereof) or subsequent rehearsal hour in excess of the maximum hours per week compensated by weekly compensation as provided in Article THIRD (B);

(vi)  any studio rehearsal hours in excess of fifteen (15) hours in a week during the New York Season;

(vii)  any studio rehearsal hours in excess of twenty (20) hours in a week during Pre-Season;

(viii)  any studio rehearsal hours in excess of three (3) hours on any day in which the Dancer performs;

(ix)  any studio rehearsal hours within twelve (12) hours following the final curtain of a performance the previous evening in which the Dancer participated.

(c)  Double Time Per Hour

$120.24, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Compensation at double (2 times) the hourly rehearsal rate shall be paid for each segment of fifteen (15) minutes or less of the following:

(i)  any stage rehearsal within three (3) hours or any combined staging or studio rehearsal within four (4) hours prior to the scheduled call time of any performance in which Dancer appears except for essential run-throughs as provided in Article THIRD (D) (6);

(ii)  any rehearsal after midnight (or after 11:30 P.M. Monday through Friday during a season in which the standard curtain time is 7:30 P.M.);

(iii)  any rehearsal on a day during the New York Season in which Dancer is scheduled in a matinee;

(iv)  any rehearsal on a Sunday;

(v)  any rehearsal during a free period as specified in Article SEVENTH;

(vi)  any photo call following an evening performance;

(vii)  any evening stage rehearsal as provided for in Article THIRD (D) (7).

(d)  Time and One-half of Double Time

Compensation at one and one-half (1-1/2) times the applicable double time rate shall be paid for each segment of fifteen (15) minutes or less of any rehearsal hours during a free period (as specified in Article SEVENTH) which would be compensated at one and one-half (1-1/2) times or double (2 times) the hourly rehearsal rate if such rehearsal were held other than during a free period.

(e)  Hazard Pay

A Dancer who is required to and actually performs hazardous work during a rehearsal shall receive, in addition to his/her weekly compensation, the applicable Hazard Pay fee specified in Article THIRD (C) (7) (a).  Such fee shall be paid to a Dancer once for any rehearsal in which he/she participates, in compensation for one or more run-throughs of hazardous work.

(f)  Heavy Carries

A Dancer who is required to and actually performs a heavy carry, as defined in

IV - 9

Article THIRD (C) (7) (e), during a stage rehearsal shall receive, in addition to his/her weekly compensation, the applicable Heavy Carries fee specified in Article THIRD (C) (7) (a).  Such fee shall be paid to a Dancer once for any stage rehearsal in which he/she participates, in compensation for one or more run-throughs involving heavy carries.

5.   SPECIAL REHEARSALS

(a)  If a Dancer is called to rehearse a Principal Solo, Intermediate Part or Chorus Singing at a time when the Ballet is not rehearsing, he/she shall receive time and one-half (1-1/2) credit for all time worked but no less than the minimum call.

(b)  If a Dancer is called to rehearse a Principal Solo Intermediate Part or Chorus Singing when the Ballet is rehearsing, then he/she shall receive time and one-half (1-1/2) credit for the time actually worked only, but in no event less than one (1) hour, and the balance, if any, of the minimum call shall be credited at regular time.

(c)  Subparagraphs (a) and (b) above shall also be applicable to any Dancer who is required to attend a rehearsal as an alternate or cover for a Principal Solo Part except that if a Dancer is required to attend a rehearsal as an alternate or cover for a Principal Solo Part at a time when the Ballet is rehearsing and does not actively participate in the rehearsal but attends as an observer only, he/she shall be credited for the rehearsal at straight time.

(d)  Any credit given a Dancer under (a), (b) and (c) above in excess of straight time shall be used only for the purpose of computation and payment for services in excess of the maximum hours per week compensated by weekly compensation.

6.   ESSENTIAL RUN-THROUGHS

(a)  If any Dancer substitutes for another Dancer in any scene, he/she and up to four (4) other Dancers with whom he/she directly participates in any particular stage business may, without rehearsal compensation, be called in costume and make-up within the twenty (20) minute period prior to the performance or to any act or scene in which they are to appear in order to run through such stage business.

(b)  If the stage set-up of scenery in any city is different from the set-up on the New York stage, then any Dancer participating in that scene may, without rehearsal compensation, be required to be available on stage in costume and make-up ten (10) minutes prior to any act or scene in which the different scenery set-up is being used, both for artistic reasons and to assure safety of Dancers.

(c)  Notwithstanding anything to the contrary contained in this Article THIRD (D), any Dancer may be required, during a performance in which he/she appears, to run through any routine in the main stage or dressing room area for safety or artistic reasons (i.e., a duel or a carry with a new ARTIST) without payment of rehearsal compensation therefor.

7.   EVENING REHEARSALS

(a)  The Met shall have the right to schedule rehearsals in lieu of evening performances ("Evening Rehearsals").  Evening rehearsals shall be compensated at double (2 times) the hourly rehearsal rate specified in paragraph Article THIRD (D) (4) (c).

8.   REST PERIODS

(a)  Stage Rehearsals, Combined Staging Rehearsals, and Studio Rehearsals Involving Staging That Commence Prior to 11:30 A.M./12:00 Noon

Except as provided in subparagraph (b)(i) below, each Dancer will be allowed a twenty-five (25) minute rest period within the first two (2) hours of a two and one-half (2-1/2) hour call for a stage, combined staging rehearsal, or studio rehearsal involving staging that commences prior to 12:00 Noon (or prior to 11:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.), and a

thirty (30) minute rest period within the first two hours of a three (3) hour call for such a rehearsal.

There will be an additional ten (10) minute rest period approximately at the beginning of each subsequent hour or five (5) minutes at the beginning of a subsequent half-hour.

(b) New York Season Stage Rehearsals and Combined Staging Rehearsals

(i) A three and one-half (3-1/2) hour Stage Rehearsal or Combined Staging Rehearsal during the Regular Season may consist of two segments, one of a maximum of ninety (90) minutes and the other of a maximum of eighty (80) minutes with a rest period of forty (40) minutes between the two segments which may occur in either order.  When the first segment of such rehearsal extends longer than eighty (80) minutes, such segment shall be considered the ninety (90) minute segment and the second segment shall be a maximum of eighty (80) minutes in duration.  In the case of a Stage Rehearsal with Orchestra of longer than three and one-half (3-1/2) hours, upon advance notice to the Dancers prior to or during the rehearsal, following the first break of thirty (30) minutes which may take place no later than ninety (90) minutes after the start of the rehearsal (except as otherwise provided in subparagraph (b)(ii) below), the breaks may be scheduled to coincide with the breaks required by the Orchestra under the collective bargaining agreement between the Met and Local 802 of the A.F. of M. in effect at the time, provided that the total amount of rest period required in the rehearsal by this Agreement, i.e., no less than five (5) minutes for each half-hour of rehearsal call, is not reduced and that no break is less than fifteen (15) minutes in duration.

(ii) In a Stage Rehearsal with Orchestra during the New York Season other than as provided for in (b) (i) above, each Dancer will be allowed a thirty (30) minute rest period within the first two (2) hours of a three (3) hour call, except as specified herein.  When the first act being rehearsed in a day is "long" (a minimum of sixty (60) minutes), each Dancer will be allowed a break of no less than fifteen (15) minutes within the first hour and one-half of the rehearsal, scheduled to permit the first act to be completed before the "long break."   Such "long break" shall be no less than twenty-five (25) minutes in length, given upon completion of the first act, and shall begin approximately two (2) hours after the start of the rehearsal call.  Nothing in this provision shall reduce the required amount of rest period in the complete Stage Rehearsal, i.e. no less than five (5) minutes for each half-hour of rehearsal call.

(c) Studio Rehearsals

Each Dancer will be allowed a rest period of ten (10) minutes within each hour of a studio rehearsal and a rest period of five (5) minutes in the final rehearsal half-hour, if any.  Any two (2) rest periods may be combined so long as no studio rehearsal continues longer than fifty (50) minutes without a rest period.

(d) Transit

If during a rehearsal, any Dancer shall be required to go from one rehearsal location to another, he/she shall be given a ten (10) minute interval for transit if the locations are on separate stage levels or a five (5) minute interval for transit if the locations are on the same level.  Such interval shall not be charged to earned rest periods.  For the purpose of this paragraph, the main stage and any or all of the three (3) adjacent stages used for a single rehearsal shall be considered one (1) location.

(e) In Conjunction with Costume Change

In the event that a period shall be allocated during a rehearsal in costume for the purpose of change of costume, any time after the first twenty (20) minutes of such period may, in the discretion of the Management, be allocated to an earned rest period.

9. REHEARSAL SCHEDULE AND NOTICE OF CHANGE

Rehearsal schedules, containing approximate stop times, shall be posted by Friday of each week for rehearsals in the succeeding week subject to change no later than 6:00 P.M. (or 5:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) on the day before the scheduled rehearsal.  If such schedule shall be subsequently altered, then, if such alteration represents a postponement or cancellation of a rehearsal call, any Dancer who is not performing in the house at the time of notice of such alteration, or who is not notified by telephone, telegram or electronic mail prior to 10:00 P.M. (or 9:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) on the day immediately preceding the changed rehearsal, and who appears for rehearsal in accordance with the original notice, shall be credited with the minimum rehearsal call, or with the interval between the call specified in the original notice and the time of the postponed call, whichever is shorter.  If a change in rehearsal schedule establishes a starting time for the rehearsal earlier than posted, any Dancer who is not performing in the house at the time of notice of such an alteration or who is not notified by telephone or telegram prior to 10:00 P.M. (or 9:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) on the day immediately preceding the changed rehearsal shall not be obliged to attend such rehearsal.

10. SATURDAY REHEARSALS

Dancers who are not performing in the matinee that day may be called for a Saturday when needed to work with (a) the choreographer of a new work or (b) a solo singer in any work. The Met recognizes that such Saturday rehearsals should not be called except when necessary, and the Met will give notice of such rehearsal to regular Dancers at least eight (8) days prior to the rehearsal and to extra Dancers at least ten (10) days prior to the rehearsal when possible, or as soon as practicable.  In the case of (a), the call shall be a minimum of four (4) hours at the hourly rehearsal rate.  In the case of (b), the call shall be a minimum of three (3) hours at the hourly rehearsal rate.

E. **AUDIENCE DEVELOPMENT PERFORMANCES**

1. The Met shall have the right to schedule up to four (4) "Audience Development" performances per week on Monday through Friday to be held between 11 a.m. and 3:30 p.m.

2. No more than one (1) Audience Development performance may be held on any one (1) day.

3. For an Audience Development performance of up to two (2) hours (exclusive of dressing and undressing), a participating Dancer shall be paid a fee as follows: $283.46, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

4. Any Dancer who performs in excess of two (2) hours (exclusive of dressing and undressing) during an Audience Development performance shall be paid at the rate of 80% of the Dancer's regular hourly per-performance rate.  Compensation for such performance overtime shall be paid in segments of fifteen (15) minutes for each fifteen (15) minutes or less of work.

5. Audience Development performances and rehearsals shall not be included in performance and rehearsal counts for any purpose except that:

    (a) rehearsals shall count toward the maximum hours covered by weekly compensation, and

    (b) performances and rehearsals shall count for purpose of the length-of-day provision in Article THIRD (C) (6) (c).

F. **MEDIA**

1. MEDIA SALARY

Each year the Met will guarantee to each Regular Dancer a "Media Salary" as follows.  The annual amount will be payable on a weekly basis, but will not be included in any rate calculations, commencing with the week of the first transmission and/or capture of a

performance provided for hereunder and ending with the final week of the New York season: $8,323.20, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

$8,323.20

2. REVENUE SHARING GUARANTEE

Regular Dancers shall be guaranteed $5,000 annually in revenue sharing.

3. ADDITIONAL PAYMENTS

(a) In addition to Media Salary and revenue sharing payments, Regular Dancers shall receive the more favorable of the following rates in effect during either the capture or initial release of

(b) (i) any compilation product (audio or audiovisual) embodying any materials other than (a) archival performances, and (b) the performances described in Section ONE, Article TENTH (C),

(ii) performances other than those described in Section ONE, Article TENTH (C) released by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network, or by means of a physical CD released as part of normal catalogue product by a major record distribution company (with the understanding that any version of a production— e.g., a highlights record, a 3-disc CD - is considered part of the same performance) or a comparably permanent product, and

(iii) performances described in Section ONE, Article TENTH (C) released by means of exploitation beyond that permitted by that paragraph: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) Except with the consent of the Union, the Met may not acquire the rights described in this paragraph (3) by payment, after the term of this Agreement, of the applicable sums.

(c) The payments in this paragraph (3) are one-time payments per project, with the applicable sum due within 30 days following the first exploitation beyond the applicable restriction or limitation on the Met.

4. SOLO FEES

A Dancer who performs a solo part for an audio-visual service shall be paid as follows:

| | |
|---|---|
| Principal Solo | $404.29 |
| Intermediate Part | 228.99 |
| Minor Part | 170.49 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Such solo part fees shall be in addition to the Performance Extras fees set forth in this Section FOUR, Article THIRD, Paragraph C.(7).(a)

## G. **RELEASES**

A Dancer who misses a portion of his/her contractual employment period in connection with an approved release from contract shall receive a reduction in pay as follows:

1. If the release is for one or more weeks, the Dancer shall not receive weekly base pay for such week(s).

2. If the release is for a partial week, the Dancer shall receive a reduction in weekly base pay as follows:

    (a) <u>during Pre-Season:</u>

        (i) Monday-Friday:  20% reduction (1/5th) for each day of release, except that there is no reduction for a Free Day.

        (ii) Saturday:  20% reduction if the Ballet rehearses, whether or not the Dancer is scheduled to rehearse; no reduction if Saturday is a Free Day.

        (iii) Sunday:  no reduction

    (b) <u>during the Regular New York Season:</u>

        (i) Monday-Saturday:  A Dancer may be released for a portion of a day; reduction by the fraction of the number of hours of scheduled work actually missed divided by twenty-five (25) hours, e.g., a 20% reduction if the Dancer misses five (5) hours for which he/she is scheduled.

        (ii) Sunday:  no reduction

3. If a radio broadcast or telecast occurs during the period of release, the Dancer shall not receive the fee otherwise payable.

## H. **PER DIEM**

Per Diem shall be paid as additional compensation and is not included in the weekly compensation specified in Paragraph A, but shall not be paid for performances within New York City limits.

1. If a member of the Ballet is required to be absent from New York City less than a full day, partial per diem as a percentage of the applicable food allowance specified in this Paragraph H, as set forth below, shall be paid in accordance with the hour of arrival in New York or departure from New York:

    (a) arrival in New York after 9:00 A.M. or departure prior to 8:00 A.M.  –  breakfast (15%) shall be paid;

    (b) arrival in New York after 1:00 P.M. or departure prior to 12:00 noon  –  lunch (35%) shall be paid;

    (c) arrival in New York after 7:00 P.M. or departure prior to 6:00 P.M.  –  dinner (50%) shall be paid.

2. If a Dancer is required to remain outside the New York City limits overnight following the last performance of the day, the per diem shall be comprised of a food allowance and a hotel allowance as follows:

    (a) The food allowance shall be: $98.75, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

    (b) If the Met does not provide hotel rooms for Dancers, the hotel allowance in each year of the AGREEMENT shall be determined by the following method and shall be added to the food allowance in order to arrive at the total per diem:

        On March 1st of each year, an average (single room) hotel rate, including local hotel tax, if any, shall be determined for each city on the Tour.  These applicable city averages shall be weighted by the number of days spent in the respective cities in order to arrive at the average hotel rate.

3. Per diem for Mid-Winter or International Tour or festival outside New York City shall be

negotiated with AGMA prior to each such engagement.

I.   **MAINTENANCE ALLOWANCE**

Each regular Dancer shall each year receive an allowance of nine hundred ($900) dollars towards the Dancer's expenses of physical maintenance, outside classes, chiropractic treatments, etc., such sum to be paid at the beginning of the regular New York Season.

J.   **PYRAMIDING OF PAYMENTS**

It is understood that in no event shall there be any pyramiding of payments, i.e. pay upon pay.  In the event that compensation in excess of weekly compensation shall be payable hereunder, only the higher rate shall apply and no additional compensation shall be payable.

**FOURTH:  GUARANTEED EMPLOYMENT**

A.   **MINIMUM NUMBER OF DANCERS**

Notwithstanding the terms of Article Ninth B and Article Fifteenth B of this Section IV, effective on or before September 1, 2011, the Met shall give notice to four (4) regular Dancers of non-renewal of their employment for the 2012-2013 New York Season. The choice of which Dancers shall be given notice shall be solely that of the Met and not subject to challenge for any reason. Effective August 1, 2012, the non-renewed Dancers shall no longer be employed by the Met and shall be entitled to severance pay, equal to a total amount of $75,000, less withholding, paid on a weekly basis over the course of the 2012-2013 year. Such amount shall not be subject to other benefits. Said Dancers shall also be entitled to medical and prescription drug coverage under Met Medical Plan B through July 31, 2014. The minimum number of Dancers in the Corps de Ballet shall then be twelve (12).

Effective on or before September 1, 2012, the Met shall give notice to four (4) regular Dancers of non-renewal for the 2013-2014 New York Season. The choice of which Dancers shall be given notice shall be solely that of the Met and not subject to challenge for any reason. Effective August 1, 2013, the non-renewed Dancers shall no longer be employed by the Met and shall be entitled to severance pay equal to a total amount of $75,000, less withholding, paid on a weekly basis over the course of the 2013-14 year. Such amount shall not be subject to other benefits. Said Dancer shall also be entitled to medical and prescription drug coverage under Met Plan B through July 31, 2015. The minimum number of Dancers in the Corps de Ballet shall then be eight (8).

In addition to the above, any regular Dancer may, by the end of the 2012-2013 New York Season but before August 1, 2013, voluntarily resign from employment; and in that event, the Dancer shall continue to be employed during the 2013-2014 season and effective August 1, 2014, shall no longer be employed by the Met and shall be entitled to severance pay equal to a total amount of $75,000, less withholding, paid on a weekly basis over the course of the 2014-15 year. Such amount shall not be subject to other benefits. Said Dancer shall also be entitled to medical and prescription drug coverage under the Met Plan B through July 31, 2016. For each Dancer that voluntarily resigns under this paragraph, the Corps de Ballet shall be reduced by one.

During the term of this Agreement, there shall be no minimum number of regular Dancers in the Corps de Ballet.

B.   **MINIMUM PERIOD OF GUARANTEED EMPLOYMENT**

The Met shall offer to all regular Dancers forty (40) weeks of guaranteed employment in a year, such weeks to include a maximum of five (5) vacation weeks during which no services shall be required.

C.   **SUPPLEMENTARY BENEFITS**

Each regular Dancer agrees to be available to the Met for an additional twelve (12) weeks of employment during each year of this AGREEMENT in accordance with Article SEVENTEENTH of

SECTION ONE.

D. **PERSONS ENGAGED AFTER AUGUST 1**

It is understood that, notwithstanding anything contained in Paragraph A of this Article FOURTH, the minimum guaranteed number of weeks shall not be applicable to Dancers engaged after the beginning of any year of employment during that year.

E. **VACATION**

Each Dancer shall be entitled to one (1) week of vacation for each ten (10) weeks of actual availability to the Met, up to a maximum of four (4) weeks of vacation, provided, however, that thirty-five (35) weeks of availability to the Met shall entitle a Dancer to five (5) weeks of vacation. Vacation Weeks [in units of no less than one (1) week] shall be selected by the Met, provided, that at least two (2) weeks will be consecutive.

