UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
ANNA NETREBKO, :
 :
 :
             Plaintiff, :
 :
        v. : Case No. 1:23-cv-06857-AT
 :
METROPOLITAN OPERA ASSOCIATION, :
INC. d/b/a THE METROPOLITAN OPERA :
and PETER GELB, in his professional and :
individual capacities, :
 :
             Defendants. :
------------------------------------- X

# REPLY MEMORANDUM IN SUPPORT OF
# THE METROPOLITAN OPERA ASSOCIATION, INC. AND PETER GELB'S
# MOTION TO DISMISS

PROSKAUER ROSE LLP

Lloyd B. Chinn, Esq.
Howard Z. Robbins, Esq.
Hayden F. Bashinski, Esq. (admitted *Pro Hac Vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3000
Facsimile: 212.969.2900
lchinn@proskauer.com
hrobbins@proskauer.com
hbashinski@proskauer.com

*Attorneys for Defendants*
*Metropolitan Opera Association, Inc. and*
*Peter Gelb*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... ii
TABLE OF AUTHORITES ...................................................................................................... iii
PRELIMINARY STATEMENT ................................................................................................ 1
ARGUMENT ............................................................................................................................... 3
I.    Plaintiff's Opposition Fails To Save Her Speculative And Conclusory Discrimination Claims. ................................................................................................................................ 3
      A.    National Origin Discrimination ............................................................................ 4
      B.    Intersectional Discrimination ................................................................................ 6
      C.    Issue Preclusion ..................................................................................................... 7
II.    Plaintiff's Defamation Claim Is Legally Implausible. ......................................................... 8
      A.    Substantial Truth ................................................................................................... 8
      B.    Malice ................................................................................................................. 10
      C.    Opinion ............................................................................................................... 11
      D.    Issue Preclusion ................................................................................................... 12
III.    Plaintiff's Breach Of Contract Claim Is Barred By Res Judicata And Section 301 Preemption. ........................................................................................................................ 14
CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Buckley v. Littell*,
   539 F.2d 882 (2d Cir. 1976)................................................................................................12

*Chudnovsky v. Leviton Mfg. Co.*,
   2002 WL 1208762 (E.D.N.Y. Apr. 25, 2002), *aff'd*, 53 F. App'x 148 (2d Cir.
   2002) ................................................................................................................................5

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001)................................................................................................11

*Cmty. House, Inc. v. Boise*,
   468 F.3d 1118 (9th Cir. 2006) .............................................................................................5

*Concha v. Purchase Coll. State Univ. of N.Y.*,
   2019 U.S. Dist. LEXIS 119110 (S.D.N.Y. July 27, 2019) .........................................................5

*Cummings v. N.Y.*,
   U.S. Dist. LEXIS 31572 (S.D.N.Y. Feb. 24, 2020) ....................................................................11

*Dapelo v. Banco Nacional de Mexico*,
   1993 U.S. Dist. LEXIS 6185 (S.D.N.Y. May 11, 1993) ............................................................13

*DiFolco v. MSNBC Cable LLC*,
   622 F.3d 104 (2d Cir. 2010)..................................................................................................7

*Dineen v. Stramka*,
   228 F. Supp. 2d 447 (S.D.N.Y. 2002)...................................................................................11

*Fulani v. NY Times Co.*,
   260 A.D.2d 215 (1st Dep't 1999) .........................................................................................8

*Grant v. Readers Digest Ass'n*,
   151 F.2d 733 (2d Cir. 1945)................................................................................................12

*Jewell v. NYP Holdings, Inc.*,
   23 F. Supp. 2d 348 (S.D.N.Y. 1998)......................................................................................8

*Johnson v. Riverhead Cent. Sch. Dist.*,
   420 F. Supp. 3d 14 (E.D.N.Y. 2018) ....................................................................................11

*Kamalian v. Reader's Dig. Ass'n*,
   29 A.D.3d 527 (2006) .......................................................................................................11

*Lingle v. Norge Div. of Magic Chef*,
    486 U.S. 399 (1988) .................................................................................................... 15

*Livadas v. Bradshaw*,
    512 U.S. 107 (1994) .................................................................................................... 15

*Mullenmeister v. Snap-On Tools Corp.*,
    587 F. Supp. 868 (S.D.N.Y. 1984) ............................................................................... 12

*Schwartz v. Nordstrom, Inc.*,
    160 A.D.2d 240 (1st Dep't 1990) ................................................................................ 12

