UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNA NETREBKO,

                Plaintiff,

      -against-

METROPOLITAN OPERA ASSOCIATION, INC.
d/b/a THE METROPOLITAN OPERA and PETER
GELB, in his professional and individual capacities,

                Defendants.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _8/22/2024_ |

23 Civ. 6857 (AT)

**ORDER**

ANALISA TORRES, District Judge:

After Anna Netrebko, an acclaimed opera singer, refused to repudiate Russian President Vladimir Putin in the wake of Russia's 2022 invasion of Ukraine, the Metropolitan Opera fired her. Netrebko brings this action against Defendants, the Metropolitan Opera Association, Inc. d/b/a the Metropolitan Opera and Peter Gelb, its general manager (collectively, the "Met"), alleging that the Met defamed and discriminated against her, and breached its contractual obligations. *See generally* Second Am. Compl. ("SAC"), ECF No. 27. Netrebko asserts claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C Admin. Code § 8-101, *et seq*; and New York state common law. *Id.* ¶¶ 1, 90–142.

The Met moves to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). Def. Mot., ECF No. 36; *see* Def. Mem., ECF No. 37. For the reasons stated below, the Met's motion is GRANTED IN PART and DENIED IN PART.

<h1 style="text-align:center">BACKGROUND[1]</h1>

I.  <u>Factual Background</u>

    A.  Netrebko's Contract with the Met

Netrebko is a "world-renowned opera singer" who has been described as "opera's biggest star" and "among the very top tier of true stars in the opera world."  SAC ¶ 2 (quotation marks and citations omitted).  Netrebko "resides in Vienna, Austria, is a dual citizen of Austria and Russia, and is of Russian origin."  *Id.* ¶ 13.

Since 2002, Netrebko has sung in "nearly two hundred performances" at the Met, and has long been considered its "reigning prima donna."  *Id.* ¶ 3 (internal quotation marks and citations omitted).  Her final performance there was "a New Year's Eve gala . . . on December 31, 2019, before the Met ceased in-person performances due to the COVID-19 pandemic."  *Id.* ¶ 19.  After the height of the pandemic, Netrebko's manager and the Met agreed that Netrebko would perform in nine future productions: *Turandot* in the 2021-2022 season, *Don Carlo* and *Lohengrin* in the 2022-2023 season, *La forza del destino* and *Andrea Chénier* in the 2023-2024 season, *Tosca* and *Pique Dame* in the 2024-2025 season, and *Manon Lescaut* and *Macbeth* in the 2025-2026 season.  *Id.* ¶ 20.

Netrebko was covered by a collective-bargaining agreement (the "CBA") between the Met and the American Guild of Musical Artists (the "Union").  *Id.* ¶ 62; *see* CBA, Robbins Decl. Ex. D, ECF No. 38-4.  The CBA and the practice of the parties create a two-step process for forming contracts with artists.  In the first stage, parties agree upon the opera and the dates it will

---

[1] The following facts are taken from the SAC and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

be performed.  *Id.* ¶ 64 (citing Arbitration Award at 26, ECF No. 38-2).[2]  "[E]ach side [then]

places a hold on the dates of performance."  *Id.* (quoting Arbitration Award at 26).  Holds are

often agreed upon four or five years in advance.  Arbitration Award at 9.  In the second phase of

the process, a formal agreement called a Standard Principals Contract ("SPC") is executed and

filed with the Union, thereby replacing the hold.  SAC ¶ 64 (cleaned up).  Critically, the CBA

also contains a "pay or play" provision, which requires the Met to pay artists in the event that it

later decides not to provide the contractually specified number of appearances.  CBA ¶ II.5.N,

ECF No. 38-4; Arbitration Award at 24.

Of the nine productions discussed by Netrebko's manager and the Met, five were reduced

to SPCs—*Turandot*, *Don Carlo*, *Lohengrin*, *La forza del destino*, and *Andrea Chénier*—and four

remained as holds.  *See* SAC ¶ 63; Arbitration Award at 30–31, 34; Union Arbitration Brief at 19

n.11, 33, ECF No. 43-3.

B.  Russia's 2022 Invasion of Ukraine

Predating the parties' current dispute, "Netrebko was known as a supporter of Russian

President Vladimir Putin [based on] [n]umerous public communications from her."  Arbitration

Award at 2.  As described in an article cited by the SAC,

> [Netrebko's] name [has] appeared on a list endorsing Putin's election in 2012, and
> she has spoken glowingly of him over the years, describing him as "a very attractive
> man" and praising his "strong, male energy."  In 2017, in the run-up to Putin's re-
> election, she told a Russian state news agency that it was "impossible to think of a
> better president for Russia."  She has also occasionally lent support to his policies;
> she once circulated a statement by Putin on Instagram alongside flexed biceps
> emojis.  In 2014, she donated to an opera house in Donetsk, a war-torn city in
> Ukraine controlled by Russian separatists, and was photographed holding a
> separatist flag. . . . [Netrebko] has [also] been photographed wearing the black-and-
> orange St. George ribbon, a symbol of the Russian military that has become popular

---

[2] "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).  Because the Arbitration Award is mentioned throughout the SAC and central to the facts at issue, the Court finds that it is incorporated by reference.

among Putin supporters. . . . Putin, in turn, has showered Netrebko with praise and awards over the years. She was invited to sing at the 2014 Sochi Winter Olympics and other state celebrations. [And], on her 50th birthday, he sent a telegram calling her the pride of Russia, and describing her as an "open, charming and friendly person, with an uplifting personality and a clear-cut civic stance." At a concert celebrating her birthday at the State Kremlin Palace, the president's press secretary, Dmitry Peskov, read Putin's message from the stage.

