

Ariadne Panagopoulou
77 Water Street, Suite 2100
New York, New York 10005
Ariadne.Panagopoulou@lewisbrisbois.com
Direct: 212.232.1300

August 20, 2025                                             File No. 37986.9173

**VIA ECF**
Hon. Analisa Torres
United States District Court
Southern District Of New York
500 Pearl Street
New York, New York 10007

      Re:    *Netrebko v. Metropolitan Opera Association, Inc. et al.*
              Docket No. 23-cv-06857-AT-OTW

Dear Judge Torres:

      We are counsel for Defendants Metropolitan Opera Association, Inc. and Peter Gelb (collectively, "Defendants") in the above-referenced matter. We write in response to Plaintiff's letter motion seeking leave to file a proposed supplemental complaint (hereinafter "PSC") pursuant to Fed.R.Civ.P. 15(d). Leave to file a supplemental pleading may be denied, at the discretion of the court, where it would prejudice the opposing party, cause undue delay, or be futile. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). Here, the PSC does all three. As explained below, the PSC effectively seeks to revive Plaintiff's defamation claim which was properly dismissed both at first instance and following Plaintiff's motion for reconsideration. It also adds novel retaliation claims for which extensive discovery would be needed, causing undue delay and prejudice to the Defendants. Finally, both the defamation and retaliation claims are frivolous and would not survive a Rule 12(b)(6) motion to dismiss. For these reasons, Plaintiff's request should be denied.

      **1. Allowing Plaintiff to Supplement her Pleading would Unduly Prejudice the Defendants**

      Plaintiff first initiated this case on August 4, 2023. Since then, the parties have engaged in extensive discovery, including agreeing upon a detailed ESI protocol with search terms and custodians, whereupon Defendants reviewed a total of 20,711 documents (exceeding 100,000 pages) and ultimately produced thousands of documents to Plaintiff. All fact discovery is intended to be completed on January 15, 2026. *See* Dkt. No. 97. Now, two years after the filing of this case, Plaintiff seeks to file a supplemental pleading which includes novel retaliation claims under the New York State and New York City Human Rights Law. The retaliation claims are based on statements made by Defendant Gelb to the press including, *inter alia*, on May 13, 2024 and July 31, 2024. While Plaintiff claims that "there has been no undue delay, bad faith, or dilatory motive," (Plaintiff's Letter,

p. 2) she does not explain why she waited <u>a whole year</u> following some of the alleged defamatory statements to file the instant application. Allowing the supplementation at this stage would unduly prejudice the defense by requiring them to perform additional discovery, on top of the laborsome document review that they have already completed.

### 2. Plaintiff's Proposed Supplemental Pleading Is Procedurally Improper and Barred by Res Judicata

Rule 15(d) is limited to events "that happened after" the filing of the original complaint. *See* Fed.R.Civ.P. 15(d). Plaintiff has already pleaded a defamation claim, the basis of which were statements made by Gelb to the press regarding Netrebko's relationship and political stance towards Putin. These were adjudicated twice: this Court dismissed them in its order on Defendants' motion to dismiss (hereinafter "Motion to Dismiss Order") and later affirmed such dismissal in its most recent order on Plaintiff's motion for reconsideration (hereinafter "Motion for Reconsideration Order"). As the Court stated in the latter, "the complaint did not allege the types of objective facts from which courts ordinarily may draw a plausible inference of actual malice, such as those relating to the defendant's own actions or statements, the dubious nature of its sources, or the inherent improbability of the story spun by the defendant." Dkt. No. 108, p. 9 (internal quotations omitted). Plaintiff's newfound "post-complaint" defamation claim, which is again premised on Gelb's statements to the press regarding the same subject matter, represents an improper attempt at a third bite of the apple. Plaintiff essentially strives to revive her earlier claims under the guise of supplementation. Plaintiff's defamation claim is thus procedurally improper and barred by res judicata. *See Sidari v. Orleans Cnty.*, 169 F. Supp. 2d 158, 161 (W.D.N.Y. 2000) (noting that supplementation was not permissible in order to relitigate issues that were or could have been raised in a prior action).

### 3. The Proposed Supplemental Pleading is Futile

A motion to supplement may be denied when the proposed pleading would be futile—i.e., when it would not survive a motion to dismiss under Rule 12(b)(6). *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). Here, even if all of Plaintiff's allegations in the PSC are accepted as true, they still fail to state a claim upon which relief may be granted.

