# Exhibit F

```
------------------------------------x

In the Matter of the Arbitration    :

        - Between -                  :   Re:   Anna Netrebko

METROPOLITAN OPERA ASSOCIATIONS,     :
INC.
                                     :

        "Met" or "Employer"          :

        - and -                      :

AMERICAN GUILD OF MUSICAL
ARTISTS, AFL-CIO                     :

        "AGMA" OR "Union"            :

------------------------------------x
```

**APPEARANCES**

    <u>For the Met</u>
PROSKAUER ROSE
    Howard Robbins, Esq.
Peter Gelb, General Manager

    <u>For AGMA</u>
Annie Hollister, Esq.
Sam Wheeler, Esq.
John Ward, Esq., Mid-West Counsel
Raymond Menara, President, AGMA
Miguel Esteban, General Manager to Anna Netrebko
Ned Hanlon, Chorus Committee Chair

BEFORE:  HOWARD C. EDELMAN, ESQ., ARBITRATOR

CONFIDENTIAL

Met000351

## BACKGROUND

This grievance protests the Met's failure to pay Singer Anna Netrebko for a number of performances listed for the 2022-23, 2023-24, 2024-25 and 2025-26 seasons.[1] The Union insists that under Pay or Play provisions of the Collective Bargaining Agreement between the parties Netrebko is entitled to the full value of the performances in question, or $615,485. The Met maintains no monies are due.

Anna Netrebko is a world famous opera singer. She has appeared at the Met in a lead role a number of times dating back some ten years or more. Prior to this dispute, Netrebko was known as a supporter of Russian President Vladimir Putin. Numerous public communications from her attest to her views.

On February 24, 2022, Russia invaded the Ukraine. Netrebko did not criticize Putin for the attack.

Shortly thereafter, Met General Manager Peter Gelb asked Netrebko to renounce her support of Putin. He spoke to her then agent, Judith Neuhoff, as well as

_____

[1] Some of these performances are contained in contracts executed between the Met and Netrebko; others are "holds" referred to in various communications. These two categories are discussed below.

2

CONFIDENTIAL

Met000352

Netrebko.  The Grievant did not, stating to Gelb, "I'm sorry.  I stand with my country."

On March 3, 2022, the Met announced that Netrebko had withdrawn from *Turandot* and *Don Carlo* which were scheduled to be performed in the 2022-23 season.  Having not heard further from Netrebko, the Met cancelled all her other scheduled performances on March 28, 2022.  The next day her new manager, Miguel Esteban, disputed the cancellation of all performances except those from which she voluntarily withdrew.  Er. Ex. 5.

AGMA timely grieved the cancellation of the performances and failure to pay the artist.  The Met rejected the grievance, whereupon the Union demanded Arbitration.

I was selected to decide the dispute.  A hearing was held before me on October 10, 2022.  Upon my receipt and exchange of briefs, I closed the record.  This Opinion and Award follows.[2]

---

[2] The parties graciously agreed to extend the submission of this Award to March 1, 2023.

CONFIDENTIAL

Met000353

## THE ISSUE

The parties were unable to stipulate to one. After review of the record, I find that the issue to be decided is:

> Did the Met violate the Collective Bargaining Agreement when it failed to pay Anna Netrebko for forty performances during the period in dispute?
>
> If so, what shall be the remedy?

## RELEVANT AGREEMENT LANGUAGE

Section One, Article Fifth.E:

Any agreement (including options) relating to the employment of any ARTIST BY THE Met shall be null and void and of no effect unless it is executed by ARTIST and the Met on a STANDARD FORM CONTRACT, provided, however, that any written agreement between the Met and any PRINCIPAL shall be binding to the full extent provided by law, provided:
. . .

2.   Such agreement shall contain a provision that its terms shall be incorporated in the STANDARD PRINCIPALS CONTRACT and that it shall be subject to the provisions of the AGREEMENT in effect for the year to which such agreement pertains, and

3.   Such agreement shall be filed with AGMA in accordance with Paragraph a.

4.   The Met shall not be entitled to enforce such agreement unless it tenders to PRINCIPALS a STANDARD PRINCIPALS CONTRACT, in accordance with the terms of such agreement, prior to the date when PRINCIPALS' services are to begin. Any such agreement made during the term of

4

CONFIDENTIAL

Met000354

this AGREEMENT shall be enforceable against either PRINCIPALS or the Met only to the extent as would an agreement made on the STANDARD PRINCIPALS CONTRACT form at the same time.

