```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANNA NETREBKO,

 4                  Plaintiff,

 5          v.                            23 Civ. 6857 (AT)(OTW)

 6   METROPOLITAN OPERA
     ASSOCIATION, INC. d/b/a THE
 7   METROPOLITAN OPERA and PETER
     GELB,
 8                                        Conference

 9            Defendants.

10   ------------------------------x
                                          New York, N.Y.
11                                        August 21, 2025
                                          10:00 a.m.
12
     Before:
13
                        HON. ONA T. WANG,
14
                                          U.S. Magistrate Judge
15
                        APPEARANCES
16
     NESENOFF & MILTENBERG, LLP
17        Attorneys for Plaintiff
     BY:  KARA L. GORYCKI
18
     LEWIS BRISBOIS BISGAARD & SMITH LLP
19        Attorneys for Defendants
     BY:  ARIADNE A. PANAGOPOLOU ALEXANDROU
20        ELIOR D. SHILOH

21   Also Present:

22   Natasha Bunten, Intern

23

24

25
```

```
 1              (Case called)

 2              MS. GORYCKI:  Kara Gorycki, Nessenoff and Miltenberg

 3    on behalf of plaintiff Anna Netrebko.

 4              And your Honor, if it's okay, our intern, Natasha

 5    Bunten, is sitting at the counsel table with me.

 6              THE COURT:  Of course.

 7              MS. GORYCKI:  Thank you.

 8              MS. PANAGOPOULOU:  Ariadne Panagopolou from the law

 9    firm of Lewis Brisbois Bisgaard & Smith for the defendants in

10    this matter.

11              MR. SHILOH:  Elior Shiloh of Lewis Brisbois on behalf

12    of the defendants.  Thank you.

13              THE COURT:  Great.

14              We're here for a status conference.  First, I wanted

15    to apologize for starting so late.  I had one of those New York

16    City public transportation snafus, so I apologize.  Thank you

17    all for your patience.  And thank you, especially, to our court

18    reporter.

19              We're here for a status.  I understand that there's

20    some request to amend or supplement the complaint.  So why

21    don't I hear from plaintiff's counsel first, just an overview

22    of where we are, where you are on the request to amend or

23    supplement, and then I'll hear from defense counsel.  Okay?

24              MS. GORYCKI:  Thank you, your Honor.

25              Currently, teed up for today is a discovery dispute
```

1    over documents that defendants have refused to produce from

2    three Met Opera employees.

3             THE COURT:  Okay.  I asked you first to talk to me

4    about the motion or request to amend your complaint, because I

5    think unless and until we know what the operative complaint

6    is, it doesn't give us much space to understand where we're

7    going next.

8             The other thing I wanted to note is that I think I

9    haven't seen you since last fall, so I would like a general

10   update of where you are before you tell me about what the

11   disputes are.

12            MS. GORYCKI:  Understood, your Honor.

13            THE COURT:  Thanks.

14            MS. GORYCKI:  So the motion to supplement the

15   complaint, we've submitted our letter, as you are aware.  Last

16   night, defendants responded to that.  In terms of

17   discovery, our perspective is that we would not have to --

18            THE COURT:  Wait, is last night's response, is that on

19   the docket?

20            MS. PANAGOPOULOU:  Yes.

21            THE COURT:  It is.  Okay.  Let me see if I have it.

22            (Pause)

23            THE COURT:  Okay.  Go on.

24            MS. GORYCKI:  In terms of discovery, your Honor, we do

25   not believe that extensive discovery would be needed, should

1    Judge Torres allow us to supplement the pleading.  It would be

2    very narrow, simply relating to Mr. Gelb's statements, the

3    basis for those statements, as well as communications

4    surrounding his interviews.  So, we do not believe that it

5    would take a lot of time or cost in order to conduct additional

6    discovery with respect to the supplemental complaint.

7            And we also would be willing, your Honor, to discuss

8    with opposing counsel engaging in discovery sooner rather than

9    later on those topics with the understanding, of course, that

10    it's up to Judge Torres whether we'll be allowed to supplement

11    the pleading.

12            THE COURT:  It may be up to Judge Torres, but I

13    thought that this was a referral for -- well, it's general

14    pretrial.  I'm not sure if there's a referral for a report and

15    recommendation on dispositive motions.  I'm also not 100

16    percent sure whether this would, in fact be a dispositive

17    motion.  What my goal would be here today is to try to see if

18    there's a way that we can work through all of this so we don't

19    end up stalling the case in extensive motion practice, so, all

20    right.

21            Let me hear from defendants on the issue of motion to

22    supplement.  And as I understand it, it's to file a

23    supplemental complaint, not an amended complaint?

24            MS. PANAGOPOULOU:  Yes, your Honor, so --

25            THE COURT:  Well, that was actually plaintiff, right,

1   because that's plaintiff's pleading.  Is it a supplemental

2   complaint or an amended complaint?

3             MS. GORYCKI:  Supplemental, your Honor.

4             THE COURT:  Okay.  What Federal Rule does that fall

5   under?

6             MS. PANAGOPOULOU:  15(d).

7             THE COURT:  It's still Rule 15.  Okay.

8             MS. PANAGOPOULOU:  Yes.

9             THE COURT:  Okay.  I'm just pulling up the rule.

10            Go ahead.  I'm going to mangle your last name, but I'm

11   trying.

