
Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

December 16, 2022

By Email (hcearb@gmail.com)

Arbitrator Howard Edelman

Howard Z. Robbins
Member of the Firm
d +1.212.969.3912
f 212.969.2900
hrobbins@proskauer.com
www.proskauer.com

Re: American Guild of Musical Artists
        -and-
    The Metropolitan Opera (re: Anna Netrebko)

Dear Arbitrator Edelman:

We submit this memorandum in support of The Metropolitan Opera's ("The Met") position that the American Guild of Musical Artists ("AGMA" or "Union") has failed to carry its burden of proving that The Met violated the parties' collective bargaining agreement ("CBA") in terminating individual performance contracts (and paying compensation) of singer Anna Netrebko.

**Preliminary Statement**

Under the clear language of the CBA and the record in this case, The Met clearly had the right to terminate Anna Netrebko's individual performance contracts, as demonstrated below and at the hearing in this matter.

First, only contracts—not "holds"—can be deemed at issue in this proceeding. Holds are not enforceable contracts and no compensation can be owed based only on a hold.

Second, Ms. Netrebko should be found to have withdrawn from *Turandot* and *Don Carlo*, even if The Met had the right to terminate the contracts covering those engagements.

Third, The Met was within its rights, under the Standards of Conduct provision and general principles of New York law, to terminate Ms. Netrebko's contracts. More specifically:

As required under the Standards of Conduct provision, The Met relied on conduct in which Ms. Netrebko engaged after she entered into the relevant Standard Principal's Contracts. As in a continuing violation sexual harassment case—which AGMA acknowledged to be covered by (and even the main purpose of) the Standards of Conduct clause, referring to Placido Domingo—Ms. Netrebko's public statements after the invasion of Ukraine were inseparable from her previous public comments supportive of Vladimir Putin. It was *because* of her longstanding support for Putin that the music world expected Ms. Netrebko to distance herself from Putin after his invasion of Ukraine. Her tepid comments after the invasion effectively reaffirmed her prior allegiance and support.

**Proskauer»**

Arbitrator Howard Edelman
December 16, 2022
Page 2

      The Met also properly concluded that Ms. Netrebko's post-contractual conduct was "serious conduct . . . that threaten[ed] to . . . bring the Metropolitan Opera into disrepute or scandal" under the Standards of Conduct provision.  Ms. Netrebko's post-invasion comments, with their pointed refusal to condemn Putin in the face of widespread public consternation over her previous embrace of Russia's dictator, became a vastly more serious reputational problem.  Ms. Netrebko was initially shunned by almost all of the opera world, not just The Met.  The threat to The Met's reputation if it retained Ms. Netrebko was real, and The Met had negotiated the right to protect itself from that threat.  Although The Met strongly wished to continue its relationship with Ms. Netrebko, she rejected The Met's efforts to make that possible.

**Relevant Contracts and Contract Provisions**

*Collective Bargaining Agreement between The Met and AGMA* (Joint Exh. 1)

Section One, Article Fifth.E:

> Any agreement (including options) relating to the employment of any ARTIST BY THE Met shall be null and void and of no effect unless it is executed by ARTIST and the Met on a STANDARD FORM CONTRACT, provided, however, that any written agreement between the Met and any PRINCIPAL shall be binding to the full extent provided by law, provided:  . . .
>
> 2. Such agreement shall contain a provision that its terms shall be incorporated in the STANDARD PRINCIPALS CONTRACT and that it shall be subject to the provisions of the AGREEMENT in effect for the year to which such agreement pertains, and
>
> 3. Such agreement shall be filed with AGMA in accordance with Paragraph A.
>
> 4. The Met shall not be entitled to enforce such agreement unless it tenders to PRINCIPALS a STANDARD PRINCIPALS CONTRACT, in accordance with the terms of such agreement, prior to the date when PRINCIPALS' services are to begin.  Any such agreement made during the term of this AGREEMENT shall be enforceable against either PRINCIPALS or the Met only to the extent as would an agreement made on the STANDARD PRINCIPALS CONTRACT form at the same time.

Section Two, Article Fifth.N: Pay or Play Contract:

> Except as otherwise provided in this contract, the employment of Principal hereunder is not cancelable, and the compensation is "pay or play".

*2018 Memorandum of Agreement* (Joint Exh. 2)

> Section S:  <u>Morals Clause</u>

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 3

The parties agree that the Met and AGMA will discuss language of a Morals Clause.

*2021 Agreement*

The Met and AGMA agreed as part of their 2021 Memorandum of Agreement on the inclusion of a Standards of Conduct clause into all AGMA Artists' individual contracts. (Joint Exh. 4). The Standards of Conduct included the following text in paragraph 2:

> In the event that, following execution of the Artist's contract, the Metropolitan Opera becomes aware of serious conduct or serious allegations that threaten to or do bring the Metropolitan Opera into disrepute or scandal, including but not limited to sexual assault or harassment, criminal convictions (other than drug possession with no intent to distribute) or acts of moral turpitude, the Metropolitan Opera may, upon written notice, terminate this Agreement, in which event the Metropolitan Opera shall not have any further obligation to Artist, including any financial or other obligations such as travel or accommodation.