F. **NOTIFICATION OF SCHEDULE**

The Met agrees to make best efforts to notify the Ballet of its summer schedule by March 1st of each year.  Notwithstanding this agreement and any such notification that shall have been made, the Met shall have the right to seek and provide employment for the Dancers during the summer period and to alter an announced schedule upon reasonable notification.

G. **LEAVES OF ABSENCE**

1. Dancers who have five (5) or more years of seniority (based upon full-time employment with the Met)* shall be entitled to leaves of absence for a period of up to one (1) year provided:

   (a) No more than three (3) Dancers shall receive leaves of absence during a period of two (2) years and no more than one (1) male and one (1) female Dancer shall receive a leave of absence in any year during such period; and

   (b) No Dancer shall receive more than one (1) leave of absence during the period August 1, 2014 - July 31, 2018.

2. A female Dancer who has completed at least one (1) year of employment shall be entitled to a leave of absence of up to one year for maternity, inclusive of any leave taken under the provisions of SECTION ONE, Article FIFTEENTH.

   *\* Compiled in accordance with the requirements of the Metropolitan Opera Corps de Ballet Savings Plan.*


**FIFTH:  CONDITIONS APPLICABLE TO EMPLOYMENT ON A PER PERFORMANCE BASIS**

A. **PERFORMANCE**

1. <u>RATES PER PERFORMANCE</u>

| | |
|---|---|
| Principal Dancer | $1,575.51 |
| Extra Dancer | 215.65 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(a) The foregoing per performance compensation includes a sum paid in lieu of any fringe benefits.  In addition to such sum included in the per performance rates, an extra Dancer shall also receive in each year an amount equal to seven percent (7%) of the Dancer's gross earnings (excluding media earnings) for such year in lieu of any fringe benefits.

(b) In addition to the contribution specified in sub-paragraph (a) above, an extra Dancer shall also receive in each year an amount equal to eleven percent (11%) of the Dancer's media earnings (e.g., radio, television) for such year in lieu of any fringe benefits.

2. Performance Covers

(a) An extra Dancer who covers a performance and is required to and does attend such performance shall receive the following compensation for a maximum of three (3) parts covered: $107.83, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b) For the fourth and each additional part such extra Dancer covers in a performance, such Dancer shall receive an additional cover fee as follows: $40.85, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(c) On each occasion that an extra Dancer who has been contracted as a cover is required to stay more than two (2) hours as a cover, he/she shall receive a flat fee of $35.00, subject to the provisions of SECTION ONE, Article TWENTY-THIRD, in addition to the rates in subparagraphs (a) and (b) above.

3. Conditions Applicable to Performances

The provisions of Article THIRD (C) shall be applicable to performances by extra Dancers engaged on a per performance basis.

4. Audience Development Performances

The provisions of Article THIRD (E) shall be applicable to Audience Development performances by extra Dancers engaged on a per performance basis. For an Audience Development performance of up to two (2) hours, a participating Dancer shall be paid a fee as follows: $283.46, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

B.   **REHEARSALS OF EXTRA DANCERS**

The following provisions are applicable only to extra Dancers employed on a per performance basis.

1. REHEARSAL RATE

$60.12, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

2. CONDITIONS APPLICABLE TO REHEARSALS

The provisions of Article THIRD (D) and (E) (5) shall be applicable to rehearsals of extra Dancers except as follows:

(a) Article THIRD (D) (2) (b) notwithstanding, if the interval between dismissal from one rehearsal and the call for a subsequent rehearsal shall be more than two (2) hours, the rehearsal period shall be deemed continuous from the beginning of the first rehearsal to the end of the subsequent rehearsal.

(b) Article THIRD (D) (3) (a) (iii) notwithstanding, a studio rehearsal may commence at 10:00 A.M. (or 9:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is  7:30 P.M.) and will be paid at the hourly rehearsal rate unless the Dancer has performed the previous evening, in which event compensation will be at one and one-half (1-1/2) times the hourly rehearsal rate for time between 10:00 A.M. and 12:00 noon (or 9:30 A.M. and 11:30 A.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M).

3. An extra Dancer who is engaged for a new production and is not called for rehearsals for such production before the fourth (4th) day of the applicable rehearsal period specified in such Dancer's individual contract shall receive rehearsal compensation as specified herein for each day (Monday through Friday) on which such Dancer is not called to rehearse, except that such payment shall be made only for a period of one or more consecutive days prior to the first day of rehearsal for such production.  Such daily compensation shall be equal to two (2) hours at the applicable rate specified in this Paragraph (B) (1).

4. Notice of rehearsals (including rehearsal changes) shall be posted no later than seventy-two (72) hours in advance.  Once such notice is given, the rehearsal call may not be cancelled. An extra Dancer shall be given individual notice of a rehearsal call in the event that such extra Dancer is not scheduled for a rehearsal or performance during the seventy-two (72) hour period immediately preceding such call.

C. **MEDIA**

1. MEDIA SALARY

   Extra Dancers who participate in a media service shall receive Media Salary payments as follows:

   (a) For a week in which a Metropolitan Opera International Radio Broadcast ("radio broadcast") is worked but no other performance involving media activity is worked: $386.16, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

   (b) For a week in which a radio broadcast is worked and one (1) to four (4) additional performances involving media activity are worked:$451.19, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

   (c) Per media performance for a week in which a radio broadcast is not worked, but one (1) or more additional performances involving media activity are worked: $65.03, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

2. REVENUE SHARING GUARANTEE

   Extra Dancers shall be guaranteed $39.06 in revenue sharing for each media service performed.

3. ADDITIONAL PAYMENTS

   (a) In addition to Media Salary and revenue sharing payments, Extra Dancers who are participants in a media event as described below, and did not work the Saturday radio broadcast in the same week, shall receive the more favorable of the following rates in effect during either the capture or initial release of:

       (i) any compilation product (audio or audiovisual) embodying any materials other than (A) archival performances and (B) the performances described in Section ONE, Article TENTH (C),

       (ii) performances other than those described in Section ONE, Article TENTH (C) released by a mix of commercial and non-commercial radio outlets that is substantially similar to the current mix comprising the Metropolitan Opera International Radio Network, or by means of a physical CD released as part of normal catalogue product by a major record distribution company (with the understanding that any version of a production—e.g., a highlights record, a 3-disc CD—is considered part of the same performance) or a comparably permanent product,

       (iii) performances described in Section ONE, Article TENTH (C) released by means of exploitation beyond that permitted by that paragraph: $127.32, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

(b)  Except with the consent of the Union, the Met may not acquire the rights described in this paragraph (3) by payment, after the term of this Agreement, of the applicable sums.

(c)  The payments in this paragraph (3) are one-time payments per project, with the applicable sum due within 30 days following the first exploitation beyond the applicable restriction or limitation on the Met.

4.  SOLO FEES

A Dancer who performs a solo part for a Metropolitan Opera audio-visual capture shall be paid as follows:

| | |
|---|---|
| Principal Solo | $404.29 |
| Intermediate Part | 228.99 |
| Minor Part | 170.49 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

Such solo part fees shall be in addition to the Performance Extras fees set forth in this Section FOUR, Article THIRD, Paragraph C (7) (a).

D.  **PER DIEM** - As in Article THIRD (G).

E.  **SICK BENEFITS**

An Extra Dancer who has performed during each of the preceding two (2) years and who is actually ill or disabled shall be eligible for one (1) day of sick leave in each year for every ten (10) performances worked in such year.  Such day shall consist of a rehearsal and/or performance call.

F.  **MEDICAL**

The Met shall make an annual contribution to the AGMA Health Plan B for each extra Dancer in the amount equal to three percent (3%) of an extra Dancer's gross earnings, up to a maximum contribution of $2,000 per fiscal year.  Gross earnings for the purposes of calculating AGMA Health Plan B contributions shall include Media Salary. Gross earnings for the purposes of calculating AGMA Health Plan B shall not include the payment set forth in this Section FOUR, Article FIFTH, Paragraph G. below.

In lieu of the above, effective August 1, 2014 and continuing until both parties agree to an alternate arrangement, the Met shall pay the above identified extra Dancer, as taxable wages, an amount equal to the Plan B percentage contribution that the Met otherwise would be making on their behalf in order to assist them with purchasing health insurance on the exchange or through another venue, or to offset medical expenses that were incurred. Such payments shall be made at the end of each New York Season and will include a summary statement of earnings against the percentage contribution. The Met will likewise provide to AGMA a summary statement of all eligible extra Dancers, their gross earnings for the New York Season and the amount of the contribution tendered to the extra Dancer.

G.  **PENSION**

The Met shall include in each extra Dancer's gross earnings a payment equal to eleven percent (11%) of Media Salary in each year in lieu of receiving any retirement benefits.

H.  **PROGRAM CREDIT**

The Met agrees to include the names of extra Dancers in the Metropolitan Opera House performance program.  The list of such Dancers shall be prepared once each season for inclusion beginning with the Opening Night program (according to the timetables normally established for closing this program), and shall include all extra Dancers whose contracts for such season have

been executed by that time.

## SIXTH: CONDITIONS APPLICABLE TO PRINCIPAL DANCERS AND CHOREOGRAPHERS ENGAGED ON A WEEKLY BASIS

### A. WEEKLY COMPENSATION

| | |
|---|---|
| Principal Dancer | $1,680.58 |
| Choreographer | $2,100.73 |

Subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

### B. ADDITIONAL PERFORMANCES

Any Principal Dancer engaged on a weekly basis shall receive, in addition to his/her regular weekly compensation, an amount equal to forty percent (40%) of his/her weekly compensation for each performance in excess of four (4) in a week.

### C. VACATION

Principal Dancers and Choreographers engaged on a weekly basis shall be entitled to vacation with pay as provided in Article FOURTH (E).

### D. HEALTH AND LIFE INSURANCE

1. Anything to the contrary contained in Article FIFTEENTH notwithstanding, the Met will furnish at its own expense Comprehensive Medical, Vision, Dental and Life Insurance as provided in Article FIFTEENTH to Principal Dancers and Choreographers.

2. Any Principal Dancer or Choreographer engaged on a weekly basis for ten (10) or more weeks in a year may participate, at his/her expense, in the Comprehensive Medical, Vision, and Dental program, provided that if his/her engagement is extended to no less than thirty-four (34) weeks in a year, the Met shall reimburse him for any insurance premiums paid by him in such year.

## SEVENTH:  FREE PERIODS

### A. SUNDAY

Sunday shall be a free day except for:

1. a performance on New Year's Eve;

2. a performance replacing a canceled or postponed performance;

3. a pension fund or similar gala performance;

4. a safety rehearsal on the main stage which is held for the protection of ARTISTS and which involves equipment or activity which may create a physical hazard for the ARTISTS;

5. an independent ballet performance on a Sunday in which event one (1) other day shall be designated as a free day for that week.

The Met will give AGMA prior notice of its intention to schedule a performance or rehearsal in accordance with the above on a Sunday and prior approval of AGMA will be required in the event of a pension fund or similar gala performance on Sunday.

B. **PRE-SEASON**

During Pre-Season, Saturday shall be a free day for Dancers, except that if a stage rehearsal falls on a Saturday, the Met may, at its option, either designate another free day during that week or compensate the Dancer on the Saturday at the rates applicable to rehearsals during a free period.

C. **ADDITIONAL FREE PERIOD**

Each Dancer shall be entitled to one (1) day other than Sunday, in every two (2) week segment of the Regular Season during which he/she shall not be assigned to perform and/or rehearse prior to 6:00 P.M., or prior to 5:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M. Such day shall be a Monday unless:

1. Thanksgiving, Christmas, New Year's or Good Friday falls within the two (2) week period and the Met elects to use such holiday as a substitute for Monday;

2. a dress rehearsal for a Wednesday or Thursday premiere is scheduled for Monday;

3. a full ensemble cannot be assembled for rehearsal on a day other than Monday.

4. No such Monday substitution shall be permitted for Labor Day.

5. For 6:00 P.M. performances of *HANSEL AND GRETEL* scheduled for Christmas Day and/or New Year's Day, a 5:30 P.M. call shall not be subject to penalty payments incurred for invasion of a free day. Notice of such day shall be given to the Dancer by no later than Friday of the week preceding the week in which such day is scheduled.

D. **TOUR**

On Tour, the weekly ballet schedule distributed by Friday of the preceding week shall designate the days of the week on which it is contemplated that rehearsals might be scheduled. All days not so designated shall be considered free days until 6:00 P.M. and any rehearsals held on those days shall be compensated at the rate applicable to rehearsals during a free period.

E. **OFF-SEASON**

The two (2) free days for Dancers during Off-Season non-performance weeks shall be any two (2) consecutive days during the week designated by the Met.

F. **RELIGIOUS HOLIDAYS**

Any Dancer who is prevented by the rules of his/her religion from participating in a rehearsal and/or performance on the first day of each of the Jewish High Holy Days and Good Friday shall be excused without loss of any portion of his/her weekly compensation. It is further understood that any Dancer wishing to be excused for professional as opposed to religious reasons to participate in another engagement during these Holy Days must apply for a release, and that if the release can be granted, any missed services will be deducted from the Dancer's weekly compensation on a pro-rata basis.

G. **DESIGNATION OF A FREE PERIOD**

A free period to be designated under Paragraphs A through D hereof shall be deemed to have been so designated if Dancer is notified personally or in writing or if the free period is specifically indicated as such on the weekly rehearsal schedule. Any such notification must be made on or before Friday immediately preceding the week in which the free period falls.

**EIGHTH:  COSTUMES, WIGS AND MAKE-UP**

A.  **COSTUMES, WIGS, SHOES AND ATTIRE**

1.  All costumes and wigs, including any incidentals, which any Dancer is required by the Met to wear at any rehearsal or performance, shall be furnished at the expense of the Met, and shall be worn by said Dancer.  Dance belts shall be considered part of the costume.  All costumes and wigs shall be cleaned before being used for the first time in any season.

2.  In each season, regular Dancers shall receive clothing and shoes as follows:

   Female Dancers:   Ballet shoes  –  one (1) pair in first rehearsal week; five (5) additional pairs, as needed, during remainder of season.

   Jazz shoes  –  one (1) pair in first rehearsal week.

   Toe shoes  –  four (4) pairs per month, if requested, except in any season with one or more pointe ballets in the repertory when, during rehearsal periods for pointe ballets, there shall be two (2) pairs per week. In addition, toe shoes shall be provided as needed for stage rehearsals and performances.  A Dancer's shoes shall be provided in sufficient time to allow for break-in.

   Tights  –  one (1) pair in first rehearsal week; one (1) additional pair during remainder of season.

   Male Dancers:   Ballet shoes  –  two (2) pairs in first rehearsal week; nine (9) additional pairs, as needed, for rehearsals during remainder of season.

   Jazz shoes  –  one (1) pair in first rehearsal week.

   Tights  –  one (1) pair in first rehearsal week; one (1) additional pair during remainder of season.

   Dance belts  –  one (1) in first rehearsal week; three (3) additional belts, as needed, for rehearsals during remainder of season.

3.  An extra Dancer who is engaged for one (1) or more operas during any season shall receive one (1) pair of ballet shoes for such season.

B.  **FITTINGS**

Any Dancer may be required to attend fittings inside or outside of the Opera House for shoes, costumes and/or wigs, as may be deemed necessary by the Met.

C.  **CHANGING INTO AND OUT OF COSTUME**

1.  Any Dancer required to be in 'full' costume for any rehearsal shall be allocated one-half (1/2) hour for dressing and one-half (1/2) hour for undressing and shall receive the applicable credit or compensation except that compensation for undressing after a rehearsal in costume finishing at or before 6:00 P.M. (or 5:30 P.M. Monday through Friday during the New York Season in a season in which the standard curtain time is 7:30 P.M.) shall be at the hourly rehearsal rate.

2.  The time for dressing and undressing referred to in subparagraph 1 and the dressing time referred to in subparagraph 4 hereof shall not be included in computing rehearsal time for which rest period must be given.

3.  Any Dancer required to be in less than 'full' costume for any rehearsal shall be given the necessary period for dressing and undressing during his/her regular rehearsal period.

4.  Any Dancer whose rehearsal call is fifteen (15) minutes early because the Dancer is required

for safety or other technical reasons to wear an unusual part of a costume (e.g., the bird-heads or gas masks in *VOYAGE*) for a non-costume rehearsal on the main stage shall receive the applicable credit for such fifteen (15)minute dressing time.

5. If the Dancer shall be given time to dress subsequent to his/her first service in a rehearsal or to undress prior to his/her last service in a rehearsal, no additional time credit or compensation shall be due such Dancer.

D. **MAKE-UP**

1. Each Dancer shall provide, at his/her own expense, all make-up required by the Met to be worn for performances and rehearsals and shall wear make-up according to the standards and specific instructions of the Met.  The Met shall furnish, however, at its expense, any individual 'special effect' make-up, such as body and clown make-up.

2. Any Dancer required to appear in body make-up in any rehearsal shall, in addition to his/her weekly compensation, receive: $77.03, subject to the provisions of SECTION ONE, Article TWENTY-THIRD.

3. If there are no hot and cold water showers available for a performance on tour, then no Dancer shall be required to use body make-up for such performance.

E. **QUICK CHANGE ON STAGE**

A sheltered area shall be provided for any costume change which must take place on stage.

**NINTH:  ENGAGEMENT AND REENGAGEMENT**

A. **ENGAGEMENT**

Upon at least twenty-one (21) days' notice to AGMA, the Met will hold auditions of Dancers to fill vacancies (weekly or per performance) prior to the commencement of each season.  Any Dancer designated by AGMA or the Met may participate.  A representative of AGMA may be present and may express opinions to the Met, however, the Met shall have the right to fill each position with any available Dancer who, in its sole discretion, is qualified.

B. **NON-REENGAGEMENT**

The non-reengagement of a Dancer for reason other than for cause, failure to fulfill contract, or incapacitation in manner as to be incapable of performing professional duties shall be subject to the following procedures:

1. If the Met wishes to discontinue the services of a Dancer with more than two years of service (considered the "probationary period"), it shall give the Dancer a written warning, specifying the Dancer's deficiencies and shall give the Dancer three (3) months in which to correct the deficiencies to the satisfaction of the Met.

2. If the Met wishes to proceed with the discontinuance of such a Dancer's services, it shall give a Notice of Non-Reengagement to the Dancer and to AGMA no later than the end of the regular New York season and such notice shall specify the Dancer's continued deficiencies. Such Notice of Non-Reengagement shall not become effective until the conclusion of the season immediately following such Notice.  With respect to Dancers who were hired by the Met before January 1, 2001, upon receipt of such Notice, AGMA shall have the right to challenge the discontinuance by sending written notice to the Met within 20 days of receipt. The right to any challenge is limited to the procedure specified in paragraph 3. below and pursuant to the time restrictions therein, and no other means may be used.  No Dancer hired after January 1, 2001 shall have the right to challenge a notice of discontinuance by this procedure or any other means, and the discontinuance of such Dancer shall become effective automatically at the end of the subsequent season.