*Tomasino v. Mt. Sinai Med. Ctr. & Hosp.*,
    U.S. Dist. LEXIS 3766 (S.D.N.Y. Mar. 13, 2003) ........................................................ 7

*Toomey v. Farley*,
    2 N.Y.2d 71 (1956) ...................................................................................................... 12

*Vetere v. Associated Press, Inc.*,
    U.S. Dist. LEXIS 3894 (Apr. 17, 1989) ......................................................................... 8

*Williams v. N.Y. Unified Ct. Sys.*,
    2017 U.S. Dist. LEXIS 162736 (S.D.N.Y. Sept. 30, 2017) ........................................... 4

**STATUTES**

Labor Management Relations Act § 301 ................................................................... 14, 15

**PRELIMINARY STATEMENT**

Plaintiff's Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("the Opposition") does nothing to alter the unavoidable conclusion that her claims fail as a matter of law. There is simply no legal claim available to vindicate her disagreement with the Met and Peter Gelb over her support for Vladimir Putin. For Plaintiff's claims to proceed, the Court would have to find that it is unlawful for an employer to oppose Vladimir Putin and his full scale invasion of Ukraine. There is unsurprisingly no legal authority that would support any such conclusion.

Plaintiff's Opposition only confirms that this case presents nothing more than a political disagreement between the parties regarding Vladimir Putin. She expressly volunteers that, in terminating Plaintiff's contracts, the Met was motivated either to rebrand its image, or by a financial decision with regard to business and marketing, or for other non-discriminatory reasons – echoing similar allegations in the SAC – having nothing to do with unlawful discrimination. (ECF No. 42 at p. 6; see ECF No. 27 at ¶ 36). These asserted motivations on the part of the Met are perfectly lawful. All of the material assertions in the SAC revolve around Plaintiff's support for Putin and the Met's reaction to that support – there is not a mention of Russian animus anywhere on the face of the SAC. For that matter, nor are there any allegations of anti-woman animus or anti-Russian woman animus in the SAC.

Indeed, as to national origin, Plaintiff pleaded in the SAC and inexplicably emphasizes in her Opposition that other Russian performers were not terminated in the wake of Putin's invasion of Ukraine. Concerning her intersectional "national-origin-plus-gender" claim, Plaintiff fails to address the speculative and conclusory nature of her "because of" allegations; instead, she asks

the Court to allow her to engage in a fishing expedition to develop some factual basis for bringing this lawsuit. (ECF No. 42 at p. 22).

Her defamation claims too are legally implausible. Only three of six statements originally identified by Plaintiff remain in dispute, as she has conceded that three (ECF No. 27 at ¶¶ 56(f), (i)-(j)) were statements of opinion. As to the remaining three statements, they are all substantially true based on the SAC itself and documents that have been incorporated by reference and placed before the Court. Plaintiff readily admits the essential *bona fides* of her support for Putin and that she has been widely recognized as his supporter, including by her own Union ("the Union"). (ECF No. 42 at p. 25, 43-3 at p. 2, 4 & 21–24). Newspaper articles incorporated by reference in the SAC as well as the Union's brief submitted on Plaintiff's behalf in arbitration (also before the Court by the agreement of the parties) make it plain that Plaintiff's support for Putin has been well-known for many years. (ECF Nos. 37 at pp. 26–27 & 43-3 at pp. 2, 4, 21–24). Mr. Gelb's various statements that Plaintiff was a Putin-supporter could have thus had no different effect on the mind of a reader than the matters pleaded and conceded by Plaintiff herself. While Plaintiff attempts to assert falsity based on her denials alone, those denials do not even go to the substance of Gelb's statements and, even if they did, do not alone establish malice as a matter of law. In the alternative, the remaining statements at issue are plainly opinion, especially in light of the pleaded facts of Plaintiff's support for Putin available in the public media. Her attempts to avoid her own arguments asserted by her Union and the conclusions of the arbitration between the Union and the Met regarding her support for Putin are flimsy and should be rejected.

Finally, Plaintiff's breach of contract claim is frivolous and, indeed, sanctionable. The Arbitrator unequivocally held that the holds were not binding contracts under the applicable

---

the Court to allow her to engage in a fishing expedition to develop some factual basis for bringing this lawsuit. (ECF No. 42 at p. 22).