Javier C. Hernández, *The Netrebko Question*, N.Y. Times (June 22, 2022),

https://perma.cc/EC3Z-NBMV.[3]

Following Russia's invasion of Ukraine, on February 25, 2022, Netrebko stated on Instagram: "These are very sad days and we are deeply concerned for the well-being of all people involved.  Every war is a terrible tragedy. This is not a time for music but for reflection and prayer. And so we hope and pray for a swift and peaceful resolution."  SAC ¶¶ 24, 25.  The next day, the Met asked Netrebko to issue a statement "denouncing Putin and using specific language" that it had provided.  *Id.* ¶ 26.  Netrebko posted two statements on Instagram that day.  Arbitration Award at 21.  In one, she stated that she was opposed to the war, but also opposed to "forcing artists, or any public figure, to voice their political opinions in public and to denounce their homeland."  SAC ¶ 27.  In a second post, Netrebko characterized "those from the West who criticized Putin as 'despicable,' 'human shits[,]' and 'evil as blind aggression.'"  Arbitration Award at 21–22.  The latter post was subsequently deleted.  *Id.*

On February 27, 2024, the Met released a statement, announcing that it would "no longer engage with artists or institutions that support Putin or are supported by him—not until the invasion and killing has been stopped, order has been restored[,] and restitutions have been made" (the "February 27 Policy").  SAC ¶ 29.  On March 2, 2022, Peter Gelb, the Met's general

---

[3] Because the SAC directly quotes this article, the Court finds that it is incorporated by reference.  *See* SAC ¶ 1 n.1; *Chambers v. Time Warner, Inc.*, 282 F.3d at 152.

manager, in a phone call with Netrebko, asked her to issue a statement denouncing Putin. *Id.* ¶ 30. Although Netrebko had released multiple statements opposing the war in Ukraine, *see id.* ¶ 28, Gelb indicated that her continued relationship with the Met was contingent on repudiating Putin. *Id.* ¶ 30. "Netrebko responded that, as a Russian citizen, she could not make such a statement." *Id.* On March 3, 2022, the Met announced that Netrebko would not perform during the 2021-2022 and 2022-2023 seasons because she failed to denounce Putin while he wages war on Ukraine. *Id.* ¶ 31. By letter dated March 28, 2022, the Met informed Netrebko's manager that the Met "was compelled to ask for her withdrawal from *Turandot* and *Don Carlo*, and was also canceling the contracts for the 2023-24 season and all holds for future seasons" because she had "so closely aligned [herself] with Putin." *Id.* ¶ 33 (cleaned up).

C. The Union Arbitration Proceedings

Following Netrebko's termination, the Union filed a grievance with the Met, arguing that the Met's cancellation of her performances violated the parties' CBA. *Id.* ¶ 63. The grievance went unresolved, and the Union demanded arbitration. *Id.* Pursuant to the CBA, "[a]ny dispute as to the interpretation, application, or alleged violation or breach of [the CBA] shall be determined by arbitration before a single arbitrator." CBA ¶ I.12.

The parties to the arbitration were the Union and the Met, and the issue adjudicated was: "Did the Met violate the [CBA] when it failed to pay [] Netrebko for forty performances during the period in dispute?" Arbitration Award at 4. In making his ultimate determination, the arbitrator addressed four issues:

First, did the Met have the authority to cancel all [of] Netrebko's performances pursuant to the Standards of Conduct clause?[4] If not, did the Met have the authority

---

[4] The Standards of Conduct clause reads: "In the event that, following execution of the Artist's contract, the Metropolitan Opera becomes aware of serious conduct or substantiated allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal, including but not limited to sexual assault or harassment, criminal

to cancel Netrebko's performances pursuant to generally accepted principles of contract law? If not, did the Met have authority to cancel [the] holds? Fourth, did Netrebko withdraw from scheduled performances of *Turandot* and *Don Carlos*?

Arbitration Award at 17–18 (internal quotation marks omitted). The arbitrator found that Netrebko did not violate the Standards of Conduct clause, and therefore, the Met lacked authority to suspend her performances pursuant to that provision. *Id.* at 22–23. Likewise, the Met was not entitled to cancel her performances based on common law principles of contract law. *Id.* at 24–26. Accordingly, the Met was bound to compensate Netrebko for the performances for which the parties had SPCs. *Id.* at 26–28. However, the arbitrator held that the holds were not binding contracts, and the Met was not obligated to pay Netrebko for those performances. *Id.* at 30. Lastly, the arbitrator concluded that Netrebko had voluntarily withdrawn from *Turandot*, but not *Don Carlos. Id.* at 31–33. Based on these findings, the arbitrator awarded her "[f]ull compensation, including rehearsal and other stipends, if any, for all performances for which SPCs were filed except *Turandot* and *Lohengrin*."[5] *Id.* at 34. The arbitrator subtracted "compensation for two performances" from the award as a penalty for Netrebko's February 26, 2022 Instagram post in which she "clearly crossed the line by heaping invective upon 'despicable people from the West,' some of whom were surely opera lovers and Met donors." *Id.* at 33–34.