#### a. The Defamation Claim is Futile

Plaintiff's defamation claim is futile for a number of reasons, many of which were already addressed in Defendants' prior briefs in support of their motion to dismiss and in opposition to Plaintiff's motion for reconsideration. *See* Dkt. Nos. 37, 46, 74. Such arguments are incorporated herein by reference. As a brief summary, Plaintiff's newly alleged defamatory claim is subject to dismissal for the following five reasons.

First, all of Gelb's statements at issue are substantially true based on the SAC, the PSC, and documents that have been incorporated therein by reference. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247–248 (2d Cir. 2017) (the question of "substantial truth" is properly adjudicated on a Rule 12 motion). As the Court correctly observed in its Motion to Dismiss

Order, when the Met had originally asked Netrebko to issue a statement denouncing Putin, Netrebko had issued several contradictory statements on social media; specifically one where "she stated that she was opposed to the war, but also opposed to "forcing artists, or any public figure, to voice their political opinions in public and to denounce their homeland" [and] a second post, [where] Netrebko characterized "those from the West who criticized Putin as 'despicable,' 'human shits[,]' and 'evil as blind aggression.'" *See* Dkt. No. 64, p. 4 *citing* SAC ¶ 27 and Arbitration Award at 21–22. Eventually, on March 30, 2022, twenty-seven days after the Met publicly announced that it had repudiated Netrebko's contracts for future seasons, Netrebko issued a press release condemning the war on Ukraine and "acknowledge[ing]" herself that "past actions or statements…could have been misinterpreted." SAC ¶¶ 31, 34. Hence, Gelb's statement that "she claimed to be against the war…a month afterwards" following her dismissal from the Met (PSC ¶ 7) is substantially true, since any prior attempts to denounce the war were, at best, lackluster and nullified by contemporaneous and contradictory social media posts criticizing "those from the West" as "despicable" and "human shits."

Further, Gelb's statement that Netrebko had told him "I stand with my country" is also true. The arbitrator, in adjudicating the outcome of Netrebko's dispute with the Met brought by AGMA and after having heard extensive testimony from all parties, determined that Netrebko "told [Gelb], "I'm sorry, I stand with my country."[1] Arbitration Award, Dkt. No. 24-2, pp. 23. Even if this court fails to credit the Arbitration Award (as it should), Netrebko concedes in the SAC that "as a Russian citizen, she could not make [] a statement" denouncing Putin, as Gelb had asked her to (SAC ¶ 30), rendering Gelb's statement substantially true.

Second, a number of statements made by Gelb are clearly non-actionable expressions of opinion. *See* PSC ¶ 7 ("<u>I believe</u> she had certain conversations with the Kremlin"), *id*. ("her later statement…was, <u>in my opinion</u>, insincere"); ¶ 8 ("<u>In my view</u>, she condemned the war purely out of expediency"); ¶5(a) (characterizing the Palm Beach Opera's actions as "unfortunate"). Expressions of opinion "receive absolute protection under the New York Constitution." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020). Further, all of Gelb's statements were made in the context of a broader editorial piece published by another author, not Gelb. *See Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012) (statements published in "editorial formats ... create the 'common expectation' that the communication would 'represent the viewpoint of [its] author[ ] and ... contain considerable hyperbole, speculation, diversified forms of expression and opinion.'")

Third, defamation is ordinarily "not actionable unless the plaintiff suffers special damage which is defined as the loss of something having economic or pecuniary value." *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 180 (S.D.N.Y. 2024).[2] Here, Netrebko does not allege that she suffered any

---

[1] The Court has determined that the arbitration award is incorporated to the SAC by reference. Motion for Reconsideration Order, Dkt. No. 108, p. 4.

[2] Plaintiff's argument that "each of Gelb's statements is per se defamatory and injurious to Netrebko in her professional capacity" (Plaintiff's Letter, p. 4) is meritless. As the New York Court of Appeals has held, "to be actionable as words that tend to injure another in his or her profession, the challenged statement must be more than a general reflection upon decedent's character or qualities. Rather, the statement must reflect on her

harm as a result of Gelb's statements; she claims, rather, that "the dissemination of the statements throughout Ukraine and beyond increased the possibility of threats of physical harm to Netrebko as she performs around the world." PSC ¶ 13 (emphasis added). There is also no allegation that any opera house, including Palm Beach Opera, decided to cancel Netrebko's contracts as a result of Gelb's statements. The lack of actual harm renders Netrebko's defamation claim subject to dismissal. *See Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010) ("courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity.").