Section Two, Article Fifth.N:    Pay or Play Contract:

Except as otherwise provided in this contract, the employment of Principal hereunder is not cancelable, and the compensation is "pay or play.

Joint Exhibit 1

...

### STANDARDS OF CONDUCT CLAUSE

In the event that, following execution of the Artist's contract, the Metropolitan Opera becomes aware of serious conduct or serious allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal, including but not limited to sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude, the Metropolitan Opera may, upon written notice, terminate this Agreement, in which even the Metropolitan Opera shall not have any further obligations to Artist, including any financial or other obligations such as travel or accommodation.

Joint Exhibit 4

### POSITIONS OF THE PARTIES

The Union maintains its grievance must be sustained. In support of this position it cites the Pay or Play provision of the labor contract. Stated simply, that language allows the Met to refuse to permit an

5

CONFIDENTIAL

Met000355

individual to appear in any agreed upon performance unless it pays her the contractual rate. Thus, it seeks a sustaining Award on this basis alone (32:21 - 33:2).[3]

The Met seeks to avoid this clear obligation, the Union submits, by arguing:

1. Netrebko voluntarily withdrew from *Turandot* and *Don Carlo*;

2. It is not obligated to pay for holds;

3. Netrebko violated the contract's "morals" clause by failing to repudiate Putin and/or the attack upon Ukraine.

4. Other non-contractual, legal defenses.

Each argument is without merit, in AGMA's view, as follows:

1. The Artist did not voluntarily withdraw from *Turandot*[4], as the Met claimed. While a writing confirms her withdrawal from *Lohengrin* for the 2022-23 season, none exists with respect to *Turandot*; and the memo of March 29, 2022 from Esteban to Gelb refers only to a withdrawal from certain performances. It makes no reference to *Turandot*. Esteban, the Union suggests, had recently taken over as the Grievant's manager and was not aware from which performances she had withdrawn.

---

[3] Numbers in parentheses refer to pages in the transcript, unless otherwise indicated.
[4] The Union's arguments concerning Turandot apply equally to Don Carlo.

CONFIDENTIAL

Met000356

The Union insists Gelb's conversation with Netrebko on March 2, 2022, does not reflect an intention to withdraw from *Turandot*. Rather, the General Manager conceded, the call centered on the kind of statement he wanted her to make on condemning the war in Ukraine, AGMA argues.

The substance of the Met's March 3, 2022 public statement and others affirm "there was no way forward" for the Met to continue to employ Netrebko, the Union urges. Gelb's testimony at the hearing confirms this view, AGMA argues. When asked if there was any way that Netrebko could continue other than issuing a satisfactory statement, he replied, "No" (155:10-17). Thus, the Union concludes, she did not voluntarily withdraw from *Turandot*.

2.    The Union insists that the "holds" for 2023-26 are binding contracts under New York law. Citing a number of cases, it posits that a binding contract may be established by "objective manifestations of the interests of the parties as expressed by their words and deeds."

AGMA maintains the "words and deeds" demonstrate:

CONFIDENTIAL

Met000357

offers by the Met of the title role in *Manon Lescaut* for five performances between November 24, 2025 – January 17, 2026 and for *Lady Macbeth* for March 25 – May 2, 2026, both at the rate of $17,000 per performance.

Netrebko's agent responded, "Yes" to *Manon Lescaut* and "I [Neuhoff] think [Macbeth] will also be a 'Yes.'" It also notes that Gelb believed Anna was "definitely on board" for *Macbeth* – July 27, 2022. Furthermore, it cites:

- a series of emails between the Met and Neuhoff which confirm the Grievant's engagement for Tosca during the 2024-25 season, followed by confirming emails shortly before the Ukraine invasion which pinned down the engagement period.

- an offer and acceptance to perform in *Pique Dame* for five performances during the period April 28-June 7, 2025.

These and related emails confirm the existence of binding contracts under New York Law, as the Union sees it. They include material terms and are consistent with custom and practice in the industry so as to demonstrate they are enforceable, it urges.

AGMA acknowledges the Met's contention that not memorializing the holds in a Standard Form Contract invalidates any agreement to perform. However, it contends, the Employer may not benefit from its own

8

CONFIDENTIAL

Met000358

failure to follow through on what it bound itself. In fact, it suggests, the relevant language of the labor agreement is intended to be enforced against the Met, not the affected artist.

Also, AGMA notes, "holds" are often agreed upon four or five years before the date of performance, and every contract is memorialized on a Standard Form Agreement. In the Union's words:

> ...it strains credulity to conclude that the Met did not consider Netrebko's contracts for those seasons to be binding commitments for which a Standard Form Contract would be issued in due course.
>
> Brief, p. 18.