12            MS. PANAGOPOULOU:  Panapogplou.

13            THE COURT:  Ms. Panagopolou, please go ahead.

14            MS. PANAGOPOULOU:  Yes.

15            So, plaintiff filed a motion seeking permission --

16   well, a letter motion to seeking permission to file a

17   supplemental complaint and in that complaint, there are

18   allegations of defamation -- well, the way they couch it is,

19   post-complaint defamation, so in other words, statements made

20   in the past two years since the filing of their last pleading

21   that they contend have been defamatory and new-found

22   retaliation claims.

23            We oppose the supplemental complaint for various

24   reasons, and we filed, yesterday, a letter in opposition to

25   their letter motion to supplement.

1          THE COURT:  Okay.  And just give me a quick summary of

2     what the reasons for opposing the supplemental complaint.

3          MS. PANAGOPOULOU:  There are various

4     reasons, including the prejudice to the defendants, the

5     discovery that will be required to defend the claims, but the

6     main reason is that we contend that the proposed supplemental

7     claims are futile, and they wouldn't survive a 12(b)(6) motion

8     to dismiss.

9          Particularly, plaintiff has brought a defamation claim

10    many times before.  They've amended their complaint twice.  The

11    defamation claim in their second amended complaint was

12    dismissed.  They brought a motion for reconsideration.  The

13    part of their motion arguing for the reinstatement of the

14    defamation claim was denied again on review by Judge Torres,

15    and now, their newfound defamation claim rests on statements by

16    Peter Gelb on the same subject matter, which is whether or not

17    Netrebko was, essentially, a Putin supporter.  That has been

18    something that has already been adjudicated by this court and

19    should not be adjudicated again.

20         THE COURT:  Right, but the supplemental complaint

21    raises new statements, right?  It's not rearguing that there

22    were old statements.  It's about new events, and so those would

23    have to be considered separately, right?

24         MS. PANAGOPOULOU:  Well, it's new statements, but the

25    basis for these statements are, essentially, what transpired

1    during the time when the Met terminated Netrebko.  So, the

2    statements that Peter Gelb made are very similar to statements

3    he had made previous to the press, and those statements were

4    held by Judge Torres not to be defamatory.

5         There are other reasons why we believe the defamation

6    claims would fail, including lack of special damages, lack of

7    actual malice, and we go into that in our opposition.

8         THE COURT:  Okay.

9         MS. McCREA:  As far as the retaliation claims are

10   concerned, their main claim is that the alleged defamatory

11   statements were made in retaliation of Netrebko having filed

12   this lawsuit.  But in order to be able to plead

13   retaliation, you need to be able, amongst other things, to show

14   two things: a materially adverse action, and you need to show

15   that the materially adverse action was causally connected to

16   the protected activity.

17        In this case, the protected activity is plaintiff's

18   filing of the instant suit.  But Peter Gelb is the general

19   manager of the Met.  He has been speaking publicly on behalf of

20   the Met for the past 20 years.  He has done so three years ago

21   when Anna Netrebko was first discharged from the Met, and he

22   has done so more recently when he was called by newspapers for

23   interviews and the subject came up.

24        The Met never published any articles defaming

25   Netrebko.  They never made any statements regarding Netrebko.

1    When it's been other journalists interviewing Gelb, Gelb, in

2    his capacity as the Met's general manager has made statements

3    in response with respect to Netrebko, as she's one of the

4    world's most famous opera singers and a former worker at the

5    Met who worked there for almost 20 years, so these are also

6    matters of public importance.

7         THE COURT:  Okay.  Talk to me about the other reasons.

8         MS. PANAGOPOULOU:  What do you mean, the other

9    reasons?

10         (Counsel conferred)

11         MS. PANAGOPOULOU:  The reasons why we believe the

12    retaliation and the defamation claims would be futile?

13         THE COURT:  No.

14         You started by saying, I believe it would be under

15    15(b) that there be there would be prejudice to the

16    defendant, it would involve a lot of discovery, and it would be

17    futile.  We just talked about futility.  I have a sense of what

18    the futility arguments would be.  Talk to me about prejudice

19    and discovery, and how those might be ameliorated.

20         MS. PANAGOPOULOU:  Yes.  Thank you, your Honor.  Thank

21    you for the clarification.

22         So, as your Honor correctly observed, these statements

23    that Gelb made to the press, they're all statements that he

24    made post the filing of the second amended complaint.

25         When we were conducting discovery, we agreed upon a

1    very extensive ESI protocol whereby we limited custodians and

2    we limited searches, and most importantly, we limited the time

3    period for the search.  Now, if we are going to have to redo

4    this again and have to pull up discovery from any statements

5    Peter Gelb made to the press for the last three years, that

6    expands, maybe significantly, the scope of discovery, because

7    at issue here is not simply the five or ten articles listed in

8    plaintiff's supplemental complaint.  There are also other

9    publications out there of other interviews that Gelb made that

10    did not reference Netrebko whatsoever.  These are relevant, as

11    they go to state of mind.

12        There are also other publications out there where

13    Peter Gelb was not involved, but those publications talk about

14    Netrebko's ties to Putin.  They talk about other opera houses'

15    perspective as to whether or not they should be hiring

16    Netrebko.  They talk about protests that they face from the

17    public regarding engaging Netrebko.  And all of that, all of

18    that information becomes relevant if we're going to be pursuing

19    what they term as a post-complaint defamation claim.