*Standard Principal Contracts*

At issue in this proceeding are the following Standard Principal's Contracts between The Met and Ms. Netrebko:

- An agreement dated January 31, 2019, concerning rehearsal and performance in the productions of *Salome* (in the fall of 2021) and *Turandot* in April and May of 2022. (Joint Exh. 13). This contract was amended in the summer of 2020 to remove the rehearsals and productions of *Salome*, reflecting Ms. Netrebko's decision to withdraw from that production because she did not think the role was right for her.[1] (Joint Exh. 14)

- An agreement dated March 9, 2021, concerning rehearsal and performance in the productions of *La Forza del Destino* and *Andrea Chenier* (all in 2024) (Joint Exh. 12)

- An agreement dated March 9, 2021, concerning rehearsal and performance in the productions of *Lohengrin* (in the fall of 2022) and *Don Carlo* (in the fall of 2023). (Joint Exh. 15) Ms. Netrebko subsequently withdrew from *Lohengrin*. (Joint Exh. 11)

The form Standard Principal's Contract (Per Performance) used in all contracts at issue between The Met and Ms. Netrebko includes the following provisions:

> This agreement is subject to and includes all the terms and conditions contained in the then current collective bargaining agreement between AGMA and The Met. …

---

[1] Met Opera cuts season by 3 1/2 months, to shorten some shows | AP News

Proskauer »

Arbitrator Howard Edelman
December 16, 2022
Page 4

> This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by The Met and Singer and only so long as the terms of the modification are not less favorable to Singer than as provided in the collective bargaining agreement between The Met and AGMA.
>
> This offer of agreement shall be binding upon The Met, and The Met reserves the right to withdraw its offer unless it is signed by Singer and returned to The Met no later than [date varies by production]. If The Met does not receive the signed agreement by said date, the offer shall be null and void unless reinstated by The Met in writing.

**Statement of Facts**

*The Metropolitan Opera and Its Relationship with Anna Netrebko*

The Metropolitan Opera is the largest performing arts organization in the United States, with a $300 million annual budget. (Tr. 111) The Met presents around 24 different operas each year, with up to seven performances of four different productions each week of its season, which runs from September to May. It is located in New York, but its footprint is national and international. Opera is an international art form, and many singers on the Met stage and other performing artists are from Western, Central and Eastern Europe, and the Met's Live in HD satellite broadcasts are beamed more than a thousand theaters around the globe.

One of opera's biggest stars of the recent era has been Russian soprano Anna Netrebko. Her career has been closely identified with the Met, almost as her "home" theater. She has performed at the Met more often than at any other opera house, has been in the opening night performance more than any other singer, and she has often appeared at the Met when it is presenting broadcasts that are being simulcast to theaters around the world as a Live in HD production. (Tr. 112-15)

Her current manager, Miguel Esteban, testified that Ms. Netrebko's relationship with The Met was "symbiotic," and that The Met had a "privileged relationship" with that "top seller" who was one of the few artists who could guarantee an almost full house. (Tr. 43-44) Ms. Netrebko, likewise, considered The Met a "second home," where she performed almost 200 times since 2007, including numerous season-opening performances. (Tr. 44)

Ms. Netrebko is a member of the AGMA bargaining unit at The Met. Her employment is governed by the CBA and her individual employment contracts, on the CBA's Standard Principal's Contract form, incorporate the Standards of Conduct provision that AGMA and The Met agreed upon in 2021. (Joint Exh. 4) The Met had previously sought to include such a morals clause in the 2018 collective bargaining negotiations, and in their 2018 Memorandum of Agreement the parties committed to discuss addition of a morals clause in the future. (Tr. 80-81;

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 5

Joint Exh. 3)  In the 2021 negotiations, the Met obtained such a clause in the Standards of Conduct.

*Ms. Netrebko's Public Support for Vladimir Putin, Before and After the Invasion of Ukraine*

Ms. Netrebko has for decades been an unabashed supporter of Vladimir Putin.  Ms. Netrebko has publicly embraced Mr. Putin and his authoritarian actions, including his undermining of Ukraine's sovereignty.  Among her public conduct prior to Russia's recent invasion of Ukraine was the following:

- In a 2011 Newsweek interview, while dismissing rumors that she was Putin's girlfriend, Ms. Netrebko stated that she'd "have loved to have been…He's a very attractive man. Such a strong, male energy."[2]  (Met Exhs. 2, 3)

- At an autograph signing after a May 2010 performance of "Carmen" in Vienna, Ms. Netrebko wore the ribbon of St. George (a notorious symbol of Russia's aggression in Ukraine) and a hand-made tank top that read "Towards Berlin!" (Met Exh. 2)

- In 2012, she signed on as one of Putin's 499 "trusted people," supporting his run for president, and campaigned for him in later elections as well.[3]  (Met Exh. 2)

- In 2014, she appeared at a press conference to make a donation to an opera house in Donetsk, in eastern Ukraine, and held up the separatist flag of Novorossiya (the area of eastern Ukraine under the control of pro-Russia separatists).[4]  (Met Exhs. 2, 3)

- Her Instagram account includes a post from 2015 praising Putin after the deadly attack on Metrojet Flight 9268, including a battalion emoji, and she added three emojis of an arm with a big bicep.[5] (Met Ex. 2)

---

[2] https://www.newsweek.com/anna-netrebko-opera-diva-die-67511

[3] https://www.news.at/a/russland-wahl-anna-netrebko-putin-318478?_ga=2.59383853.1467871367.1648655821-1832762300.1648655821

[4] https://www.theguardian.com/world/2014/dec/08/opera-singer-anna-netrebko-ukrainian-separatist-flag

[5]


After Putin ordered Russia's invasion of Ukraine on February 24, Ms. Netrebko quickly came under pressure from performing arts institutions around the world because of her longstanding support for Putin. In the face of this international pressure, on February 26, 2022, Ms. Netrebko posted on Instagram saying she opposed the war, but said nothing about Putin or whether Ukraine was wrongly attacked.