3. No later than the beginning of the season the matter shall be submitted to a review

committee established by AGMA and the Met.  The committee shall consist of three (3) dance experts, one of whom shall be chosen by AGMA, and one by the Met.  The third expert shall be selected mutually by AGMA and the Met from the agreed-upon list (Exhibit E to this AGREEMENT).  The three experts shall audition the Dancer at the same time pursuant to the Ballet Audition Procedure set forth on Exhibit F to this AGREEMENT, and each shall submit to both AGMA and the Met his/her determination as to whether the Dancer has the first-class ballet technique, appropriate physicality for ballet dancing, strong partnering skills, and dramatic ability required to perform the responsibilities of a regular member of the Met's Corps de Ballet.  This determination shall be submitted by checking the appropriate box on the Ballot shown below, a copy of which will be submitted to each expert prior to the audition, and no elaboration of the determination thereon by any expert shall be permitted.  The committee shall meet and audition the Dancer within 60 days of the beginning of the New York season and shall submit the executed Ballots within 24 hours of the time the Dancer is auditioned.  The majority opinion of the committee shall be final and binding and not subject to arbitration for any reason whatsoever or to any further review of any kind.

4.   The review procedure specified above shall be the sole method by which AGMA or a Dancer with two (2) years of service may challenge the discontinuance or non-reengagement of a Dancer, notwithstanding any other provisions of this AGREEMENT.  A determination by the majority of the review committee that a Dancer can perform as required shall require the Met to reengage that Dancer for an additional season.  If a Dancer does not participate in the audition specified in paragraph 3 above and within the specified time limits, such Dancer shall be deemed to have accepted his/her discontinuance.  Nothing herein shall prevent the Met from giving Notice of Non-Reengagement to the same Dancer by the end of the season following that in which a prior Notice of Non-Reengagement was given, in which case the procedures specified in paragraphs 2 and 3 above shall again be followed.

5.   Notwithstanding the provisions of paragraphs 2 through 4 above, any Dancer hired before January 1, 2001 who receives a Notice of Non-Reengagement shall have the option, instead of challenging the discontinuance, to invoke the following package by sending written notice to the Met within 20 days of receipt of the Notice of Non-Reengagement that he/she opts for the package:

(a)   Such Dancer will be carried as a regular employee during the season following that in which the Notice was received but will not be required to perform during that season.

(b)   For any such Dancer who is qualified for Met-provided health coverage under this AGREEMENT, the Met will provide coverage for the two seasons following that in which the Notice was received under the Preferred Provider Organization plan currently in effect for administrative staff as described in "Summary of Administrative Staff Benefits Program", and provide the prescription drug plan, vision care and dental care benefits also as described in such "Summary."

(c)   Should any Dancer who chooses the foregoing option become disabled and thereby entitled to sick leave and disability insurance benefits within the meaning of the Met's sick leave and disability insurance policies, the Dancer's benefits will then become limited to those provided by such policies.

(d)   Notwithstanding the foregoing, all benefits above to be provided by the Met will cease if such Dancer becomes covered by any other health plan.

6.   Any Dancer hired before January 1, 2001 may voluntarily terminate his/her employment and receive the package described in subparagraph 5(a) through 5(d) by asking the Met in writing for a Notice of Non-Reengagement at any time during a season.  Such Dancer thereby waives entitlement to a letter of warning under paragraph 1, will be discontinued at the end of that season, and becomes entitled to said package.

7.   No public announcement shall be made of the names of the Dancers who have not been reengaged, it being understood that except for purposes of their legal rights under this BASIC AGREEMENT or otherwise, they shall be considered to have resigned.

**DANCER BALLOT**

**Does [Dancer] have the first-class ballet technique, appropriate physicality for ballet dancing, strong partnering skills, and dramatic ability required to perform the responsibilities of a regular member of the Metropolitan Opera's Corps de Ballet?**

\_\_\_\_    **Yes**

\_\_\_\_    **No**

_____    _____

**Signature of Expert**                       **Date**

C.  **TENDER OF REENGAGEMENT**

The Met shall tender to any Dancer whom it desires to reengage for a subsequent season the applicable STANDARD FORM CONTRACT, such tender prior to the commencement of that season. A Dancer may accept reengagement by executing such STANDARD FORM CONTRACT within two weeks after the tender or by March 31 of the same year in which it was tendered, whichever is later.  If no acceptance is received within the two-week period or by March 31, whichever is applicable, the tender shall be considered declined.  Notwithstanding anything herein contained, the tender is subject to the existence of a collective bargaining agreement between the Met and AGMA for the next succeeding Regular Season and the presentation of its regular New York subscription season by the Met.

**TENTH:  ENGAGEMENT AND REENGAGEMENT (PER PERFORMANCE BASIS)**

Dancers engaged on a per performance basis shall be engaged at the time of their employment for a specific number of performances provided, however, that the Met shall have the right to assign additional performances of the same works on the same terms.  The Met shall notify such  Dancers of their performance dates at the beginning of each eight-week period of the New York Season and Dancers shall be bound to perform on these dates.  The Met shall, however, have the right to change performance dates at any time.  However, if after receipt of the eight-week schedule and prior to notice of such change any Dancer shall have accepted other employment for a date to which a performance is so changed, such Dancer shall not be required to perform on such changed date.  The Met shall have the further right to cancel any announced performance and shall not be liable for payment to such Dancers unless the actual number of paid performances is less than the minimum guaranteed in the individual Dancer's contract.

**ELEVENTH:  CASTING OF NON-DANCE ROLES**

Any director or choreographer staging a new production or restaging an existing production shall review head shots of Dancers prior to casting mute, cameo, character, acrobatic or specialty roles.  Such review shall be for purposes of consideration only and shall not require any director or choreographer to cast a Dancer for any such role.  Such head shots shall be taken by Met photographers at the Met's expense, except that any Dancer shall have the right to provide his/her own head shot if he/she prefers.

**TWELFTH:  EXCLUSIVITY**

A.  No Dancer shall accept engagements to render any service to a third party during the period of his/her contract with the Met which shall interfere with his/her ability to render the services called for under his/her contract with the Met.

B. No Dancer without the written consent of the Met shall perform in any company or ensemble using the name 'Metropolitan', 'the Met', or any variant thereof either in the name or in the description of such company, ensemble, or the over-all cast thereof, or any of the choral members thereof during or following the period of this contract.

C. No Dancer shall in the aforesaid periods (unless he/she shall have resigned or been given notice of non-reengagement), without the written consent of the Met, perform in any corps de ballet participating in performance of opera or excerpts therefrom if fifty percent (50%) or more of the personnel of any such corps de ballet consists of members of the Met's Corps de Ballet.


**THIRTEENTH:  SICK BENEFITS**

A. Every Dancer engaged by the Met on a weekly basis shall be entitled to sick leave for illness or disability during any year as specified in Paragraph B, provided, however, that no such Dancer shall be entitled to sick leave for illness or disability during the first two (2) days of such illness or disability.  No person shall be entitled to sick leave as a matter of right—i.e., sick leave can only be taken by a person who is actually ill or disabled.  In connection therewith the Met may require such Dancer to furnish a doctor's certificate verifying illness or disability.  In addition to such certificate, the Met may, from time to time, require Dancer to submit to examination by a doctor designated and paid by the Met to verify such illness or disability.  Sick leave shall be based upon number of years of service.  However, in no event shall any period of sick leave extend beyond fifty-two (52) weeks and in no event shall any period of sick leave extend beyond the term of the Dancer's contract.

B. 

| Years of Service | Sick Leave |
| --- | --- |
| 0-1 | 2 weeks |
| 2 | 4 weeks |
| 3 | 8 weeks |
| 4 | 12 weeks |
| 5 | 20 weeks |
| 6 | 28 weeks |
| 8 | 36 weeks |
| 10 and over | 52 weeks |

A week of sick leave shall be the equivalent of six (6) non-consecutive working days; however, no absence shall be counted against sick leave in any week in which Dancer performs the maximum hours per week to which weekly compensation but no additional compensation is paid.  If a Dancer has more than one call in any day and misses a portion of those calls, then one-half (1/2) day of sick leave shall be credited for the day and one-half (1/2) for the evening portion of that day.

C. The Met shall have the right to terminate the employment of any Dancer engaged on a weekly basis during his/her first season of employment if by reason of illness or disability such Dancer is unable to appear for more than one-half (1/2) of the scheduled professional services required during the first two (2) months of employment.


**FOURTEENTH:  TERMINATION OF EMPLOYMENT FOR WILLFUL FAILURE TO APPEAR**

It is expressly understood that the services of any Dancer are unique and that the willful failure of such Dancer to appear, except by reason of verified illness or disability or events beyond his/her control, will cause the Met damage.  Accordingly, it is agreed that time is of the essence of this AGREEMENT and in the event that any Dancer shall willfully fail to appear for the commencement of services or shall willfully fail to appear for a full day for any scheduled rehearsal or performance, said Dancer shall be deemed in breach of his/her agreement and the Met shall have the right to terminate the employment of such Dancer. Any Dancer who shall fail to appear at any scheduled rehearsal or performance by reason of alleged illness or disability, and who shall perform for any third party or on his/her own behalf on the same day of said alleged illness or disability without the Met's consent given on the same day, shall be deemed in breach of his/her agreement and the Met shall have the right to terminate the employment of such Dancer. Any termination hereunder shall be subject to arbitration in accordance with Article TWELFTH (E)

of SECTION ONE of this AGREEMENT.

**FIFTEENTH:   HEALTH, LIFE AND DISABILITY INSURANCE, BALLET SAVINGS PLAN CONTRIBUTIONS, AND OTHER BENEFITS**

A. Health, Life and Disability Insurance

1. The Met shall furnish at its own expense, in accordance with the provisions of this Article FIFTEENTH, Comprehensive Medical insurance under what is known as Met Medical Plan B with Prescription Drug Coverage as well as Vision, and Dental Insurance, a Life Insurance policy, and a Long-term Disability Insurance policy to 'full time' members of the Corps de Ballet and all such Dancers must participate.  As used herein the term 'full time' means a Dancer engaged on a weekly basis and who actually works twenty-nine (29) or more weeks. Vacations are not included in such minimum period of twenty-nine (29) weeks.

   (a) Life Insurance shall be an amount equal to two (2) times such Dancer's annual compensation for the prior year, as shown on his/her W-2 form for such year, or one hundred four (104) times such Dancer's regular weekly compensation of the prior year, whichever is greater, except that in no event shall such benefit exceed two hundred thousand dollars ($200,000).  In the event a Dancer is making contributions towards a deferred annuity, the amount of such contribution shall, nevertheless, be considered as compensation for the purpose of determining Life Insurance. Effective August 1, 2008, annual compensation for the purposes of calculating life insurance shall include media salary and guaranteed revenue sharing amounts.

   (b) Long-term Disability insurance shall provide benefits after utilization of applicable sick leave, as provided in Article THIRTEENTH, for such Dancer who, during a period of verified illness or other total disability, is unable to dance and otherwise perform his/her functions as a member of the Corps de Ballet.  Such benefit shall be based on actual gross earnings, including rehearsal pay, performance overtime, SUB, etc., and effective August 1, 2008, gross earnings shall include media salary and guaranteed revenue sharing amounts. Such benefit shall be based on an amount equal to fifty-two (52) times the individual Dancer's regular weekly salary at the time of total disability, or his/her total annual salary for the last full year preceding total disability, whichever is greater.

   (c) Summary Plan Descriptions of the Comprehensive Medical, Vision, Dental, Life Insurance, and Long-term Disability contracts are available for review upon request from the Met's Human Resources department.

2. It is understood that the Met obligates itself to furnish coverage only and not monies in lieu of coverage.

B. Metropolitan Opera Corps de Ballet Savings Plan

The contribution rates specified in Section 4.1 of the Metropolitan Opera Corps de Ballet Savings Plan shall be as follows:

For regular compensation, including media salary, additional media payments as specified in Section ONE, Article TENTH (C) (11) and guaranteed revenue sharing amounts, as defined in Section 1.11 of the Plan, the contribution rate shall be fifteen percent (15%).

C. Transit and Parking

Regular Dancers shall be eligible to participate in the Met's transit program.  Such employees shall also be eligible to participate in a program under which parking can be paid in pre-tax dollars as permitted by the Internal Revenue Service.  The terms and conditions of such programs must be in accordance with then-current Internal Revenue Service regulations.

D. Exit Pay

Exit pay shall be provided, up to a maximum of fifteen weeks' payment, to Regular Dancers who

leave employment after completion of at least three (3) years of service, equal to one (1) week per year for each year of continuous service as a Regular Dancer, except if the Dancer is terminated for gross misconduct.  Only Dancers hired after January 1, 2001 shall be eligible for this pay.


## SIXTEENTH:  COMMITTEES

A.   The Met agrees to meet regularly during the New York season and otherwise as necessary with a small committee of the Corps de Ballet to discuss anticipated problems affecting the Ballet.  Such committee shall also be invited to attend all stage plan meetings.

B.   Representatives of the Corps de Ballet shall be invited to see designs and staging plans (including preliminary sketches, ground plans, models and fabric selections) of new productions in order to anticipate and avoid, where possible, conditions which might result in 'hardship'.  Existing productions shall also be reviewed for revision of 'hardship' conditions where practicable.

C.   Members of the negotiating and grievance committees who are requested to participate in meetings with the Met at a time when they would otherwise be participating in a rehearsal or performance shall suffer no loss in compensation as a result of participation in such meetings.


## SEVENTEENTH:  MISCELLANEOUS

This AGREEMENT shall be construed in accordance with and governed by the procedural and substantive laws of the State of New York and shall not be modified or discharged except by a writing signed by the parties.  Captions and headings are inserted for convenience only and shall in no event be deemed a part of this AGREEMENT.

# CHORUS APPENDIX
## 2014-18 Contract

| OPERA | SOLO PARTS | INTERMEDIATE PARTS | MINOR PARTS |
|---|---|---|---|
| ADRIANA LECOUVREUR | - | Major Domo | Duclos' maid |
| AEGYPTISCHE HELENA | Elves (2) | Elves (6) | - |
| ALCESTIS | 4 Leaders of People | - | - |
| ANTHONY & CLEOPATRA | Sentinel | Soldier of Anthony | Anthony's Guard (3) |
| | Second Guard | - | First Watchman |
| | Demetrius | - | Second Watchman |
| | Canidius | - | - |
| ARABELLA | Waiter | Three Card Players | - |
| | Welco | Djura | - |
| | - | Jankel | - |
| ATLANTIDE | Mezzo Solo | - | Tenor Solo |
| | - | - | Solo Quartet |
| BILLY BUDD | - | - | Gunnersmate |
| | - | - | Sailor |
| | - | - | Solo Baritone |
| | - | - | Solo Bass |
| | - | - | Solo Tenor |
| | - | - | Offstage Voice "Earrings" |
| BOCCANEGRA | - | Maid servant | - |
| BOHÈME | Parpignol | Sergeant | 1 Hawker |
| | - | Officer | ("Prugne di Tours") |
| BORIS GODUNOV | - | | Afemya (mute) |
| CARMEN | - | - | Act I Whistle |
| | - | - | "Voulez-vous" "section a gauche" Soldier Act I Command |
| CAVALLERIA RUSTICANA | - | - | Woman Screaming |
| CONTES D'HOFFMANN | - | - | "La Harpe" |
| CYRANO | - | - | Muskateer |
| | - | - | 1st Sentinel |
| | - | - | 2nd Sentinel |
| | - | - | Cook |
| DIALOGUES OF THE CARMELITES | - | 11 Carmelite Nuns | Off-Stage Spoken Line |
| DON GIOVANNI | - | - | Scream |

**APPENDIX**
continued

| OPERA | SOLO PARTS | INTERMEDIATE PARTS | MINOR PARTS |
|---|---|---|---|
| DON PASQUALE | - | | Chorus Soli Servants (9) |
| ENTFÜHRUNG AUS DEM SERAIL | - | 4 Chorus Soli | - |
| EUGENE ONEGIN | - | Peasant Man | - |
| FAUST | | | Wagner's Mother<br>Wagner's Girlfriend |
| FAVORITA | - | - | Spanish Nobleman |
| FEDORA | - | - | Michele |
| FILLE DU REGIMENT | Corporal | Townsman | "Vous" |
| FIRST EMPEROR | - | - | Guard |
| FORZA DEL DESTINO | Surgeon<br>3 Vendors | Beggar Woman<br>- | -<br>- |
| FRANCESCA DA RIMINI | Prisoner | - | - |
| FREISCHÜTZ | Solo Bridesmaids | - | - |
| GHOSTS OF VERSAILLES | - | - | 6 Soldiers |
| GIOCONDA<br>*(can have 4 or 5 solos)* | Second Singer<br>- | First Singer<br>Pilota<br>(if 5 singers used, then all Intermediate) | "Un' Altra Voce"<br>- |
| GÖTTERDÄMMERUNG | - | 2 Vassals | - |
| GYPSY BARON | Pali<br>Sergeant | Chamberlain<br>2 Peasant Girls | -<br>- |
| JENůFA | - | Voice - Woman | Offstage Voice - Man |
| (LA) JUIVE | - | Officer | - |
| KATYA KABANOVA | Townswoman | Passerby | - |
| KHOVANSHCHINA | Klevret/Golytsin Servant | | -        - |
| LADY MACBETH OF MTSENSK | -<br>-<br>-<br>- | 2nd Foreman<br>Policeman<br>-<br>-<br>- | Drunken Guest<br>1st Foreman<br>3rd Foreman<br>Coachman<br>Screamer |

# APPENDIX
## continued

| OPERA | SOLO PARTS | INTERMEDIATE PARTS | MINOR PARTS |
| --- | --- | --- | --- |
| LAST SAVAGE | Mezzo Soprano | Protestant Minister[*] | A Woman |
| | Scientist | Protestant | - |
| | First Learned Man | Catholic Priest[*] | - |
| | Second Learned Man | Rabbi[*] | - |
| | Painter | Orthodox Priest[*] | - |
| | Poet | - | - |
| | Composer | - | - |
| | Doctor | - | - |
| | English Tailor | - | - |
| | First American Tailor | - | - |
| | Second American Tailor | - | - |
| I LOMBARDI | - | - | Slave Dancer |
| LUISA MILLER | Contadino | - | - |
| MACBETH | - | - | Herald |
| MADAMA BUTTERFLY | - | Uncle | Registrar |
| | - | Mother | Aunt |
| | - | - | Cousin |
| MAGIC FLUTE | 3 Slaves (English) | Slave (German) | 2 Slaves (German) |
| MAHAGONNY | - | - | 1st Man |
| | - | - | 2nd Man |
| MANON | - | - | 8 Travelers Act I (4M, 4F) |
| | - | - | Porter Act I |
| | - | - | Old Woman Act I |
| | - | - | 3 Male Gamblers Act IV (spoken part) |
| MANON LESCAUT | - | Madrigalisti | |
| MARTHA | 3 Maids | 2 Farmers | - |
| | - | 3 Lackeys | - |
| MEISTERSINGER | - | Solo Lehrbub | All Lehrbuben |
| | | | Woman - Scream |
| MERRY WIDOW | - | - | Woman |

---

[*] *If any one of these four roles should be sung in a given performance by a PRINCIPAL, then all four parts shall be considered Solo Parts for that performance.*

**APPENDIX**
continued

| OPERA | SOLO PARTS | INTERMEDIATE PARTS | MINOR PARTS |
|---|---|---|---|
| MOSES UND ARON | - | 3 Elders | Man |
| NOSE | - | - | Woman's Voice |
| OTELLO | - | -    2 Chorus Soli | |
| PAGLIACCI | - | 2 Peasants | - |
| PÉRICHOLE | Tarapote | Jailer | 3 Speaking Parts |
| | - | 4 Ladies | - |
| PETER GRIMES | | "A Fisherwoman | Scream |
| | | - | - |
| | | A Lawyer | "Auntie" |
| | - | Burgher #1 | "Storm" |
| | - | Off-Stage Fisherwoman | "Dr. Crabbe" |
| | - | "There's been a .." | Burgher #2 |
| | - | "within reach" | Burgher #3 |
| | - | - | Burgher #4 |
| | - | - | Burgher #5 |
| | - | - | Burgher #6 |
| | - | - | Dr. Crabbe (mute) |
| | - | - | Whistle (for soloist if needed) |
| RAKE'S PROGRESS | - | - | Man at Auction |
| | - | - | 4 Bidders |
| RIGOLETTO | Page | Guard | - |
| ROBERTO DEVEREUX | - | - | Act One Male Solo |
| RONDINE | - | Adolf | Butler |
| | - | - | Robonnier |
| | | - | Georgette |
| | | - | Gabriele |
| | | - | Lolette |
| ROSENKAVALIER | Leopold | - | Noble Widow |
| | 3 Orphans | - | Doctor |
| | Animal Vendor | - | A Whistle |
| | Milliner | - | - |
| | 4 Lackeys | - | - |
| SLY | | Coachman | Drunkard #1 |
| | - | Un Beone Solo | Cook |
| | - | - | Student |
| | - | - | Beone #2 |
| | - | - | Beone #3 |
| | - | - | Beone #4 |
| | - | - | Offstage Voices (5) |
| SUOR ANGELICA | - | - | Sister Osmina |

# APPENDIX
## continued

| OPERA | SOLO PARTS | INTERMEDIATE PARTS | MINOR PARTS |
| --- | --- | --- | --- |
| | - | - | Sister Lucilla |
| | - | - | 3 Sisters |
| | - | - | "Una Suora" |
| SUSANNAH | - | - | 2 Men |
| TANNHÄUSER | - | - | 4 Pages |
| THAIS | - | "Le Pain"/"Sur l'Athanael" | "Le Miel" |
| | - | "L"Eua"/Athanael…Qui' | "Le Sel" |
| | - | - | "L'Hysope" |
| TOSCA | - | - | Screams - Act II |
| | - | - | (Cavaradossi) |
| TRAVIATA | Giuseppe (two entrances) | Messenger (Gardener) | Servant (La Cena) |
| | | Giuseppe (1 entrance) | |
| TROVATORE | - | Gypsy | Putana |
| | - | Messenger | - |
| TROYENS | - | Ghost of Cassandra | |
| TURANDOT | Act I Handmaidens | - | 4 Heralds |
| | (if solo) | - | 3 Wise Men |
| TWO BOYS | Suburban Mom #1 | - | - |
| | Suburban Mom #2 | - | - |
| VANESSA | - | Footman | - |
| VIEW FROM THE BRIDGE | - | Man | Woman |
| | - | - | Old Woman |
| WOZZECK | - | Townsman | Soldier |
| | | | Whistle (if needed) |

The Solo, Intermediate, and Minor Parts for operas not listed herein will be established on a comparable basis by mutual agreement between AGMA and the Met prior to the first performance.