Her defamation claims too are legally implausible. Only three of six statements originally identified by Plaintiff remain in dispute, as she has conceded that three (ECF No. 27 at ¶¶ 56(f), (i)-(j)) were statements of opinion. As to the remaining three statements, they are all substantially true based on the SAC itself and documents that have been incorporated by reference and placed before the Court. Plaintiff readily admits the essential *bona fides* of her support for Putin and that she has been widely recognized as his supporter, including by her own Union ("the Union"). (ECF No. 42 at p. 25, 43-3 at p. 2, 4 & 21–24). Newspaper articles incorporated by reference in the SAC as well as the Union's brief submitted on Plaintiff's behalf in arbitration (also before the Court by the agreement of the parties) make it plain that Plaintiff's support for Putin has been well-known for many years. (ECF Nos. 37 at pp. 26–27 & 43-3 at pp. 2, 4, 21–24). Mr. Gelb's various statements that Plaintiff was a Putin-supporter could have thus had no different effect on the mind of a reader than the matters pleaded and conceded by Plaintiff herself. While Plaintiff attempts to assert falsity based on her denials alone, those denials do not even go to the substance of Gelb's statements and, even if they did, do not alone establish malice as a matter of law. In the alternative, the remaining statements at issue are plainly opinion, especially in light of the pleaded facts of Plaintiff's support for Putin available in the public media. Her attempts to avoid her own arguments asserted by her Union and the conclusions of the arbitration between the Union and the Met regarding her support for Putin are flimsy and should be rejected.

Finally, Plaintiff's breach of contract claim is frivolous and, indeed, sanctionable. The Arbitrator unequivocally held that the holds were not binding contracts under the applicable

Collective Bargaining Agreement ("CBA"), and Plaintiff's attempt to relitigate that issue here is a transparent attempt at forum shopping. Indeed, the Union spent one third of its prehearing brief arguing that the holds were contracts, and asserted that the Met's conduct in cancelling the holds violated the CBA.[1] In response, the Arbitrator expressly addressed and rejected the Union's contentions regarding the holds expressly pursuant to the CBA. (ECF No. 38-2 at p. 28 (emphasis added)). Even if the issue of the holds had not already been fully and finally resolved by the Arbitrator, any such controversy would be barred by Section 310 preemption.

## ARGUMENT

**I.     Plaintiff's Opposition Fails To Save Her Speculative And Conclusory Discrimination Claims.**

Despite filing three versions of her Complaint and her Opposition, Plaintiff's discrimination claims remain speculative and conclusory. Plaintiff admits once again in her Opposition that her differences with the Met were political in nature and that Defendants were not motivated by discriminatory animus, just as she did in the SAC. (ECF No. 42 at p. 9 (stating the Met was "helping to lead the fight for artistic liberty against Putin's cultural propaganda machine," and banning artists "with ties to Putin.")). Plaintiff admits that the SAC lacks any allegations of disparaging comments toward Russians (or women, or Russian women). Indeed, she asserts that, in terminating Plaintiff's contracts, the Met was motivated either to rebrand its image, or by a financial decision, or for other non-discriminatory reasons, echoing similar allegations in the SAC. (ECF No. 42 at p. 6; see ECF No. 27 at ¶ 36). She advances nothing in

---

[1] Plaintiff objected to the CBA cited by Defendants (ECF No. 38-4) as incomplete, and instead submitted a version of that document which she contends is the "complete" CBA. (ECF Nos. 43 at ¶ 10-11 & 43-4). While Defendants contend Plaintiff's version is, in fact, incomplete, that distinction is immaterial for adjudication of this Motion. The arbitration provisions in ECF No. 38-4 and 43-4 are identical. And Plaintiff does not dispute that any contract disputes between the parties were required to be submitted to arbitration.

the SAC to plausibly plead that Defendants were motivated by anything other than anti-Putin animus. Anti-Putin animus is not, as a matter of law, unlawful. (ECF No. 37 at pp. 8, 15). Plaintiff's own admissions mandate the dismissal of her discrimination claims.

Further, as had been predicted in Defendants' Motion (as well in earlier rounds of letters and briefs, ECF Nos. 18 at p. 3, 23 at p. 12, and 37 at p. 15), Plaintiff is unable to cite to any legal authority for the proposition that animus directed at a single political leader constitutes unlawful discrimination against those from that political leader's country. (ECF No. 37 at p. 15). Instead, she cites to EEOC guidance warning against discrimination against Muslim and Middle Eastern individuals following the 9/11 attacks. (ECF No. 42 at p. 19). Unsurprisingly, the guidance does not forbid an employer from terminating an employee because of her public support for Osama Bin Laden or Al Qaeda following 9/11, just as the NYSHRL and NYCHRL do not now prohibit Defendants from terminating Plaintiff's contracts because she refused to disavow Putin in the wake of his full-scale invasion of Ukraine.