D. The Alleged Defamatory Statements

Finally, Netrebko alleges that between March 2022 and March 2023, "Gelb, on behalf of the Met . . . engag[ed] in an unabated smear campaign against her, repeating a series of defamatory remarks even after terminating" the parties' contractual relationship. SAC ¶¶ 7, 56.

---

convictions (other than drug possession with no intent to distribute) or acts of moral turpitude, the Metropolitan Opera may, upon written notice, terminate this Agreement, in which event the Metropolitan Opera shall not have any further obligations to Artist, including any financial or other obligations such as travel or accommodation." ECF No. 43-4 at 135.

[5] The parties do not dispute that Netrebko withdrew from *Lohengrin*. Arbitration Award at 34 n.14.

For example, Netrebko alleges that Gelb said that she is a "Putin's political acolyte," has been a Putin "fan club member over a period of many years," "is inextricably associated with Putin," and "in lockstep" with him both "politically and ideologically." *Id.* ¶ 56(e), (g), (h).  Netrebko claims that (1) these statements are false, (2) Gelb knew of their falsity or acted with reckless disregard for the truth, and (3) the statements "caused injury to [her] professional reputation." *Id.* ¶¶ 57–61.

II.    Procedural History

On April 4, 2023, Netrebko brought this action against the Met.  ECF No. 1.  She subsequently amended her complaint twice, filing the second amended complaint on November 14, 2023.  *See* SAC.  On December 1, 2023, the Met moved to dismiss the SAC.

**DISCUSSION**

I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (quotation marks omitted)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*.  A court

must "accept[] the factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152.

II.    Breach of Contract Claims

Netrebko argues that the Met breached the parties' contract by failing to compensate her for the four productions that remained as holds and had yet to be memorialized in SPCs.  SAC ¶¶ 68–83, 140.[6]  The Met argues that Netrebko's contract claims are barred by the doctrine of res judicata and preempted by the Labor Management Relations Act ("LMRA").  Def. Mem. at 28–30, ECF No. 37.  Netrebko contends that res judicata does not apply because the issue before the arbitrator was the "interpretation of the CBA," and not New York state common law, which she argues governs her current breach-of-contract claims.  Pl. Opp. at 27, ECF No. 42.  The Court need not reach the question of LMRA preemption because it agrees with the Met that res judicata bars Netrebko's contract claims.

"Under res judicata, or claim preclusion, a valid final judgment bars future actions between the same parties on the same cause of action."  *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 347 (1999).  Claim preclusion "operate[s] to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."  *Parker*, 93 N.Y.2d at 347.  To prove that a claim is precluded under this doctrine, "a party must show that

---

[6] The four productions are the 2024-2025 season productions of *Tosca* and *Pique Dame*, and the 2025-2026 season productions of *Manon Lescaut* and *Macbeth*.  SAC ¶ 68.

(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284–85 (2d Cir. 2000) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  Res judicata applies to "arbitration[s] where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award" in state or federal court.  *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267–68 (2d Cir. 1997) (quotation marks and citation omitted).

Here, the arbitration bars litigation of Netrebko's contract claims.  First, the arbitration was an adjudication on the merits: The arbitrator concluded that the Met violated the CBA by refusing to pay Netrebko for the productions for which the parties had SPCs, but did not find the Met contractually liable for the holds.  Arbitration Award at 25, 28–30.  Second, the arbitration involved the Union (a party in privity with Netrebko)[7] and the Met.  *Id.* at 1, 3.  And third, Netrebko's claim that the holds are enforceable contracts requiring due compensation was presented by the Union on her behalf.  *Id.* at 28.

The Court rejects Netrebko's argument that res judicata does not apply because the arbitrator's decision was based on his "interpretation of the CBA" and not New York state common law.  Pl. Opp. at 27.  Res judicata applies to a claim "brought to a final conclusion, . . . even if based upon different theories." *Parker*, 93 N.Y.2d. at 347–48.  Accordingly, whether the

---

[7] For purposes of res judicata, a "union is in privity with the member provided that the member belonged to the union at all relevant times, and the union was the sole and exclusive collective bargaining representative for its members." *Lobban v. Cromwell Towers Apts., LP*, 345 F. Supp. 3d 334, 345 (S.D.N.Y. 2018) (cleaned up).  The Met recognizes the Union "as the exclusive collective bargaining agent" for its artists, including Netrebko.  CBA ¶ I.A.1.  And, Netrebko was a member of the Union during the relevant time period.  *See* SAC ¶ 62.

arbitrator's determination was based on his interpretation of the CBA or state common law is immaterial—res judicata bars Netrebko from asserting her contract claims.