Fourth, Plaintiff has failed to allege actual malice. As the Court ruled its Motion to Dismiss Order, "only those false statements made with a high degree of awareness of their probable falsity are actionable". *See* Dkt. No. 64, p. 22. Here, Plaintiff has not credibly alleged that Gelb made any statements regarding Netrebko that he knew were false; as discussed above, Gelb's statement that Netrebko had not denounced the war until a month after her termination from the Met is substantially true given the contradictory social media posts she had published during the days preceding her termination, while various other statements he made regarding Netrebko's political beliefs were clearly statements of opinion.

Finally, the *Diapason* article cited in the PSC was published on May 13, 2024, more than one year prior to Plaintiff's letter motion to supplement. Accordingly, any statements made by Gelb therein are barred by the statute of limitations. *See* CPLR 215(3); *Nussenzweig v. diCorcia*, 9 N.Y.3d 184, 188 (2007) ("a cause of action for defamation accrues on the date the offending material is first published").

### b. The Retaliation Claims Are Futile

To make out a prima facie case of retaliation, a plaintiff must show, *inter alia*, that the employer took an adverse employment action against her and a causal connection exists between the alleged adverse action and the protected activity. *Mi-Kyung Cho v. Young Bin Cafe*, 42 F. Supp. 3d 495, 506 (S.D.N.Y. 2013). Here, Plaintiff's retaliation claims under the NYSHRL and the NYCHRL are predicated on Plaintiff's allegation that "Gelb and the Met waged a public campaign to defame Netrebko and disparage her in retaliation for instituting this litigation against them." Plaintiff's Letter, p. 1. Plaintiff cannot make either of the aforementioned showings.

First, Plaintiff does not credibly allege that Defendants engaged in any type of adverse action following her filing of the instant suit. The sole basis of Plaintiff's retaliation claim rests on five instances where Gelb, in the course of responding to media inquiries on various issues surrounding the Met, including the Met's opposition of Russian's war against Ukraine, spoke about the Met's relationship with Netrebko and termination thereof. As the General Manager of the Met, one of the largest and most renowned opera institutions in the world, Gelb is frequently called upon to conduct

---

performance or be incompatible with the proper conduct of her business." *Golub v. Enquirer/Star Grp., Inc.,* 89 N.Y.2d 1074, 1076 (1997). Here, Gelb's statements and opinions on Netrebko's political beliefs concerning Putin and the Russian war against Ukraine have nothing to do with her ability to perform her profession as an opera singer.

interviews all over the world with major news media, which he has been doing for almost two decades on behalf of the Met. Netrebko is also a public figure: according to the SAC she is "opera's biggest star" and had previously "sung nearly two hundred performances" at the Met. SAC ¶¶ 2-3. These facts cannot be overstated. Gelb cannot suddenly be expected to refrain from responding to media inquiries about matters concerning the Met or participating in interviews on behalf of the Met merely by virtue of the fact that Netrebko has filed the instant suit. *See also Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 310 (2d Cir. 2017) (negative comments made by the employer, including distributing a negative statement about the plaintiff after a lawsuit was filed, did not meet the standard for a materially adverse action).

Moreover, it should be stressed that, out of the five allegedly defamatory publications cited in the PSC that Plaintiff takes issue with, <u>not a single one was authored, edited, reviewed or published by the Met</u>. Additionally, with the exception of the New York Times article entitled "Anna Netrebko, Shunned in U.S. Over Putin Support, Will Sing in Palm Beach" (PSC ¶ 5), none of the articles discussed Netrebko as their main subject matter.[3] Instead, Netrebko's name was mentioned tangentially in the course of Gelb's answering of the various questions posed to him by interviewers. The articles referenced in PSC ¶¶ 4-8 are annexed for the Court's review as **Exhibit A**.[4]

As far as the New York Times article is concerned, it is abundantly clear that its author – Javier Hernandez – was the driving impetus behind that publication. The opening paragraph of Mr. Hernandez's article reads as follows: "Since the Russian invasion of Ukraine, the superstar soprano Anna Netrebko has been persona non grata at cultural institutions in the United States, shunned for her past support of Russia's president, Vladimir V. Putin." Mr. Hernandez goes on to state that "most American institutions, including the Metropolitan Opera, where she reigned as a prima donna for two decades, have continued to refuse to engage her because of her past support for Mr. Putin and her