Finally, on this issue, AGMA suggests to permit the Met to evade its pay or play obligations in this way would allow it to delay the issuance of a Standard Form Contract until the last minute to the detriment of the artist. In fact, it observes, an agreement to terminate a contract must be filed with AGMA, yet *Lohengrin* was terminated only via an email between the parties and without Union notice. Thus, if I find that filing with AGMA is necessary to validate a contract, then the

9

Met000359

termination of *Lohengrin* required the same notice and, thus, fees for that opera should be paid the Grievant.

3.    The Standard of Conduct Clause does not warrant a finding for the Met, the Union avers.    It points out that the prohibited behavior must have been unknown to the Met before the contract was executed.    Here, AGMA insists, Netrebo's political views were open and notorious for at least ten years prior to February 2022. The Met conceded this point at the hearing, AGMA observes. (18:14-17).    Hence, it seeks a rejection of the Met's arguments on this issue.

Moreover, AGMA contends, possible harm to the Met's operations/reputation was made manifest in 2015 when a protester disrupted a curtain call by jumping onto the stage with a sign of the Ukranian flag and an identification of the Grievant as a contributor to Putin's war against Ukraine. Un. Ex. 6.    Consequently, it concludes, the events of February-March 2022 did not alter what the Met knew about Netrebko's beliefs long before then.

Moreover, the clause was negotiated as an outgrowth of the "Me, too" movement and not any political issue. Citing Ned Hanlon's testimony, AGMA maintains that the

CONFIDENTIAL

Met000360

provision was intended to ensure that no one would be hired who could endanger the safety of its artists. That the provision makes no reference to political beliefs is further evidence it was not intended to cover Netrebko's comments or positions regarding the war, the Union submits. Thus, it argues, the general prohibition against behavior which brings the Met "into disrepute or scandal" is substantially narrowed by the listed focus of the misconduct. Consequently, it insists, political statements, like the Grievant's, do not warrant rejection of its grievance.

Nor do common law defenses permit the Met to violate the Pay or Play provision, AGMA alleges. Noting that the common law defense of "impossibility" of performance is rarely upheld, AGMA asserts there is no evidence Netrebko's appearance on stage was impossible or, more important, that the Met could not pay her if performances were cancelled. Nor is there any evidence a production in which she starred would be "frustrated" by her appearance, it alleges.

For these reasons the Union asks me to uphold its grievance. As remedy, it seeks payment of $615,485 which, it argues, factors in agreed upon pay per

11

Met000361

performance, rehearsal pay and deductions for the period
April 30, 2022 - July 31, 2025.

The Met asserts AGMA's grievance must be denied for
a number of reasons. First, it argues, "holds" are not
enforceable agreements. Rather, they are "placeholders"
on the calendar which may or may not be followed by a
binding contract, it alleges. The language of Section
One, Article Fifth.E supports this interpretation by
stating that:

> Any agreement…relating to the employment of
> any ARTIST…shall be null and void…unless it is
> executed by ARTIST and the Met on a STANDARD
> FORM CONTRACT…

Relevant testimony is further evidence that holds are
not binding, as the Met sees it. It notes that Netrebko
has removed a number of holds[5] without penalty and that
Esteban concedes he had no way of knowing whether she
had removed any of the ones in dispute.

Furthermore, the Met contends, Netrebko voluntarily
withdrew from *Turandot* and *Don Carlo*. That this is so
is evidenced in Esteban's March 29, 2022 letter to Gelb,
it suggests; and the Grievant herself announced her
withdrawal from all concerts four weeks earlier: "This
is not the right time for me to be performing and making

---

[5] *Aida, LaGioconda, Salome* and *Lohengrin* (55, 142-43).

CONFIDENTIAL

Met000362

music." (Jt. Ex. 10). Given this evidence, as well as Gelb's discussion with the Grievant's prior agent, Judith Neuhoff, the Met concludes that it properly considered Netrebko to have withdrawn from *Turandot* and *Don Carlo*.

Even if any of the above arguments offered by the Met are rejected, the Union's grievance must nonetheless be denied, it avers. Suggesting that her conduct after the execution of the contracts violated the Standards of Conduct provision, it insists that the entirety of what she said must be considered. To that end it contends she has long been a strong supporter of Putin as far back as May 2010. At that time and on a number of occasions thereafter she wore the ribbon of St. George, a symbol of Russia's aggression in Ukraine – May 2010; expressed fondness for the Russian Leader – 2011; signed on as one of Putin's 499 trusted people – 2012; held up a separatist flag of an area in Eastern Ukraine under control of pro-Russian adherents –2014; and posted an account on Instagram praising Putin after the deadly attack on Metrojet Flight 9268 – 2015.