20        MR. SHILOH:  Your Honor, may I be permitted to

21    supplement my colleague's position?

22        THE COURT:  Of course.

23        MR. SHILOH:  Peter Gelb is the figurehead of the New

24    York Metropolitan Opera for over two decades.  He travels

25    around the world regularly as an ambassador to the world of

1    opera as well as to the New York Metropolitan Opera.  He sits

2    in interviews regularly where they ask him about the state of

3    opera, productions taking place around the world at different

4    opera houses as well as in New York, the successful productions

5    as well as the flops.

6          And, in the world of opera, there's only a limited

7    amount of hot news, but -- not to say that all news related to

8    opera isn't hot -- but in this particular instance, and with

9    the backdrop of Russia's invasion of Ukraine and Anna Netrebko

10   being a staunch supporter of Vladimir Putin who has -- this

11   court has found her being a staunch supporter of Vladimir

12   Putin, and in the motion to dismiss and not dismissing some of

13   the statements that were made and in the previous arbitration

14   -- and at times, there are questions that are posed to Peter

15   Gelb saying, you know, are you still standing firmly behind

16   your decision or, what do you think about the Palm Beach Opera

17   House permitting Anna Netrebko?

18          And for the most part, his statements have been short,

19   concise, and have also related back to the previous statements

20   that he had made prior to the lawsuit being filed, which were

21   -- those defamation claims themselves were found to be

22   dismissed.

23          This supplemental pleading is trying to create a brand

24   new lawsuit and a third bite of the apple.  And to go back and

25   now to run further searches -- and while my colleague on the

1    other side of the table stated that the remaining discovery

2    isn't going to be that expensive, well, it is.  Because that

3    absorption of the review is conducted by the New York

4    Metropolitan Opera, and their coffers are covering the cost of

5    that further review.

6         And the futility argument directly goes to the thrust

7    of why we shouldn't have to proceed forward with a further

8    review of further ESI production, a further review of every

9    single communication Mr. Gelb had with a journalist from around

10   the world, the translations between the foreign language that

11   periodical was written in, the further review of emails and

12   running searches.

13        And while counsel may believe that this isn't going to

14   back us up, it not only will back us up, but at the same

15   time, this case has to move forward.  We have individuals that

16   are listed to be deposed in October, in November, in December.

17   And what is actually right, which is the claims in this case --

18   in the underlying case -- that's the subject of the discovery

19   that we are here for today.

20        And putting aside the fact that some of the statements

21   that they're now drawing upon, which were made over a year ago

22   and now are being brought to the court's attention today

23   are outside of statute of limitations and all of our failure to

24   state a cause of action arguments, just because they have a

25   hunch and they want to proceed forward with discovery doesn't

1      mean that this court should order that discovery to proceed

2      forward.  There's not enough there, because the same arguments

3      or the same position they're taking is a position that they had

4      previously lost on.

5            And that's why we're kind of drawing a line in the

6      sand and saying, no.  We've literally opened the -- pulled back

7      the curtain, using a pun.  We've pulled back the curtain

8      figuratively and literally.  We've given them everything.  We

9      ran the searches on the custodian.

10            Even with the majority of her case tossed out on a

11     motion to dismiss, we still ran the same searches.  We didn't

12     even say, most of your claims have been dismissed, therefore,

13     no, no, no.  We now need a subset of what you actually wanted

14     to look for.  We didn't do that.  We spent hundreds of hours in

15     review.  Hundreds of thousands of documents have been produced.

16     Thousands of documents have been translated.  We've

17     participated in multiple meet and confers in good faith.

18            And we appreciate the good faith presented by our

19     adversary when we try to work out issues, but on this

20     particular issue, there's a difference.  It's not an actual

21     claim.  It's -- we have strong arguments to make as far as the

22     prejudice and expense and the burdensome arguments that go

23     along with why you shouldn't have to proceed forward with

24     something.

25            Because, again, it's not a real claim.  Who knows if

1    it will lead to anything, because it's not before this court,

2    other than an application.

3              Thank you, your Honor.

4              THE COURT:  Okay.  All right.  So, I'm just going to

5    throw a few hypotheticals out there, and we could talk about

6    what might happen next.  For example, I am mindful of the

7    length of discovery.  And I do think that the last time we were

8    here -- and the parties have represented that you were nearly

9    done with discovery.

10             So, I would like to explore whether you could willing

11   to consent to supplementing and then file a motion to dismiss.

12   And we would stay any new discovery on the supplemental

13   complaint while that is pending.

14             The other thought or concern I would have is -- and

15   the reason why I'm asking that is that, if the post-complaint

16   activity does not need to relate back, then,

17   theoretically, there would be nothing stopping this plaintiff

18   from filing a completely separate complaint, a separate action,

19   and try to move forward on it, which, unfortunately, I have

20   seen that happen in cases where there are parties that are

21   really not willing to stop.