Ms. Netrebko made additional comments on Instagram that day—which she deleted by March 1—in which she further criticized those who wanted her to distance herself from Putin:

> It's especially despicable from people from the West, seated comfortably in their home, not fearing for their lives, to pretend to be brave and pretending to 'fight' by putting in trouble artists who asked for nothing. This is just hypocrisy of them. These people who think that being on the 'right side' allows them everything and excuses their unfair behavior are just human shits. They are as evil as blind aggressors. No matter which side they are from.[6]

(Joint Exh. 8; Met. Exh. 2, at p. 4; Met. Exh. 3, at p. 5)

The next day, February 27, 2022, the Met's General Manager, Peter Gelb, issued an announcement on Facebook that the Met would be suspending ties with (unnamed) Russian artists and institutions allied with Putin. There was speculation in the press that he was referring to Ms. Netrebko and to Valery Gergiev—a Russian conductor who had publicly allied himself with Putin—because Netrebko and Gergiev were widely understood to be Putin supporters. Mr. Gelb deliberately chose not to name any individual artists because he hoped his statement would help persuade Ms. Netrebko "to take a stand that would make it possible for [The Met] to continue working with her." (Tr. 119-20)

The entire world was also cutting ties with Russia as early as late February to early March of 2022. A wide range of companies, like Apple, Disney, McDonald's and Harley-Davidson, halted operations in Russia or stopped shipping products there. The Met was not alone among cultural institutions, with Carnegie Hall canceling performances by the Mariinsky Orchestra (whose conductor was Valery Gergiev, a noted Putin supporter), and Live Nation announcing that it would not promote shows in Russia or any Russia-based vendors.[7]

---

[6] https://twitter.com/zwoolfe/status/1497674011660238854/photo/1

[7] https://www.cbsnews.com/news/russia-ukraine-corporations-pull-out-invasion/ "*These are the companies that have pulled out of Russia since its invasion of Ukraine*, CBS News, *Moneywatch*, March 11, 2022.

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 7

      Mr. Gelb spoke numerous times in late February with Ms. Netrebko's longtime manager, Judith Neuhoff, who shared the Met's goal of working out a statement for Ms. Netrebko to make that would enable The Met to continue to work with her. (Tr. 120-21)

      On March 1, 2022, before the Met had made a decision regarding Ms. Netrebko's contracts, Ms. Netrebko announced she has "made the extremely difficult decision to withdraw from concerts until further notice." (Tr. 49, 70-73) Although the announcement referred to concerts, Ms. Netrebko withdrew from all scheduled opera performances through the spring. For example, Ms. Netrebko had been scheduled to perform at La Scala in a series of performances of *Adriana Lecouvreur* beginning on March 9 but she withdrew, writing on Instagram (contrary to a news report that her health was an issue), "Healthy, but NOT coming!" (Met Exh. 3, at p. 5) In her March 1 announcement, Ms. Netrebko also stated, "This is not the right time for me to be performing and making music. I hope my audience will understand this decision." On March 30, Ms. Netrebko announced on Instagram that "[a]fter taking my announced break, I will resume performing in late May, initially in Europe." (Joint Exh. 10)

      The Met nevertheless hoped that Ms. Netrebko would make a rehabilitative statement that would enable her to perform in upcoming performances scheduled at The Met; Ms. Netrebko was scheduled to perform in April and May in *Turandot* and in *Don Carlo* early the following season.

      On March 2, 2022, Mr. Gelb had additional telephone calls with Ms. Neuhoff about the inadequacy of Ms. Netrebko's February 26 statement. Ms. Neuhoff told Mr. Gelb that she had already spoken with Ms. Netrebko about the need for a stronger statement, and that Ms. Netrebko wanted more time to think about it.

      Ms. Netrebko did not make a statement against Putin, however. Instead, she reached out to Mr. Gelb that evening and said, "I'm sorry. I stand with my country." Mr. Gelb understood Ms. Netrebko to have rejected the request that she make a stronger statement to address her perceived support of Putin, and that she was withdrawing from upcoming performances at The Met. (Tr. 131)

      The next day, March 3, 2022, the Met announced that Ms. Netrebko had withdrawn from *Turandot* and *Don Carlo* (scheduled for the beginning of the next season, 2022-23). The Met immediately set about to find replacements for those roles, as top opera singers are generally booked years in advance. (Tr. 138-39)

      On March 28, 2022, as Ms. Netrebko had not changed her public position, the Met sent a further letter to Ms. Netrebko, canceling her contracts for the 2023/24 season. The letter also removed holds (informal requests that she hold certain dates, without a contractual commitment).

      The next day, March 29, 2022, Ms. Netrebko's new manager (as of mid-March), Miguel Esteban, wrote to Mr. Gelb in response to his March 28 letter, disputing the termination of any

agreements "beyond the performances for which Anna voluntarily withdrew." (Tr. 37, 70; Met Exh. 5)

## ARGUMENT

### THE MET HAD THE RIGHT TO TERMINATE CONTRACTS FROM WHICH MS. NETREBKO HAD NOT WITHDRAWN

**1. Only Contracts Are Binding, Not "Holds"**

Although AGMA seeks to include "holds" in this case, those are simply not contracts as to which Ms. Netrebko (or the Met) could have had any enforceable rights.