THE METROPOLITAN OPERA                    APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY  10023                      1430 Broadway, 14th Floor, New York, NY  10018

**EXHIBIT A1**

**STANDARD PRINCIPAL'S CONTRACT (PER PERFORMANCE)**
**SEASON 200#/200#**

AGREEMENT dated #, made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#ARTIST** ("Singer"), #c/o manager, address.

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

The Met hereby engages Singer's services as singer on an individual basis and Singer agrees to render such services as follows:

**#REHEARSAL WEEKS:**
Singer agrees to be available for # (#) rehearsal week#s:
          from 10:00 AM # through #
and Singer shall receive therefore the applicable amount as stipulated in Article Fifth, A. of SECTION TWO of the collective bargaining agreement between AGMA and the Met towards rehearsal expenses.

**PERIOD OF ENGAGEMENT:**
In the following period#s
          from # through #
The Met agrees to engage Singer for and Singer agrees to accept a minimum of # (#) performance#s:
          # (#) of #Role in #OPERA (in#Language)
And # (#) cover#s:
          # (#) of #Role in #OPERA (in#Language).

#Singer hereby grants the Met the option to engage Singer #during #following the close of #the regular New York season within the period from # through # (#) on the same terms as specified in this contract by notifying Singer in writing of such engagement not later than #.

**COMPENSATION:**
**#OPERA**
The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS ($#) for each performance #of this role performed hereunder which performance shall include requisite rehearsals therefor. Any additional covered performances #of this role as agreed upon shall be compensated at the same fee. #The Met further agrees to pay to Singer the sum of # DOLLARS ($#) for each covered performance #of this role. Should Singer be called upon to sing, the Met agrees to pay Singer the additional sum of # DOLLARS ($#) for each such sung performance #of this role.

#The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS ($#) for each covered performance #of this role performed hereunder which performance shall include requisite rehearsals therefor. Any additional covered performances #of this role as agreed upon shall be compensated at the same fee. Should Singer be called upon to sing, the Met agrees to pay the Singer the additional sum of #DOLLARS ($#) for each sung performance #of this role.

#The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS ($#) for each second covered performance #of this role performed hereunder which performance shall include requisite rehearsals therefor. Any additional second covered performance #of this role as agreed upon shall be compensated at the same fee. Should Singer be called upon to sing, the Met agrees to pay to Singer the additional sum of # DOLLARS ($#) for each first covered performance # of this role.

#The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS ($#) for each first covered performance #of this role performed hereunder which performance shall include requisite rehearsal therefor. Should Singer be called upon to sing, the Met agrees to pay to Singer the additional sum of # DOLLARS ($#) for each sung performance #of this role. Should Singer be called upon to sing, the total compensation for each sung performance #of this role would be # DOLLARS ($#).

#Singer agrees to cover the role of #ROLE in #OPERA while simultaneously singing the role of #ROLE in #OPERA for no additional compensation. Should Singer be called upon to sing #Role instead of #Role, the Met agrees to pay the total sum of # Dollars ($#) for each such sung performance.

#The Met also agrees to pay to Singer the total sum of # DOLLARs ($#) towards preparation of the role of #Role in #OPERA (in #Language), said fee to be payable on #.

**#ADDITIONAL COMPENSATION:**
Singer shall receive additional compensation for the following services:
        #Role in #OPERA:  # DOLLARS ($#) for each such sung performance of this role.

**MEDIA:**
The August 18, 2014 Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated herein in full and defines in full, among other things, the rights which Singer hereby grants to the Met, computation of net revenues and other financial considerations.

If the Materials embodying Singer's work are commercially released (including as part of an audiovisual recording such as a movie, a home video or a television production), the Met will pay Singer an amount equal to Singer's "Percentage" of the Principal's share of the "Pool." The Pool is an amount equal to 60% of "net revenues" which are defined and will be calculated in accordance with the provisions of the "Definition of Net Revenues" incorporated in the 2014-2018 collective bargaining agreement between AGMA and the Met. The Principal's share of this Pool is 28.7%, and the Percentage to Singer will be calculated based upon how many other Principals are in the work and their performance compensation ratios.

All audio, visual, audiovisual and other material made hereunder embodying Singer's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe.  The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes.  To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Singer hereby assigns to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein.  Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so.  Singer waives all rights of "droit moral" or similar rights which Singer may now or hereafter have in the Materials.  Singer acknowledges that he/she will not have any independent rights to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Memorandum of Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Singer's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Singer hereby releases the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Singer may have at any time relating to the Materials.

If Singer is signatory to an exclusive recording contract which would preclude Singer from granting CD or DVD rights to the Met, Singer will notify the Met, and if neither Singer nor the Met obtains a waiver from Singer's record company to enable Singer to grant the Met the rights, said rights will be excluded from the rights the Met is able to exploit hereunder.

**#TRAVEL:**
The Met will provide Singer with one (1) round trip economy class airfare #/New York in each of the aforementioned periods (for a total of # [#] airfares) if Singer is present there at the commencement of each period of this contract. #The Met will provide Singer with one (1) round trip economy class airfare, #New York if Singer is present there at the commencement of this contract.  Travel will be arranged at the minimum applicable airfare to be prorated with any other engagements en route. All travel arrangements will be made by Singer unless arranged otherwise with the Met.  If The Met arranges travel and Singer does not accept such travel arrangements, Singer shall be responsible for all additional costs, if any.

#The Met agrees to reimburse Singer towards living expenses in New York up to the amount of # DOLLARS ($#) during the period(s) Singer is under contract to the Met, to wit # through #. Reimbursement for such living expenses will be made by the Met to Singer at the end of each week during the period Singer is performing/covering for the Met. In connection with such reimbursement, Singer shall furnish the Met such records of expenses as may be reasonably required by the Met to substantiate such expenses. In order to fulfill the rehearsal and service requirements under this contract, Singer agrees to reside in New York for a minimum average of # (#) days for each service contracted for hereunder. In the event

2

that Singer shall fail to perform any such contracted service, then the aforesaid allowance for living expenses shall be reduced by # DOLLARS ($#) for each service in which Singer shall fail to appear. Such reduction shall be in addition to any other rights and remedies the Met may have under this contract.

**SINGER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Singer hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract.  Singer hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Singer by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**
Singer shall not disclose and will instruct his/her management not to disclose to the press or otherwise any information pertaining to this engagement until such time as the Met shall agree to issue a public announcement of such engagement.

This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and the Met.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Singer thereof, in writing, and thereafter Singer (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Singer, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Singer's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

The indisposition of Singer shall be immediately reported to the Artistic Administration by written notice.  The Met may require Singer to produce a doctor's certificate within twenty-four (24) hours after notification of illness.  The Met may require Singer to submit to examination by a doctor designated and paid by the Met.

Piano scores and singing parts that are the property of the Met must be kept in good condition and returned when not required and, in any event, before the end of the season.  Each Singer borrowing any piano scores or singing parts from the Met may be required to furnish a deposit of fifty dollars ($50) which will be returned when such material has been restored in good condition to the Met's library.

If the Met shall in its discretion agree to permit Singer to use costumes which are the property of the Met for performances other than those given by the Met, it shall do so without compensation therefor from Singer, provided however that Singer shall be required to return any such costume cleaned and in the same condition, reasonable wear excepted.

The Met shall be required to assume the expense of one (1) round trip railroad or airfare at the Met's election, for each Singer engaged for the road tour or other trips away from the City of New York, provided that if Singer is engaged for non-consecutive weeks or per performance, the Met will pay Singer's fare from the place of Singer's last required performance for the Met to such place as Singer may elect and Singer's return fare from such point as Singer may elect to the place of Singer's next required performance provided, however, that the total of any such fares shall not exceed the fare from the place of Singer's last required performance to the City of New York and return to the place of Singer's next required performance.

Singer warrants and represents that: Singer has the full right to enter into this agreement; Singer is under no restriction or prohibition in respect of Singer's right to execute this agreement and perform its terms and to grant to the Met the rights herein granted; the rights granted to the Met, and the exploitation by the Met of the results and proceeds of Singer's

3

services, do not violate the rights of any entity; and Singer will obtain all third party consents (including from any record company) required in connection with such exploitation except with respect to rights for CDs and DVDs which are addressed above in the final paragraph of the "MEDIA" section of this agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by the Met and Singer and only so long as the terms of the modification are not less favorable to Singer than as provided in the collective bargaining agreement between the Met and AGMA.

This agreement shall not be binding upon the Met in any respect, and the Met reserves the right to withdraw its offer unless it is signed below by Singer and returned back to the Met which must be no later than #, 201#.  If the Met does not receive the signed agreement by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

THE METROPOLITAN OPERA

Phone Number:
Social Security Number:


_____          By:_____
Signature of Singer                Date                        General Manager

THE METROPOLITAN OPERA
Lincoln Center, New York, NY 10023

APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
1430 Broadway, 14th Floor, New York, NY 10018

**EXHIBIT A2**

**STANDARD PRINCIPAL'S CONTRACT (WEEKLY)**
**SEASON 200#/200#**

AGREEMENT dated #, made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#ARTIST** ("Singer"), #c/o Manager, address #at address.

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

The Met hereby engages Singer's services as singer on a weekly basis and Singer agrees to render such services as follows:

**#REHEARSAL WEEKS:**
Singer agrees to be available for # (#) rehearsal week#s:
       from 10:00 AM # through #
       from 10:00 AM # through #
#and Singer shall receive therefore the applicable amount as stipulated in Article Fifth, A. of SECTION TWO of the collective bargaining agreement between AGMA and the Met towards rehearsal expenses.

#and Singer shall receive therefore the sum of # DOLLARS ($#) per week towards rehearsal expenses.

**PERIOD OF ENGAGEMENT:**
Singer agrees to render such services for the continuous period or periods totaling # (#) weeks:
       from # through # (not required #)
       from # through # (not required #).

Singer hereby grants the Met the option to engage Singer #during #following the close of #the regular New York season within the period from # through # (#) on the same terms as specified in this contract by notifying Singer in writing of such engagement not later than #.

**REPERTOIRE:**
Singer agrees to be prepared in and to perform at such time as his/her services may be required in any and all of the following roles:
       #Role in #OPERA (in #Language)
       #Role in #OPERA (in #Language)
       #Role in #OPERA (in #Language).

**COMPENSATION:**
The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS and # CENTS ($#) per week for services rendered during the foregoing period or periods.

**#COMPNESATION:**
The Met agrees to pay and Singer agrees to accept the rates of compensation provided in accordance with the applicable agreement between the Met and AGMA.

**#ADDITIONAL COMPENSATION:**
Singer shall receive additional compensation for the following services:
       #Role in #OPERA:  # DOLLARS ($#) for each such sung performance of #this/these role(#s).

       #Role in #OPERA:  # DOLLARS ($#) for each first covered performance; should Singer be called upon to sing, the Met agrees to pay to Singer the additional sum of # DOLLARS ($#) for each such sung performance of #this/these role(#s).

       #Role in #OPERA:  # DOLLARS ($#) for each second covered performance; # DOLLARS ($#) for each first covered performance.  Should Singer be called upon to sing, the Met agrees to pay to Singer the sum of # DOLLARS ($#) for each sung performance of #this/these role(#s).

**MEDIA:**

The August 18, 2014Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated herein in full and defines in full, among other things, the rights which Singer hereby grants to the Met, computation of net revenues and other financial considerations.

All audio, visual, audiovisual and other material made hereunder embodying Singer's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe.  The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes.  To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Singer hereby assigns to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein.  Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so.  Singer waives all rights of "droit moral" or similar rights which Singer may now or hereafter have in the Materials.  Singer acknowledges that he/she will not have any independent rights to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Summary Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Singer's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Singer hereby releases the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Singer may have at any time relating to the Materials.

If Singer is signatory to an exclusive recording contract which would preclude Singer from granting CD or DVD rights to the Met, Singer will notify the Met, and if neither Singer nor the Met obtains a waiver from Singer's record company to enable Singer to grant the Met the rights, said rights will be excluded from the rights the Met is able to exploit hereunder.

**#TRAVEL:**

The Met will provide Singer with one (1) round trip economy class airfare #/New York #in each of the aforementioned periods (for a total of # [#] airfares) if Singer is present there at the commencement of #each period of #this contract. Travel will be arranged at the minimum applicable airfare to be prorated with any other engagements en route. All travel arrangements will be made by Singer unless arranged otherwise with the Met.  If the Met arranges travel and Singer does not accept such travel arrangements, Singer shall be responsible for all additional costs, if any.

**#VACATION:**

The Met agrees to pay to Singer one (1) week vacation for every ten (10) weeks worked.

**SENIORITY:**

Singer acknowledges that at the commencement of this engagement he/she is entering the # (#th) year of employment.

**SINGER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**

Singer hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract.  Singer hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Singer by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**

Singer shall not disclose and will instruct his/her management not to disclose to the press or otherwise any information pertaining to this engagement until such time as the Met shall agree to issue a public announcement of such engagement.

This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and the Met.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Singer thereof, in writing, and thereafter Singer (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure. The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure. Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Singer, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Singer's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Whenever Weekly Singer is absent from his/her residence for a longer period than two (2) hours on a day when he/she has a responsibility to either sing or cover, he/she shall either leave word at his/her residence or inform the Artistic or Rehearsal Department where he/she can be found.  No Singer shall leave the city or its environs on a day of a rehearsal or a performance without informing the Artistic or Rehearsal Department where he/she can be found.

The indisposition of Singer shall be immediately reported to the Artistic Administration by written notice.  The Met may require Singer to produce a doctor's certificate within twenty-four (24) hours after notification of illness.  The Met may require Singer to submit to examination by a doctor designated and paid by the Met.

Every Singer is obliged in case of illness of another Singer or change of repertoire, to replace such Singer and appear in any roles of his/her repertoire.

Piano scores and singing parts that are the property of the Met must be kept in good condition and returned when not required and, in any event, before the end of the season.  Each Singer borrowing any piano scores or singing parts from the Met may be required to furnish a deposit of fifty dollars ($50) which will be returned when such material has been restored in good condition to the Met's library.

If the Met shall in its discretion agree to permit Singer to use costumes which are the property of the Met for performances other than those given by the Met, it shall do so without compensation therefor from Singer, provided however that Singer shall be required to return any such costume cleaned and in the same condition, reasonable wear excepted.

The Met shall be required to assume the expense of one (1) round trip railroad or airfare at the Met's election, for each Singer engaged for the road tour or other trips away from the City of New York, provided that if Singer is engaged for non-consecutive weeks, the Met will pay Singer's fare from the place of Singer's last required performance for the Met to such place as Singer may elect and Singer's return fare from such point as Singer may elect to the place of Singer's next required performance provided, however, that the total of any such fares shall not exceed the fare from the place of Singer's last required performance to the City of New York and return to the place of Singer's next required performance.

Singer has the full right to enter into this agreement for his/her services; Singer is under no restriction or prohibition in respect of his/her right to execute this agreement and perform its terms and to grant to the Met the rights herein granted; the rights granted to the Met, and the exploitation by the Met of the results and proceeds of Singer's services, do not violate the rights of any entity; and Singer will obtain all third party consents (including from any record company) required in connection with such exploitation except with respect to rights for CDs and DVDs which are addressed above in the final paragraph of the "MEDIA" section of this agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by the Met and Singer and only so long as the terms of the modification are not less favorable to Singer than as provided in the collective bargaining agreement between the Met and AGMA.

This agreement shall not be binding upon the Met in any respect, and the Met reserves the right to withdraw its offer, unless and until it is signed below by Singer and returned back to the Met which must be no later than #, 20##.  If the Met does not receive it by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

THE METROPOLITAN OPERA

Phone Number:
Social Security Number:


_____     By:_____
Signature of Singer              Date                    General Manager

THE METROPOLITAN OPERA                            APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY  10023                            1430 Broadway, 14th Floor, New York, NY  10018

EXHIBIT A3

**STANDARD PRINCIPAL'S CONTRACT (WEEKLY-PLAN)**
**SEASON 201#/201#**

AGREEMENT dated #, made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#ARTIST** ("Singer"), #c/o manager, address.

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

The Met hereby engages Singer's services as singer on an individual basis and Singer agrees to render such services as follows:

**#REHEARSAL WEEKS:**
Singer agrees to be available for # (#) rehearsal week#s:
          from 10:00 AM # through #
          from 10:00 AM # through #
          from 10:00 AM # through #
#and Singer shall receive therefore the applicable amount as stipulated in Article Fifth, A. of SECTION TWO of the collective bargaining agreement between AGMA and the Met towards rehearsal expenses.

**PERIOD OF ENGAGEMENT:**
Singer agrees to render such services for the continuous period or periods totaling # (#) week#s:
          from # through #
          from # through #

Singer confirms that he/she has been offered a minimum of thirty-five (35) weeks for above season and understands that he/she must accept a minimum of thirty-five (35) weeks in order to be eligible for the Metropolitan Opera's benefits associated with regular status.