  A.  **National Origin Discrimination**

Plaintiff's Opposition fails to explain how her national origin discrimination claim can survive, when she asserts that other Russians were not terminated at the time of Putin's full-scale invasion. (ECF No. 37 at p. 17). In addition to the absence of any allegation of animus (as discussed above), this claim should be dismissed on this basis as well. *See Williams v. N.Y. Unified Ct. Sys.*, 2017 U.S. Dist. LEXIS 162736, at *30 n.11 (S.D.N.Y. Sept. 30, 2017) ("[T]he more favorable treatment of other male employees only undermines Plaintiff's claim of an inference of discriminatory intent based on sex."). Plaintiff's various attempts to rescue this plainly meritless claim all fail as a matter of law.

First, Plaintiff's allegation that the Met's rationale for terminating her contracts was false because she was not a Putin supporter, and is therefore pretextual, is simply wrong. With regard

4

to pretext, it is the Met's good faith belief regarding Plaintiff's actions that matters, not whether it is ultimately correct. *See Concha v. Purchase Coll. State Univ. of N.Y.*, 2019 U.S. Dist. LEXIS 119110, at *27 (S.D.N.Y. July 27, 2019) ("'An employer's good faith belief that an employee engaged in misconduct is a legitimate reason for terminating [her]."). And on the face of the SAC and within the various documents incorporated therein by reference, there is ample support for the Met's good faith basis for concluding that Plaintiff was a Putin supporter (indeed, Plaintiff herself does not deny being a Putin supporter). (ECF Nos. 27 at ¶¶ 29, 30, 34, 59(c), (e)-(g) and (j); 37 at p. 11, 26–27; 38-2 at p. 22–24; 38-3 at p. 9; & 43-3 at pp. 2, 4, 21–24).

Second, Plaintiff misuses the term "facially discriminatory" when referring to the Met's policy. That policy expressly refers to "artists that . . . support Putin" – and not to Russians. A policy can only be "facially discriminatory" when, on its face, it applies less favorably to a protected group. *See Chudnovsky v. Leviton Mfg. Co.*, 2002 WL 1208762, at * 3 (E.D.N.Y. Apr. 25, 2002), *aff'd*, 53 F. App'x 148 (2d Cir. 2002) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *Cmty. House, Inc. v. Boise*, 468 F.3d 1118, 1123 (9th Cir. 2006) ("A facially discriminatory policy is one which on its face applies less favorably to a protected group."). The Met policy does not explicitly (or "facially") treat Russians differently than those from any other country. Indeed, the policy plainly applies to non-Russian artists who receive support from or support Putin, regardless of their national origin (*e.g.*, the American actor Steven Seagal, reportedly a supporter of Putin, if he were instead a Met opera performer).

Third, Plaintiff's claim that she is not required to rely on comparators is a red herring, as (i) she has elected to do so and (ii) she offers no other factual assertions to support this claim.

5

(ECF No. 42 at p. 21).  Plaintiff ignores a number of Defendants' cases on this point. (*Compare* ECF No. 37 at pp. 15–16, *with* ECF No. 42 at pp. 20–21).

Even after filing three versions of her Complaint, Plaintiff points to not a single *non-Russian* artist who performed at the Met after Russia invaded Ukraine and was: (i) allegedly known by the Met to be a Putin-supporter; and (ii) not required to issue a statement condemning him/his invasion of Ukraine. Indeed, she admits as to her purported replacements that their, "views of Putin are entirely unknown." (ECF No. 42 at p. 20).  If the views of Plaintiff's purported replacements are not known to Plaintiff, they are presumably not known to the Met either and therefore cannot be comparators, given that Plaintiff's views were plainly known to all, including the press and her own Union.