That said, even if res judicata did not apply, the holds are not enforceable based on the plain language of the CBA, which states that "[a]ll contracts or agreements by the Met with ARTISTS shall be in the respective forms" of an SPC or another contract form annexed to the CBA. CBA ¶ I.5.A. Moreover, any agreement "relating to the employment of any ARTIST by the Met shall be null and void and of no effect unless it is executed by [the] ARTIST and the Met" in an SPC. *Id.* ¶ I.5.E. The CBA provides a carveout for non-SPC contracts so long as they satisfy the requirements of paragraphs I.5.E.1 through I.5.E.4, which include (1) containing a provision that the contract is subject to the CBA and (2) filing the non-SPC contract with the Union. *Id.* Here, the holds are neither SPCs nor another form of CBA-approved contract.

For these reasons, the Met's motion to dismiss Netrebko's breach of contract claims is GRANTED.

III.    NYSHRL Employment Discrimination Claims

Netrebko alleges that the Met's termination of the parties' contractual relationship was the result of discrimination based on (1) her national origin and (2) her national origin and gender.[8] SAC ¶¶ 90–133. Claims of disparate treatment under the NYSHRL are analyzed using the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Ferrante v. Am. Lung Ass'n*, 90 N.Y.2d 623, 629 (1997) (noting that NYSHRL claims are analyzed under *McDonnell Douglas* and "[t]he standards for recovery under [the NYSHRL] are in accord with [the] [f]ederal standards under [T]itle VII.").

---

[8] The Court notes that although gender and sex have different definitions, precedential authority cited throughout this opinion refers to the terms interchangeably. Therefore, the Court uses the terms "sex" and "gender" interchangeably. *See Doe v. New York Univ.*, 438 F. Supp. 3d 172, 180 n.3 (S.D.N.Y. 2020); *see, e.g.*, *Roe v. St. John's Univ.*, 91 F.4th 643, 647 n.2 (2d Cir. 2024).

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Netrebko must show "that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).  In order to satisfy this burden at the pleadings stage, a plaintiff must plausibly allege "facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

### A.  Collateral Estoppel

The Court rejects the Met's argument that Netrebko's discrimination claims are barred by the doctrine of collateral estoppel.  "Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding."  *Marvel Characters, Inc.*, 310 F.3d at 288.  It applies when:

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Id.* at 288–89.  Collateral estoppel applies to "arbitration[s] where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award."  *Jacobson*, 111 F.3d at 267 (citation omitted); *see Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005).

Here, in deciding whether Netrebko violated the CBA's Standards of Conduct clause, the arbitrator found that she was fired for "what [she] did not do—repudiate Putin."  Def. Mem. at 16 (quoting Arbitration Award at 22 (emphasis omitted)).  This finding does not touch on the

issue of whether the Met discriminated against Netrebko.  And, as the Second Circuit has stated, the resolution of two parties' contractual rights does not preclude reconsideration of factual issues that underlie a party's statutory claims.  *Siddiqua v. N.Y. State Dep't of Health*, 642 F. App'x 68, 70–71 (2d Cir. 2016) (summary order) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 46 n.6, 49–50, 54 (1974)).  Because the issue of discrimination was not necessary to the arbitrator's judgment—and the arbitration settled the parties' contractual rights and not Netrebko's statutory rights—collateral estoppel does not bar the adjudication of Netrebko's NYSHRL discrimination claims.

      B.  National Origin Discrimination

The parties do not dispute that Netrebko is a member of a protected class based on her national origin, that she was qualified for the position, and that her firing constitutes an adverse employment action.  Def. Mem. at 8–9; Pl. Opp. at 14–15.  However, they disagree about whether her termination took place under circumstances evincing a "minimal inference of discriminatory motivation."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).  In other words, the Met denies that Netrebko's "national origin was a motivating factor in" its termination decision.  *Vega*, 801 F.3d at 87.

Netrebko first alleges that the Met's February 27 Policy, in which it announced it would cut ties with artists and institutions that support or are supported by Putin, is "facially discriminatory" because it "singles out Russian artists."  SAC ¶¶ 43, 46.  The Met argues that the Policy was "a political statement" and demonstrates that Netrebko's termination "ha[d] nothing to do with Netrebko being Russian" and everything to do with the Met's support for Ukraine and Netrebko's support for Putin.  Def. Mem. at 8.

"Facial discrimination is discrimination 'because of' a protected characteristic." *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 369 (S.D.N.Y. 2014), *as amended*, No. 14 Civ. 5107, 2014 WL 12772237 (S.D.N.Y. Dec. 30, 2014). For example, "[a]n employer cannot implement a policy, 'Members of protected class P need not apply,' and then [] argue that the policy was not motivated by any animus toward the protected class." *Id.* at 370. The February 27 Policy is not facially discriminatory as it does not explicitly implicate a protected class. On its face, non-Russians can run afoul of the Met's policy. Moreover, a policy that targets "a generalized political affiliation, [and] not a specific national origin," cannot form the basis of a claim for national origin discrimination. *Pasic v. Eztzi's Tex. Holding Corp.*, No. 01 Civ. 1114, 2002 WL 31938854, at *3 (S.D.N.Y. Jan. 9, 2002); *see Filozof v. Monroe Cmty. Coll.*, 411 F. App'x 423, 427 (2d Cir. 2011) (affirming judgment for defendant where plaintiff "failed to demonstrate circumstances giving rise to the inference that he was not renewed for his tenure-track position on account of his race (as opposed to his political beliefs)"). That there exist Russian expatriates in the United States who support Putin does not compel a finding that the February 27 Policy facially discriminates against them.