---

[3] Even the titles of these articles make this abundantly clear. For example, the *Diapason* article entitled "Peter Gelb: où va le Met" (PSC ¶ 4) meaning "Where is the Met going?" discusses recent financial challenges the Met has faced since the pandemic. The article by Ivan Kosiakin entitled "Peter Gelb, General Manager of the Metropolitan Opera: When the Putin regime is trying to destroy a nation, only supporting Ukraine is right" (PSC ¶ 6) discusses his position towards the conflict against Ukraine and the Met's efforts to support Ukraine. Similarly, the article by Sonya Koshkina (PSC ¶ 7) discusses the Met's "production of *The Mothers of Kherson*, an opera focusing on the deportation of Ukrainian children and the mothers who undertake a perilous journey to retrieve them". Finally, the Austrian article in *Der Standard* is entitled "Met Director: 'Gergiev is a kind of artistic representative of Putin" (PSC ¶ 8) and discusses Gelb's criticisms of allowing conductor Valery Gergiev to perform in Italy, given that he is a devout supporter of Putin.

[4] In considering the viability of the PSC, the Court is permitted to review the entirety of these articles which are linked to the PSC and thereby incorporated by reference. As the Court recently held, "because Netrebko linked the article in the complaint and quoted from it, the Court reasonably found that she made a clear, definite, and substantial reference to the reporting, allowing the Court to consider the full contents of the article and not merely the three quoted words." Motion for Reconsideration Order, Dkt. No. 108, p. 4 (internal citations and quotations omitted). Foreign language articles in footnotes 1 and 5 of the PSC – the articles published in *Diapason* and *Der Standard* respectively – have been translated using google translate. The translated versions follow the originals in Exhibit A.

unwillingness to criticize him now." In the course of drafting that article, Mr. Hernandez asked Gelb to provide his position on behalf of the Met which he did. Netrebko's management also provided statements refuting the Met's position which were published in the same article. Plaintiff cannot plausibly claim that Gelb or the Met retaliated against her merely by exercising their right to free speech. Nor do any statements made to the media qualify as "adverse actions".

Second, Plaintiff does not allege that Gelb's alleged defamatory statements were causally linked to Plaintiff's engagement in protected activity via the filing of the instant suit. As aforementioned, none of the five publications that Plaintiff takes issue with were authored, reviewed, or published by the Met. Nor is there any allegation that Gelb exercised any control over the timing of such publications. Accordingly, there is simply no plausible validity to Plaintiff's allegation that Gelb's statements to the various media outlets were made "in retaliation for asserting her rights and instituting this litigation". PSC ¶ 1.

Further, as the SAC makes clear, Gelb had been outspoken about his position with regards to Netrebko, even before any litigation between the parties. In fact, Netrebko herself alleges that between March 2022 and March 2023, "both before and…after terminating its relationship with Netrebko…Gelb, on behalf of the Met…engag[ed] in an uabated smear campaign against her, repeating a series of defamatory remarks." SAC ¶¶ 7, 56. *See also* SAC ¶ 41 ("Gelb and the Met maintained the international publicity around its dramatic turn against Netrebko by engaging in a campaign disparaging Netrebko for more than a year after terminating the relationships with Netrebko.") This negates Netrebko's newfound assertion that there is any type of causal link between Netrebko's filing of the instant suit and Gelb's recent statements to the press. If anything, the allegations in the SAC reinforce the fact that Gelb's position towards Netrebko has remained consistent throughout, *despite* Netrebko's filing of the instant suit.[5] *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no inference of retaliation where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity").

Accordingly, both Plaintiff's defamation and retaliation claims are futile since they would not survive a Rule 12(b)(6) motion to dismiss. For these reasons, Plaintiff's application should be summarily denied.

---

[5] It should be noted that Gelb's position has been far from unique in the opera industry. To the contrary, as recently as August 2025, many prominent newspapers have reported that opera houses around the world have cancelled or have been called to cancel performances featuring Netrebko due to her wide-known pro-Putin stance, and in response to protests from the Parliament and from the public. *See e.g. The New York Times,* https://www.nytimes.com/2025/04/10/arts/music/anna-netrebko-london-zurich.html, *The Guardian*, https://www.theguardian.com/music/2025/aug/14/royal-ballet-and-opera-house-urged-to-drop-anna-netrebko-russian-soprano-putin-links, *The Telegraph*, https://www.telegraph.co.uk/news/2025/08/18/why-is-the-royal-opera-house-allowing-a-russian-singer-back/.

Hon. Analisa Torres
August 20, 2025
Page 7

                    Respectfully submitted,

*Ariadne Panagopoulou*

Ariadne Panagopoulou of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc:    All Counsel (via ECF)