This past behavior was exacerbated after the February 24, 2022 attack on Ukraine to such an extent that all future performances had to be cancelled,

CONFIDENTIAL

Met000363

according to the Met. It points out that the artist never distanced herself from Putin, noting only she opposed war while criticizing those in the West as "unfair," "human shits" and "as evil as blind aggressors."[6]

Even though the entire world was cutting ties with Putin, Netrebko declined to do so despite entreaties from Gelb, the Employer submits. Some of the withdrawals from Russian sponsored events came from cultural institutions, it observes.

Gelb continued to implore the Grievant to make rehabilitative statements concerning her attachment to Putin, but to no avail, the Met argues, as evidenced by his testimony that she told him on March 2, "I'm sorry. I stand with my country." (131). In light of this record, there is no doubt the Met properly announced her withdrawal from *Turandot* and *Don Carlo* on March 3, 2022 and cancelled her contracts for the 2023-24 season, it argues.

Moreover, these actions are authorized pursuant to the Standards of Conduct clause, the Met insists. It argues that the pre-invasion statements, when combined

---

[6] This post was removed three days later.

14

with the post-invasion ones, constitute a continuing course of improper conduct, just as sexual misconduct and hostile work environment claims do, though those after February 24, 2022, standing alone, are sufficient to disqualify her from appearing in future Met performances.[7]

This provision does not require a showing of "scandal and disrepute," the Employer observes, only that the offensive actions "threaten[ed]" to do so. Others, aside from Met officials, agreed, it suggests.

In addition, Netrebko herself recognized the need to be more proactive in condemning Putin, the Met alleges. It cites her comment to Gelb, "I'm sorry: I stand with my country," as indicative of the choice she made between her career and Putin.

The Met rejects any suggestion that the Standards of Conduct provision bars political views. It is Netrebko's statements, not her opinion, which threatened its reputation; and the clause applies to all forms of actions, not just those involving sexual harassment and similar misdeeds, the Employer reasons.

---

[7] The dismissal of Placido Dominguez is analogous to Netrebko's circumstances, the Met alleges.

CONFIDENTIAL

Met000365

The Met also insists that it has the right to protect its image by banning Netrebko from future performances. This is especially important given the almost universal condemnation of the invasion and its diverse donor base, which would likely have withheld contributions had no action been taken against Netrebko, according to the Met.

Rejecting AGMA's contention that it tolerated the Grievant's prior support of Putin and should do so now, the Met insists Putin's war represented reputational risk different from earlier events. The same is true for protests over *The Death of Klinghoffer* and *Iolanta*, it maintains. None of those situations were as charged and potentially harmful to its reputation as the war in Ukraine and Netrebko's response, the Met concludes.

Also relevant is the ubiquity of "morals" clauses, in the Met's view. These are widespread in the entertainment industry and serve to protect the producer's good name. This is especially important in the United States where, contrasted with other countries, much support arises from private donations, rather than public funds.

In addition, on this issue, the Met suggests it was not alone in cancelling a number of the Grievant's

16

CONFIDENTIAL

Met000366

performances. Its actions are, therefore, in line with the conventions of the day and the responses of others, it reasons.

Finally, the Met asserts it terminated the Grievant's contracts in accordance with generally held legal principles. Citing Corbin on Contracts, the Met contends that an employee has a duty to refrain from actions which are detrimental to the employer's interests or otherwise devalue the performances scheduled. Even where these activities do not constitute a breach of contract, the services of the employee may nonetheless be terminated, it urges. Therefore, it concludes, "The Met was…also privileged to terminate Ms. Netrebko's contracts under basic contract law principles." Brief p. 12. Consequently, the Employer asks me to deny the grievance in its entirety.

### DISCUSSION AND FINDINGS

The resolution of this dispute centers on four issues. First, did the Met have the authority to cancel all Netrebko's performances pursuant to the Standards of Conduct clause? If not, did the Met have the authority to cancel Netrebko's performances pursuant to generally accepted principles of contract law? If not, did the

17

CONFIDENTIAL

Met000367

Met have the authority to cancel "holds?" Fourth, did Netrebko withdraw from scheduled performances of *Turandot* and *Don Carlo*? As all aware, a positive answer to questions one or two warrants the dismissal of the grievance in its entirety, while affirmative answers to three and four produce a finding that the Met violated the labor contract in part. Though somewhat related, each issue will be analyzed independently.