22             And if Mr. Gelb, in his role, is frequently asked to

23   comment on such things, it seems to me that this might be a

24   problem that your clients would face even if the supplemental

25   complaint were not permitted.

```
1              So, I am wondering if there is a way that gets you
2     through this case in a way that mitigates or minimizes the
3     burden -- and particularly the burden on discovery -- that
4     allows you to complete the discovery on the complaint as
5     narrowed here and that these later claims, if they get
6     addressed, get addressed later and that discovery happens
7     later.
8              Another thought -- and this is a question, I think,
9     principally, for defendants -- is, if you were to prevail on
10    the complaint, if you were to win on the merits on the
11    complaint as it stands and as it's narrowed --
12             MR. SHILOH:  The underlying complaint.
13             THE COURT:  The complaint as it stands right now,
14    because no leave has been granted for any of the supplemental
15    claims -- if you were to win on the merits, would a decision on
16    the merits operate to preclude or to estop these post-complaint
17    statements in such a way that your clients get the closure they
18    need, given what we're now seeing is the dynamic
19    post-complaint?
20             MR. SHILOH:  A ruling in favor of my client on the
21    underlying complaint would establish that the decision that
22    they made surrounding their separation from Ms. Netrebko has
23    merit.
24             Taking one step further this hypothetical that we're
25    discussing, in saying then there were then this outstanding new
```

1    lawsuit that's filed relating to these statements, the court's

2    adjudication on the merits would, I think it would moot the

3    complaint, the new complaint that would then be filed.

4         That's number one.  I'm kind of just talking out loud.

5         THE COURT:  Mm-hmm.

6         MR. SHILOH:  Number two -- and I don't know if your

7    Honor wants me to address this point based on the first

8    hypothetical that you gave.

9         Your Honor said, Elior, would your client be willing

10   to consent to the filing of the supplemental pleading then

11   proceed forward with your motion to dismiss, but then discovery

12   relating to that supplemental pleading is going to be stayed,

13   and then we're going to explore discovery based on the

14   decision.

15        Do I have that accurate, your Honor?

16        THE COURT:  Somewhat.

17        And with the idea that in the meantime, we may come to

18   a different conclusion among the parties here, that if, indeed,

19   a ruling on the merits of the instant suit and the claims that

20   are live right now, if they might moot the new complaint, then

21   maybe the discovery stay would extend further.

22        MR. SHILOH:  Your practical approach makes complete

23   sense.  I'm a big fan of a rational, logic, practical approach:

24   Why have to file motions, why kick things up and create more

25   delay.

1            The difference is that in this instance, we're

2    presented with a scenario and landscape where these very claims

3    were already dismissed and then on a motion for

4    reconsideration, these claims were dismissed, and the same

5    arguments, while the statements may have been made

6    post-complaint, the very legal arguments are the same to a

7    certain extent without -- and in my colleague's opposition that

8    she filed last night touches on those points, and I think

9    that's why it makes it necessary to still go through the motion

10   seeking leave process then followed by if there's an actual

11   filing of a 12(b)(6).

12           I like trying to be creative and not wasting the

13   parties' time, but in this instance, because of the history

14   surrounding the same exact statements of the same nature, just

15   stated at a different point in time, I think that the practical

16   approach doesn't apply here.

17           THE COURT:  Let me hear from plaintiffs on this point.

18           MS. GORYCKI:  Your Honor, the supplemental pleading is

19   in no way identical to the past claims.  The statements made by

20   Mr. Gelb are quite different.  They're based on the timing of

21   what he knew and what he was saying about Ms. Netrebko's public

22   position on Russia and Putin.

23           We also have a retaliation claim that was not brought

24   before, based on his repeated statements, false and disparaging

25   statements about Netrebko that do not stop.

1          Most recently, we learned that he's going to be part

2     of a podcast discussing her upcoming performances at the

3     British Royal Opera.  I do not believe, your Honor, that a

4     decision on the merits on national origin and gender

5     discrimination will moot the new claims for defamation and

6     retaliation that relate to post-complaint conduct.

7          I also do not believe this is a *res judicata* issue, as

8     defendants assert in their responsive letter.

9          We are always willing to cooperate, of course, your

10    Honor, but if they are not willing to accept the supplemental

11    pleading, obviously, we're at an impasse there.

12         I'd also like to point out that defendants did not

13    produce 100,000 pages or 100,000 documents.  They've produced

14    less than 2,000, limited at present to two custodians.  And I

15    did not hear any specifics, really, about proportionality or

16    burden on the new discover, and I do believe it would be quite

17    narrower than they're proposing.

18         Many articles about the Ukraine-Russia conflict, about

19    Netrebko, about the Met Opera's position on Ukraine have been

20    produced in discovery and actually in plaintiff's

21    production, so I think we could come to an agreement on a very

22    narrow scope just related to the new claims, should they go

23    forward.

24         THE COURT:  Well, what about my thought on staying

25    discovery on the new claims?

```
 1              MS. GORYCKI:  We would be open to that, your Honor.

 2              MS. PANAGOPOULOU:  Your Honor, may I just respond to a

 3    couple of points?

 4              THE COURT:  Sure.

 5              MS. PANAGOPOULOU:  I just want to clarify.  I don't

 6    think we've ever stated that we produced 100,000 documents.  We

 7    have stated that we have reviewed 20,700 documents.  Those were

 8    separate documents, and the number of pages we reviewed

 9    actually exceeded 100,000 documents.  That's something that can

10    be verified by our discovery vendor.  Out of those, we produced

11    the relevant communications that corresponded to the search

12    terms and also were responsive to their discovery demands.

13    Those were just our ESI searches.  Of course, we produced

14    independent documents such as board minutes of the Met.

15              The second point I wanted to make is, I don't believe

16    we needed a motion for us to go through the motion practice of

17    a motion to dismiss in order for the newfound claims to be

18    adjudicated.  I believe Judge Torres has the power, upon

19    reviewing their application for a motion to amend and our

20    opposition, to say:  I'm not going to grant your

21    application, because should it be allowed to proceed, the

22    claims would be subject to dismissal as a matter of law under a

23    12(b)(6) motion to dismiss.

24              THE COURT:  Rule 15(b) says, on motion and reasonable

25    notice.  These letters are not motions, especially if you're
```

1    taking on as seriously an argument as futility.