Holds are just what the term indicates—a placeholder on the calendar that may or not be followed by a binding contract. The CBA is clear that singers and other Artists may be engaged only through one of the form contracts appended to the CBA. (Joint Exh. 1, Section One, Article Fifth.E)

The form Standard Principal's Contract for per-performance singers that Ms. Netrebko and all other such singers sign before performing at The Met, provides that the contract must be signed and returned to The Met by a specified date for it to be valid. (Tr. 140-41; Joint Exhs. 12-15)

The Met has never paid a singer for a hold where the production did not ultimately go forward, and has never put a singer on stage based on just a hold; there is always a contract. (Tr. 140-41)

Mr. Esteban's testimony regarding holds, and his introduction of Ms. Netrebko's calendars, show only that Ms. Netrebko really did hold dates on her calendar. (Tr. 53-60) As Mr. Gelb explained, putting together an opera production involves getting commitments from many different individuals, and holds are used until The Met is confident that all those pieces can be locked into place; it is at that point that The Met issues contracts to confirm those informal commitments. (Tr. 140-41)

Just as some singers may have canceled holds to accept dates at The Met to replace Ms. Netrebko, Ms. Netrebko's own holds were not final or binding commitments. Mr. Esteban acknowledged that he had no basis to say whether Ms. Netrebko had removed holds, and that he was unaware of Ms. Netrebko ever having been compensated for a removed hold, or ever having performed at The Met without signed contract. (Tr. 68, 74) In fact, despite Mr. Esteban referring to holds as "sacrosanct," Ms. Netrebko had in recent years removed numerous holds and even contracted productions when she changed her mind about a role, including Met productions of *Aida, La Gioconda, Salome* and *Lohengrin*. (Tr. 53, 142-43)

Accordingly, the grievance should be dismissed insofar as it concerns holds.



Arbitrator Howard Edelman
December 16, 2022
Page 9

2. **Ms. Netrebko Voluntarily Withdrew from *Turandot* and *Don Carlo***

As reflected by Mr. Esteban's March 29 letter to Mr. Gelb, Ms. Netrebko voluntarily withdrew from a number of performances at The Met—specifically, performances of *Turandot* in April and May of 2022 and the fall 2022 production of *Don Carlo*. The grievance should also be dismissed with respect to claims for compensation concerning those productions.

Ms. Netrebko plainly understood that it was impossible for her to appear on *any stage* in the near future; she withdrew not just from productions at The Met, but also from performances around the world, in an apparent effort to lay low in the hope that the storm over her support of Putin would pass.

Although Ms. Netrebko had been advised, through her then-manager Judith Neuhoff, that she needed to repudiate Putin to be able to perform at The Met (Tr. 166), she did not wait to find out if The Met would cancel her upcoming engagements. On March 1, 2022—before The Met had taken or announced any action regarding her contracts—Ms. Netrebko announced that she had "made the extremely difficult decision to withdraw from concerts until further notice." She withdrew, in fact, from all public performances—not just concerts—as Mr. Esteban claimed, and he acknowledged that she withdrew from opera performances as well, supposedly by "mutual agreement"—although he offered no explanation why she would have withdrawn only from concerts. (Tr. 49, 70-73) In her March 1 announcement, Ms. Netrebko added, "This is not the right time for me to be performing and making music. I hope my audience will understand this decision." Ms. Netrebko confirmed this plan on March 30, when she announced on Instagram that *"[a]fter taking my announced break, I will resume performing in late May*, initially in Europe." (Joint Exh. 10)

For example, Ms. Netrebko had been scheduled to perform at La Scala in a series of performances of *Adriana Lecouvreur* beginning on March 9 but she withdrew, writing on Instagram (contrary to a news report that her health was an issue), "Healthy, but NOT coming!" (Met Exh. 3, at p. 5) This was her decision, concerning all her performances. Although Mr. Esteban testified that Ms. Netrebko's performance schedule "picked up" in April of 2022 with a performance at the Monte Carlo opera in April of 2022 (Tr. 77), Mr. Esteban failed to note that Ms. Netrebko was a last-minute substitute for the sick lead singer and only after two other potential replacements didn't work out. (Met. Exh. 8).

Ms. Netrebko apparently believed that, at least for some months, she was better off remaining out of the public eye. Indeed, Mr. Gelb learned from Ms. Netrebko's manager (Ms. Neuhoff) that Valery Gergiev—Ms. Netrebko's longtime mentor and a strong supporter of Putin—had advised Ms. Netrebko to lay low and that everything was going to blow over. (Tr. 128-29) Ms. Netrebko's decision not to perform through May of 2022 is consistent with that advice.

The Met's March 3, 2022 announcement of Ms. Netrebko's withdrawal, and Mr. Gelb's letter to Ms. Netrebko that day, reflect that The Met expected her to withdraw from *Turandot* and

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 10

*Don Carlo* if she would not repudiate her prior support for Vladimir Putin while he waged war on Ukraine. (Joint Exhs. 6, 7)  But Ms. Netrebko clearly understood herself that it would be untenable for her to appear on any stage, and she withdrew from *all* performances in the near future for that reason.

Accordingly, it should be concluded that Ms. Netrebko chose to withdraw from the upcoming performances at The Met of *Turandot* and *Don Carlo*, as noted in Mr. Gelb's March 3, 2022 letter, regardless of whether The Met would have had the right to cancel those contracts unilaterally.  Mr. Esteban's March 29, 2022 letter to Mr. Gelb, contesting termination of contracts "above and beyond the performances for which Anna voluntarily withdrew" bolsters this conclusion.  (Met. Exh. 5)  Ms. Netrebko did not testify regarding the discussions around her not appearing in *Turandot* or *Don Carlo*; Mr. Gelb's testimony that Ms. Netrebko withdrew from those productions voluntarily, supported by the correspondence between him and Mr. Esteban and his discussions with Ms. Neuhoff, should be credited.