**#OPTION:**
#Singer hereby grants the Met the option to engage Singer #during #following the close of #the regular New York season within the period from # through # (#) on the same terms as specified in this contract by notifying Singer in writing of such engagement not later than #.

**COMPENSATION:**
The Met agrees to pay and Singer agrees to accept the sum of # DOLLARS AND CENTS ($#) per week for Singer's services during the foregoing period or periods.

**#COMPENSATION:**
The Met agrees to pay and Singer agrees to accept the rates of compensation in accordance with the applicable agreement between the Met and AGMA.

#The Met also agrees to pay Singer the total sum of # DOLLARS ($#) towards preparation of the role of #Role in #OPERA (in #Language), said fee to be payable on #.

**REPERTOIRE:**
Singer agrees to be prepared in and to perform at such time as his/her services may be required any and all of the following role#s:
          #Role in #OPERA (in #Language)
          #Role in #OPERA (in #Language)
          #Role in #OPERA (in #Language)

**MEDIA:**
The August 18, 2014 Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated here in full and defines in full, among other things, the rights which Singer hereby grants to The Met, computation of net revenues and other financial considerations.

All audio, visual, audiovisual and other material made hereunder embodying Singer's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe.  The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes.  To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Singer hereby assigns to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein.  Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so.  Singer waives all rights of "droit moral" or similar rights which Singer may now or hereafter have in the Materials.  Singer acknowledges that he/she will not have any independent rights to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Memorandum of Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Singer's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Singer hereby releases the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Singer may have at any time relating to the Materials.

If Singer is signatory to an exclusive recording contract which would preclude Singer from granting CD or DVD rights to the Met, Singer will notify the Met, and if neither Singer nor the Met obtains a waiver from Singer's record company to enable Singer to grant the Met the rights, said rights will be excluded from the rights the Met is able to exploit hereunder.

**VACATION:**
The Met and Singer agree that Singer's vacation shall consist of five (5) weeks and the Met will notify Singer as to the exact date of such five (5) week vacation.

**SENIORITY:**
Singer acknowledges that at the commencement of this engagement he/she is entering the # (#th) year of employment.

**SINGER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Singer hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract.  Singer hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner.  Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Singer by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**
Singer shall not disclose and will instruct his/her management not to disclose to the press or otherwise any information pertaining to this engagement until such time as the Met shall agree to issue a public announcement of such engagement.

This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and the Met.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Singer thereof, in writing, and thereafter Singer (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Singer, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not

2

Singer's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Whenever Weekly Singer is absent from his/her residence for a longer period than two (2) hours on a day when he/she has a responsibility to either sing or cover, he/she shall either leave word at his/her residence or inform the Artistic or Rehearsal Department where he/she can be found.  No Singer shall leave the city or its environs on a day of a rehearsal or a performance without informing the Artistic or Rehearsal Department where he/she can be found.

The indisposition of Singer shall be immediately reported to the Artistic Administration by written notice.  The Met may require Singer to produce a doctor's certificate within twenty-four (24) hours after notification of illness.  The Met may require Singer to submit to examination by a doctor designated and paid by the Met.

Every Singer is obliged in case of illness of another Singer or change of repertoire, to replace such Singer and appear in any roles of his/her repertoire.

Piano scores and singing parts that are the property of the Met must be kept in good condition and returned when not required and, in any event, before the end of the season.  Each Singer borrowing any piano scores or singing parts from the Met may be required to furnish a deposit of fifty dollars ($50) which will be returned when such material has been restored in good condition to the Met's library.

If the Met shall in its discretion agree to permit Singer to use costumes which are the property of the Met for performances other than those given by the Met, it shall do so without compensation therefor from Singer, provided however that Singer shall be required to return any such costume cleaned and in the same condition, reasonable wear excepted.

The Met shall be required to assume the expense of one (1) round trip railroad or airfare at the Met's election, for each Singer engaged for the road tour or other trips away from the City of New York, provided that if Singer is engaged for non-consecutive weeks or per performance, the Met will pay Singer's fare from the place of Singer's last required performance for the Met to such place as Singer may elect and Singer's return fare from such point as Singer may elect to the place of Singer's next required performance provided, however, that the total of any such fares shall not exceed the fare from the place of Singer's last required performance to the City of New York and return to the place of Singer's next required performance.

Singer warrants and represents that: Singer has the full right to enter into this agreement; Singer is under no restriction or prohibition in respect of Singer's right to execute this agreement and perform its terms and to grant to the Met the rights herein granted; the rights granted to the Met, and the exploitation by the Met of the results and proceeds of Singer's services, do not violate the rights of any entity; and Singer will obtain all third party consents (including from any record company) required in connection with such exploitation except with respect to rights for CDs and DVDs which are addressed above in the final paragraph of the "MEDIA" section of this agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by the Met and Singer and only so long as the terms of the modification are not less favorable to Singer than as provided in the collective bargaining agreement between the Met and AGMA.

This agreement shall not be binding upon the Met in any respect, and the Met reserves the right to withdraw its offer unless it is signed below by Singer and returned back to the Met which must be no later than #, 201#.  If the Met does not receive the signed agreement by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

THE METROPOLITAN OPERA

Phone Number:
Social Security Number:


_____          By:_____
Signature of Singer                      Date                          General Manager

THE METROPOLITAN OPERA             APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY  10023             1430 Broadway, 14th Floor, New York, NY  10018

EXHIBIT A4

**STANDARD CONTRACTOR'S CONTRACT (PER PERFORMANCE)**
**SEASON 201#/201#**

AGREEMENT dated #, made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#CORPORATION**, having its principal place of business c/o # manager, address and organized under the laws of the state of # ("Contractor").

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

Contractor hereby agrees to furnish to the Met the services of its employee, **#ARTIST** ("Singer"), as Singer on an individual basis and the Met agrees to engage Contractor for the services of Singer as follows:

**#REHEARSAL WEEKS:**
Singer shall be made available for # (#) rehearsal week#:s:
      from 10:00 AM # through #
#and Contractor shall receive therefore for the services of Singer the applicable amount as stipulated in Article Fifth, A. of SECTION TWO of the collective bargaining agreement between AGMA and the Met towards rehearsal expenses.

**PERIOD OF ENGAGEMENT:**
In the following period#:s:
      From # through #,
The Met shall engage Contractor for the services of Singer and Contractor shall guarantee the Met the services of Singer for a minimum of # (#) performance(#)s:
      # (#) of #Role in #OPERA (in #Language).
The Met and Contractor further mutually agree that Singer shall cover # (#) performance(#)s:
      # (#) of #Role in # OPERA (in #Language).

#Contractor hereby grants the Met the option to engage Singer #during #following the close of #the regular New York season within the period from # through # (#) on the same terms as specified in this contract by notifying Contractor in writing of such engagement not later than #.

**COMPENSATION:**
#OPERA
The Met agrees to pay and Contractor agrees to accept the sum of # DOLLARS ($#) for each performance #of this role performed hereunder by Singer which performance shall include requisite rehearsals therefor.  Any additional performances #of this role as agreed upon shall be compensated at the same fee.

#The Met further agrees to pay to Contractor the sum of # DOLLARS ($#) for each covered performance. Should Singer be called upon to sing, the Met agrees to pay Contractor the additional sum of # DOLLARS ($#) for each such sung performance #of this role.

#The Met agrees to pay and Contractor agrees to accept the sum of # DOLLARS ($#) for each covered performance #of this role performed hereunder by Singer which performance shall include requisite rehearsals therefor. Any additional covered performances # of this role as agreed upon shall be compensated at the same fee. Should Singer be called upon to sing, the Met agrees to pay Contractor the additional sum of # DOLLARS ($#) for each such sung performance #of this role.

#The Met agrees to pay and Contractor agrees to accept the sum of # DOLLARS ($#) for each first covered performance #of this role performed hereunder which performance shall include requisite rehearsal therefor. Should Singer be called upon to sing, the Met agrees to pay to Contractor the additional sum of # DOLLARS ($#) for each sung performance #of this role. Should Singer be called upon to sing, the Met agrees to pay to Contractor the additional sum of # DOLLARS ($#) for each first covered performance #of this role.

#The Met agrees to pay and Contractor agrees to accept the sum of #DOLLARS ($#) for each first covered performance #of this role performed hereunder which performance shall include requisite rehearsal therefor. Should Singer be called upon to sing, the Met agrees to pay to Contractor the additional sum of # DOLLARS ($#) for each sung performance #of

this role. Should Singer be called upon to sing, the total compensation for each sung performance #of this role would be # DOLLARS ($#).

#Contactor agrees to provide Singer to cover the role of #Role in #OPERA while simultaneously singing the role of #Role in #OPERA for no additional compensation. Should Singer be called upon to sing #Role instead of #Role, the Met agrees to pay to Contractor the total sum of # DOLLARS ($#) for each such sung performance.

#The Met also agrees to pay to Contractor the total sum of # DOLLARS ($#) towards preparation of the role of #Role in #OPERA (in #Language), said fee to be payable on #.

**#ADDITIONAL COMPENSATION:**
Contractor shall receive additional compensation for Singer's following services:
        #Role in #OPERA:  # DOLLARS ($#) for each such sung performance of #this/these role(#s).

**MEDIA:**
The August 18, 2014  Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated herein in full and defines in full, among other things, the rights which Contractor on behalf of Singer hereby grants to the Met, computation of net revenue and other financial considerations.

If the Materials embodying Singer's work are commercially released (including as part of an audiovisual recording such as a movie, a home video or a television production), the Met will pay Contractor an amount equal to Artist's "Percentage" of the Principals' share of the "Pool." The Pool is an amount equal to 60% of "net revenues" which are defined and will be calculated in accordance with the provisions of the "Definition of Net Revenues" incorporated in the 2014-2018 collective bargaining agreement between AGMA and the Met. The Principals' share of this Pool is 28.7%, and the Percentage to Singer will be calculated based upon how many other Principals are in the work and their performance compensation ratios.

All audio, visual, audiovisual and other material made hereunder embodying Singer's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe.  The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes.  To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Contractor and Singer hereby assign to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein.  Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so.  Contractor and Singer waive all rights of "droit moral" or similar rights which either of them may now or hereafter have in the Materials.  Contractor acknowledges that neither it nor Singer will have any independent rights to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Memorandum of Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Singer's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Contractor and Singer hereby release the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Contractor of Singer may have at any time relating to the Materials.

If Singer, or Contractor on Singer's behalf, is signatory to an exclusive recording contract which would preclude Contractor or Singer from granting CD or DVD rights to the Met, Contractor will notify the Met, and if neither Singer/Contractor nor the Met obtains a waiver from Singer's record company to enable Singer to grant the Met the rights, said rights will be excluded from the rights the Met is able to exploit hereunder.

**#TRAVEL:**
The Met will provide Contractor with one (1) round trip economy class airfare #/New York #in each of the aforementioned periods (for a total of # [#] airfares) if Singer is present there at the commencement of #each period of #this contract. Travel will be arranged at the minimum applicable airfare to be prorated with any other engagements en route. All travel arrangements will be made by Contractor unless arranged otherwise with the Met.  If the Met arranges travel and Contractor does not accept such travel arrangements, Contractor shall be responsible for all additional costs, if any.

#The Met agrees to pay and Contractor agrees to accept the sum of #DOLLARS ($#) per day towards Singer's living

2

expenses in New York in the aforementioned period.

#The Met agrees to reimburse Contractor towards Singer's living expenses in New York up to the amount of # DOLLARS ($#) during the period(s) Contractor is under contract to the Met, to with # through # residing in New York. Reimbursement for such living expenses will be made by the Met to Contractor at the end of each week during the period Singer is performing/covering for the Met hereunder. In connection with such reimbursement, Singer or Contractor shall furnish the Met such records of expenses as may be reasonable required by the Met to substantiate such expenses. In order to fulfill the rehearsal and service requirements under this contract, Singer agrees to reside in New York for a minimum average of # (#) days for each service contracted for hereunder. In the event that singer shall fail to perform any such contracted service, then the aforesaid allowance for living expenses shall be reduced by # DOLLARS ($#) for each service in which Singer shall fail to appear. Such reduction shall be in addition to any other rights and remedies against Contractor and singer the Met may have under this contract.

**CONTRACTOR'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Contractor hereby warrants that Singer is a member of AGMA in good standing and will remain so for the duration of this contract. Contractor hereby authorizes and directs the Met to deduct from wages/pay any dues payable by Singer to AGMA as AGMA may instruct the Met. This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Contractor by sending written notice that it wishes to revoke all or part of it to AGMA and the Met by registered mail. To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner. Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**

This agreement is pursuant to and includes all the terms and conditions contained in the collective bargaining agreement between AGMA and the Met current at the time the applicable services hereunder are rendered, which terms and conditions are incorporated herein and made a part hereof in the same manner as it fully set forth herein. The term "Principal" as used in the collective bargaining agreement shall be deemed to refer to and include Contractor and Singer as if specifically named herein as "Principal."

Contractor shall not disclose and will instruct Singer and Singer's management not to disclose to the press or otherwise any information pertaining to this engagement until such time as the Met shall agree to issue a public announcement of such engagement.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Contractor or Singer thereof, in writing, and thereafter Contractor (whether Singer is engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure. The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure. Should such a condition of force majeure continue for a period of ten (10) days or more after such notice, either party may, during said period of continuance, terminate this contract. The foregoing shall apply to any contract whether or not Singer's services thereunder have commenced at the time of the condition of force majeure. In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Contractor warrants also as follows:

A. Singer shall reside in the New York metropolitan area throughout the Period of Engagement. Whenever Singer is absent from said residence for a longer period than two (2) hours on a day when he/she has a responsibility to either sing or cover, he/she shall either leave word at his/her residence or inform the Artistic or Rehearsal Department where he/she can be found. No Singer shall leave the city or its environs on a day of a rehearsal or a performance without informing the Artistic or Rehearsal Department where he/she can be found.

B. The indisposition of Singer shall be immediately reported to the Artistic Administration by written notice. The Met may require Singer to produce a doctor's certificate within twenty-four (24) hours after notification of illness. The Met may

3

require Singer to submit to examination by a doctor designated and paid by the Met.

C.  Piano scores and singing parts that are the property of the Met must be kept in good condition and returned when not required and, in any event, before the end of the season.  Each Contractor or Singer borrowing any piano scores or singing parts from the Met may be required to furnish a deposit of fifty dollars ($50) which will be returned when such material has been restored in good condition to the Met's library.

D. If the Met shall in its discretion agree to permit Singer to use costumes which are the property of the Met for performances other than those given by the Met, it shall do so without compensation therefor from Contractor or Singer, provided however that Contractor or Singer shall be required to return any such costume cleaned and in the same condition, reasonable wear excepted.

E.  The Met shall be required to assume the expense of one (1) round trip railroad or airfare at the Met's election, for each Singer engaged for the road tour or other trips away from the City of New York, provided that if Singer is engaged for non-consecutive weeks, the Met will pay Singer's fare from the place of Singer's last required performance for the Met to such place as Singer may elect and Singer's return fare from such point as Singer may elect to the place of Singer's next required performance provided, however, that the total of any such fares shall not exceed the fare from the place of Singer's last required performance to the City of New York and return to the place of Singer's next required performance.

F. Contractor has the full right to enter into this agreement for Singer's services; Singer is under no restriction or prohibition in respect of Contactor's right to execute this agreement and perform its terms and to grant to the Met the rights herein granted; the rights granted to the Met, and the exploitation by the Met of the results and proceeds of Singer's services, do not violate the rights of any entity; and Contractor or Singer will obtain all third party consents (including from any record company) required in connection with such exploitation except with respect to rights for CDs and DVDs which are addressed above in the final paragraph of the "MEDIA" section of this agreement.

Contractor and Singer hereby agree to indemnify and hold harmless the Met against any claim by any party by reason of any matter contained in the agreement and Contractor and Singer further agree that they will comply with all local laws and governmental regulations respecting Singer's employment by Contractor.

This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by the Met and Contractor and only so long as the terms of the modification are not less favorable to Singer than as provided in the collective bargaining agreement between the Met and AGMA.

This offer or agreement shall not be binding upon the Met, and the Met reserves the right to withdraw its offer, unless and until it is signed by Contractor, and by Singer on the following page, and returned to the Met no later than #, 201#.  If the Met does not receive the agreement signed by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

THE METROPOLITAN OPERA

Phone Number:
Corporate Identification Number:

_____          By:_____
#CORPORATION                    Date                    General Manager
for the services of #Singer

#Date


TO:  THE METROPOLITAN OPERA


I have read and am familiar with the Standard Contractor's Agreement of even date being executed concurrently herewith relating to services to be performed by me on behalf of #CORPORATION for The Metropolitan Opera for the season #.

In order to induce you to enter into said Agreement, and in consideration of your doing so, I acknowledge that my Employer was entitled to make such contract under the terms of my own employment contract with my Employer.  I hereby agree to render all services required by me, to comply with all duties which are to be furnished by me, to accept the restrictions agreed to by my Employer in said Contractor's Agreement and I hereby agree that I will not or fail to do any act or thing which interferes with any of the rights or privileges of AGMA.


Very truly yours,


_____
#Singer                                                Date

THE METROPOLITAN OPERA                                    APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY  10023                                  1430 Broadway, 14th Floor, New York, NY  10018

**EXHIBIT B-1**

**STANDARD BALLET CONTRACT**
**SEASON 201#-201#**

AGREEMENT dated # made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#DANCER** ("Dancer").

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

**PERIOD OF ENGAGEMENT:**
#Dancer accepts engagement for # (#) weeks:
          from # through #.

**VACATION:**
It is anticipated that Dancer's vacation shall consist of five (5) weeks and the Met will notify Dancer as to the exact date of such five week vacation as soon as possible.

**COMPENSATION:**
The Met agrees to pay and Dancer agrees to accept the applicable rates of compensation provided in the collective bargaining agreement between the Met and AGMA.

**SENIORITY:**
Dancer acknowledges that at the commencement of this engagement he/she is entering the # (#th) year of full time employment.

**DANCER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Dancer hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner.  Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Dancer by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, this notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**
This agreement is subject to and includes all the terms and conditions contained in Section One and Section Four of the current bargaining agreement between the Met and AGMA.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Dancer thereof, in writing, and thereafter Dancer (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Dancer, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Dancer's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined in accordance with the procedures governing disputes contained in said collective bargaining agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York, and shall not be modified or discharged except in writing executed by the Met and Dancer and only as long as the terms of the modification are not less favorable to Dancer than as provided in the collective bargaining agreement between the Met and AGMA.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

THE METROPOLITAN OPERA

_____               By:_____
Signature of Dancer                    Date                              Assistant General Manager, Artistic

_____
Address

_____
Phone Number

_____
Social Security Number

THE METROPOLITAN OPERA
Lincoln Center, New York, NY  10023

APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
1430 Broadway, 14th Floor, New York, NY  10018

EXHIBIT B-2

**STANDARD EXTRA DANCER'S CONTRACT**
**SEASON 201#/201#**

AGREEMENT dated #, made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#DANCER** ("Extra Dancer").

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

**PERIOD OF ENGAGEMENT:**

A. The Met engages Extra Dancer to render services for the following performances:

-----------------------------------------------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------------------------------------------

B. REHEARSAL.  Extra Dancer agrees to be available for the following rehearsal weeks:

-----------------------------------------------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------------------------------------------

**COMPENSATION:**   The Met agrees to pay and Extra Dancer agrees to accept the applicable rates of compensation provided in the then-prevailing collective bargaining agreement between The Met and AGMA.