### B.     Intersectional Discrimination

Plaintiff's intersectional discrimination claim fares no better than her standalone national origin claim.  Indeed, she begs the Court to ignore the conclusory nature of her intersectional discrimination claim and the law of this Circuit, and to instead allow her to engage in a fishing expedition to save this wholly implausible theory. (ECF Nos. 37 at p. 19, 42 at p. 22).  This the Court should not do.  As discussed above, Plaintiff offers nothing but her own speculation as to why the Met sought to terminate her employment. Other than reasserting the allegations in her SAC, Plaintiff fails to address any of the arguments with regard to the flaws in her intersectional claim, including that she failed to allege anti-Russian or anti-woman bias, let alone anti-Russian-woman bias. (ECF No. 37 at pp. 18–20).[2]

As to the purported Russian male comparators identified by Plaintiff, she does not dispute

---

[2] Plaintiff does not dispute that her aiding and abetting claims must be dismissed if her national origin and intersectional discrimination claims are dismissed.

her failure to assert that they had made public statements supporting Putin at or around the time of the invasion of Ukraine and that Defendants were aware of such statements. (ECF No. 42 at p. 22). Plaintiff merely contends that there is no evidence that she herself made any such statements. (Id.). Plaintiff's contention is patently false. In addition to all of the other undisputed support by Plaintiff for Putin (including after his initial 2014 invasion of Ukraine), an article expressly incorporated by reference in the SAC discusses Plaintiff's support of Putin's February 2022 full-scale invasion. (ECF No. 27 at ¶ 35, n. 12; ECF No. 42 at pp. 13–14). That article stated that "[Plaintiff] shared a text that used an expletive in reference to her Western critics, and said they were 'as evil as blind aggressors.' She remained silent about Mr. Putin." (ECF No. 27 at ¶ 35, n. 12). Plaintiff's claim thus fails. (ECF No. 37 at pp. 19–20).

### C. Issue Preclusion

In finding partially in Plaintiff's favor and partially in the Met's favor, the Arbitrator has already concluded that the Met acted out of a legitimate, non-discriminatory motive in terminating Plaintiff's contracts. That conclusion is entitled to, at a minimum, "great weight" if not outright issue preclusion. *Tomasino v. Mt. Sinai Med. Ctr. & Hosp.,* U.S. Dist. LEXIS 3766, at *34 (S.D.N.Y. Mar. 13, 2003).

Plaintiff's known support of Putin was necessary to the Arbitration Award, as the Arbitrator specifically cited to Plaintiff's February 26, 2022 Instagram post (immediately following Putin's full-scall invasion of Ukraine) characterizing the West as "human shits" in docking her award by two performances. (ECF No. 38-2 at pp. 34–35).[3]

---

[3] Plaintiff attempts to object to Defendants' reliance upon certain portions of the Arbitration Award fails. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). As Plaintiff has relied heavily on the terms and effect of the Arbitration Award, she may not selectively exclude the portions that contradict her claims.

## II.     Plaintiff's Defamation Claim Is Legally Implausible.

### A.     Substantial Truth

The allegedly defamatory statements are "substantially true," and Plaintiff's own Opposition concedes as much.  Plaintiff admits that publicly available evidence (that she has twice appeared on a list of celebrities who endorsed Putin's reelection, has met Putin a handful of times, was photographed with a pro-Russian separatist in Ukraine, holding a pro-Russian separatist flag) show she was a Putin supporter.  She merely objects to certain descriptions of that support: "Putin's acolyte and fan club member" or that she was "in lockstep politically and ideologically" with him.  However, Plaintiff's admission that she twice appeared on a list of several hundred Putin supporters – in a country of a hundred and fifty million people – alone establishes the substantial truth of these statements. (ECF No. 42 at p. 25).  The substantial truth of the statements is further supported by the newspaper articles and the Union's arguments on Plaintiff's behalf.  (ECF Nos. 37 at pp. 26–27 & 43-3 at pp. 2, 4, 21–24).

As in *Vetere v. Associated Press*, Plaintiff has expressly admitted that she supported Putin, just as Vetere admitted to marching with and handing out literature on behalf of the American Nazi Party. U.S. Dist. LEXIS 3894 (Apr. 17, 1989) (ECF No. 42 at p. 25).  Whether Plaintiff was merely a Putin supporter or an "acolyte" or "in lockstep" with him is immaterial for this analysis. *See Fulani v. NY Times Co.*, 260 A.D.2d 215, 216 (1st Dep't 1999) (statement that plaintiff was currently a member of a controversial and "cult-like" political group was substantially true, even where she no longer belonged to the group).  Likewise, in *Jewell v. NYP Holdings, Inc.*, it was immaterial whether he was the "prime" or "main" suspect in the bombings since he admitted he was "a" suspect – just as Plaintiff admits she (at least) appeared to be a Putin supporter.  23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998).  It makes no difference if Mr. Gelb called her "a" Putin supporter or a "huge" one, or "associated" with him instead of "close[ly]

8

associate[ed]."