Next, Netrebko alleges that the Met's discriminatory motivation is evidenced by (1) the "pretextual nature" of its stated reason for her firing (Netrebko's support of Putin), and (2) the fact that she was replaced by non-Russian performers. SAC ¶¶ 48–50. The Court disagrees.

First, the truth or falsity of the Met's stated reason for Netrebko's termination is immaterial so long as the Met's decision was based on a belief held in good faith. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, [] we are decidedly not interested in the truth of the allegations against plaintiff."); *see also Newman v. Montefiore Med. Ctr.*, No. 96 Civ. 2687, 1996 WL 741599, at *5

& n.1 (S.D.N.Y. Dec. 27, 1996).  Netrebko has alleged no facts which plausibly suggest that the Met's stated reason for her termination masked an invidious motive to discriminate against Russians.  This argument is, therefore, unavailing.

Netrebko's claim that her replacement by non-Russian performers establishes pretext fares no better.  SAC ¶¶ 49, 50.  Although a plaintiff may raise an inference of discriminatory motivation by showing that her employer treated her less favorably than similarly situated employees outside her protected group, "in order to do so, [she] 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Cooper v. Templeton*, 629 F. Supp. 3d 223, 231 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977 (2d Cir. June 8, 2023) (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "Ordinarily, whether two employees are similarly situated presents a question of fact, rather than a legal question to be resolved on a motion to dismiss."  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (cleaned up).  However, this "rule is not absolute."  *Colon v. City of New York*, No. 16 Civ. 6425, 2018 WL 740992, at *8 (S.D.N.Y. Feb. 6, 2018).  "[I]f there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated."  *Cooper*, 629 F. Supp. 3d at 231 (citation omitted).  "[W]hat matters at the motion to dismiss stage is whether it is plausible that a jury could ultimately determine that the comparators are similarly situated."  *Colon*, 2018 WL 740992, at *8 (cleaned up).

The SAC's treatment of Netrebko's non-Russian replacements is too cursory to permit a jury to determine whether they were similarly situated.  "Plaintiff must 'show that similarly situated employees who went undisciplined engaged in comparable conduct.'"  *Cooper*, 629 F.

14

Supp. 3d at 231 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).[9]  In

support of this claim, Netrebko alleges only her replacements' nation of origin.  The SAC fails to

describe how Netrebko's non-Russian replacements might be similarly situated as either Putin

supporters or holders of a political belief or affiliation the Met finds similarly odious.  *See* SAC

¶ 50 (alleging that Netrebko's replacements were Ukrainian, Italian, and Norwegian).

At bottom, the Met's firing of Netrebko, "while potentially indicating unfair dislike,"

does not sufficiently implicate her national origin to permit an inference of discrimination.  *See*

*Buckler v. Craft Beekman, LLC*, No. 23 Civ. 9275, 2024 WL 3274509, at *2 (S.D.N.Y. July 2,

2024) (quoting *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013).[10]

Accordingly, the Met's motion to dismiss Netrebko's NYSHRL national origin claims is

GRANTED.

   C.  National Origin and Gender Discrimination

In addition to her national origin discrimination claims, Netrebko asserts intersectional

discrimination claims based on both her national origin and gender.  "A plaintiff states an

intersectional discrimination claim when he or she alleges discrimination on the basis of two

protected characteristics . . . and shows that the discrimination he or she experienced is

---

[9] In *Cooper*, a white woman was fired after a video of her "went viral—garnering millions of views—and earned [her] the moniker 'Central Park Karen' on social media," due to her racist conduct.  629 F. Supp. 3d at 232.  The district court granted defendant's motion to dismiss because the misconduct of plaintiff's proposed comparators was "simply too different in kind to be comparable to her conduct."  *Id.* at 232.  Here, Netrebko fails not only to allege sufficiently similar comparators; she fails to allege any comparator conduct that a jury could compare with her own.

[10] Courts in this Circuit have addressed a somewhat similar issue in the context of race discrimination.  For example, in *Buckler*, the plaintiff's allegations that "he would not have been deemed a racist by [d]efendants were he not white" was "conclusory" and "unsupported by assertions of facts."  *Buckler*, 2024 WL 3274509, at *2 (cleaned up).  Further, the adverse employment actions resulting from his alleged racism did not implicate his race "because—as the Second Circuit has squarely held—'racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race."  *Id.* (cleaned up)*; see also Cooper*, 629 F. Supp. 3d at 230.  Similar to the plaintiff in *Buckler*, Netrebko conflates support for Putin and Russian national origin.  As alleged, her firing—resulting from her support for Putin—is not an adverse action based on her status as a Russian citizen.

attributable, at least in part, to the combination of those protected characteristics." *Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 1051, 2020 WL 2866960, at *11 (S.D.N.Y. Mar. 2, 2020), *R&R adopted*, 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020) (emphasis added). The Circuit has recognized that "the attempt to bisect a person's identity at the intersection of race and gender," for example, "often distorts or ignores the particular nature of their experiences." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 52 (2d Cir. 2021) (summary order) (recognizing intersectional discrimination claims as articulated in *Gorzynski*); *DeSio v. Singh*, No. 19 Civ. 3954, 2021 WL 4449314, at *10 (S.D.N.Y. Sept. 28, 2021). That is, "where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components." *Gorzynski*, 596 F.3d at 110.