Article XV, dubbed a "morals" clause, contains a number of elements which must be demonstrated by the Met. They are:

    a. did the conduct alleged occur after the execution of Netrebko's contract?

    b. did the conduct alleged threaten to or bring the Met into disrepute or scandal?

    c. Was the conduct similar to sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude?

(C), the parties agree, is not restricted as listed, but includes other forms of conduct, not enumerated, which threaten to bring the Met into disrepute or scandal.

Element (a) is seemingly easily answered. Netrebko's contracts were signed well before the acts which resulted in the termination of performances. The invasion of Ukraine occurred on February 24, 2022. The

18

CONFIDENTIAL

Met000368

Grievant's comments, written or oral, were made, obviously, after that date and before her services were terminated in March 2022. The contracts at issue here were executed in 2019 and in 2021. Thus, the Met clearly became aware of the alleged misconduct well after the "execution of the Artist's contract…". Para. 2 of the Standards of Conduct.

On the other hand, a complicating factor exists in this context. The Met contended pre-2019 actions must also be considered. It characterized these events as "pre-existing conduct" which may be considered beyond the limitations period. The Union argued that by its very terms the provision excluded pre-signing behavior.

I find the Met's view persuasive. While only post-signing activity may be charged, earlier ones may be considered as part of a continuing pattern of behavior.[8] Arguably, a relatively minor indiscretion may be deemed more significant if it is part of a series which, taken as a whole, warrants some form of disciplinary action.

Did the conduct alleged tend to threaten or actually tarnish the Met with scandal or disrepute? This issue constitutes the core of the Met's claim. I have

---

[8] See additional analysis below.

CONFIDENTIAL

Met000369

reviewed the record carefully on this matter and I find it did not, except as noted below. This is so for a number of reasons.

First, despite the Met's insistence to the contrary, it was attempting to negate a belief Netrebko held. There is no doubt she was a Putin supporter, as she had a right to be. By requiring she issue a statement condemning Putin, she was being asked to lie about her allegiance to the dictator. Though most people in the world would have different views from Netrebko's, what she was being asked to do was fundamentally not to take corrective action but to disavow a strongly felt personal opinion.

The inclusion of her pre-signing activities does not alter this conclusion. The Employer cataloged the following events:

- wearing a pro-Russian aggression badge in 2010;

- praising Putin in 2011 as a "very attractive man;";

- signing on as one of Putin's 499 trusted people in 2012;

- holding up a separatist Ukrainian flag in 2014 at a press conference;

- posting praise for Putin in 2015 after a deadly attack on Metrojet Flight 9268.

CONFIDENTIAL

Met000370

Certainly, these were events which did not endear Netrebko to many, and perhaps most in the opera world. However, the latest occurred some seven years prior to the 2022 invasion. Also, there is nothing in this record which suggests the Met put Netrebko on notice that similar actions in the future could lead to a cancellation of scheduled performances or other lesser forms of punishment.

This is not to say Netrebko was a "shrinking violet," such that concert goers, donors and Met officials would have forgotten the Grievant's pro-Putin leanings by February 2022. It is to say, however, that her views were certainly tolerated. As the Met acknowledged, she remained its most popular singer during this period, having appeared before full or nearly full houses on numerous occasions.

In addition, Netrebko posted two items on Instagram on February 26, 2022. One merely stated she was against war but did not repudiate Putin or his invasion of Ukraine. The other was more insidious. It characterized those from the West who criticized Putin as "despicable," "human shits" and "evil as blind

CONFIDENTIAL

Met000371

aggression." Significantly, it had been taken down by March 1, 2022, three days later.[9]

With the exception of the "despicable" post, the charges against Netrebko are "negative" in nature; i.e., that she refused Gelb's demand to criticize Putin and the invasion. These failures to act do not rise to an attempt to bring the Met into scandal or disrepute, or even an acknowledgment they could, I find.

The language of the morals clause supports this conclusion. The parties agree it arose from actions suspected or committed by Placido Domingo involving sexual improprieties. While the clause adds, "including but not limited to sexual harassment," it is hard to equate its reference to "other" misconduct to what Netrebko did not do- repudiate Putin. "Closely aligning yourself with Putin" (Joint Ex. 7) is certainly not moral turpitude or worthy, in and of itself, of actionable misconduct.

The Met emphasized that, "The entire world was cutting ties with Russia as early as late February to early March 2022." This, of course, is so. But those doing so were either companies conducting full scale

---

[9] See additional discussion of this post below.