2         So, what I would have done, if we can't reach some

3    kind of on agreement on a permission to supplement and then

4    stay discovery on all of those claims pending a motion to

5    dismiss or something like that, is that there would be a motion

6    to supplement under Rule 15(d).

7         And I have not done the research yet, but here's the

8    challenge with the referral.  On a motion to supplement or a

9    motion to amend, it generally, in the first instance, does go

10   to the magistrate judge, because it's not really dispositive

11   because there is a claim and there are claims that are

12   proceeding.  However, if a defendant brings in a futility

13   argument, the claims would be subject to dismissal because they

14   are futile.  They would not survive a 12(b)(6) standard.  Then

15   that injects the motion to dismiss and the merits part of that

16   into the decision on the supplementation.

17        What then what happens is -- and I've done this

18   before -- is, I have granted or denied leave to amend where it

19   is procedural.  But if a futility argument is brought in, is

20   injected in the opposition to the motion to supplement, then it

21   goes to the merits.  It becomes a little bit of a mixed

22   motion, and that's what I'm trying to clear up for me and for

23   Judge Torres about who's doing what, who needs to do what and

24   on which timeline.

25        And if we were to plead the two together, which is

1    possible -- I mean, do a motion and brief it together -- it

2    would be motion to supplement, opposition, based on the

3    proposed supplemental complaint.  You know, there's these

4    procedural reasons why it should not be allowed, but there's

5    also this substantive merits-based reason, which is, if certain

6    issues were previously decided, and even if they're not,

7    they're not pleaded properly and would not survive a 12(b)(6),

8    that essentially becomes your brief on your motion to

9    dismiss, right?  Then their reply to supplement also becomes an

10   opposition to the motion to dismiss, right?

11         The sort of motion to dismiss before the supplemental

12   complaint's actually been filed and then there's a reply.  So

13   there would be four rounds of briefing, a surreply to the

14   motion to supplement, which is, in essence, the reply on your

15   motion to dismiss.  And because if the briefing being briefed

16   together, it really is a surreply, and it really will start to

17   make things very complicated.  That's why I was trying to

18   really break the two out.

19         And also, not for nothing, but, they could just file a

20   separate complaint, which would probably be designated as

21   related.  It would then be referred to me, and I would stay

22   that entire complaint, pending decision here.

23         So that's why I'm trying to get to a situation where

24   it gets your case, the main case and the claims that survive

25   right now, to a merits decision as quickly as possible and with

1    the least amount of delay, prejudice to the parties, since you

2    are largely done with discovery.

3           And with that, I see counsel standing up, so why don't

4    you respond.

5           MR. SHILOH:  I understand the court's reasoning and

6    what it's proposing and how much thought is being put in and

7    the reasons why.

8           With the court's permission, I'd like to opportunity

9    to speak to my client, share with him the court's proposal and

10   the reasons why.  And if the court would entertain us coming

11   back, say, Thursday, or -- you know, I haven't looked at my

12   calendar, but I'm just throwing out a date or any date that's

13   available for all the parties as well as the court, we could

14   then address this limited issue.  Or maybe if the Court would

15   rather have a conference call or something along those lines

16   for this -- I don't want to call it a narrow issue because it's

17   a big issue, but it's a narrow issue for purposes of today's

18   conference.

19          THE COURT:  Exactly.  I mean, it's an issue that can

20   sort of turn this case and add other things.  It's complicating

21   things.  It's largely procedural, but I do hear what you're

22   saying about the merits.

23          I also would like you to meet and confer with each

24   other about this, because I think you see where I'm going.

25          Why don't you do this.  I'm willing to also take this

```
 1    to sort of confidential settlement with a little "S" purposes.
 2    In other words, you could file a joint status letter if you
 3    both manage to agree on how you wish to proceed.  If there are
 4    things that defendants, in particular, would like to discuss
 5    about what the challenges are to reaching a settlement
 6    agreement that you think should be covered by Rule 408. you may
 7    also send an ex parte email.  However, I would generally prefer
 8    that you find a way to clear this up procedurally.
 9              And if it turns out that you need to brief the
10    issue, then give me a proposed briefing schedule on whether
11    it's a motion to supplement concurrent with folding in the
12    briefing on futility/12(b)(6) standards or an agreement on the
13    date a supplemental proceeding may be filed, and then a
14    briefing, a proposed briefing schedule on your mission to
15    dismiss.
16              If you agree on the supplemental complaint to be
17    filed, I expect that it will not be broader than the proposed
18    supplemental complaint.
19              MS. GORYCKI:  Understood.
20              THE COURT:  But it may be and is encouraged to be
21    narrower.  And here, I will give you a little bit of my own
22    view.  But I'm not deciding the motion, so you can take it as
23    guidance or not.
24              I'm really concerned about the defamation claims being
25    subject to dismissal because this is a broad public issue.
```

```
1    Similar claims on similar statements have been dismissed and
2    denied reconsideration, so those are not the things that I
3    think should be clogging up, and those are the types of claims
4    that I think are more likely to get dismissed again.  And I'm
5    concerned for that, and I'm concerned that this will be a waste
6    of time. It will certainly a waste of defendants' resources to
7    have to brief that.
8            The retaliation issues, on the other hand, are
9    new, because they relate in timing and they relate to,
10   potentially, an animus.  And I'm not opining on the merits of
11   that, because I have not reviewed the supplemental complaint in
12   detail and, certainly, you know the case and the facts better.
13           But, generally, retaliation claims can survive a
14   motion to dismiss more readily than the underlying
15   discrimination or other substantive claim about the statements
16   or the action taken themselves.  That's why I'm saying, if you
17   agree on filing a supplemental pleading, your joint status
18   letter will have a proposed date by which that will be done.
19   and it will include a red line to the current proposed
20   supplemental pleading so that I know that it's not expanding
21   and it's only narrowing.  So you have up to the breadth of, but
22   you're not going to discuss and you're not going to bring
23   anything new in.
24           MS. GORYCKI:  Understood, your Honor.
25           THE COURT:  Go ahead, Mr. Shiloh.
```