3. **Termination of Ms. Netrebko's Contracts Was Proper Based on Her Violation of the Standards of Conduct Incorporated Into Those Contracts**

*The Met's Decision Was Based on Conduct Following Execution of Ms. Netrebko's Contracts*

Consistent with the Standards of Conduct provision, The Met based its decision to terminate Ms. Netrebko's contracts based on her conduct after execution of those contracts.  That conduct—Ms. Netrebko's statements in the days after Vladimir Putin's invasion of Ukraine—is inseparable from, and forms part of an overall course of conduct with, Ms. Netrebko's longstanding public enthusiasm for Putin.

As AGMA asserted at the hearing in this matter, the Standards of Conduct provision was negotiated with sexual harassment issues in mind, among other conduct encompassed by that provision.  (Tr. 81-86)  This case is directly analogous to one involving an act of sexual harassment where there is a continuing violation of inappropriate conduct; a violation within the limitations period allows for consideration and aggregation of conduct outside the limitations period.[8]

---

[8] A hostile work environment claim, by its very nature, is predicated on a series of separate acts that collectively constitute an unlawful discriminatory practice.  *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 117 (2002). Under the "continuing violation" doctrine, even though one of those acts might have occurred outside of the limitations period, the claim will be considered timely as long as one of the acts occurred within the limitations period (*id*. at 117–118). "In the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within [the statutory period]" and that "once that is shown, a court ... may consider the entire time period of the hostile environment in determining liability" *Strauss v. New York State Dept. of Educ*., 26 A.D.3d 67, 69, 805 N.Y.S.2d 704 [internal quotation marks omitted]; *see also Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004).

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 11

   That is, this case involves a series of statements and actions, some prior to the date of Netrebko's contracts and some after, which create the same threat of scandal and disrepute as if there were a series of sexually harassing statements or conduct. As in a sexual harassment situation, where later conduct is considered a "continuing violation" and is aggregated with earlier incidents, Netrebko's series of statements and conduct regarding Vladimir Putin must be viewed together. Her recent statements—post-invasion and post-contract—are hugely problematic on their own—and exist as part of a continuum with her earlier statements. Indeed, it was *because* of her earlier statements that Netrebko obviously needed to say something about her relationship with, and views of, Vladimir Putin and his invasion of Ukraine. Even in isolation, and certainly if aggregated as a continuing violation with her prior statements and conduct, Netrebko's actions privileged the Met to terminate her outstanding contracts.

   The Met could not dismiss as isolated an act of sexual harassment by a star performer if that singer had, in the past, engaged in a pattern of sexually-harassing conduct. Indeed, at the hearing in this case, Ned Hanlon (the chair of AGMA's negotiating committee when the Standards of Conduct clause was agreed upon) testified that singer Placido Domingo's history of alleged sexual harassment was discussed during negotiations over this clause. (Tr. 83) AGMA surely would not view an additional act of sexual harassment by Mr. Domingo (if he were to work at The Met again) as an isolated circumstance under the Standards of Conduct clause; it would reasonably allow and even expect The Met to consider previous alleged conduct in assessing the seriousness of the newer acts.

   Likewise, the Met appropriately viewed Ms. Netrebko's statements in late February of 2022 regarding Vladimir Putin as part of her course of conduct regarding Mr. Putin over the years. And just as Mr. Domingo's alleged conduct over the years is seen through a different lens in the post-Me-Too era, Ms. Netrebko's statements after the invasion of Ukraine took on a darker and greater importance.

   The limited available authority interpreting morals clauses supports the Met's position. For example, in *Galaviz v. Post-Newsweek Stations*, 380 Fed.Appx. 457 (5th Cir. 2010), the Fifth Circuit affirmed the grant of summary judgment dismissing a sex discrimination claim by a television news reporter who claimed to have been unfairly terminated under a morals clause in her contract.[9] The plaintiff had worked under two three-year contracts that included a morals clause, entered into in March 2004 and renewed in February 2007. The employer relied on three episodes of violative conduct to terminate her employment—incidents in July of 2004, February of 2006 and July of 2007. That is, the employer was on notice of the first two incidents at the time it renewed her contract in February of 2007, but was not foreclosed from relying on the totality of her conduct in terminating her contract after the final incident, based on the totality of the conduct.

---

[9] *Galaviz v. Post-Newsweek Stations*, Civ. Action SA-08-CA-305, 2009 WL 2105981 (W.D.Tex. 2009).

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 12

      Putin's invasion of Ukraine and attendant atrocities (widely considered war crimes) unquestionably changed the prism through which Netrebko's statements about Putin and Ukraine (past and future) would be expected to be viewed.  Just as Charles Lindbergh's statements and Leni Riefenstahl's films were considered more noxious after the start of World War II, so, too, were Netrebko's 2022 statements more damaging after Putin's invasion and viewed as part of a continuum, and to have occurred following execution of her contracts in 2019 and 2021.

*The Met Had the Right to Terminate Ms. Netrebko's Contracts Because She Engaged in Serious Conduct that Threatened to Bring The Met Into Disrepute or Scandal*

      The Standards of Conduct provision does not require the Met to establish that Netrebko's actions definitely would have caused the Met scandal and disrepute, but only that her actions "threatened" to do so.  The Met clearly faced such a threat in March of 2022.  As noted above, The Met was by no means alone in concluding that Ms. Netrebko's history of supporting Vladimir Putin made it imperative for her to distance herself from Putin so as to make her tolerable to its donors and the public.  It was also not alone in concluding that she had not done so, and that her post-invasion comments only made matters worse.