The above compensation shall be "PAY OR PLAY" and be paid in United States currency (a) prior to the commencement of each single performance or (b) before 6 P.M. on the last day of each performance week.

**MEDIA:**   The August 18, 2014Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated herein in full and defines in full, among other things, the rights which Extra Dancer hereby grants to the Met, computation of net revenues and other financial considerations.

All audio, visual, audiovisual and other material made hereunder embodying Extra Dancer's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe. The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes. To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Extra Dancer hereby assigns to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein. Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so. Extra Dancer waives all rights of "droit moral" or similar rights which Extra Dancer may now or hereafter have in the Materials. Extra Dancer acknowledges that he/she will not have any independent right to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Memorandum of Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Extra Dancer's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Extra Dancer hereby releases the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Extra Dancer may have at any time relating to the Materials.

**EXTRA DANCER'S SERVICES:**   Extra Dancer shall, for the compensation herein provided, perform all services, which the Met may require pursuant to the collective bargaining agreement between the Met and AGMA.

**EXTRA DANCER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Extra Dancer hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this Contract. Extra Dancer hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Extra Dancer by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS:**   This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and the Met.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Extra Dancer thereof, in writing, and thereafter Extra Dancer (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Extra Dancer, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Extra Dancer's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined in accordance with the procedures governing disputes contained in said collective bargaining agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York, and shall not be modified or discharged except in writing executed by the Met and Extra Dancer and only as long as the terms of the modification are not less favorable to Extra Dancer than as provided in the collective bargaining agreement between the Met and AGMA.

This offer of agreement shall not be binding upon the Met, and the Met reserves the right to withdraw this offer unless it is signed by Extra Dancer and returned to the Met no later than #, 201#.  If the Met does not receive the signed agreement by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.


_____          THE METROPOLITAN OPERA
Signature of Extra Dancer                    Date

_____          BY_____
Address                                                  Assistant General Manager, Artistic

_____


_____
Phone

_____
Social Security Number

THE METROPOLITAN OPERA                                                        APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY  10023                                          1430 Broadway, 14th Floor, New York, NY  10018

**EXHIBIT C-1**

**STANDARD CHORISTER'S CONTRACT**
**SEASON 201#–201#**

AGREEMENT dated # made in the City, County and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#CHORISTER** ("Chorister").

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

**PERIOD OF ENGAGEMENT**:  Chorister accepts engagement for # (#) weeks as follows:
       from # through #
       from # through #.
All dates are inclusive.

**VACATION**:  It is anticipated that Chorister's vacation shall consist of five (5) weeks and the Met will notify Chorister as to the exact date of such five week vacation period as soon as possible.

**COMPENSATION**:  The Met agrees to pay and Chorister agrees to accept the applicable rates of compensation provided in the collective bargaining agreement between the Met and AGMA.

**SENIORITY**:  Chorister acknowledges that at the commencement of this engagement he/she is entering his/her # (#) year of full time employment.

**CHORISTER'S SERVICES**:  Chorister shall, for the compensation herein provided, perform all services which the Met may require pursuant to the collective bargaining agreement between the Met and AGMA.

**CHORISTER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS**:
Chorister hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract.  Chorister hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Chorister by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS**:
This agreement is subject to and includes all the terms and conditions of Section One and Section Three of the collective bargaining agreement between the Met and AGMA.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Chorister thereof, in writing, and thereafter Chorister (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Chorister, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Chorister's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined in accordance with the procedures governing disputes contained in said collective bargaining agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York, and shall not be modified or discharged except in writing executed by the Met and Chorister and only as long as the terms of the modification are not less favorable to Chorister than as provided in the collective bargaining agreement between the Met and AGMA.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.


_____                    THE METROPOLITAN OPERA
Signature of Chorister                    Date

_____
Address

_____                    By:_____
Phone                                                       Assistant General Manager, Artistic

_____
Social Security Number

THE METROPOLITAN OPERA
Lincoln Center, New York, NY  10023

APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
1430 Broadway, 14th Floor, New York, NY  10018

EXHIBIT C-2

STANDARD EXTRA CHORISTER'S CONTRACT
SEASON 201#-201#

Agreement dated # made in the City, County, and State of New York by and between THE METROPOLITAN OPERA ("the Met"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **#EXTRA CHORISTER** ("Extra Chorister").

WITNESSETH:  In consideration of the mutual agreements herein contained, the parties agree as follows:

**PERIOD OF ENGAGEMENT:**

A. The Met engages Extra Chorister to render services for the following performances:

B. REHEARSAL. Extra Chorister agrees to be available for the following rehearsal weeks:

**COMPENSATION:**  The Met agrees to pay and Extra Chorister agrees to accept the applicable rates of compensation provided in the then-prevailing collective bargaining agreement between The Met and AGMA.

The above compensation shall be "PAY OR PLAY" and be paid in United States currency (a) prior to the commencement of each single performance or (b) before 6 P.M. on the last day of each performance week.

**MEDIA:**  The August 18, 2014 Memorandum of Agreement between AGMA and the Met ("Memorandum of Agreement") is incorporated herein  in full and defines in full, among other things, the rights which Extra Chorister hereby grants to the Met, computation of net revenues and other financial considerations.

All audio, visual, audiovisual and other material made hereunder embodying Extra Chorister's work (collectively the "Materials") and the copyright and all renewals and extensions thereof in the Materials, are exclusively the property of the Met in perpetuity throughout the universe. The Materials shall be deemed works-made-for hire for the Met, and the Met shall be deemed the author thereof for copyright purposes. To the extent the Materials do not for any reason vest in the Met as works-made-for hire then, to such extent, Extra Chorister hereby assigns to the Met all right, title and interest in and to the Materials including, without limitation, all copyrights and renewals and extensions of copyrights therein. Without limiting the foregoing, the Met shall have the exclusive and perpetual right to reproduce, perform, distribute, edit, compile and otherwise exploit the Materials or refrain therefrom in any media now known or hereafter devised, including without limitation by means of television, film, radio, webcast, digital downloads, DVDs and other forms of home video, audio records including instant CDs, theatrical release, inclusion in documentaries and promotional materials and otherwise, upon such terms and conditions, and in such forms and versions, as the Met may in its sole discretion determine, and to authorize others to do so. Extra Chorister waives all rights of "droit moral" or similar rights which Extra Chorister may now or hereafter have in the Materials. Extra Chorister acknowledges that he/she will not have any independent rights to limit the Met's exploitation of the Materials beyond those accorded through AGMA under the provisions of the Memorandum of Agreement and the 2014-2018 collective bargaining agreement.

The Met shall have the right to use and to allow others to use Extra Chorister's name, likeness, and biographical material in any and all media in perpetuity in connection with the rights hereunder and the Met's activities. Extra Chorister hereby releases the Met and its licensees, contractors, broadcasters, sponsors and/or advertisers of the Materials, and their assigns, from any claim Extra Chorister may have at any time relating to the Materials.

**EXTRA CHORISTER'S SERVICES:**   Extra Chorister shall, for the compensation herein provided, perform all services, which the Met may require pursuant to the collective bargaining agreement between the Met and AGMA.

**EXTRA CHORISTER'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Extra Chorister hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract. Extra Chorister hereby authorizes and directs the Met to deduct from his/her wages/pay any dues payable by him/her to AGMA as AGMA may instruct the Met.  This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and the Met, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Extra Chorister by sending written notice that he/she wishes to revoke all or part of it to AGMA and the Met by registered mail.  To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner.  Any such revocation shall become effective the first day of the calendar month following its receipt by the Met.

**OTHER TERMS**:  This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and the Met.

It is agreed that if by reason of fire, accident, strike, lockout, or collective refusal to work by members of any union employed by the Met, riot, Act of God, epidemic, war, government regulations, revolution, rebellion, terrorist acts, the public enemy, or by reason of any other cause of the same general class, the Met is unable to conduct, or shall find itself compelled to cancel, its scheduled rehearsals or performances or any of them (the foregoing being referred to as a "condition of force majeure"), the Met may notify Extra Chorister thereof, in writing, and thereafter Extra Chorister (whether engaged on a weekly or per performance basis) shall not be entitled to compensation during the period of said condition of force majeure.  The parties hereto expressly acknowledge that a lockout shall be a condition of force majeure.  Should such a condition of force majeure continue for a period of ten (10) days or more after such notice to Extra Chorister, either party may, during said period of continuance, terminate this contract.  The foregoing shall apply to any contract whether or not Extra Chorister's services thereunder have commenced at the time of the condition of force majeure.  In the event of such termination, the Met will pay for all services rendered prior to the aforesaid condition of force majeure and transportation back to New York City in the event the Company is out of town at the time.

Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined in accordance with the procedures governing disputes contained in said collective bargaining agreement.

This agreement shall be governed by and construed in accordance with the laws of the State of New York, and shall not be modified or discharged except in writing executed by the Met and Extra Chorister and only as long as the terms of the modification are not less favorable to Extra Chorister than as provided in the collective bargaining agreement between the Met and AGMA.

This offer of engagement shall not be binding upon the Met, and the Met reserves the right to withdraw this offer unless it is signed by Extra Chorister and returned to the Met no later than #. If the Met does not receive the signed agreement by said date, the offer shall be null and void unless reinstated by the Met in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.


_____          THE METROPOLITAN OPERA
Signature of Extra Chorister             Date

_____          BY_____
Address                                                   Assistant General Manager, Artistic

_____

_____
Phone

_____
Social Security Number

2

**Exhibit A**

Exclusivity and Representation

a.      Amend Section I, Article First, A(1) as follows:

The Met hereby recognizes AGMA as the exclusive collective bargaining agent for, and this BASIC AGREEMENT ( "AGREEMENT") shall cover, all "ARTISTS" engaged by the Met solely in connection with the performance by ARTISTS of services rendered in the preparation of, or in connection with the giving of performances by ARTISTS for the general public and, in addition, any recording or reproduction by mechanical, electronic or other means of such performances. Except as set forth herein, this AGREEMENT does not cover a group of ARTISTS engaged by the Met for performances other than performances of  the regular Metropolitan Opera Company.  Examples of performances other than performances of the Metropolitan Opera Company include those such as Met Stars Live In Concert pay-per-view recitals (e.g. soloists with piano or quartet) and other touring ensembles (e.g. Bolshoi Opera or Paris Opera Ballet). Notwithstanding the above, Solo Singers engaged by the Met for performances for the general public shall be covered by this AGREEMENT even if they perform independently of the regular Metropolitan Opera Company.

b.      Amend Section III of the CBA to provide:

"The Metropolitan Opera Chorus shall continue to be used solely and exclusively in all performances of the regular Metropolitan Opera Company, including performances in the New York Season, Tours, and Off-Season, as heretofore, and the Met will not use a special outside chorus in any such productions.  If a chorus is used in a production or partnership where the Metropolitan Opera Orchestra performs outside the Metropolitan Opera House, The Metropolitan Opera Chorus shall be used unless it is logistically or economically impracticable to do so.

c.      For the avoidance of confusion, nothing herein is intended to limit AGMA's traditional jurisdiction as it existed prior to the 2021 season.

## Grievance and Arbitration Agreement

The Grievance and Arbitration provisions shall be revised as set forth below.

## ELEVENTH: GRIEVANCE PROCEDURE

A. **DEFINITION:** A "Grievance" shall mean:

1. Any claim or dispute which may be the subject of an arbitration pursuant to the provisions of Article TWELFTH of this SECTION ONE (hereinafter sometimes referred to as an "Arbitrable Grievance"); or

2. Any claimed grievance of AGMA against the Met or by the Met against AGMA, arising out of, or relating to, any condition of employment of an ARTIST or ARTISTS whether or not the same shall be included in subparagraph 1 above.

B. **PROCEDURE:** It is the intention of both parties that an orderly procedure for the handling of all Grievances be established. Unless AGMA and the Met shall agree to waive the Grievance Procedure, no Arbitrable Grievance shall be arbitrated without first having been made the subject of the Grievance Procedure provided in this Article.  To this end, AGMA and the Met further agree:

1. Step 1: Within ninety (90) days of when the grieving party knew or reasonably should have known of the facts giving rise to the grievance, a grievance may be initiated by the filing of a written grievance requesting a meeting of the Grievance Committee, consisting of representatives designated by the Met and by AGMA.  The ninety (90)- day period shall be tolled during the off-season.  The grievance shall provide reasonable specificity as to the nature of the dispute and the contract provision(s) allegedly violated.  At this first step, the grievance shall be submitted to the Director of Labor Relations or to AGMA, as applicable. Grievances filed within the

2. Step 2:   By the earlier of thirty (30) days from the Grievance Committee meeting or forty-five (45) days after the initial filing of the grievance if the grievance has not been satisfactorily adjusted, then either party shall have the right to submit the dispute to arbitration in accordance with the provisions of Article TWELFTH.

   (a) The Grievance Committee shall have no power to amend or modify the provisions of this AGREEMENT or of any STANDARD FORM CONTRACT or to bind either the Met or AGMA.

3. Notwithstanding anything herein contained, it is agreed that the procedure herein outlined is not intended to prevent the prior utilization of other informal methods of settling any Grievance; nor shall the provisions of this article be deemed to prevent any ARTIST from discussing ARTIST's individual Grievance with the Met.

C. This Article shall not apply to the discontinuance by the Met of a Chorister or the non-reengagement by  the Met of a Dancer, in which instances the procedures set forth in

9598252.1

SECTION THREE, Article NINTH, and SECTION FOUR, Article NINTH, shall govern exclusively.

## TWELFTH: ARBITRATION

A. Every contract entered into between the Met and any ARTIST during the term of this AGREEMENT shall be deemed to contain the following provisions:

"Any dispute as to the interpretation, application, or alleged violation or breach of this contract shall be determined by arbitration before a single arbitrator, subject, however, to the prior requirements of Article ELEVENTH (Grievance Procedure) of this AGREEMENT, in accordance with the Voluntary Labor Arbitration rules, then obtaining, of the American Arbitration Association subject, however, to the following procedures:

"1. An arbitration may be instituted by either the Met or AGMA (hereinafter referred to as the 'initiating party') by serving a written demand (herein referred to as the 'Demand') therefore upon the other party and upon the American Arbitration Association. Such Demand shall set forth, clearly and concisely:

a) The question or questions at issue.

b) The specific provisions of the contract which it is claimed govern the determination of the issues to be arbitrated.

c) The contentions of the party demanding arbitration with respect to the issues to be arbitrated.

d) The relief sought on the arbitration.

Such demand shall be delivered by the initiating party to the other party and, if delivered to the Met, to the attention of its General Counsel; if delivered to AGMA, to the attention of its Executive Director.

"2. Within twenty (20) days after receipt by the other party (hereinafter referred to as the 'responding party') of the Demand, the responding party shall serve its written Answer thereto upon the initiating party and upon the American Arbitration Association. Such Answer shall set forth the same matters as are required for the Demand.

"3. The award of the arbitrator shall be final and binding and judgment upon such award may be entered by any such party in the highest court of a forum, state or federal, having jurisdiction.

"4. Notwithstanding anything in this paragraph contained, either party to this contract shall be entitled to seek injunctive relief in any appropriate court for any breach of this contract for which such relief would be available absent the provisions of this paragraph.

2

B.  Any dispute as to the interpretation, application or alleged violation or breach of this AGREEMENT shall be determined in the same manner as provided in Paragraph A above.

C.  The members of AGMA collectively shall not refuse to carry out the terms of this AGREEMENT or the terms of their employment agreements with the Met, nor will they collectively participate in strikes, walkouts, picketing, stoppage of work, retarding of work or boycott, whether primary or secondary, or any other interference of whatsoever nature with the conduct or operation of the Met's business except in the event that the Met shall fail to comply with Article ELEVENTH or Paragraph A or B of this Article, or any confirmed award rendered in accordance therewith, or with Paragraph D of this Article..

D.  The Met agrees during the term of this AGREEMENT that it will not discriminate against AGMA or its members nor shall it lock out members of AGMA except in the event that AGMA fails to comply with Article ELEVENTH, or with Paragraph A or B hereof or any confirmed award rendered in accordance therewith, or with Paragraph C of this Article..

E.  Nothing contained in this AGREEMENT shall be deemed to derogate from the Met's right to terminate any ARTIST's employment by reason of the failure of ARTIST to fulfill ARTIST'S obligations under ARTIST's contract or under this AGREEMENT, it being understood, however:

1.  that the Met will notify AGMA immediately of any such termination of employment and the specific grounds therefor, and

2.  that AGMA shall have the right to arbitrate the propriety of said dismissal  as provided in Paragraphs A and B hereof, provided that Demand therefore is filed not more than sixty (60) days after the date of said dismissal and shall be served upon the Met, and

3.  that in the event that the arbitrator shall find such dismissal unjustified, they shall be entitled to make such award as they shall deem fit, including, without limitation, the reinstatement to his/her prior position of ARTIST with pay retroactive to the date of dismissal.

F.  The provisions of this Article shall not apply to the discontinuance of any Chorister pursuant to SECTION THREE, Article NINTH, or to the non-reengagement of any Dancer pursuant to SECTION FOUR, Article NINTH, the provisions of which shall apply and are not subject to arbitration.

G.  If with respect to any demand for arbitration made by AGMA under this AGREEMENT, the Met takes the position that AGMA has failed to fulfill any time limitation set forth in any provision of this AGREEMENT (SECTIONS ONE, TWO, THREE and/or FOUR) and that, therefore, AGMA has waived its rights and no arbitration can be allowed, and if the Met nevertheless must participate in such an arbitration, AGMA shall pay all costs and expenses, including reasonable attorney's

3

fees, incurred by the Met in connection with such arbitration if the Met is the prevailing party.

4

**<u>Agreement re Standards of Conduct</u>**

All Artist form contracts for per-performance singers and principal dancers, visiting directors and choreographers shall be amended to add the following provision:

<u>Standards of Conduct</u>

1. The Metropolitan Opera's policies governing the conduct of members of the AGMA bargaining unit, including but not limited to its policy prohibiting discrimination and harassment, are equally applicable to Artist.

2. In the event that, following execution of the Artist's contract, the Metropolitan Opera becomes aware of serious conduct or substantiated allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal, including but not limited to sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude, the Metropolitan Opera may, upon written notice, terminate this Agreement, in which event the Metropolitan Opera shall not have any further obligations to Artist, including any financial or other obligations such as travel or accommodation.

3. AGMA shall retain the right to contest, through arbitration, whether or not the identified conduct is violative of this provision.

4. Private, non-criminal conduct between consenting adults which does not constitute sexual assault, harassment or discrimination and which is reasonably expected to remain private shall not be considered conduct which is violative of this provision.

5. An Artist shall have a right to union representation if the Metropolitan Opera seeks to invoke this provision. In the event that the Metropolitan Opera seeks to interview a bargaining unit member who it believes may have violated the standards of conduct set forth above, the Metropolitan Opera will (a) inform the Artist of the right to have representation during any investigatory interview, (b) to the extent reasonable under the circumstances, provide AGMA with at least twenty-four (24) hours' notice prior to the interview, and (c) to the extent reasonable under the circumstances, an AGMA representative shall attend such interviews unless the Artist declines representation.

## <u>MEMORANDUM OF AGREEMENT</u>

MEMORANDUM OF AGREEMENT made and entered into this 30th day of August, 2018, between THE METROPOLITAN OPERA (the "Met"), having its principal office at the Metropolitan Opera House, Lincoln Center, New York, New York, and AMERICAN GUILD OF MUSICIAL ARTISTS ("AGMA"), having its principal office at 1430 Broadway, New York, New York.