Further, the Opposition does not substantively address the impact of the newspaper articles on the substantial truth of Mr. Gelb's statements. (ECF Nos. 37 at pp. 26–27, 42 at p. 26). Indeed, Plaintiff's assertion that the statements are inadmissible hearsay misses the mark. The information in the articles establish that Mr. Gelb's allegedly defamatory statements would not have a different effect on the mind of the reader from that which the pleaded truth would have produced. (ECF No. 37 at p. 25). These articles state, *inter alia*, that Plaintiff: (i) "shared a text that used an expletive in reference to her Western critics, and said they were 'as evil as blind aggressors.' She remained silent about Mr. Putin."; and, (ii) "had endorsed [Putin's] re-election and was photographed in 2014 holding a flag used by Russian-backed separatists in Ukraine." (ECF No. 37 at pp. 26–27). One such article even quoted the Arbitration Award, stating that "'there is no doubt [Plaintiff] was a Putin supporter, as she had a right to be.'" (Id. at p. 27).

Plaintiff's own Union acknowledged the widely held beliefs regarding Plaintiff's support for Putin. It stated as follows: "[f]rom her debut in 2002 to her termination in 2022 . . . media reports have linked Netrebko with Russian President Vladimir Putin . . . ." (ECF No. 43-3 at p. 2); "[f]or years, Netrebko's mutually beneficial relationship with the Met thrived alongside her purported relationship with Putin . . . ." (Id.); "[t]he Met has been aware of Netrebko's purported relationship with Putin for over a decade, including through protests of Netrebko herself while performing on the Met stage." (Id. at p. 4). Indeed, a full three and one-half pages are dedicated to this very argument, including the Union's statement that, "[a]ll these sensational examples undermine, rather than support the Met's case, because they underscore that the Met was fully aware of Netrebko's alleged association with Putin yet continued to actively contract with her up to nine days before Russia's 2022 invasion of Ukraine." (Id. at pp. 21–24).

9

Against all of this, Plaintiff merely asserts that the statements are not substantially true because following Putin's invasion of Ukraine, she said as follows: (i) she opposed the invasion, (ii) called for Russia to end the invasion and condemned it, (ii) was not a member of a political party or allied with "any leader of Russia," and, (iv) had not taken part in a political campaign. (ECF No. 42 at p. 26). She asserts that, based on these statements alone, Mr. Gelb should have understood that all prior reporting on her actions had been "misinterpreted." (Id. at p. 27).

But the allegedly defamatory statements attributed to Mr. Gelb (ECF No. 27 at ¶¶ 56(e)–(j)) say nothing about Plaintiff's support for the invasion of Ukraine, any asserted party membership or any participation in a political campaign. Plaintiff's oddly unspecific comment that she was, "not allied with any leader of Russia" alone does not undermine the substantial truth of Mr. Gelb's comments, given the admissions in the SAC, the articles incorporated therein by reference, the Union's presentation to the Arbitrator and the Arbitration award itself – all of which indicate that Plaintiff supported Putin, or at the very least, that everyone believed she did. (ECF Nos. 37 at pp. 26–27, 38–2 at pp. 11, 21–22, 43-3 at p. 2).

B.     **Malice**

Plaintiff does not dispute that Mr. Gelb's statements are protected by the qualified privilege, which requires that she plausibly allege actual or common law malice. She also admits that she is a public figure such that she must plausibly plead actual malice. However, she has advanced no facts supporting any plausible claim of malice.

Plaintiff does not dispute that, until she refused to disavow her relationship with Putin, the Defendants publicly and privately supported and promoted her career, which is the very opposite of common law malice. She advances no assertions whatsoever to satisfy this standard.

As for actual malice, there is no assertion on the face of the SAC that Mr. Gelb himself in fact possessed any serious doubts about the truth of his statements. Indeed, Plaintiff completely

ignored Defendants' cited authority dictating that her mere denials alone cannot establish malice. (ECF No. 37 at p. 29). Her threadbare allegations thus do not impute "serious doubt" to Mr. Gelb. *See Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (explaining that the defendant did not have "serious doubts" regarding the allegedly defamatory statements where he relied on, *inter alia*, newspaper articles and periodicals, and interviews and personal experience, when making the statements).