Netrebko claims that the Met terminated their contractual relationship "because she is a Russian woman." SAC ¶ 39. Specifically, she claims that "[m]aking an example out of its 'reigning prima donna'" was "the most visible way" the Met could demonstrate its "commitment to support Ukraine," "garner international headlines," and "firmly establish [its] new anti-Russia brand." *Id.* ¶¶ 5, 40. Netrebko alleges that while she was publicly rebuked and terminated, the Met maintained its relationship with its Russian male performers, failing to "apply the February 27 policy" to them, despite each having "received support from, or expressed support for, Putin and/or the Russian government, including by performing at Russian state-funded theaters and/or performing at Russian political events." *Id.* ¶ 51.

Netrebko's firing does not present a scenario in which two grounds for discrimination cannot be "reduced to distinct components" or where bisecting her identity, as a Russian woman, "ignores the particular nature of [her] experience[]." *Gorzynski*, 596 F.3d at 110.[11] That said,

---

[11] And, for the reasons stated above, she has not adequately pleaded national-origin discrimination. *See supra* Part III.B.

she has pleaded a claim of gender discrimination based on the "more favorable treatment" received by her male counterparts whom Netrebko alleges also had connections to Putin and the Russian state. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009). For example, she alleges that the male opera singer Ildar Abdrazakov performed at political events, "including at least one event at which Putin. . . spoke about the war in Ukraine," and that Abdrazakov organized a Kremlin-backed music festival. SAC ¶ 51(a). She further states that male opera singer Evgeny Nikitin was featured at a Victory Day event involving Putin, *id.* ¶ 51(b), and that Igor Golovatenko and Alexey Markov have performed at state-sponsored venues since the invasion of Ukraine, *id.* ¶ 51(c), (d). Although Netrebko has not alleged comparable conduct on the part of her female, non-Russian replacements, she has alleged conduct that permits comparison on the basis of gender.[12]

Here, Netrebko's claim of gender discrimination crosses the line from merely possible to plausible. The Second Circuit has held that "[a] defendant is not excused from liability" when discrimination is not the product of "a discriminatory heart, but rather [] a desire to avoid practical disadvantages" such as "negative publicity" or public pressure. *Doe v. Columbia Univ.*, 831 F.3d 46, 58 & n.11 (2d Cir. 2016) (holding that motivations like "avoid[ing] liability or bad publicity" are not necessarily "lawful motivations distinct from sex bias.").[13] "[C]lear procedural irregularities," against the backdrop of potential backlash and public scrutiny, may evince an unlawful "policy of bias favoring one sex over the other." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019); *Doe*, 831 F.3d at 58 & n.11. In both *Doe* and *Menaker*, male

---

[12] Netrebko does not claim that the male Russian performers had connections to Putin outside of a professional performance setting or made statements hinting at a pro-Putin stance. *See id.* ¶ 51. At summary judgment, Netrebko will be required to produced evidence to establish that the conduct of the male performers is not "too different in kind to be comparable to [Netrebko's] conduct." *Cooper*, 629 F. Supp. 3d at 231.

[13] Although *Doe* is a Title IX case, the Circuit has explicitly stated that its holding applies to the employment discrimination context. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 32 (2d Cir. 2019).

plaintiffs accused of sexual misconduct alleged that they were subject to disparate treatment when the defendant universities—facing public pressure over their mishandling of sexual assault and harassment on campus—found them culpable after hasty adjudicative processes plagued by procedural irregularities.  *Doe*, 831 F.3d at 49–51; *Menaker*, 935 F.3d at 28–30.  The Circuit found that the irregularities in the handling of these matters coupled with other allegations were sufficient to establish a prima facie case of gender discrimination.  *Menaker*, 935 F.3d at 37, 39; *Doe*, 831 F.3d at 57–59.

Here, the simultaneity of Netrebko's termination, public outcry over Putin's 2022 invasion, and the Met's efforts to show its pro-Ukraine bona fides—taken in conjunction with Netrebko's claim that the Met arbitrarily applied the February 27 Policy—suffice at the pleadings stage to create an inference of discrimination.  Since 2017, the Met has collaborated with Moscow's Bolshoi Theatre, a "state-controlled institution," and Gelb was in Moscow for a Bolshoi rehearsal "on the eve of the invasion of Ukraine."  SAC ¶ 6.  Netrebko alleges that the Met's "rapid turnabout on the Russian question"—from being at the Bolshoi one day to firing her a few days later—was part of its "anti-Russia publicity campaign."  *Id.* ¶¶ 6, 7 (citation omitted).  Given the prominence of female opera singers compared to their male counterparts, Netrebko claims that "actions against [her], as a well-known 'diva' or 'prima donna' . . . would garner more international headlines than similar actions taken against male artists and would therefore be more successful in furthering the Met's anti-Russia publicity campaign."  *Id.* ¶ 54.[14]