22

Met000372

business in Russia or Russian sponsored events, such as the Marinsky Orchestra. That is a far cry from terminating the services of a Russian performer who refused to condemn its President.

Gelb asked Netrebko repeatedly to disavow Putin. He spoke to her and her manager. Ultimately, she told him, "I'm sorry, I stand with my country…."

I find her statement is not an admission of culpability. Rather, it reflects her inability to comply with Gelb's request because of her strong beliefs. Also, it does not reflect an intent to withdraw from all future performances, I am convinced.

In fact, during the period February 24, 2022 to March 28, 2022, when Gelb was willing to take her back if she expressed the right sentiments from his perspective, she issued two public statements opposing war or "the" war. Afterwards, she issued a statement "expressly condemn[ing]" Russia's invasion. Joint Exs. 8, 11, respectively. Her failure to go as far as Gelb wanted, does not rise to the level of culpability required by the morals clause, I find.

This determination should not be misconstrued as a condemnation of Gelb's interactions with Netrebko. Far from it. As General Manager he had an obligation to

23

CONFIDENTIAL

Met000373

consider potential harm to the Met's reputation. However, by insisting upon a "reverse loyalty oath," as it were, he imposed a condition neither authorized, contemplated nor inferentially subsumed within Article XV. Thus, I conclude, the Met did not have the right to terminate the Grievant's contracts on this basis.

Similarly, I find, termination was improper under general common law defenses. In this context, the "Pay or Play" provision is dispositive. It is contained in all the contracts signed by the parties. Thus, the common law defenses would have to apply to this clause, as well. They do not. Whatever difficulties the Met may have had in putting Netrebko on stage, there was none with respect to paying her if she did not appear.

Also, it is undisputed that the alleged reputational harm or scandal surrounding performances by Netrebko are found in the morals clause provision. That is, the parties agreed to this language to address a foreseeable event; i.e., that a performance could not go on stage if, say, a principal violated the Standards of Conduct.[10]

---

[10] See Warner v. Metal Res. Grp. Ltd 741, NYS 2d, 218, 220 (NY App. Div. 2002).

CONFIDENTIAL

Met000374

The Met noted Corbin for the proposition that an agent may not conduct himself so as to bring disrepute to the principal, even where it does not constitute a breach of contract. In the cited case, Drayton v. Reid Daly's Rep 442 (NYC 1824), dismissal was upheld due to indecent and immoral acts "too gross and disgusting to be described."

Acknowledging unconventional behavior in 1874 is far different today, it is nonetheless hard to characterize Netrebko's actions as close to this level of disgust. Similarly, in Scott v. RKO Radio Pictures, Inc. 240 F. 2d 37 (9th Cir. 1957) the implied covenant not to injure one's employer [for refusing to testify before Congress] is far more objectionable than refusing to condemn Putin for the Ukraine invasion.

Indeed, in Scott, the court was clearly offended that the entertainment industry was harboring and sheltering Communists, and that defendant's refusal to answer any questions did "shock, insult and offend the Committee [House American Activities Committee] and public morals and decency." Even allowing for the difference in attitude towards Communists in 1947 and today, the two cases are surely not similar in their

25

CONFIDENTIAL

Met000375

import.    Therefore, I am convinced, the Met's non-
contractual, common law defenses must be rejected.

On the holds question, I find that the Met did have
the authority to cancel them.  The Collective Bargaining
Agreement and the practice of the parties creates a two-
tiered mechanism for engaging an artist to perform at
the Met.  After discussions between the artists (and/or
their agents) and Met representatives (usually the
General Manager), the parties agree upon the opera to be
performed and the dates upon which it will be.  They may
often discuss pay and other terms and conditions of
employment.  It is undisputed each side places a hold on
the dates of performance.

Thereafter, pursuant to the terms of the labor
contract, a formal agreement – STANDARD PRINCIPALS
CONTRACT ("SPC") is executed and filed with AGMA.[11]  This
action converts the hold into a binding, enforceable
agreement.

The Collective Bargaining Agreement is clear and
unambiguous as to the status of the SPC. Section One,
Article Fifth.E states, in relevant part:

> 1. Any agreement (including options) relating
>    to the employment of any ARTIST BY THE Met

---

[11] Performers who are not "principals" execute a "STANDARD FORM
CONTRACT."  Netrebko is a PRINCIPAL.