1              MR. SHILOH:  Your Honor, the parties consent to your

2    Honor adjudicating the procedural portion as well as the merits

3    portion.

4              Would that clean up the issue?  Because --

5              THE COURT:  It would certainly clean up the issue.

6              MR. SHILOH:  Are we permitted to -- I can't speak for

7    my --

8              THE COURT:  Consent to a motion only or consent for

9    all purposes.

10             MR. SHILOH:  For this motion.

11             THE COURT:  Yes.

12             So, here's how it works.  You are permitted.  You can

13   use the same consent form to consent to my adjudicating the

14   motion only.  You may also consent to my jurisdiction for all

15   purposes.  Generally, I give that spiel at the end of the

16   conference, not in the middle of the conference, but I say I'm

17   happy to do it.

18             MR. SHILOH:  The back and forth that you were saying

19   -- I said, this court is able to rule on everything, so it will

20   be something that we will -- I just first wanted to make sure

21   we were permitted to request this Court's jurisdiction over the

22   entire application, but I'd have to speak about it with my --

23             THE COURT:  Yes.  They certainly have to consent, and

24   I'm certainly happy to do that.  And I will say, if you were to

25   do that, it would certainly make things much simpler.  And I

1  think Judge Torres, as much as she loves you, would be happy to

2  have a case taken off of her docket if you were to consent for

3  all purposes.

4          MR. SHILOH:  For the whole case, or just this motion.

5          THE COURT:  Either.

6          MR. SHILOH:  Play.

7          THE COURT:  I think it's a little more complicated

8  with just the motion, because -- well, it might not be because

9  the rest of it stays with Judge Torres, but I've seen that

10 happen as well.

11         If you do consent only for the motion, I would suggest

12 you make that very clear in the form, and then we can handle it

13 that way, too.

14         But I'll give you one little plug right now is, I'm

15 happy to do it.  Obviously I'm going to be managing discovery.

16 I have been managing discovery, and that's what we'll talk

17 about in the remaining time for the conference.  But, yeah, do

18 consider that.

19         I hadn't even thought of that, actually, since you've

20 been with Judge Torres so long, and I haven't seen you since

21 last Fall.

22         So do consider -- oh, right.  So, the last time I saw

23 you, you had your motion for reconsideration pending I think,

24 so I didn't want to disturb that, which is why we didn't talk

25 about it.

1          But, do consider consent for all purposes.  Any appeal

2     goes to the Second Circuit, so it kind of skips the district

3     judge part.  So, free to do it.  Happy to do it.

4          So, here's what I'd do.  Why don't you just give you

5     August 28 for a status, update on the status of the

6     supplemental complaint and your proposed briefing around that.

7          You can and should also consider consent, as

8     Mr. Shiloh raised, whether it's to the motion or for all

9     purposes.

10          So what I'll could is, in the post-conference order,

11     it will simply say, joint status letter due August 28 regarding

12     the supplemental complaint issues.

13          So, where are we in discovery?  It sounds like you

14     have depositions scheduled for October?

15          MS. GORYCKI:  October, through December, your Honor.

16          THE COURT:  Okay.

17          MS. GORYCKI:  With the exception of the employees that

18     are the subject of our dispute.  Mr. Gelb and Anna Netrebko are

19     scheduled for December as well as the Met Opera 30(b)(6), as

20     well as Judith Neuhoff, a non-party who I believe will be

21     available for deposition, but we have not scheduled her yet.

22          THE COURT:  Okay.  But right now, the remaining

23     depositions are scheduled for October through December.

24          MS. GORYCKI:  Yes.

25          THE COURT:  Okay.  And after -- assume, for now, that

1    if there's a supplemental complaint or even a new case filed,

2    that discovery is stayed.

3         MS. GORYCKI:  As to that portion, as to the

4    supplemental complaint.  Yes.

5         THE COURT:  Then, does extending the fact discovery

6    deadline through some date in December finish discovery in this

7    case.

8         MS. PANAGOPOULOU:  We had asked for discovery to be

9    extended for fact discovery to be extended until middle of

10   January for all depositions to be completed.

11        THE COURT:  Okay.  So what is still outstanding that

12   you might have to clean up in mid-January?