      Ms. Netrebko plainly understood the need for her to address her history of support for Putin, and that the failure to do so would jeopardize her ability to perform.  On February 25, the day after Russia's invasion—and prior to any urging by The Met—Ms. Netrebko made a statement on Instagram urging peace, but without distancing herself from Putin. (Tr. 47)  On February 26, Ms. Netrebko posted another weak statement on Instagram, saying she opposed the war, but again declining to criticize Russia or its leader, and undermining any value of that statement by adding in the same Instagram post that "forcing artists . . . to voice their political opinions in public and to denounce their homeland is not right."  Ms. Netrebko made additional comments on Instagram in late February—which she deleted by March 1—in which she further criticized those who wanted her to distance herself from Putin:

> It's especially despicable from people from the West, seated comfortably in their home, not fearing for their lives, to pretend to be brave and pretending to 'fight' by putting in trouble artists who asked for nothing.  This is just hypocrisy of them.  These people who think that being on the 'right side' allows them everything and excuses their unfair behavior are just human shits.  They are as evil as blind aggressors.  No matter which side they are from.[10]

(Joint Exh. 8; Met. Exh. 2, at p. 4; Met. Exh. 3, at p. 5)  Rather than put out the fire, Ms. Netrebko managed to fan the flames of outrage over her support of Putin.

---

[10] https://twitter.com/zwoolfe/status/1497674011660238854/photo/1

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 13

      The next day, February 27, 2022, the Met's General Manager, Peter Gelb, issued an announcement that the Met would be suspending ties with (unnamed) Russian artists and institutions allied with Putin. There was speculation in the press that he was referring to Ms. Netrebko and to Valery Gergiev—a Russian conductor who had publicly allied himself with Putin—because Netrebko and Gergiev were widely understood to be Putin supporters.

      Ms. Netrebko herself seemed to recognize that she had worsened the situation with her comments in the days immediately following Russia's invasion. But she was unwilling to make a strong enough statement regarding Putin and his invasion to make it feasible for her to appear at The Met. Knowing that her own manager and Mr. Gelb were both urging her to make such a statement, Ms. Netrebko called Mr. Gelb on the evening of March 2 to let him know she would not do so. "I'm sorry," Ms. Netrebko said when he telephoned Mr. Gelb. "I stand with my country." (Tr. 130-31) Ms. Netrebko plainly understood that she was making a choice between career and patron.

      This is the first case testing the application of the Standards of Conduct provision that was negotiated into the CBA in 2021. Although Mr. Hanlon testified that AGMA intended the Standards of Conduct provision to address sexual harassment and a narrow range of other matters to protect the safety of its members, the Standards of Conduct clause covers any conduct that presents a threat or actual reputational harm to The Met, and only The Met has the power to exercise that clause. As with morals clauses throughout the entertainment industry for the past 100 years, it is for The Met, not AGMA, to decide whether to exercise its rights under the Standards of Conduct clause, based on whether it faces a threat of scandal or actual damage to its reputation.

      AGMA argued in its opening statement that the Met had terminated Ms. Netrebko's contracts because she was "merely holding or expressing disfavored political views" (Tr. 15), as if Ms. Netrebko's continued public enthusiasm for Vladimir Putin and his incursion into Ukraine were simply a personal political opinion, or that the contract terminations were due to the Met's institutional insistence on political uniformity. Neither is the case.

      The contract terminations were not about the Met's judgment of Ms. Netrebko's political views, but about the impact of her public statements even after the invasion of Ukraine, and the feared impact on The Met's donors and public if she were to be associated with it through further performances on its stage. Mr. Gelb was familiar with Ms. Netrebko's support of Vladimir Putin long before her comments in the wake of the 2022 invasion. Ms. Netrebko had told him she was glad that Putin had jailed the members of the Pussy Riot band, and he was aware of her social media posts over the years supporting Putin and the separatist movement in eastern Ukraine, and of her being photographed with a separatist flag, among other things. (Tr. 111-17) It was when a cold war became a globally-condemned shooting war that Mr. Gelb determined that The Met could not continue to do business with the Bolshoi or other organizations receiving support from Putin, or with artists and institutions closely aligned with Putin, because of how The Met's donors and public would react if it continued those ties. (Tr. 117-21, 134-35) To Mr. Gelb—

**Proskauer»**

Arbitrator Howard Edelman
December 16, 2022
Page 14

whose primary responsibilities include raising money (Tr. 111)—it was obvious that The Met's donor base would not be comfortable with Ms. Netrebko continuing to sing on The Met's stage as long as she remained closely aligned with Putin. Mr. Gelb concluded, with the support of The Met's executive committee and full board of directors, that retaining Ms. Netrebko "would have been leading The Met into a suicidal position with the public and with our donors. It would have … resulted in a disaster to The Met that would have harmed us economically. Our stature would have been harmed." (Tr. 137-38)

This was not a step The Met wanted to take, and it did not do so precipitously. Ms. Netrebko was one of opera's biggest and most bankable stars, and was closely identified with The Met—largely as a result of efforts Mr. Gelb had made over the course of more than 15 years. The Met cast Ms. Netrebko in more opening night performances than any other star singer, featured her in performances in its Live in HD worldwide theater streaming series, and committed to casting her in two productions every year. Through conversations with Ms. Netrebko's manager as well as Mr. Gelb's veiled statement on February 27 that The Met would be unable to continue to work with those allied with Putin, The Met tried to encourage Ms. Netrebko to make a statement that would enable her to continue performing at The Met. (Tr. 43-44, 112-15)