A.   <u>Term</u>

    1.   The Agreement between the Metropolitan Opera and the American Guild of Musical Artists effective between August 1, 2014 and July 31, 2018 is extended for the period beginning August 1, 2018 (the "Effective Date") through and including July 31, 2021, except as modified in this Memorandum of Agreement.

    2.   Dates in any provision of the 2014-2018 Collective Bargaining Agreement ("CBA") which have not been changed in this Memorandum of Agreement shall be changed so that all provisions in the 2014-2018 Collective Bargaining Agreement are effective from August 1, 2018 through July 31, 2021, so long as such changes have no economic impact different than the impact during the 2014-2018 Collective Bargaining Agreement.

B.   <u>Wages</u>

    The equivalent of all wages[1] paid to each employee covered by the CBA will be increased as follows:

    1.   August 1, 2018: 3%

    2.   August 1, 2019: 3%

    3.   August 1, 2020: 1%

    4.   February 1, 2021: 1%

---

[1] The term "wages" as used in this section refers to all items that were subject to annual percentage increases in the 2011-2014 Collective Bargaining Agreement or to the reductions in the 2014-2018 Collective Bargaining Agreement, including base weekly salary and overscale; all hourly, penalty, and per performance extra rates and fees; all rehearsal compensation; costume payments; 5th, 6th, and 7th penalty show rates; Media compensation (exclusive of revenue sharing guarantees), and; compensation for audience development performances.

This Agreement will preserve the historic differential between the Orchestra and Chorus weekly base.

C.    <u>Pension</u>

Section One, Thirteenth of the 2011-2014 Collective Bargaining Agreement shall be amended, to provide for the following pension changes for employees who participate in the Metropolitan Opera Association Retirement Plan (the "Plan") and to employees who retired under the 2014-2018 Collective Bargaining Agreement, consistent with Section One Thirteenth, B of the 2011-2014 Collective Bargaining Agreement. Proposed Plan amendments shall be provided to the Union prior to being adopted by the Plan trustees.

1.    The Plan shall be amended to update the definition of Annual Compensation provided in Section 1.6(i) of the Plan for Members who retire on or after August 1, 2018 to be the greater of Annual Compensation received in either the (A) 12-month period commencing August 1, 2004 and ending July 31, 2005; or (B) 12-month period commencing August 1, 2005 and ending July 31, 2006; provided, however, that Members whose Annual Compensation as of July 31, 2018 is greater than their Annual Compensation would be under the Plan as so amended shall continue to have their benefits under the Plan determined using the greater Annual Compensation in effect prior to August 1, 2018 with respect to all of their Years of Credited Service before and after August 1, 2018.

2.    The definition of Annual Compensation in the Plan shall be further amended for Employees (as such term is defined in the Plan) who retire on or after August 1, 2018 who did not earn at least one (1) "Year of Credited Service" (as such term is defined in the Plan), during the applicable two-year period described in Section 1, above, and who earn a Year of Credited Service subsequent to August 1, 2006 to be the greater of the (A) Annual Compensation received during such Member's first Plan Year following August 1, 2006 in which s/he earns a Year of Credited Service or (B) if such Member commenced employment by the Met on or after October 1 and was not employed in his/her first year of employment for the full Plan Year during which s/he first earned a Year of Credited Service, Annual Compensation received during such Member's next following full Plan Year,

2

subject to the adjustment at the end of the first sentence of Section 1.6(iii) of the Plan, but using the Base Chorister's weekly wage in effect during the twelve (12) months ending July 31, 2006, and including a corresponding amendment to the second sentence in Section 1.6(iii) of the Plan to refer to the applicable AGMA CBAs.  For purposes of clarification, Section 1.6(iii) of the Plan shall continue to apply as before to all other Employees who retire on or after August 1, 2018 who did not earn at least one (1) Year of Credited Service during the applicable two-year period described in Section 1, above, as amended to include both: (a) using the Base Chorister's weekly wage in effect during the twelve (12) months ending July 31, 2006, and (b) a corresponding amendment to the second sentence in Section 1.6(iii) of the Plan to refer to the applicable AGMA CBAs.

3.     The definition of Annual Compensation in the Plan shall be further amended for Members who retire on or after August 1, 2018 and who, following the Plan Year(s) referred to in Section 1 above, have a "Qualifying Promotion" (as defined below) to be either: (a) if the Qualifying Promotion becomes effective at the beginning of a full Plan Year, the Annual Compensation received in that Plan Year; or (b) if the Qualifying Promotion becomes effective other than at the beginning of a Plan Year, the greater of the Annual Compensation the Member receives in the Plan Year of the actual promotion or the Annual Compensation the Member receives in the following Plan Year. All Annual Compensation as determined pursuant to the foregoing sentence shall continue to be subject to the adjustment at the end of the first sentence of Section 1.6(iii) of the Plan, but using the Base Chorister's weekly wage in effect during the twelve (12) months ending July 31, 2006, and including a corresponding amendment to the second sentence in Section 1.6(iii) of the Plan to refer to the applicable AGMA CBAs. A "Qualifying Promotion" shall mean a bona fide employment classification promotion from one of the following classifications (which shall be maintained as an Appendix to the Plan, subject to the agreement of the Met and the Union to amend the list from time to time) and where the Member has been employed in such promoted position for two (2) years with respect to promotions listed in (a) through (c), below, or obtained tenure with respect to the promotion described in

(d) below. The eligible promotions include: (a) a promotion from a weekly or per performance solo singer to regular chorister; (b) a promotion from a weekly or per performance solo singer to plan artist solo singer; (c) a promotion from assistant stage manager to stage manager; and (d) a promotion of a regular following an audition to a titled chair (i.e., principal, associate principal, or assistant principal).

4.      Annual Compensation, as defined in the Plan, that may be taken into account for purposes of calculating benefits or contributions shall continue to be limited to $200,000 without adjustments that may apply under section 401(a)(17) of the Internal Revenue Code.

5.      Notwithstanding anything herein to the contrary, no bargaining unit employee's accrued benefit under the Plan at any time on or after August 1, 2018 shall be less than the employee's accrued benefit under the Plan calculated as of July 31, 2018.

D.    <u>Pension Fund Performance</u>

1.      Section One, Thirteenth, E(a) of the 2011-2014 Collective Bargaining Agreement shall be amended to increase the length of the Pension Fund Performance from two and one-half (2 ½) hours to four (4) hours.

2.      Section One, Thirteenth, E(a) of the 2011-2014 Collective Bargaining Agreement shall be amended to increase the length of the Pension Fund Rehearsal from two and one-half (2 ½) hours to three (3) hours.

3.      The Pension Fund Performance will not count toward the guarantee and will not result in a guarantee adjustment.

4.      All current rules and conditions concerning the Pension Fund Performance and Rehearsal shall continue to apply, except as expressly modified in this section.

E.    <u>Sundays</u>

The 2014-2018 Collective Bargaining Agreement shall be amended to provide that the Met may schedule performances as follows, subject to the conditions set forth in Exhibit 1:

1.      No Sundays in 2018-19.

2.      Up to 20 Sundays in 2019-20.

3.      Up to 27 Sundays in 2020-21 and thereafter unless the parties determine otherwise after the expiration of this Agreement.

F.      Opera Fund Performance

The 2014-2018 Collective Bargaining Agreement shall be amended to provide that the Met shall have the right to have an Opera Fund Performance and Rehearsal under the same terms as the Pension Fund Performance and Rehearsal, described above. The performances and rehearsals for the Pension Fund Performance and Rehearsal and Opera Fund Performance and Rehearsals may not be held in the same week.

G.      Mid-Season Break

The Met may schedule a four-week break in the regular New York season beginning on or about the month of February, provided that the four (4) weeks must be contiguous, with at least one (1) guaranteed "dark week" (e.g., a CTO week) in which no services will be performed, and provided further that the following conditions apply for members of the Chorus:

1.      In a week without performances, the Chorus will be available for 27 ½ hours of rehearsal for base salary.

2.      Pre-season limitations apply (e.g., evening rehearsals (after 6 pm) will be compensated at double time the rehearsal rate, with a 2 ½ hour minimum call).

3.      Weekly base compensation for mid-season week

a.      In a mid-season mixed week (i.e., one with fewer than four (4) opera performances), the first sixteen (16) hours of work (performance and/or rehearsal) shall be included in the weekly base pay. Performances shall count as four (4) hours and shall be credited first. Worked stage rehearsal or combined staging rehearsals will be credited second, followed by any worked studio hours. Credited hours will exclude any hours paid at a premium rate.

b.      Any rehearsal hours worked in excess of the sixteen (16) hours covered by weekly base will be paid at straight time unless a penalty rate applies.

c.      Any hours worked in excess of 27.5 will be paid at one-and-a-half times the stage rate or room rate, as applicable, unless a penalty rate applies.

4.      Gap rules apply to days with performances as set forth in the CBA.

H.     Health Care

    1.     The 2014-2018 Collective Bargaining Agreement shall be amended to provide for employee healthcare contributions, in the following amounts:

        a.     Regular Chorus: $900 per year annually for individuals, $1,800 for family.

        b.     Plan Solo Singers, Stage Managers and Assistant Stage Managers, Stage Directors and Assistant Stage Directors: $450 annually for individuals, $900 annually for family.

    2.     The Met shall adopt a cafeteria plan allowing the Met to withhold bargaining unit members' health care contributions on a pre-tax basis from the members' pay. If a member opts out of the pre-tax deduction, the Met shall deduct the contributions on a post-tax basis from the member's pay, unless the member declines the Met's health care coverage altogether.

    3.     In the case of two Met employees who are married to each other and both are eligible to participate in the Met's medical plan, the Met will amend the terms of the plan to remove the prohibition against one of the employees being enrolled as a dependent in the plan by the other, subject to the following:

        a.     Such married employees will retain the option to enroll as separate covered persons.

        b.     For married employees who elect to have one spouse enrolled as a dependent by the other spouse, if the employees are subject to different employee health contribution amounts, the employee with the greater health contribution amount must enroll as the eligible employee, and the spouse with the lesser employee health contribution must be enrolled as an eligible dependent.

        c.     Any person who is enrolled in the Met's medical plan as an eligible employee cannot also be enrolled at the same time as an eligible dependent of another eligible employee.

I.     Long-Term Disability and Sick Leave Committee

    1.     The parties agree to form a Joint Long Term Disability/Sick Leave Committee, comprising no more than six (6) representatives (combined) from AGMA and Local 802, as well as representatives from Met administration. The Committee

6

will meet as often as necessary, at least monthly, during the period from contract ratification through February 28, 2019, to attempt to reach agreement on changes to the Met's Long Term Disability Insurance Coverage (including but not limited to the universe of covered employees and the elimination period), sick leave benefits (including but not limited to sick leave accrual), and coordination between sick leave and long-term disability.

2.      The Parties agree to discuss unresolved issues with an agreed-upon mediator.

J.      <u>Safety</u>

1.      The Parties agree to establish a Joint Safety Committee to review and make recommendations on AGMA's safety proposals, attached as Exhibit 2, by no later than December 31, 2018.

2.      The Parties agree to discuss unresolved issues with an agreed-upon mediator, with any agreements to be memorialized in an LOA.

K.      <u>Artistic Advisory Committee</u>

Section One of the 2011-2014 Collective Bargaining Agreement shall be amended to incorporate the language set forth in Exhibit 3.

L.      <u>AGMA-Met Cooperation</u>

1.      The Efficiency Task Force will continue for the period of the term of the new CBA.

2.      For as long as Gene Keilin continues to serve in the role of Independent Financial Analyst, the Met will provide Mr. Keilin with the same type of information that it currently provides and continue current practices. Once Mr. Keilin leaves the role, the Met, AGMA, and Local 802 will attempt to mutually agree upon the identity of a successor and the type of information to be provided to the successor.

3.      Met Donor/Public Engagement/Volunteer Committee

a.      The Parties shall create a joint committee to partner in revenue generating initiatives, as well as in direct engagement with donors, fans, and new and young audiences.

b.      Bargaining unit-members will provide service through the committee on a volunteer basis, with a goal of an average of four (4) hours per individual per New York Season.

c.      The Met acknowledges that donors are attracted to social and educational programs, as well as direct contact with Met Artists.

d.      Some opportunities can be tied to grant and foundation funding, as well as audience development, including, but not limited to:

      i)      Continuing the Met Orchestra Musicians and Met Chorus Artists small community/VA/school concerts, under the umbrella of the Met Development Office, to attract major donors, secure grants, and engage the community.

      ii)      Inviting audience members to meet Met Artists following short performances.

      iii)      Including Met Artists at donor events to enhance personal connections to the institution (e.g., chamber music performances, Q&A Panel discussions).

      iv)      Involving Met Artists in personally thanking donors.

      v)      Organizing online and in-person "meet and greets" with audience members before, during intermissions of, and after performances (e.g., Young Associates, FUN40, live tweeting, Google educational hangouts, using Met Artists in the lobby to engage with audience members).

e.      These efforts will be organized and subject to the approval of the Met's Marketing, Development, and/or Education departments.

f.      While Dancers may participate in this program on a voluntary basis, nothing in this section shall alter the compensation Dancers current receive for similar activities.

M.      <u>Long-Term Disability</u>

1.      AGMA Plan Solo Artists, Stage Directors and Assistant Stage Directors, and Stage Managers and Assistant Stage Managers with sufficient service will be permitted to purchase individual long-term disability coverage through the Met's existing voluntary plan.

2.      It is understood that this option is subject to the Met's ability to make payroll deductions to finance the program.

N.    <u>Chorus Master</u>

      Section Three of the 2011-2014 Collective Bargaining Agreement shall be amended to provide that the Chorus Committee shall be given the opportunity to provide input with respect to the selection of any new Chorus Master.

O.    <u>Plan Solo Artists</u>

1.    Section Two, Seventh, P of the 2011-2014 Collective Bargaining Agreement shall be amended to change the rehearsal limitations contained therein to provide that a Solo Singer shall receive an additional ten percent (10%) of his/her weekly salary for any day in which he or she is required to rehearse in excess of six (6) hours in the day.

2.    Section Two, Seventh, P of the 2011-2014 Collective Bargaining Agreement shall be amended to change the rehearsal limitations contained therein to provide that a Solo Singer shall receive an additional ten percent (10%) of his/her weekly salary in instances in which he or she is required to rehearse in excess of thirty (30) hours in a week.

P.    <u>Stage Managers and Assistant Stage Managers</u>

1.    Section One, Thirteenth, E(b) and Section Two, Seventh E(2)(a), Seventh, F(3), Seventh, F(4), Seventh F(5)(a), and Seventh G of the 2011-2014 Collective Bargaining Agreement shall be modified to include Stage Managers and Assistant Stage Managers.

2.    Section One, Fourteenth and Fifteenth of the 2011-2014 Collective Bargaining Agreement shall be modified to change the term "staff stage manager" and "staff assistant stage manager" to "Plan Artist Stage Manager" and "Plan Artist Assistant Stage Manager."

Q.    <u>Dancers</u>

      Section Four of the 2011-2014 Collective Bargaining Agreement shall be amended to provide as follows:

1.    The Met shall provide daily company class, at no cost to the Dancers, at least four (4) days every week, from the first call for dancers through the end of the New York Season. The Met and AGMA shall discuss the necessity of scheduling class

9

during weeks when the dancers are not in rehearsals and/or performances (e.g. Mid-Season Break).

2.     The Met shall give first consideration for reengagement for the revival of an opera in which Dancers were used in the most recent run of performances to a Dancer(s) who appeared in such performance, provided that the Dancer(s) has appeared in an opera at the Met in the previous five (5) years. The Met shall, upon request, provide Dancers who are not re-engaged with the reason why they were not re-engaged.

3.     The Parties agree that the Met shall continue past practice regarding rehearsal compensation for dancers covering and/or performing Intermediate and Principal solo roles.

4.     Representatives of the Met and AGMA will meet promptly after ratification to discuss adequate notification of dancers' schedules and projected income at the time the individual contracts are offered, with any agreements to be memorialized as a LOA.

5.     The Met shall increase "in-lieu-of-benefits" payments by 2%, from 7% to a total of 9%.

R.     Side Letters

       The Parties will continue all existing side letters to the CBAs provided that:

1.     The Parties will discuss appropriate modifications to the *Porgy & Bess* side-letter.

2.     The Parties will modify the side letter regarding the AGMA symphonic adjustment to provide that the Chorus will receive a payment of $1,500 for each memorized symphonic program and $250 for each unmemorized symphonic program, up to a maximum payment of $3,000 per year per performer.

S.     Morals Clause

       The Parties agree that the Met and AGMA will discuss language of a Morals Clause.

T.     Bereavement Leave

1.     Section Three, Seventh, F of the 2011-2014 Collective Bargaining Agreement shall be amended to increase bereavement leave afforded to members of the Regular Chorus and to Steady Extra Choristers from three (3) days to one (1)

week. Bereavement pay will apply to any base services that are missed for bereavement purposes in the seven calendar days following the death.

2. Section Two, Third of the 2011-2014 Collective Bargaining Agreement shall be amended to afford Plan Stage Managers and Plan Assistant Stage Managers, Plan Stage Directors and Plan Assistant Stage Directors, and Plan Solo Artists one (1) week. Bereavement pay will apply to any base services that are missed for bereavement purposes in the seven calendar days following the death.

3. Section Two, Third of the 2011-2014 Collective Bargaining Agreement shall be amended to provide that non-Plan employees contracted on a weekly basis (stage directors, assistant stage directors, and weekly solo artists) shall receive one (1) day of paid bereavement leave for every three (3) weeks of contracted work, with a cap of six (6) days.

4. Section Three, Seventh, F of the 2011-2014 Collective Bargaining Agreement shall be amended to provide that Extra Choristers may use accrued sick time for bereavement leave.

5. Section Four of the 2011-2014 Collective Bargaining Agreement shall be amended to provide that Extra Dancers may use accrued sick time for bereavement leave.

U. <u>Primary/Secondary Caregiver Leave</u>

1. Section One, Fifteenth of the 2011-2014 Collective Bargaining Agreement shall be amended to change current language concerning "maternity" to instead use the term "primary caregiver".

2. The title of Section One, Fifteenth of the 2011-2014 Collective Bargaining Agreement shall be changed from "Maternity Leave" to "Primary/Secondary Caregiver Leave."

3. Section One, Fifteenth of the 2011-2014 Collective Bargaining Agreement shall be amended to include the adoption of a new child and to add one (1) week of Secondary Caregiver leave.

V. <u>Anti-Discrimination/Harassment Prevention</u>

Section One, Third of the 2011-2014 Collective Bargaining Agreement shall be amended to include the following provisions relating to anti-discrimination and harassment prevention:

1. The Met agrees to meet and confer with Union representatives prior to conducting its annual anti-discrimination/harassment prevention training to provide the opportunity for input and feedback so as to maximize the efficacy of the training.

2. The Met will, on request, meet with Union representatives each year after the annual anti-discrimination/harassment prevention training is conducted to obtain feedback and to discuss ideas for improvement.

3. The Met agrees to create a committee, which will include three (3) Local 802 representatives, three (3) AGMA representatives and Met representatives, to discuss issues related to harassment and misconduct and how better to prevent it. This committee will meet at least twice every contract year.