### C. Opinion

Plaintiff has conceded that three of the purported defamatory statements are opinion (ECF No. 27 at ¶¶ 56(f), (i)–(j)) – any defamation claim premised on those statements must therefore be dismissed summarily. *See Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (finding that plaintiff's failure to address claim in opposition papers "enable[es] the Court to conclude that [plaintiff] has abandoned them."). As to the three statements Plaintiff contests as being fact (ECF No. 42 at p. 29), she is wrong on all of them.

Where the essential facts to a plaintiff's defamation claim are known to the public, "[a] pure expression of opinion occurs when the parties to the communication know the facts or assume their existence and the statement is obviously based on those facts as justification for the opinion." *Cummings v. N.Y.*, U.S. Dist. LEXIS 31572, at *63 (S.D.N.Y. Feb. 24, 2020); *see also Johnson v. Riverhead Cent. Sch. Dist.*, 420 F. Supp. 3d 14 (E.D.N.Y. 2018); *Kamalian v. Reader's Dig. Ass'n*, 29 A.D.3d 527, 528 (2006). Here, Plaintiff pleaded various actions on her part that demonstrated her support for Putin (all of which had been described publicly), and Mr. Gelb's conclusory statements of opinion regarding Plaintiff's support for Putin were plainly based on those publicized facts. (*See* ECF No. 27 at ¶ 35, n. 12; ECF No. 37 at pp. 30–33). Since the public had available to them the facts demonstrating Plaintiff's support for Putin, Mr. Gelb's mere statements that she was a Putin supporter are mere opinions drawn from those facts.

11

Moreover, Plaintiff's legal argument regarding statements as to political affiliation is unfounded. First, the cases where well-defined political affiliations were determined to be statements of fact cases came in the context of calling someone a member of the Communist Party during the Red Scare. *See Toomey v. Farley*, 2 N.Y.2d 71 (1956), *Grant v. Readers Digest Ass'n*, 151 F.2d 733 (2d Cir. 1945). In *Buckley*, the Court drew a distinction, albeit in *dicta* that, according to *Toomey* and *Grant*, accusing someone of "being a member of the Communist Party, or a legislative representative of the Communist Party" is readily perceivable as an allegation of fact, but ultimately found that accusing someone of being a "fascist," "fellow traveler," and part of the "radical right" were statements of opinion. *Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir. 1976) (dismissing as "opinion" defamation claims based on these terms). Further, the *Mullenmeister* opinion cited by Plaintiff held that "the identification of defamatory inference in political labels [is] a dangerous task," and dismissed defamation claims premised on a caricature of Plaintiff that characterized him as a Nazi. *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 873–874 (S.D.N.Y. 1984). Here, Mr. Gelb did not accuse Plaintiff of being a member of any particular party much less a legislative representative for Mr. Putin; he merely stated (in various forms) that Plaintiff was a Putin supporter. And indeed, courts more recently have found that calling someone a "Nazi" is a statement of opinion, and the most important of those decisions did not rely on the fact that the term was used as a slur or an insult. (ECF No. 37 at p. 32 (citing *Schwartz v. Nordstrom, Inc.*, 160 A.D.2d 240, 241 (1st Dep't 1990)).

### D.     <u>Issue Preclusion</u>

An arbitration between the Union and the Met already determined that Plaintiff was a Putin supporter, and she therefore cannot plausibly allege any false statements necessary to support her defamation claim. In fact, Plaintiff's support for Putin arose during the arbitration in two contexts, with both the Union and the Met relying upon it for different purposes.

12

Plaintiff cannot be allowed to take one position during the labor arbitration regarding her well-known support for Putin – and to prevail in part on that basis – only to advance a diametrically opposed position here. *See Dapelo v. Banco Nacional de Mexico*, 1993 U.S. Dist. LEXIS 6185, at *10 (S.D.N.Y. May 11, 1993) (judicially estopping plaintiff from taking a position in court when she testified inconsistently in arbitration). Notwithstanding the Union's post-arbitration attempt to caveat Plaintiff's relationship with Putin using terms like "allegedly" and "purportedly," as discussed above, the Union repeatedly emphasized Plaintiff's well-known and longstanding relationship with Putin to support its position and advance Plaintiff's interests in the arbitration. What's more, the Arbitrator relied on this very argument in finding certain contracts were breached by the Met. The Arbitration Award specifically states that "AGMA **insists**, Netrebko's political views [supporting Putin] were open and notorious for at least ten years prior to February 2022." (ECF No. 38-2 at p. 11 (emphasis added)). The Arbitrator agreed with the Union's argument, and outlined the evidence showing Plaintiff was an open and notorious Putin supporter well-before Putin's invasion of Ukraine. (ECF No. 38-2 at pp. 21–25).