In all, Netrebko plausibly alleges that, faced with "practical disadvantages"—such as the

---

[14] Further supporting Netrebko's gender discrimination claim, an article cited—and incorporated by reference—in the SAC notes that another female Russian performer, Hibla Gerzmava, was fired by the Met after "com[ing] under fire for her ties to Putin," including for "signing a letter in support of Putin in 2014."  SAC ¶ 50 n.15 (citing Javier C. Hernández, *Dropping Anna Netrebko, the Met Turns to a Ukrainian Diva*, N.Y. Times (Apr. 28, 2022), https://perma.cc/669Q-ZKKB).

possibility of public pressure and negative press over its connections to the Russian state and individuals aligned with Putin—the Met adopted a "policy of bias favoring one sex over the other." *Menaker*, 935 F.3d at 33 n.39; *see Doe*, 831 F.3d at 58 & n.11.  Accordingly, the Met's motion to dismiss is DENIED as to Netrebko's NYSHRL gender discrimination claims.

IV.    <u>NYCHRL Claims</u>[15]

NYCHRL claims are "evaluated separately from . . . state law claims and given liberal, independent construction." *Gorokhovsky v. N.Y.C. Housing Auth.*, 552 F. App'x 100, 101 (2d Cir. 2014) (summary order) (citation omitted).  Under the NYCHRL, a plaintiff bears "a lesser burden of showing only that Defendants' actions were based, in part, on discrimination." *Allen v. A.R.E.B.A. Casriel, Inc.,* No. 15 Civ. 9965, 2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017).  The NYCHRL, however, "is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (citation omitted).  There must be some "connective tissue that links [a plaintiff's] protected status to the alleged" adverse action. *Scalercio-Isenberg v. Morgan Stanley Servs. Grp. Inc.*, No. 19 Civ. 6034, 2019 WL 6916099, at *5 (S.D.N.Y. Dec. 19, 2019).

A.  National Origin Discrimination

At the motion to dismiss stage, for an NYCHRL claim to proceed, "[a] discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that comparators were treated better than the plaintiff was." *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20 Civ. 4558, 2021 WL 5179914, at *5 (S.D.N.Y. Nov. 8, 2021) (cleaned up); *see also*

---

[15] The Met argues that collateral estoppel precludes adjudication of Netrebko's NYCHRL claims.  *See* Def. Mem. at 14.  For the reasons discussed above, this argument is rejected.  *See supra* Part III.A.

*Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 427–28 (S.D.N.Y. 2022).

Although the standard is lower than that which applies to Netrebko's NYSHRL claims, she must still plausibly plead that she was fired "because of" her national origin or plausibly allege "facts that would give rise to such a connection." *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 71 (2d Cir. 2016). Because Netrebko has failed to do so, *see Cooper*, 629 F. Supp. 3d at 233, the Met's motion to dismiss her NYCHRL national origin discrimination claims is GRANTED.

### B.  National Origin and Gender Discrimination

As the Court has determined that Netrebko's NYSHRL gender discrimination claims are sufficient to withstand the Met's motion to dismiss, it concludes that her NYCHRL claims similarly survive, because "state civil rights law[] is a floor below which the City's Human Rights law cannot fall." Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 § 1 (Oct. 3, 2005); *see, e.g., Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671, 2013 WL 2358596, at *11 n.13 (S.D.N.Y. May 30, 2013).

Accordingly, the Met's motion to dismiss is DENIED as to Netrebko's NYCHRL gender discrimination claims.

### V.    Defamation Claim

Finally, Netrebko alleges that over the course of a year—coinciding with Russia's invasion of Ukraine and her firing by the Met—Gelb, on behalf of the Met, defamed her on multiple occasions. SAC ¶ 56.[16] She claims that Gelb made the statements "on-the-record" and

---

[16] Paragraph 56 of the SAC lists ten statements made by the Met that Netrebko claims amount to defamation. SAC ¶ 56(a)–(j). Based on the parties' papers, however, it appears only six are at issue. *Id.* ¶¶ 56(e)–(j). *See* Def. Mem. at 17; Pl Opp at 21; *e.g.*, SAC ¶ 59(a)–(i) (discussing only "statements set forth in paragraphs 56(e) through 56(j)"). "[D]istrict courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition at the motion to dismiss stage." *Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 11 (2d Cir. 2020)

"with the knowledge that they would be published and widely disseminated," and that each was in fact published and widely disseminated. *Id.* ¶ 57.[17]  Netrebko further alleges that, at the time the statements were made, Gelb knew they were false, "should have known they were false, or spoke with reckless disregard [for] the truth." *Id.* ¶ 59.