CONFIDENTIAL

Met000376

shall be null and void unless it is executed by ARTIST and the Met on a STANDARD FORM CONTRACT, provided however, that any written agreement between the Met and any PRINCIPAL shall be binding to the full extent provided by law…

2. Such agreement shall contain a provision that its terms shall be incorporated in the STANDARD PRINCIPAL CONTRACT…

3. Such agreement shall be filed with AGMA in accordance with Paragraph a.

This language could not be clearer. The SPC is the document which is enforceable. It must be filed with AGMA. To the extent a separate "written agreement" is also binding, it, too, shall be incorporated into the SPC and also filed with the Union.

It is undisputed that the holds in this case were not converted into SPCs since none of them was executed. Obviously, no SPC was filed with AGMA. Consequently, the manifest language of the Collective Bargaining Agreement mandates rejection of the Union's claim regarding holds.

The practice of the parties supports this conclusion. As Gelb's unrebutted testimony indicated, holds are used to put into place the many pieces needed to create and finalize a production:

27

CONFIDENTIAL

Met000377

...when we feel confident that it [a new production] will happen, we issue contracts.

Q. Have you ever had a star singer go on stage with just a hold without issuing a contract?

A. No.

. . .

We've never ever paid a singer for a hold that didn't go forward in my history as well. It's just not done. That's why a hold is a hold: it's not a contract.                    (140-51)

The past practice of the parties is consistent with the clear language of the Collective Bargaining Agreement. Taken together they demonstrate that holds are not binding.

The Union raised a number of arguments in support of the enforceability of holds. Essentially, they may be viewed as a single proposition - that the holds for the applicable operas are binding contracts under New York law. It contended that in each case[12], "the expressed words and deeds[13] of the parties established offer, acceptance, and material terms, resulting in a binding contract." Brief, p. 10.

---

[12] Four operas are involved: *Manon Lescaut*, *Macbeth*, *Tosca* and *Pique Dame*.
[13] See Brown Bros. 41 NY 2d, at 399.

CONFIDENTIAL

Met000378

This argument is misplaced, I find. The issue here is not whether the communications, oral and written, constitute binding contracts. Rather, the issue is whether holds, however viewed, are enforceable under the terms of the Collective Bargaining Agreement and the parties' practice. They are not and the status of the holds, standing alone, cannot alter this conclusion.

The Union also insisted that the failure to memorialize the holds into SPCs does not invalidate them. It maintained that rejecting the enforceability of holds on this basis would allow the Met to benefit from its own failure to memorialize them and, therefore, undermine the protection of the labor contract.

I disagree. It is undisputed these holds were discussed and agreed to at various times, some four to five years before the planned productions. SPCs in this case were issued one to three years before the scheduled performances.

The holds were removed when the Met terminated Netrebko's services in March 2022 anywhere from two to four years before these operas were due to be presented. Consequently, there was no inordinate delay in the Met's failure to execute SPCs on any of the holds and it should

29

not be disadvantaged for acting or failing to act regarding their issuance.

Also, if Netrebko believed the holds should have been converted into SPCs before she was let go, her agent could easily have requested the Met to do so. This did not occur, most likely because, consistent with the long period between the holds and the SPCs, there was no perceived need to execute and submit them to AGMA.

Esteban's testimony as to the "sacrosanct" status of the holds does not alter this finding. Even if both sides agreed on this point, the holds did not become binding until the SPCs were issued. Also, while the Union correctly noted that the Met could cancel a hold by not issuing an SPC until a few days before the performance, that is not the case here. Moreover, if it did so in another matter, the Union would be free to protest if it believed the failure to issue the SPC was arbitrary. Accordingly, I conclude, the Met is not obligated to pay Netrebko for holds.

Did the Grievant withdraw from *Turnadot* and *Don Carlo?* There is an element of "he said; she said," in analyzing this issue and it is true Gelb testified while Netrebko did not. Nonetheless, and after reviewing the record, I find that the Grievant withdrew from *Turnandot*

30

CONFIDENTIAL

Met000380

but not from *Don Carlo*. Central to this determination are the dates upon which the two operas were scheduled.

The *Turandot* performances were due to take place in April and May of 2022. Jt. Ex. 13. Not long before these dates, Netrebko made it clear she was taking a break from her professional career. On March 1, 2022, Netrebko announced, "This is not the right time for me to be performing and making music." Also on March 29, 2022, her Manager wrote to Gelb that she disputed the termination of any agreements, "beyond the performances for which Anna voluntarily withdrew" Met Ex. 5. On March 30, 2022, the Grievant proclaimed on Instagram that "[a]fter taking my announced break, I will assume performing in late May, initially in Europe."