13        MS. PANAGOPOULOU:  So, the depositions are scheduled

14   to take place, all of them to finish by the end of December.

15   There might be some supplemental document requests that arise

16   out of the depositions.

17        And then there are a few disputes regarding documents

18   between the parties.  There's a potential dispute we might be

19   bringing to the court in the next three weeks regarding

20   plaintiff's document production.

21        THE COURT:  Okay.  So I'm going to extend the fact

22   discovery to January 13.  That's the Friday before MLK weekend.

23        All right.  Do you also have a ripe ESI dispute now?

24        MS. GORYCKI:  Yes, your Honor.

25        THE COURT:  Is that the only dispute that's ripe right

1   now?

2          MS. GORYCKI:  Yes, your Honor.

3          THE COURT:  Okay.  You want to give me a quick summary

4   of it?

5          MS. GORYCKI:  Yes, your Honor.

6          So, the parties initially agreed to have defendants

7   collect ESI for two custodians, Peter Gelb and Michael Heaston.

8   Initially, plaintiff's counsel had proposed ten custodians and

9   upon agreement, has narrowed it down do two.

10         There are three Met employees, Lee Abrahamian, Gilly

11  Brierley and Matt Dobkin, who were engaged in extensive

12  communications with Mr. Gelb surrounding Ms. Netrebko's

13  termination.

14         As you're aware, your Honor -- or you may be from the

15  facts of this case -- this is a bit unique in terms of

16  discrimination, because Ms. Netrebko was terminated via the

17  press, first in a press release issued on March 3 and then a

18  statement made by Mr. Gelb, to the New York Times, thereafter.

19         In the documents already produced, we can see that

20  these three employees were involved in decision-making process

21  with Mr. Gelb, meaning: the crafting of the statements;

22  advising him on language usage; phone calls with PR firms that

23  were doing crisis communications; discussions about

24  similarly-situated comparators, including a Russian male opera

25  singer, as well as a Russian female, as well as conversations

1    about a Ukrainian female opera singer.

2         Dobkin and Brierley had phone conversations that are

3    referenced in the email communications with Mr. Gelb that have

4    already been produced.  There are also references to phone

5    calls they had with each other about discussions with Mr. Gelb.

6    And therefore, we requested that defendants, using the agreed

7    upon search terms, which are narrowly crafted, go back and

8    collect ESI, email communications from Brierley, Dobkin, and

9    Abrahamian.

10         They have represented to the court, your Honor, in

11   their response to our letter motion, that these people were

12   simply involved in advertising and selling tickets through

13   press coverage, but the documentation that's already been

14   produced readily disputes that.  It contradicts it.

15         So, we believe that there is relevant information to

16   be discovered, your Honor, that concerns the decision-making

17   process and Mr. Gelb's state of mind and the motives for the

18   gender and national origin discrimination claims that are in

19   this case.

20         THE COURT:  And you haven't done any depositions yet?

21         MS. GORYCKI:  No, your Honor.

22         THE COURT:  Okay.  Let me hear from defendants.

23         MS. PANAGOPOULOU:  Yes, your Honor.

24         Just to respond to a couple of these points, first of

25   all, let me just say, all three employees were employees of the

1    marketing and communications department.  They are not involved

2    in hiring any artist for the Met.  They were not involved in

3    any decision to hire or fire any artist for the Met.  And their

4    sole purpose with respect to communicating with the press was

5    to advertise and sell shows for the Met.

6             THE COURT:  Okay.

7             MS. PANAGOPOULOU:  In the event that they had to speak

8    to the press regarding Netrebko, those statements had to be

9    preapproved by Mr. Gelb.

10            Yes, counsel is correct that there were some very

11   limited communications in which Peter Gelb and these employees

12   went back and forth regarding the specific language that is

13   going to be used to communicate to the press Netrebko's

14   termination.

15            Plaintiffs have those communications.  Why?  Because

16   we performed ESI searches across Mr. Gelb's accounts, and we

17   produced all these materials to them.  That's how they have

18   these emails.  There's nothing in the thousands of documents

19   that we've produced that suggests that these employees had any

20   type of involvement in Netrebko's termination or in the

21   continued employment of other Russian artists in the Met.

22            The other point that I wanted to make is that we also

23   have not withheld any documents regarding or that involve these

24   employees, all communications between Gelb and these employees

25   that plaintiff is concerned about.

```
1              THE COURT:  Essentially, what you're saying is that
2    any of these communications with either be irrelevant or
3    duplicative, right?
4              MS. PANAGOPOULOU:  That's what I'm saying.
5              THE COURT:  Because if they're talking amongst
6    themselves:  Hey, you want to go get lunch?  Yeah, I really
7    don't like that Netrebko lady, that's irrelevant, because
8    whatever they personally thought had nothing to do with the
9    termination, right?
10             MS. PANAGOPOULOU:  Exactly.  All the communications --
11             THE COURT:  And if there were communications between
12   these individuals and Mr. Gelb, who had to approve anything
13   that was publicly stated, who had to approve the decision, they
14   had to go through Mr. Gelb, and Mr. Gelb would have been
15   the custodian, so anything else would be duplicative.
16             MS. PANAGOPOULOU:  Yes.
17             And those communications have been produced, and
18   that's how they have them.
19             THE COURT:  Right.  Okay.  Let me hear from plaintiff.
20             MR. SHILOH:  Your Honor, can I just supplement one
21   further point by my colleague?
22             THE COURT:  Sure.  Go ahead.
23             MR. SHILOH:  We understand the representation that
24   we're make as to why we shouldn't produce this, and we
25   understand that we take a lot of responsibility in making this
```

1    statement.  And we stand behind this statement, and they'll

2    have an opportunity to depose Michael Heaston, Peter Gelb, and

3    the corporate representative, and they'll also be permitted to

4    ask pointed, specific questions as to the communications where

5    these individuals are copied asking them how involved are they,

6    what did they do.