The fact that The Met has occasionally endured previous protests does not mean it has forever waived its right to avoid scandal and disrepute. AGMA pointed to a protest at The Met over its production of *The Death of Klinghoffer* and a protest during a 2015 production of *Iolanta* (starring Ms. Netrebko) over Russia's annexation of Crimea. (Tr. 88-98; AGMA Exhs. 6-8) But neither of those situations presented the same sort of reputational risk as Ms. Netrebko's wartime statements. *Klinghoffer* had been performed previously (Tr. 101) and the world's reaction to Russia's takeover of Crimea was (right or wrong) was not remotely like the global proxy war now underway, with the United States and most of the Western world firmly on the Ukrainian side and providing weapons and other military aid in the largest land war since World War II. Mr. Hanlon acknowledged that Russia's 2022 invasion of Ukraine resulted in a much higher level of intensity of discussion among AGMA members than the takeover of Crimea. (Tr. 102-03)

The Met's morals clause (the term generally used for clauses like the Standards of Conduct provision), like those in the entertainment industry generally, go beyond sexual harassment. Morals clauses became common in the entertainment industry in the wake of the 1921 Fatty Arbuckle scandal; the actor had been charged with the rape and murder of an actress at a party. Although Arbuckle was acquitted, his public image was shattered. As a result of the Arbuckle case, Universal Film Company (and then many other studios and industry employers)

**Proskauer**

Arbitrator Howard Edelman
December 16, 2022
Page 15

added morals clauses to all existing and new actor agreements; these clauses stated that talent could be terminated if they "forfeit the respect" of the public.[11]

Moral clauses became common in all areas of the entertainment industry, not just movies: in television shows (with a federal court upholding the morals clause-based termination of *All My Children* actor Michael Nader over the negative publicity from his arrest over drug charges[12]); in news programs (notable terminations of newscasters under morals clauses included CBS anchor Alycia Lane for being arrested for assault, and Virginia Galaviz, discussed *infra*); and in player contracts in the National Football League, National Basketball Association, Major League Baseball and National Hockey League.[13]

The Met does not condone—or engage in—the blacklisting of artists due to their political views. It does, however, maintain its negotiated right to terminate artists' contracts where their public conduct—even if it involves their positions on major issues of the day—threatens to bring the Met into scandal or disrepute. AGMA agreed to give the Met that right in 2021. AGMA's effort to dignify Ms. Netrebko's embrace of a war criminal as a "political view" is itself undignified, and AGMA inaccurately paints The Met's decision as political rather than protective of its reputation and financial future under the clause AGMA negotiated.

The Met could not wait months to see how the war and public opinion would progress; it was entitled under the Standards of Conduct clause to take action in March of 2022, based on the threat of reputational harm. As Mr. Gelb explained, unlike European opera houses that are supported by public funds, The Met depends on private donations for half of its $300 million annual budget. (Tr. 133) It could not risk alienating its critical donor base.

The Met also needed to act quickly to line up replacements for Ms. Netrebko. As Mr. Gelb testified, The Met is the world's largest opera house and is considered the most difficult for singers to sing in, due to the house's size. That often requires casting

---

[11] S. Gallagher, *Who's Really "Winning"?: The Tension of Morals Clauses in Film and Television*, 16 Va. Sports & Ent. L.J. 88 (Fall 2016); see also C. Epstein, *Morals Clauses: Past, Present and Future*, 5 NYU J. Intell. Prop. & Ent. L. 72, 76-79 (Fall 2015).

The main portion of the Universal morals clause stated:

> The actor (actress) agrees to conduct himself (herself) with due regard to public conventions and morals and agrees that he (she) will not do or commit anything tending to degrade him (her) in society or bring him (her) into public hatred, contempt, scorn or ridicule, or tending to shock, insult, or offend the community or outrage public morals or decency, or tending to the prejudice of the Universal Film Manufacturing Company or the motion picture industry

[12] *Nader v. ABC Television, Inc.*, 330 F. Supp.2d 345 (S.D.N.Y. 2004).

[13] C. Epstein, *Morals Clauses: Past, Present and Future*, 5 NYU J. Intell. Prop. & Ent. L. 72, 82-92 (Fall 2015).

Proskauer

Arbitrator Howard Edelman
December 16, 2022
Page 16

decisions four or five years ahead of time, as there may be only one or two singers in the world capable of singing a particular role on The Met's stage. (Tr. 138-39) Mr. Gelb could not wait for the war to end, or to wait for Ms. Netrebko to change her position regarding Putin, before moving to replace her.

As noted above, the Met was not alone in finding Ms. Netrebko's statements in February and early March totally inadequate and, rather than quelling concerns over her prior support of Putin, only inflamed the situation. Although the actions of other opera houses are not dispositive, they do underscore the reasonableness of The Met's conclusion.

Ms. Netrebko's public stance regarding Putin and his war have continued to impact Ms. Netrebko's standing with performing arts institutions around the world. Although Mr. Esteban professed an encyclopedic knowledge of Ms. Netrebko's performance history and calendars, he suddenly had a poor memory when asked on cross-examination whether Ms. Netrebko's performance schedule is lighter than before Russia's invasion of Ukraine. (Tr. 76-77) It is clear that many institutions, not just the Met, paused their relationship with Ms. Netrebko because her recent statements reinforced rather than recanted her affinity for Putin following his invasion of Ukraine. Indeed, Mr. Esteban acknowledged that at least one other opera house, the Bavarian State Opera, terminated its contracts with Ms. Netrebko and nevertheless paid her for those performances. (Tr. 49-50) That is, even with the cost of paying her fees, Ms. Netrebko's reputation was so toxic that the Bavarian State Opera canceled her performances. (Tr. 49-50) Performances in other opera houses were also canceled, including at La Scala in Italy and Aarhus in Denmark. (Tr. 49) Even if by "mutual agreement" as Mr. Esteban claimed (Tr. 49), those cancellations reflect Ms. Netrebko's reputational stain. The Met cannot be said to have been unreasonable in determining that putting Ms. Netrebko on its stage presented a threat of scandal or disrepute.