4. When the Met receives a report of misconduct in which the accused is a member of the AGMA bargaining unit, the Met agrees to notify the Executive Director of AGMA at least twenty-four (24) hours before conducting an investigatory interview of that individual. The Met shall inform both the complainant (if he/she is a bargaining unit member) and the accused that he/she is entitled to union representation before conducting an investigatory meeting with that individual. A representative from the Union shall have the right to attend such investigatory interviews on behalf of a bargaining unit member unless that individual requests otherwise. The Union's right to attend such interviews and to advise bargaining unit members during the course of an investigation shall not interfere with the Met's prompt scheduling of interviews so as to conduct a prompt and thorough investigation.

5. The terms and conditions of employment of bargaining unit members are established in the CBA between AGMA and the Metropolitan Opera. The Met's policy against discrimination and harassment is applicable to members of the bargaining unit as long as such policy does not conflict with any provisions of the CBA, including but not limited to both substantive and procedural provisions

12

relating to discipline of employees. To the extent that the policy is in conflict with the terms of the CBA, the provisions of the CBA shall govern.

THE METROPOLITAN OPERA

By: _____

    Peter Gelb, General Manager

Date: _____8 | 30 | 2018_____

AMERICAN GUILD OF MUSICAL ARTISTS

By: _____

    Leonard Egert, National Executive Director

Date:_____

13

# Exhibit 1

Work Rules for Sunday Performances (except as modified by rules applying to individual groups, below).  (These rules are applicable only in seasons with Sunday performances other than Special Sunday Performances.)

1.     If the Orchestra or Chorus performs on a Sunday, no member of the Orchestra or Chorus, respectively, will be required to work on Monday.

2.     No Chorus or Orchestra rehearsals will be held on Sunday, provided that Special Sunday Performances (e.g., New Year's Eve, Galas) may include rehearsal on the day of that performance to be paid at current penalty rates. Such penalty rates shall apply to all groups.

3.     In six-performance weeks in which there is a Sunday performance, there will be two (2) weekday nights without a performance.

4.     Sundays will not be HD days.

5.     Monday rehearsals for Staff Performers, Stage Managers, Stage Directors, Music Staff, Dancers, and Solo Singers.

    a.     Individuals from these groups may be required to work on Monday.

    b.     Scheduling for these groups--including requirements to work on Mondays and free days off during the week--shall be made on an individual basis.

    c.     If an individual from these groups is required to work on Monday, he/she will be given another day off during the week.

    d.     If an individual from these groups is required to work on Monday and the Met cannot find another free day for that individual, current Sunday work rules will apply to the Monday rehearsal for that individual.

6.     There will be no Room Rehearsals on Sunday except in emergencies (as currently defined).

7.     Scheduling and Curtain Time:

14

      a.      There will be a standard curtain time of between 2:00 p.m. and 3:00 p.m., except that the curtain time for longer operas (i.e., those that exceed five (5) hours) may be at 1:00 p.m.

      b.      Other than for Special Sunday Performances (e.g., Galas and New Year's Eve), Sunday performances will be matinees.

8.      Emergency rehearsals necessitating work for groups other than the Orchestra and Chorus on Sunday or Monday (e.g., a soloist flown in for a last-minute rehearsal) will be similar to current practice.

9.      The Sunday schedule will not alter the number of guaranteed and alternate free days under the CBA.

10.      National Council will be treated consistent with current practice (including penalties) and shall not count as a Sunday performance for the purpose of how the following Monday may be scheduled.

11.      Except as provided herein, all current contractual provisions shall apply to Sunday work.

15

Work Rules

A.    Joint Conditions (Chorus, Extra Chorus)

     1.    National Council remains at current penalty rates.

     2.    If an individual in the Regular Chorus works eight (8) performances in seven (7) consecutive days, double the regular performance rate will be paid.

     3.    Current overtime limitations will apply to Sunday performances, as with any other performance

B.    Chorus

     1.    Current overtime limitations will apply to Sunday performances, as with any other performance.

     2.    The Met will continue its current contractual obligations with respect to the number of "additional free days." The Met will endeavor to make at least ten (10) of these free days contiguous with a day off, with the remainder guaranteed to be contiguous with a day off.

     3.    In each season, each Regular Chorister will be allowed one (1) personal performance off during the New York season, in addition to existing personal performances off.

     4.    In a contract year in which regular Sunday performances occur, the Chorus will receive one (1) additional CTO week.

C.    Stage Managers and Assistant Stage Managers

     1.    If an individual is required to work a Sunday performance, he/she will not be required to work on Monday. If the Met cannot provide Monday off, Sunday work rules will apply to the Monday rehearsal.

     2.    The penalty for violation of a free day shall be 2/6th of the weekly salary.

     3.    In seasons with Sunday performances, there will be one (1) week of CTO. The parties acknowledge that this week will generally be used to replace a sub-week.

D.    Plan/Weekly Solo Singers

     1.    If an individual is required to work a Sunday performance, he/she will be given another day off during the week (not necessarily Monday). If the Met cannot find another free day for the individual, Sunday work rules will apply to the Monday

rehearsal.

2.    If an individual is required to work a Sunday rehearsal, he/she will receive 20% of weekly base for the first five (5) hours of services, plus an additional 10% of weekly base if working in excess of five (5) hours.

3.    An individual cannot be required to work more than seven (7) consecutive days. If required to do so, he/she will receive 20% of weekly base for the first five (5) hours of services on the eighth day, plus an additional 10% of weekly base if working in excess of five (5) hours.

4.    Notwithstanding anything to the contrary in D.1 and D.3. above, when calculating whether an individual has worked seven (7) consecutive days, a penalty day under paragraph D.1. will not be counted toward that total.

5.    The penalty for an emergency rehearsal for a performance not on that Sunday remains as in the current contract.

6.    Except in the case of illness or other reasons beyond the Met's control, a cover may not be called in lieu of a principal for a performance or stage rehearsal that takes place on a Monday.

E.    Stage Directors and Assistant Stage Directors

1.    If an individual is required to work a Sunday performance, he/she will be given another day off during the week (not necessarily Monday) or another day in the previous week. If the Met cannot provide another free day for the individual, he/she will receive 2/6ths of weekly base

2.    If an individual is required to work a Sunday rehearsal, he/she will receive 2/6th of weekly base.

3.    Consistent with Second, Seventh, Q(1)(b)(11), there shall be no more than two (2) consecutive three (3) free day invasions.

F.    Dancers

1.    If an individual is required to work a Sunday performance, he/she will be given another day off during the week (not necessarily Monday). If the Met cannot find another free day for the individual, Sunday work rules will apply to the Monday rehearsal.

2.    An individual cannot be required to work more than seven (7) consecutive days. If required to do so, he/she will receive double the hourly rate for all services performed on the eighth day.

3.     Notwithstanding anything to the contrary in F.1 and F.2. above, when calculating whether an individual has worked seven (7) consecutive days, a penalty day under paragraph I.1. will not be counted toward that total.

4.     Eliminate Third (C) (b)(ii) for Sunday performances (i.e., dancers will be paid for dressing and undressing time on Sundays).

G.    The Parties' intent is that members of the bargaining unit not work more than seven (7) consecutive days as provided above. Issues of excessive consecutive day scheduling shall be referred to the Artistic Advisory Committee for consideration and advice regarding an appropriate remedy to preserve artistic quality and individual quality of life.

18

# Exhibit 2

**AGMA RESPONSES**
**HEALTH & SAFETY PROVISIONS**
**July 30th, 2018**

**The following provisions apply to all AGMA represented ARTISTS engaged by the Met.**

Safety Committee and Delegate

1. The existing AGMA/Met Safety Committee (under Section I, Nineteenth) shall meet on a monthly basis at mutually agreeable dates and times, and at other dates and times as may be mutually agreed, to discuss and to endeavor to resolve any current safety-related issues and concerns, including but not limited to company-wide issues affecting AGMA bargaining unit members when applicable (fire drills, training; other relevant information); and issues that may arise with productions that are coming up before the next scheduled meeting of the Safety committee.

2. Representatives of Met management (technical director, company manager and executive stage director) will meet with the full Safety Committee no later than January, to coincide with the creation of the block rehearsal schedule for the season immediately following, to discuss and identify any safety issues or concerns arising from the proposed schedule (i.e., number of costume; staging; lighting/tech rehearsals as relevant to health and safety issues).

3. A Safety Committee meeting shall be scheduled as early as practicable in each New York Season to identify and discuss health and safety-related conditions of new productions (or revival productions that have been out of the repertoire for at least eight (8) years) scheduled for the Season immediately following. If the Committee mutually agrees adjustments to be made for health and safety reasons, such adjustments will be implemented prior to the first stage rehearsal of such production[s].

4. An AGMA Delegate, or designated alternate shall serve as the Safety Delegate at all times that AGMA ARTISTS are working within or on behalf of the Metropolitan Opera.

5. An AGMA Stage Manager may stop work on the stage or elsewhere when, in his or her good faith opinion, that a condition exists that is an immediate threat to the safety or health of the performers and the work shall remain stopped until the condition is assessed and determined to be corrected or not to present an immediate health or safety threat. No Stage Manager shall in any way be disciplined by the Met for stopping a rehearsal or

19

performance to address a condition that he/she in good faith believes is a threat to the safety or health of the performers.

Notwithstanding the above, the Safety Delegates and representatives from the Met shall meet at mutually agreeable times as soon as is practical to discuss the development of conditions, protocol and guidelines for the following categories:

Toxic or Hazardous Contaminants

Conditions, safety measures and protocol for testing, reporting, monitoring, treatment, removal and/or minimizing the exposure of employees to toxic or hazardous residue, fumes or contaminants that are recognized as health and safety hazards, including mold and dust.

Stage and Rehearsal Space

1. Cleanliness of floor surfaces of all rehearsal and performance spaces during rehearsal and performance conditions;

2. Structure and conditions of sets, off stage areas and access to stage; and appropriate safety measures (glow tape, lighting etc);

3. Conditions for safe egress for performers on and off the set.

Raked Stages

Practice and protocol to improve safety and comfort for Artists working on raked stages.

Smoke and Fog

1. Appropriate notification to affected Artists of the use of smoke and fog effects, including the materials used when other than dry ice, water vapor or the LN2.

2. Conditions of use, such as; length of exposure; placement, monitoring and maintenance of the machines; adequate notification of changes in frequency, or intensity of effect.

Stage Rehearsals

Protocol and scheduling of stage rehearsals to provide adequate time and conditions for the Artists to review entrances, exits, dance and fight choreography, scenery and prop transitions that AGMA and the MET agree may affect ARTIST's safety.

Fire Effects

1. Protocol for the use of live flame or pyrotechnics, with consideration of inclusion of notification to the Artists; instruction for safe use; materials used and placement of

effects, consistency of application of the effect and adequate notification or warning of any changes;

2. Adequate notification to the Artists and safe application of the use of fire and the materials or methods used for fire retardant in costumes, wigs, sets, drops and props.

Sound Effects

Protocol for the use of sound effects, with consideration of inclusion of notification to the Artists, reasonable and appropriate adjustments to minimize effect to all performers, whether on stage, back stage or in the orchestra pit ; consistency of application of the effect and adequate notification or warning of any changes.

Firearm, Sword, Knife and Fight Safety

Protocol for the use of firearms and sword, knife and fight safety that tracks the current practice of the MET.

Dressing Rooms

Adequate space, cleanliness and temperature of all dressing rooms and bathroom facilities utilized by all AGMA represented Artists.

Makeup

Conditions, safety measures and protocol for the products, use and application of make-up as provided and applied by the Met.

**Exhibit 3**

Artistic Advisory Committee

An Artistic Advisory Committee ("AAC") will be created to promote a forum to discuss, exchange ideas about, and provide feedback on various artistic matters. The AAC will consist of three (3) members of AGMA, three (3) members of Local 802, the Music Director, and members of the production, artistic and/or other administrative staff as warranted by the subject of discussion.  The AAC will meet at least twice during the regular Metropolitan Opera Season to discuss topics including but not limited to future repertoire and scheduling, feedback on conductors and performances, plans for new productions (when available), and exploration of events outside of the New York Season.

The AAC may consider issues raised by specific Local 802 or AGMA work groups on an as-needed basis.

The Met may not use any of these discussions as a basis for taking disciplinary action against any AGMA member.  The Artistic Advisory Committee will not be utilized for criticism of members of the bargaining units or of members of the Met's administrative staff.

<u>AGMA Response to Met Proposal—5/11/21; Modified 6/3/2021</u>

1. <u>Term of Agreement:</u>  4 years (8/1/2021-7/31/2025).

2. <u>Tentative Agreements</u>:  4/27 term sheet as amended 4/30.  Confirmed 5/11/2021.

3. <u>Bridge Pay</u>: Payments due under the Bridge Agreement MOU and health benefit contributions will be made until the earlier of the 2021/2022 season or December 31, 2021.

4. <u>AGMA Proposal 2:</u>  AGMA to appoint one mutually-agreed member to the Met's Advisory Board of Directors. ACCEPT AGMA COUNTER PROPOSAL from 5/7/21.

5. <u>AGMA Proposal 8(b)</u>:  The Met will allow Weekly Solo Singers and Weekly Directors with sufficient service to buy into the Met's Long Term Disability Plan.

6. <u>AGMA Proposal 11</u>:  The Met shall equalize the contributions to the Opera Fund and Pension Fund among all members of the Chorus. The Met will effectuate one deduction in the fall and one in the spring and spread the deduction across at least two pay periods. The amount of each deduction shall be three (3) rehearsal hours and a 5th show fee, notwithstanding the weekly guarantee rate.

7. <u>AGMA Proposal 14(a)</u>: Choristers and Extra Choristers who cover a solo role shall receive a per performance fee equivalent to one half of one minor role performance fee.

8. <u>AGMA Proposal 14(b)</u>:  If a Chorister or Extra Chorister is present at the Met for a performance call and 1) suffers an injury, illness, or illness symptoms, and; 2) the Met requires the Chorister or Extra Chorister to withdraw because of the injury, illness, or illness symptom so that the Chorister or Extra Chorister cannot perform their solo, both the soloist and the cover will be compensated for the solo.

9. <u>AGMA Proposal 27:</u>  Stage Director Health Insurance: Alter the health insurance benchmarks to provide that a stage director who is contracted for:

   a. 20 weeks: Receives full AGMA Plan A Health Insurance for Individual (or Plan B Equivalent);

   b. 10 weeks: Receives 50% of AGMA Plan A Health Insurance for Individual (or Plan B Equivalent)

10. <u>AGMA Proposal 30</u>:  Stage Director Media Proposals:

   a. Increase the single service guaranteed rate by $20.

   b. Equalize revenue sharing for Plan Stage Director with Plan Stage Managers, effective in year after reaching 50% restoration benchmarks.

11. <u>AGMA Proposal 40</u>:  If a Staff Performer works seven (7) days in a row, any rehearsal hours on the seventh (7th) day and each consecutive day thereafter will be paid as premium rehearsal hours, for a minimum of four (4) hours.

12. <u>AGMA Proposal 41</u>:  In the event a Staff Performer is required to lip-sync as part of the performance, they will be paid a per show fee of one half the spoken lines fee.

13. <u>AGMA Proposal 50</u>:  Amend Section II, Article Twelfth, B(3) and B(4) to include weekly solo singers.

14. <u>AGMA Proposal 55(f)</u>:  Equalize the performance cover fee for Extra Dancers with the performance rate for Extra Dancers.

15. <u>Wage Offset for AGMA Proposals</u>:  All salary/wage rates reduced by one percent (1.0%) effective 8/1/21.

16. <u>Additional Wage Rate Reduction</u>:  All salary/wage rates reduced by an additional 2.7% effective 8/1/21.  On July 31, 2024, these salary/wage rates will be restored to the rates in effect on May 11, 2021.

17. <u>Health Care</u>:

    a. Effective at a time to be mutually agreed upon by the parties, all Regular Choristers, Plan Artist Solo Singers, the Plan Stage Director, Stage Managers, and Staff Performers will receive health coverage through AGMA Plan A. IMPLEMENTATION DATE TO BE AGREED UPON.

    b. Per performance soloists working for the Met for a period encompassing four weeks or more shall be entitled to elect to divert a portion of their total compensation, on a pre-tax basis (if permissible), to cover the cost of AGMA Plan A for an individual.

18. <u>Performance Attendance</u>:  In any week when a Chorister who is scheduled to sing four or fewer performances misses one or more of those performances (other than because the Met does not call them in or because of an illness or injury) on a day that they attend a rehearsal (except if they leave the rehearsal for an illness or injury), the Chorister's next fifth show in a week will be paid at the base contractual performance rate (which is $344 as of May 2021).  ~~In any week when a Chorister is scheduled to sing four or fewer performances and misses one or more of those performances, that Chorister's rehearsal pay in that same week will be reduced by the pro-rated value of the missed performance(s) pay.~~

19. <u>Met Unit-Wide Proposal 3(b)</u>:  TA

20. <u>20. Met Unit-Wide Proposal 7—Standards of Conduct</u>:  TA on Met Proposal from 5/11/21

21. <u>Met Unit-Wide Proposal 8—Grievance Procedure</u>:  TA to AGMA version of 4/30/21.

22. <u>Met Unit-Wide Proposal 9:</u>  In the event that full chorus rehearsals do not commence until after August 8, 2021, in order to facilitate a season opening on September 27, 2021, pre-season work calls during the 2021-22 pre-season may be scheduled as early as 10:30 and as late as 6:00 p.m.

23. <u>Met Chorus Proposal 4:</u>  Regular chorus will be reduced to 74 effective immediately, provided that the Regular chorus will consist of 75 Choristers on July 31, 2025.

24. <u>Met Chorus Proposal 5:</u>  TA effective with 2022-23 season.

25. <u>Met Chorus Proposal 12:</u>  *Porgy & Bess* side letter to be rescinded.

26. <u>Met Principal Solo Artist Proposal 35:</u>  TA to AGMA proposal 4-30-21, with fees reduced by the following amounts:

      a.    For contracts with per performance fees of $14,000 per performance or greater: 12.65%

      b.    For contracts with per performance fees between $12,000 and $13,999 per performance: 9.5%

      c.    For contracts with per performance fees between $10,000 and $11,999 per performance: 9%

      d.    For contracts with per performance fees between $6,000 and $9,999 per performance: 8%

      e.    For contracts with per performance fees of less than $6,000: 6%

The reductions in soloist compensation permitted by this agreement will not apply to individual agreements for the 2025/2026 season and beyond, and will sunset on July 31, 2025.  Any performances after that date will not be subject to the reductions provided herein.

27.  <u>Most Favored Nations:</u> In the event the Met reaches an agreement with either Local 802, AFM or Local One, IATSE for a collective bargaining agreement commencing August 1, 2021 with an overall cost reduction that is less than that attained in the 2021-25 Met/AGMA collective bargaining agreement, the 2021-25 Met/AGMA agreement will be modified to reflect such lower percentage cost reductions.

If reductions in the 2021 Local 802 and/or Local One collective bargaining agreements are restored prior to July 31, 2024, the wage reduction in the 2021-25 Met/AGMA agreement will be restored as of that date(s).

28. <u>COVID Safety:</u>  The parties agree to meet to discuss the return-to-work safety protocols including the Met's mandatory vaccination proposal within thirty (30) days of the execution of this Agreement, and as necessary depending on changing public health.

<u>29. Residual Payments</u>:  Within 30 days of this Agreement, AGMA and the Met shall meet and confer to determine a solution to the issues raised in the Met's proposal regarding low-dollar residual payments.

<u>30. Brush-Up Mini-Rehearsals</u>: The parties will meet within 90 days of the execution of this Agreement to determine whether and under what conditions principal artists can be called for 10-minute brush-ups.

*Signature:*_____                *Signature:*_____

　The Metropolitan Opera                                                    American Guild of Musical Artists