In the second context, the Arbitrator specifically cited to Plaintiff's February 26 Instagram post characterizing the West as "human shits" in docking her award by two performances. (ECF No. 38-2 at pp. 34–35).[4] He specifically stated that, based on these comments, "some reduction in the compensation due her is justified. In my view, a reasonable penalty is a loss of pay for two performances." (Id. at p. 35).

---

[4] Plaintiff objects to ECF No. 38-3 on relevance grounds. (ECF No. 42 at p. 14). However, she "avers" that the statements she was quoted as making ("I'd love to have been [his lover], but when? We only met twice. Officially and briefly. But he's a very attractive man. Such a strong, male energy.") were made in a "light-hearted" interview. *Plaintiff does not deny making these public statements of affection for Vladimir Putin*.

13

### III.  Plaintiff's Breach Of Contract Claim Is Barred By Res Judicata And Section 301 Preemption.

The Court should reject Plaintiff's attempt to forum shop and relitigate her contract claim. Plaintiff's assertions that the Arbitrator "explicitly declined to consider such an argument" as it was "misplaced," and determined "that the dispute between Netrebko and the Met over the 'holds' was not covered by the CBA," are falsehoods. (ECF No 42 at pp. 31–33).

Indeed, with regard to Plaintiff's argument that state law claims were not before the Arbitrator based solely on the Arbitration Award's use of the term "misplaced," she is wrong. The Union itself placed the holds issue squarely before the arbitrator and argued that "holds" were contracts pursuant to the CBA. (ECF No. 43-3 at p. 15–16 & 18–20). It acknowledged the Met's position that the holds were invalid "because Netrebko had not been issued a Standard Form Contract for those contracts as required by the CBA" (Id. at p. 15); quoted the entirety of the relevant CBA section (Id. at p. 16); argued that the Met's reading of holds as outside the CBA "misconstrue[d] the purpose of the CBA provision" (Id.); asserted that "any failure to timely issue a Standard Form Contract is a failure on the Met's part to comply with the terms of the CBA, not an invalidation of those contracts." (Id. at p. 18); and, argued that the Met's reading of the CBA would both "undermine" and "debilitate" the CBA. (Id. at pp. 19 & 20).

The Arbitrator specifically held that, no matter how Plaintiff characterized the holds, they were not enforceable. (ECF No. 38-2 at p. 30 ("Rather, the issue is whether holds, however viewed, are enforceable under the terms of the Collective Bargaining Agreement and the parties' practice. They are not . . . ."). The Arbitrator discussed the process from converting a hold into a Standard Principal Contract ("SPC"), and explained that the CBA itself determined what is, and what is not, an enforceable contract between a performer and the Met – "This language [in the CBA] could not be clearer. The SPC is the document which is enforceable, [not the holds] . . .

14

Consequently, the manifest language of the Collective Bargaining Agreement mandates rejection of the Union's claim regarding holds." (ECF No. 38-2 at p. 28). Accordingly, he concluded that the Met had authority to cancel the holds. (ECF No. 38-2 at p. 27). Whether the "holds" constituted binding contracts under the CBA was thus expressly decided by the Arbitrator.

Finally, even if Plaintiff's breach of contract claim was not precluded by *res judicata*, it is precluded by Section 301 of the Labor Management Relations Act. As the Arbitrator explained, the CBA governs contract formation between the Met and Plaintiff. (ECF No. 38-2 at p. 28). Indeed, Plaintiff's cited cases only support the position that her claims are precluded by Section 301. *See Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 413 (1988) (application of state law is preempted by § 301 where the Court is required to interpret whether rights exist under a CBA); *Livadas v. Bradshaw*, 512 U.S. 107, 123–124 (1994) ("[I]t is the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement, that decides whether a state cause of action may go forward.").

## CONCLUSION

Based on the arguments set forth above, the Court should dismiss this action with prejudice.

Dated: New York, New York
December 29, 2023

Respectfully submitted,

*/s/ Lloyd B. Chinn*
Lloyd B. Chinn, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3000
Facsimile: 212.969.2900
lchinn@proskauer.com

*Attorney for Defendants*
*Metropolitan Opera Association, Inc. and Peter Gelb*

15