Under New York law, the elements of defamation are a (1) false statement, (2) published without privilege or authorization to a third party, (3) constituting fault with negligence or actual malice depending on the status of the defamed party, and (4) special damages or *per se* actionability.  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

Because Netrebko is a public figure, she must prove that the allegedly defamatory statements were made with actual malice.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967).  "Actual malice is a high bar.  A plaintiff cannot, for example, allege merely that the speaker was negligent in failing to uncover falsity or that he should have investigated his claims further before speaking."  *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185

---

(summary order).  Although the Second Circuit has indicated that courts should depart from this practice in cases of manifest injustice, *see id.*, this is not such a case.  The Court, therefore, finds that Netrebko has abandoned her defamation claim as to the statements alleged in paragraphs 56(a)–(d).

[17] The alleged defamatory statements are as follows:

- In an August 14, 2022 article in the *Sunday Times*, Gelb stated, "I was always aware [Netrebko] was, you know, a huge Putin supporter . . . The fact is she put herself in this awful position by being Putin's political acolyte and fan club member over a period of many years, which I had witnessed."  *Id.* ¶ 56(e) (citation omitted).
- In the same *Sunday Times* article, Gelb stated "When the war is over, Putin has been defeated, he's no longer in office, [and] [Netrebko]'s demonstrating genuine remorse.  Maybe that's when we can consider [rehiring her]. . . . But I would say there's a very small chance of that happening.  *Id.* ¶ 56(f) (citation omitted).
- In a September 12, 2022 *Guardian* article, Gelb stated that Netrebko "is inextricably associated with Putin. . . She has ideologically and in action demonstrated that over a period of years."  *Id.* ¶ 56(g) (citation omitted).
- In a November 9, 2022 article in *Limelight*, Gelb stated, "Netrebko has demonstrated over a period of many years that she was kind of in lockstep politically and ideologically with Putin."  *Id.* ¶ 56(h) (citation omitted).
- In a February 27, 2023 *Associated Press* article, Gelb stated, referencing Netrebko's termination, "It's a small price to pay. . . . To be on the side of right was what's important.  I wouldn't be able to look at myself in the mirror and have known Putin supporters performing on our stage."  *Id.* ¶ 56(i) (citation omitted).
- In a March 17, 2023 *New York Times* article, Gelb stated, "Although our contracts are 'pay or play,' we didn't think it was morally right to pay Netrebko anything considering her close association with Putin. . . . It's an artistic loss for the Met not having her singing here. But there's no way that either the Met or the majority of its audience would tolerate her presence."  *Id.* ¶ 56(j) (citation omitted).

(S.D.N.Y. 2020); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Actual malice exists if a false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "A 'reckless disregard' for the truth requires more than a departure from reasonably prudent conduct." *Khan v. N.Y. Times Co.*, 710 N.Y.S.2d 41, 43 (2000). The allegations must "permit the conclusion that the defendant in fact entertained serious doubts as to the truth" of the statements. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Moreover, the actual malice standard is subjective and must be proven by clear and convincing evidence. *Khan*, 710 N.Y.S.2d at 43–44. "Only those false statements made with [a] high degree of awareness of their probable falsity" are actionable. *Garrison v. State of La.*, 379 U.S. 64, 74 (1964); *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992) ("[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action.").

Netrebko has not met this high bar. She alleges that because the Met knew she made multiple statements opposing the war, distancing herself from Putin, and disavowing any connection to him, its subsequent statements referring to her as a Putin supporter must have been made with knowledge of their falsity or with reckless disregard for the truth. *See* SAC ¶ 59. Yet, such a finding is not required. There is a difference between the Met knowing that Netrebko uttered these statements and the Met believing that what she said was true. Netrebko fails to allege any facts demonstrating that her statements disassociating herself from Putin's war against Ukraine altered the Met's subjective belief that she supported the Russian leader. Thus, she has not adequately pleaded that the Met made any of the allegedly defamatory statements with "high degree of awareness of their probable falsity." *Garrison*, 379 U.S. at 74. Further, the

SAC "lacks the degree of specificity required by *Iqbal* and *Twombly*, enabling [Netrebko] to prevail on [the Met's] motion to dismiss and then to engage in further discovery on the issue." *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) (citation omitted). Although a court "typically will infer actual malice from objective facts" like "the defendant's own actions or statements, the dubious nature of [its] sources, and the inherent improbability of the story," the SAC offers none that permit the Court to make this inference. *Celle*, 209 F.3d at 183 (cleaned up). At most, the SAC contains "bare assertions of ill will," which are not sufficient to allege actual malice. *Id.*

Because the SAC's allegations are inadequate with regard to the Met's "state of mind," Netrebko has not sufficiently pleaded actual malice. *Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354 (2009). Accordingly, the Met's motion to dismiss Netrebko's defamation claim is GRANTED.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED as to Netrebko's contract, defamation, and national-origin discrimination claims (the First, Second, Third, Fourth, Ninth, and Tenth causes of action). The motion is DENIED as to Netrebko's NYSHRL and NYCHRL gender discrimination claims. Netrebko may proceed on the gender-discrimination theories of her Fifth, Sixth, Seventh, and Eighth causes of action.

The Clerk of Court is respectfully directed to terminate the motion at ECF Nos. 22 and 36.

SO ORDERED.

Dated:  August 22, 2024
        New York, New York

_____
ANALISA TORRES
United States District Judge