Taken together, these comments are unequivocal statements she was withdrawing from performances during April and May 2022, the period covered by the *Turandot* performances.

The Union noted that Netrebko never specified the operas from which the Grievant was withdrawing. It also cited Esteban's email and testimony as merely a "factfinding" inquiry concerning performances she no longer wished to complete.

31

CONFIDENTIAL

Met000381

Neither argument is persuasive. When an artist announces, more than once, she will not perform during the period in which the opera was slated to be held, the employer has a right to assume she meant what she said. In fact, it now had less than two months to slot in another suitable artist or cancel performances, an unpleasant but necessary choice.

Also, I find Esteban's testimony on this matter less than credible. Though recently appointed as the Grievant's Manager, his source of which operas she withdrew from would likely have come from Netrebko, not the Met. His references to "performances from which she voluntarily withdrew" leaves no doubt this was not a query but a statement of fact.

The timeline relating to *Don Carlo* is far different. It was to be performed in the Fall of 2023, well over a year after her statements in February and March 2022. Significantly, it was also well outside her announced return date to resume appearing on stage.

The Met insisted that it properly interpreted her conversations with Gelb to mean she had withdrawn from all operas. I do not agree.

The phone call of March 2, 2022 centered on the extent to which she would repudiate Putin. Her

CONFIDENTIAL

Met000382

statement, "I'm sorry, I stand with my country," related

to her decision not to criticize Putin any further, not

that she was withdrawing from all performances.

Gelb, in fact, endorsed this interpretation of what

the Grievant said.

> Q.   Okay.  What did the Met do…at that point,
> what was your understanding with respect to
> Ms. Netrebko's intent to perform at the Met in
> that season, meaning the remainder of the 2021
> to 2022 season?
>
> A. Since the *Turandot* engagement was about to
> happen   within   a   matter   of   weeks,   my
> understanding she was withdrawing from that
> and…she was withdrawing from other engagements
> that were <u>immediately</u> coming up.   11.19-25,
> 132; 11.1-5, 133. emphasis added.

Thus, the record is clear that both the Met and

Netrebko did not view her statements during the late

Winter and early Spring of 2022 as an intent to withdraw

from an opera scheduled for performances more than one

year later.

I have analyzed the issues necessary to determine

the merits of this case.   Consequently, I turn to the

proper remedy for the violations found.   As I noted

above,   I   have   determined   that   Netrebko's

February 26, 2022 post on Instagram ("human shits") was

highly inappropriate.  She clearly crossed the line by

heaping  invective  upon  "despicable  people  from  the

33

CONFIDENTIAL

Met000383

West," some of whom were surely opera lovers and Met donors. As stated above, this post does not warrant termination of all her contracts since its basis was her failure to repudiate Putin, not these comments, and the post was removed three days thereafter. Nonetheless, I find that some reduction in the compensation due her is justified. In my view, a reasonable penalty is a loss of pay for two performances.

In light of these findings, I conclude that Netrebko is entitled to:

    a) Full compensation, including rehearsal and other stipends, if any, for all performances for which SPCs were filed except *Turandot* and *Lohegrin*[14]

less

    b) compensation for two performances.[15]

I shall retain jurisdiction in the event the parties cannot agree upon the precise sum due Netrebko. Accordingly, and for the foregoing reasons, the Union's grievance is sustained to the extent indicated in this Opinion. It is so ordered.

---

[14] It is undisputed that Netrebko withdrew from *Lohengrin*. Jt. Ex. 11.
[15] Netrebko shall receive full rehearsal pay for these performances. If she was entitled to different amounts of pay for the operas, the parties shall deduct two times the average compensation due her for one appearance.

34

CONFIDENTIAL

Met000384

## AWARD

1. The Metropolitan Opera violated the Collective Bargaining Agreement when it cancelled certain performances without compensating Anna Netrebko for them.

2. Anna Netrebko shall be awarded

    a)  Full compensation, including rehearsal pay and other stipends, if any, for all performances for which SPCs were filed except *Turandot* and *Lohengrin*

    less

    b)  compensation for two performances.

3. I shall retain jurisdiction for sixty days in the event the parties are unable to agree upon the precise amount of the compensation due Anna Netrebko.

Dated: Feb 10, 2023

_____
Howard C. Edelman, Esq.
Arbitrator

State of New York    )
                     ) s.:
County of New York   )

I, Howard C. Edelman, Esq., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my AWARD.

Dated: Feb 10, 2023

_____
Howard C. Edelman, Esq.
Arbitrator

35

CONFIDENTIAL

Met000385