7              THE COURT:  I agree with you.

8              MR. SHILOH:  And if all of a sudden --

9              THE COURT:  I'm agreeing with you.  You don't need to

10   keep arguing.

11             Go ahead, plaintiff's counsel.

12             MS. GORYCKI:  Your Honor, they have actually withheld

13   communications, particularly about New York Times articles with

14   Mr. Gelb.  There are categories of information that have not

15   been --

16             THE COURT:  Well, wait.  They've withheld a New York

17   Times article?  That's publicly-available information.

18             MS. GORYCKI:  They're saying that they haven't

19   withheld any documents or communications.  That's not the case.

20             THE COURT:  Wait.  But I don't want to argue about

21   something that is completely irrelevant and unnecessary.  Okay?

22             If you're saying they didn't produce a New York Times

23   article, you can access the New York Times article.  Tell me

24   what it is that you don't have that they have withheld.

25             MS. GORYCKI:  Communications between Gilly Brierley

1    and the reporter at the New York Times who interviewed Mr. Gelb

2    in February of 2020.

3           THE COURT:  Why does that matter?

4           MS. GORYCKI:  Because it -- the communications with

5    Ms. Brierley to the New York Times about what Mr. Gelb directed

6    her or discussed with her or how the message was to be

7    communicated about Ms. Netrebko's termination are relevant to

8    state of mind and discriminatory motive.

9           THE COURT:  But you get better evidence from just

10   deposing Mr. Gelb and looking at Mr. Gelb's communications and

11   his statements.  That's what this case is about.

12          MS. GORYCKI:  Well, your Honor, it's not clear --

13          THE COURT:  No.

14          MS. GORYCKI:  The defendant in this case --

15          THE COURT:  No.  Here's my ruling, because we don't

16   need to argue about this anymore.  No.

17          You can ask the questions you're going to ask of

18   Mr. Gelb at his deposition, at Met opera's 30(b)(6), of other

19   witnesses that you have deposed.

20          But based on counsel's representation that these three

21   custodians, these three individuals would have had to pass any

22   decision through Mr. Gelb, would have had to get approval for

23   any public statement through Mr. Gelb, and you have Mr. Gelb's

24   side of those documents and those communications, that's

25   sufficient.

1          If they're talking among themselves and Mr. Gelb isn't

2     copied, and he's not aware of what they're talking about, it

3     does not go to state of mind of Mr. Gelb.  And then as to state

4     of mind of the Metropolitan Opera, that is exactly what the

5     30(b)(6) deposition is for.

6          Okay.  That's my ruling.  It's denied.

7          MS. GORYCKI:  Your Honor, I just want to.

8          THE COURT:  What do we have next?

9          MS. GORYCKI:  What about the depositions of these

10    witnesses, your Honor?  They also refused.

11         THE COURT:  I thought they were rescheduled.

12         MS. GORYCKI:  They said they will not allow us to

13    depose these witnesses until after Mr. Gelb's deposition,

14    including based on the documents that I just discussed with you

15    about phone calls and discussions with Mr. Gelb about the

16    decision.

17         So, they will not allow us to depose them until after

18    Mr. Gelb's deposition if they see fit to allow us to do so.

19    That's their position.

20         THE COURT:  So, they're reserving decision on whether

21    Abrahamian, Brierley, and Dobkin should be deposed?

22         MS. GORYCKI:  Yes, your Honor.

23         THE COURT:  Okay.  That's a fight for later.  Let's

24    see what happens at the depositions of the principal people

25    that you've agreed depose.  You have their documents.  You have

1    their depositions scheduled.  Let's see what turns up.

2            Because this case has gone on for quite some time.  I

3    do not want this to be the ever-expanding discovery and

4    ever-expanding case.  There are specific, clear claims that

5    survive here on discrimination.  We want to hear about them.

6    The events happened years ago.  I would think that everyone

7    would like to get to determination of the merits at this point.

8            So, my goal is to get you there.  Whether you consent

9    to my jurisdiction for a forthcoming motion, whether you

10    consent for all purposes, whether you agree or don't agree to

11    bring in a supplemental completing or, God forbid, file another

12    case, you know, all of those are not the issue right now.

13            What I have before me right now is a very discrete set

14    of claims and discovery that's been going on for a while.  I'm

15    extending the discovery deadline to January 13, 2026.  And

16    then, if we can't get anything else done, we'll get this part

17    done, okay.

18            MS. GORYCKI:  Understood, your Honor.

19            THE COURT:  And if you have any disputes that arise

20    from the discovery that you've gotten, that's what I'm here

21    for.  Okay?  All right.

22            Anything else we need to do at this time?

23            MS. GORYCKI:  Not on our side, your Honor.

24            MS. PANAGOPOULOU:  No, your Honor.

25            Thank you very much.

```
1                THE COURT:  Thank you very much.

2                We are adjourned.

3                (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```