The era of social media means that inappropriate comments are likely to reach an enormous audience, at blinding speed. Companies whose reputations are at stake have often terminated their relationships with their talent or brand representatives in the wake of such comments. For example, in April 2016, ESPN terminated on-air baseball analyst Curt Schilling (the former All-Star pitcher) after he shared an arguably transphobic photo on Facebook.[14] Similarly, the NBA banned former Los Angeles Clippers owner Donald Sterling for life after revelation of racist comments that his ex-girlfriend secretly recorded on her cellphone.[15]

We note that Ms. Netrebko's statements regarding the war in Ukraine after The Met had already terminated her contracts on March 28, 2022 are irrelevant—except insofar as they show

---

[14] Curt Schilling, ESPN Analyst, Is Fired Over Offensive Social Media Post - The New York Times (nytimes.com)

[15] N.B.A. Bars Clippers Owner Donald Sterling for Life - The New York Times (nytimes.com)

**Proskauer»**

Arbitrator Howard Edelman
December 16, 2022
Page 17

that Ms. Netrebko recognized that her previous post-invasion statements were widely viewed as reinforcing her support of Vladimir Putin, and dug a deeper reputational hole.[16]

In sum, The Met reasonably assessed that Ms. Netrebko's conduct threatened to bring The Met into disrepute or scandal, and The Met was within its rights under the Standards of Conduct provision to terminate Ms. Netrebko's contracts.

*The Met Also Had the Right to Terminate Ms. Netrebko's Contracts*
*Under Generally-Applicable Contract Law Principles*

Although not necessary in light of The Met's rights under the Standards of Conduct provision, principles of New York contract law (which govern interpretation of Ms. Netrebko's contracts) also support The Met's right to have terminated those agreements. Ms. Netrebko owed The Met an implied obligation of good conduct, which she violated.

It is a longstanding principle of New York law that an employee owes a duty to refrain from activities that may be detrimental to the employer's interests or otherwise devalue the performance due.[17] *Corbin on Contracts* § 34.8 (1999); *Restatement (Second) of Agency* § 380 (1957) (Unless otherwise agreed, an agent is subject to a duty not to conduct himself with such impropriety that he brings disrepute upon the principal or upon the business in which he is engaged."); *Restatement (Second) of Agency* § 409, comment C (1950) ("The agent may be guilty of conduct which, although not such as constitutes a breach of contract for which the principal could bring an action or refuse compensation, indicates such bad moral qualities that the principal is likely to suffer loss if the agent continues to act. In such case the principal can

---

[16] On March 30, 2022, Ms. Netrebko made another weak effort to distance herself from Putin, posting on social media they had only met a few times. She stated that she was not "allied with any leader of Russia" and that she condemned the war on Ukraine, but she did not explicitly criticize Putin or address her previous record of support for him, as the NY Times noted in an article that day. She added that "I acknowledge and regret that past actions or statements of mine could have been misinterpreted."

Ms. Netrebko has not genuinely disavowed her prior statements and actions, however. After her statement on March 30, Ms. Netrebko backpedaled. In April of 2022, she issued an Instagram "clarification":

> I wanted to talk to you about my thoughts, I'm not going to justify myself further but wanted to explain what is necessary. I'm not going to go against my homeland, and I wouldn't expect the same for others.

https://www.instagram.com/stories/anna_netrebko_yusi_tiago/2811327063788578664/

[17] Actors today are generally deemed to be common law employees for employment law purposes, and not independent contractors, however labeled by the parties. For example, in *Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000), the Second Circuit held that a performer was an employee and not an independent contractor. Although Makarova retained significant control over her acting, the producer maintained artistic control over her performance, required exclusivity for the term of the agreement, and dictated her role, rehearsal, and performance schedule. The court reasoned, "As long as the employer exercises control over such aspects as the dates and times of performances and the work to be performed, the performer is an employee."



properly discharge the agent.")  *See also Drayton v. Reid,* 5 Daly's Rep. 442 (N.Y.C.P. 1874), in which a discharged actress under contract challenged her dismissal. The court upheld the dismissal on grounds of her indecent and immoral conduct (declining to state in the opinion what she had done, because it said, she committed acts "too gross and disgusting to be described.") *Id*., at 444.  In *Scott v. RKO Radio Pictures, Inc.,* 240 F.2d 87, 87-88 (9th Cir. 1957),  the Ninth Circuit likewise noted that, in addition to the contractual morals clause supporting termination, the plaintiff's conduct (refusing to testify before Congress) breached "an implied covenant . . . not to do anything which would prejudice or injure his employer."

The same conduct by Ms. Netrebko that made it untenable for her to appear at The Met likewise violated the parallel common law covenant not to engage in conduct detrimental to The Met's interests.  Her continued public association with Vladimir Putin was amplified, not dispelled, by her statements following the invasion of Ukraine, and was the sort of impropriety that would have brought disrepute on The Met.  The Met was, therefore, also privileged to terminate Ms. Netrebko's contracts under basic contract law principles.

**<u>Conclusion</u>**

For the reasons set forth above and during the hearing in this matter, the grievance should be denied.


Respectfully submitted,

Howard Z. Robbins


Enclosures

cc: Stephanie Basta, Esq.
    Mr. Peter Gelb