USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/3/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNA NETREBKO,

Plaintiff,

-against-

METROPOLITAN OPERA ASSOCIATION INC. d/b/a/ THE METROPOLITAN OPERA and PETER GELB, in his professional and individual capacities,

Defendants.

23 Civ. 6857 (AT) (OTW)

**ORDER**

ANALISA TORRES, District Judge:

Defendants, the Metropolitan Opera and Peter Gelb, move for an order dismissing Plaintiff's amended supplemental complaint (the "ASC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* Mot., ECF No. 123; Mem., ECF No. 125; Opp., ECF No. 130; Reply, ECF No. 137; ASC, ECF No. 170. The ASC, filed after Netrebko's second amended complaint ("SAC"), adds factual allegations and three new causes of action: defamation, retaliation under the New York State Human Rights Law ("NYSHRL), N.Y. Exec. Law. § 290, *et seq.*, and retaliation under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq*. *See* ASC; *see also* SAC, ECF No. 27. For the reasons stated below, the motion is granted.

## BACKGROUND[1]

I. Netrebko's Firing

On August 4, 2023, Plaintiff, Anna Netrebko, a Russian national and former "reigning prima donna" of the Metropolitan Opera, filed this action against Defendants, the Metropolitan

[1] The following facts are taken from the ASC, which the Court must accept as true for the purposes of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court may also consider exhibits, statements, and documents attached to the complaint, incorporated in the complaint by reference, or otherwise integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Because the ASC

Opera and its general manager, Peter Gelb (collectively, "the Met"). *See* Compl., ECF No. 1; *see also* SAC ¶¶ 3–4. In early 2022, the Met fired Netrebko after Gelb was dissatisfied with Netrebko's failure to make a public statement following Russia's 2022 invasion of Ukraine. *See* MTD Order at 1–5, ECF No. 64. In her SAC, Netrebko asserted claims under the NYSHRL, the NYCHRL, and New York state common law.[2] *See id.* at 1. The Court assumes familiarity with the allegations in the SAC and repeats them here only as necessary.

Prior to 2022, Netrebko was widely reported to be a supporter of Russian President Vladimir Putin. *See id.* at 3–4; *see also* Recons. Order at 3–5, ECF No. 108. On February 25, 2022, after Russia invaded Ukraine, Netrebko stated on Instagram, "These are very sad days and we are deeply concerned for the well-being of all people involved. Every war is a terrible tragedy. This is not a time for music but for reflection and prayer. And so we hope and pray for a swift and peaceful resolution." MTD Order at 4; *see* SAC ¶¶ 24–25. The following day, the Met asked Netrebko to publicly "denounc[e] Putin . . . using specific language" it had approved. SAC ¶ 26. Instead, Netrebko issued her own social media statement that she was against the war, adding, however, that she was also opposed to "forcing artists, or any public figure, to voice their political opinions in public and to denounce their homeland." *Id.* ¶ 27. That same day, Netrebko reposted a comment from a third party on her Instagram story characterizing "people from the West" who "pretend to be brave . . . by putting in trouble artists who asked nothing" as

---

incorporates by reference the allegations set forth in the SAC, *see* ECF No. 27, and the SAC and ASC together constitute the operative pleading in this matter, the Court also accepts the SAC's factual allegations as true. *See Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014); *Moore v. Samuel S. Stratton Veterans Admin. Hosp.*, No. 16 Civ. 475, 2019 WL 251725, at *1 (N.D.N.Y. Jan. 17, 2019). Further, because the ASC references and quotes extensively from the three articles supporting Netrebko's defamation claim and the two additional articles referenced in her retaliation claim, the Court considers those articles to be incorporated by reference. *See Chambers*, 282 F.3d at 152; *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).

[2] Following Netrebko's termination, the parties arbitrated certain claims under a collective bargaining agreement that covered her performances with the Met; the arbitration is largely not at issue here. *See* MTD Order at 5–7.

"human shits" and "as evil as blind ag[g]ressors." Feb. 26 Repost, ECF No. 136-3; *see also* Arbitration Award, ECF No. 124-6 at 14; MTD Order at 4.

On February 27, 2022, one day after Netrebko's post, the Met publicly stated that it "can no longer engage with artists or institutions that support Putin or are supported by him—not until the invasion and killing has been stopped, order has been restored and restitutions have been made." SAC ¶ 29. Two days later, on March 1, Netrebko again posted on Instagram, this time saying, "I am opposed to this senseless war of aggression and I am calling on Russia to end this war right now." Mar. 1 Post, ECF No. 136-5. In a phone call on March 2, Gelb told Netrebko to issue a statement specifically denouncing Putin, or she would be fired. SAC ¶ 30. Netrebko responded that, as a Russian citizen, she "could not make such a statement." *Id.*

On March 3, 2022, the Met announced that Netrebko would not perform in the 2021–22 or 2022–23 seasons. *See id.* ¶ 31. About four weeks later, on March 30, Netrebko issued a public statement that she "condemn[s] the war on Ukraine," that her "position is clear," and that she is "not a member of any political party nor [] allied with any leader of Russia." SAC ¶ 34. The Met did not rehire Netrebko. *See id.* ¶¶ 35–38.

II. The Court's Dismissal and Reconsideration Order

On August 22, 2024, the Court granted in part and denied in part the Met's motion to dismiss Netrebko's SAC. *See* MTD Order. Specifically, the Court dismissed Netrebko's national origin discrimination claims under the NYSHRL and NYCHRL but permitted her gender discrimination causes of action to proceed. *See id.* at 10–20. The Court also dismissed Netrebko's breach of contract and defamation claims. *See id.* at 10, 23. On July 28, 2025, on a motion for reconsideration, the Court reinstated Netrebko's NYSHRL and NYCHRL national origin discrimination claims. *See* Recons. Order at 15. The Court declined to reconsider

dismissal of Netrebko's defamation claim, *see id.* at 9–10, holding that the SAC failed to plausibly allege actual malice as required for a defamation claim brought by a public figure, *see id.* at 9 (citing *Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015)); MTD Order at 22–23.

III. The Supplemental Complaint

On September 10, 2025, with the Met's consent, Netrebko filed a supplemental complaint pleading three new causes of action: defamation for statements made after this case was filed and retaliation in violation of the NYSHRL and NYCHRL with respect to those statements. *See generally* Supp. Compl., ECF No. 118; *see also* ECF No. 116 (Met's consent to the filling the supplemental complaint). The Met moved to dismiss the supplemental complaint. *See* Mot. Then, several months later, and once more with the Met's consent, Netrebko sought leave to amend her supplemental complaint, which the Court granted. *See* ECF No. 169. The ASC removed certain factual allegations contained in the supplemental complaint but did not amend the causes of action. *See* ECF No. 167-2. Because the ASC rested on the same legal theories as the supplemental complaint, the parties agreed to rely on the briefing they had already filed concerning the supplemental complaint. *See* ECF No. 168.

The ASC alleges that after Netrebko filed this lawsuit, the Met "started a renewed public campaign" in which Gelb defamed Netrebko and retaliated against her for filing this lawsuit. ASC ¶ 1. Netrebko's supplemental defamation claim[3] is based on five of Gelb's statements quoted in three news articles from June to July 2025:

[3] Any reference to Netrebko's "defamation claim" refers solely to the supplemental defamation claim and not to Netrebko's first defamation claim, which the Court dismissed. *See* MTD Order at 20–23.

| Name | Date | Publication | Gelb's Statement |
| --- | --- | --- | --- |
| Statement 1 | June 26, 2025 | *Ukrinform* (Ukrainian national news agency) | "I also immediately gave our leading star, Anna Netrebko, the choice of either disavowing Putin and the war, or being fired by the Metropolitan. She chose, and we fired her. Later on, she announced she was against the war. But she only did this to show that she should be given [a way] back, if not [to] the Metropolitan, [then to] other opera companies." |
| Statement 2 | June 28, 2025 | *Lb.ua* (Ukrainian media outlet) | "Following extensive discussions with Anna Netrebko, our star performer at the time, I dismissed her, as she refused to publicly distance herself from the Russian regime." |
| Statement 3 | June 28, 2025 | *Lb.ua* | "Her later statement—only a month afterwards—in which she claimed to be against the war was, in my opinion, insincere. It was issued only after her dismissal. From a legal perspective, I believe that statement was not genuine. I do not believe she meant it." |
| Statement 4 | June 28, 2025 | *Lb.ua* | "[I]t is important to emphasize that I gave her the opportunity to publicly distance herself from Putin. She told me she could not. I believe she had certain conversations with the Kremlin. As I understand it, she returned to me and said, 'I stand with my country.'" |
| Statement 5 | July 13, 2025 | *Der Standard* (Austrian newspaper) | "In my view, she condemned the war purely out of expediency and only after the Met had fired her. I believe there are numerous examples of her sympathy toward Putin and his ideology." |

ASC ¶¶ 6–8, 19–26; *see* Opp. at 4–8.

Netrebko characterizes these statements as "verifiably false" and "intended to inflict further harm on [her] career by publicly dissuading other opera companies from employing

[her]." *Id.* ¶¶ 2, 10. Netrebko claims that the statements are false because, *inter alia*, she "*did* disavow the war" in her February and March 2022 posts. *Id.* ¶ 14 (discussing the falsity of the subject statements). She further claims that Gelb knew his statements were false when he made them. *Id.* ¶ 15. For example, she alleges that Gelb "knew it was false to say that Netrebko had not condemned the war before the Met terminated her" because he reviewed her March 1, 2022 public statement and had characterized it as "anti-war" and "denouncing the war." *Id.* ¶ 15.

Netrebko further alleges that the Met and Gelb made the 2025 statements detailed above in retaliation for her filing this lawsuit asserting her rights under the NYSHRL and NYCHRL. *Id.* ¶¶ 27–33 (NYSHRL), ¶¶ 34–39 (NYCHRL). In addition to the five statements that form the basis of her defamation claim, her retaliation claims rely on two additional statements made by Gelb in 2024. *See id.* ¶¶ 29, 36. First, in a May 13, 2024 interview with French magazine *Diapason*, Gelb stated that he "know[s] [Netrebko's] opinion on Putin and the war very well" and that "when [Gelb] gave [Netrebko] an ultimatum, she clearly told me: 'I support my country.'" *Id.* ¶ 4. Second, in a May 14, 2024 *New York Times* article, Gelb said that the Palm Beach Opera had made the "unfortunate" decision to hire Netrebko and that Netrebko had made a "made a 'disingenuous effort' to distance herself from the Russian war effort." *Id.* ¶ 5.

## DISCUSSION

### I. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff is not required to provide "detailed factual allegations" in the complaint but must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* A court must "accept[] the factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

## II. Analysis

### A. Defamation Claim

To plead defamation under New York law, a plaintiff must allege: (1) a false statement; that is (2) published without privilege or authorization to a third party; (3) made with actual malice if the plaintiff is a public figure; and (4) special damages or *per se* actionability. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 245 (2d Cir. 2017); *Stepanov v. Dow Jones & Co., Inc.*, 120 A.D.3d 28, 34 (N.Y. 2014).

The Met asks the Court to dismiss Netrebko's defamation claim, arguing that: (1) the defamatory statements are not false, because they are either substantially true or nonactionable statements of opinion; (2) Netrebko has failed to allege actual malice as required; and (3) Netrebko has failed to plead special damages. *See* Mem. at 14–15.[4] The Court finds that,

[4] The Met also asserts a statute of limitations defense with respect to the two articles that do not form the basis of Netrebko's defamation claim. *See* Mem. at 14, 23; Opp. at 8 n.3, 12 n.4. The Court, therefore, need not consider this defense.

even assuming that Gelb's five statements are actionable and false,[5] Netrebko's defamation claim must be dismissed because she fails to adequately plead actual malice.

Because Netrebko is a public figure, she must allege that Gelb acted with actual malice when he made the allegedly defamatory statements. *See* MTD Order at 21; *Celle*, 209 F.3d at 182; *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "Actual malice requires proof that the [speaker] had subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of . . . its truth or falsity." *Celle*, 209 F.3d at 182. "A 'reckless disregard' for the truth requires more than a departure from reasonably prudent conduct." *Khan v. N.Y. Times Co.*, 710 N.Y.S.2d 41, 43 (2000). An allegation that a defendant acted with "reckless disregard" for the truth of their statements must "permit the conclusion that the defendant in fact entertained serious doubts as to the truth" of the statements but made them anyway. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Only those statements made "with [a] high degree of awareness of their probable falsity" are actionable. *Garrison v. State of La.*, 379 U.S. 64, 74 (1964). "Standing alone[,] . . . evidence of ill will is not sufficient to establish actual malice." *Celle*, 209 F.3d at 183; *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) ("Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication.").

Netrebko claims that Gelb knew the statements were false, *see* ASC ¶ 15(a), but under *Iqbal* and *Twombly*, she must set forth specific factual allegations permitting a reasonable

[5] At least some of Gelb's statements are plainly nonactionable opinions—for example, Gelb's statement that he "believe[d] [Netrebko's March 30] statement was not genuine" and his statement that "in [his] view, [Netrebko eventually] condemned the war purely out of expediency." ASC ¶¶ 7, 8. Only statements alleging facts can be the subject of a defamation action because statements of pure opinion are not capable of being proven false. *See Greenberg v. Spitzer*, 155 A.D.3d 27, 41–42 (N.Y. 2017).

inference of malice. *See Biro*, 807 F.3d at 544–45. A complaint must allege "objective facts" from which a Court could infer actual malice—for example, the "the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story[,] among other circumstantial evidence." *Celle*, 209 F.3d at 183 (alterations adopted) (citation omitted); *see also* Recons. Order at 9.

In Statement 1, Gelb states that he gave Netrebko the choice of disavowing both Putin and the war or being fired and that she made her choice. *See* ASC ¶ 6. Netrebko argues that Gelb knew this statement was false because he knew that Netrebko could not choose to disavow Putin once her manager told Gelb she was "scared" to make such a statement. Opp. at 12. Nothing in the ASC raises an inference that Gelb believed or strongly considered that Netrebko lacked this choice. *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987) (observing that actual malice is "a matter of the defendant's subjective mental state"). Gelb's communications to the press, ASC ¶¶ 6–8, and the text messages and emails referenced in the complaint, *see, e.g.*, ECF No. 124-7–9; ASC ¶ 15(b)–(c), (f),[6] uniformly show that Gelb strongly believed that Netrebko could have disavowed Putin if she were willing. For example, on March 2, 2022, Gelb texted Judith Neuhoff, Netrebko's then-manager, ASC ¶ 15(b), that he "[doesn't] understand why [Netrebko] is committing professional suicide" by failing to denounce Putin and that "[t]hat's what she should be scared of, not Putin." ECF No. 124-7 at 9. In other words, Gelb subjectively believed that Netrebko had a meaningful choice to make. Netrebko has, therefore, failed to plausibly allege actual malice with respect to Statement 1.

[6] The Court finds that the email and text exchanges, which are explicitly referenced and quoted in the ASC, are incorporated by reference in the pleadings and may be considered by the Court. *See Chambers*, 282 F.3d at 152; *see also* ASC ¶ 15 (describing a text message exchange and an email exchange between Gelb and Neuhoff, Netrebko's then-manager, as well as another March 2022 email from Gelb). Notably, Netrebko cites and discusses the full communications in her opposition memorandum and does not argue that the Court may not consider them. *See, e.g.*, Opp. at 16 (citing ECF Nos. 124-7 through 124-9).

In Statement 2, Gelb states that Netrebko "refused to publicly distance herself from the Russian Regime." ASC ¶ 7. In Statement 3, Gelb references Netrebko's "later" statement claiming to be "against the war." *Id.*[7] And in Statement 5, Gelb states that Netrebko "condemned the war . . . only after the Met had fired her." *Id.* Netrebko contends that she has plausibly alleged that Gelb knew these statements were false because he knew about her March 1, 2022 anti-war Instagram post and characterized it as "denouncing the war," "against the war," and an "anti-war statement." ASC ¶ 15.

These allegations do not reasonably support an inference that Gelb believed Netrebko condemned the war before the Met fired her or that she publicly distanced herself from the Russian regime.[8] In context, Gelb's statements to the press and his colleagues reflect that he firmly believed—whether correctly or not—that Netrebko had not genuinely "condemned the war" because her March 1 post did not go far enough, she would not specifically disavow Putin, and she had equivocated on her public stance before. In July 2024, Gelb characterized Netrebko's "effort to distance herself from the Russian war" as "disingenuous." ASC ¶ 5. He has also repeatedly emphasized Netrebko's history of support for Putin in public and private communications, suggesting that he believed Netrebko did not effectively distance herself from the war, Putin, or the Russian "regime." *See, e.g.*, ASC ¶ 8 (Gelb's statement that he believes Netrebko's March 30 statement was not sincere because "there are numerous examples of her sympathy toward Putin and his ideology"); ECF No. 124-9 (Gelb's email to colleagues saying

---

[7] In context, this statement evidently refers to Netrebko's March 30, 2022 press release. *See* Mem. at 15–16; *see also* SAC ¶¶ 31, 34. In Statement 1, Gelb also says, "[l]ater on, she announced she was against the war." ASC ¶ 6. To the extent that these statements can be interpreted as Gelb claiming that Netrebko only condemned the war after the Met fired her, the Court considers them along with Statement 5.

[8] The Court need not opine on what it means to "publicly distance" oneself from a regime or "condemn" a war because the ASC does not permit a reasonable inference that Gelb genuinely believed or considered that Netrebko had done those things when he made statements to the contrary.

that "[e]ven though [Netrebko] posted a recent anti-war statement" it is "obvious" that she is "totally behind Putin.").

Gelb's messages to his colleagues about Netrebko's March 1, 2022 post confirm that he did not believe it was an adequate or sincere statement condemning the war. In a March 1 email, Gelb said that "[e]ven though [Netrebko] posted a recent anti-war statement, she is totally behind Putin (which is obvious through the balance of her posts over recent times)." ECF No. 124-9; *see* ASC ¶ 15(f) (referencing the email); *see also* ASC ¶ 4(a) (Gelb's statement that "[he] know[s] her opinion on Putin and the war very well"). In another, Gelb told Neuhoff that he does not believe Netrebko's "recent message denouncing the war . . . go[es] far enough." ECF No. 124-8; *see* ASC ¶ 15(c) (referencing the email). In a March 2 text to Neuhoff, Gelb characterized Netrebko's past statements as "equivocating," reflecting that he did not believe Netrebko had, in fact, condemned the war at that point. *See, e.g.*, ECF No. 127-9 (Gelb's text message stating, "I should add that if [Netrebko] agrees to make this [new proposed] statement, she has to really own it—with no further equivocating"). After all, Netrebko's February 25 and 26 posts conveyed mixed messages about her stance towards the war and Russia's aggression, *see* MTD Order at 4, and Netrebko deleted her March 1 post the same day she posted it. *See* ECF No. 127-8 (March 1 email to Gelb reflecting that Netrebko deleted all her posts).

Gelb's statement that Netrebko "refused to publicly distance herself from the Russian Regime," ASC ¶ 7, was also not plausibly made with actual malice. The Oxford English dictionary defines "regime" as "[a] particular ruling group, government, or administration, *esp.* an authoritarian one." *Regime*, Oxford English Dictionary, June 2026, https://doi.org/10.1093/OED/1336623698. A statement against a war, therefore, does not necessarily constitute denunciation of a regime. Netrebko's March 1, 2022 post concerns only

the war. She pleads no facts supporting an allegation that Gelb believed she had publicly distanced herself from the *Russian regime*. Instead, the communications she cites demonstrate that Gelb believed she was "totally behind Putin," notwithstanding the March 1 post. ECF No. 124-9; *see* ASC ¶ 15(f).

In sum, the messages Netrebko relies on merely reflect that Gelb knew that she had made an Instagram post with anti-war sentiments on March 1; they do not plausibly suggest that Gelb subjectively believed that Netrebko had, in fact, condemned the war or distanced herself from the Russian regime, or that Gelb entertained serious doubts as to the truth of his statements when he made them. Netrebko has not, therefore, pleaded that Gelb made any of the allegedly defamatory statements with a "high degree of awareness of their probable falsity." *Garrison*, 379 U.S. at 74.

Finally, with respect to Statement 4 (Gelb's statement that he believes Netrebko "had certain conversations with the Kremlin," ASC ¶ 7), the ASC is devoid of facts tending to show that Gelb knew that Netrebko did not communicate with the Kremlin or that he harbored serious doubts as to this claim. *See generally* ASC. The ASC does not allege, for example, that Gelb relied on questionable sources for this proposition, nor does it provide that Gelb made up the statement or that it is inherently improbable. *See Celle*, 209 F.3d at 183. In fact, in amending her supplemental complaint, Netrebko deleted the allegation that "Netrebko did not have conversations with 'the Kremlin' related to the invasion." ECF No. 167-2 at 7 (redline comparing the original supplemental complaint with the ASC). The ASC, therefore, does not plausibly allege Statement 4's falsity, let alone Gelb's actual malice in making the statement.

Because Netrebko is a public figure and has not plausibly alleged actual malice with respect to any allegedly defamatory statements, her defamation claims are dismissed.

B. Retaliation Claims

To state a claim for retaliation under the NYSHRL and NYCHRL, a plaintiff must "demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (citation omitted). Under this standard, to survive a motion to dismiss, a "plaintiff must plead facts from which the Court can reasonably infer that there is a causal connection between the plaintiff's protected activity and the adverse employment action." *Mitura v. Finco Servcs., Inc.*, 712 F. Supp. 3d 442, 461 (S.D.N.Y. 2024). A plaintiff can show causality via direct or indirect evidence. *See Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319, 334 (E.D.N.Y. Jan. 24, 2025). When evaluating indirect evidence, courts in this Circuit have regularly dismissed NYSHRL and NYCHRL retaliation claims where a complaint fails to allege close enough temporal proximity between the protected activity and retaliatory action. *See, e.g.*, *id.* at 334–35.

Netrebko's retaliation claim fails because she has not alleged a causal connection between her commencement of this action and Gelb's purportedly defamatory statements. *See* ASC ¶¶ 4–8. First, she provides no direct evidence of retaliation, and her strongest indirect evidence is the mere fact that these statements were made after she filed her suit. *See* Opp. at 22–26 & n.7; Reply at 11. The first of the statements was published on May 13, 2024, nine months after Netrebko initiated this action—a time frame that courts in this Circuit have routinely held is too long to raise an inference of causation. *See, e.g.*, *Kraiem v. JonesTrading Inst. Servs. LLC*, 571 F. Supp. 3d 53, 59–60 (S.D.N.Y. 2021); *Ronen*, 763 F. Supp. 3d at 334 ("[M]ost courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference." (citations omitted)).

Moreover, although the ASC characterizes Gelb's statements as a "renewed public campaign to defame Netrebko and disparage her," ASC ¶ 1, the SAC and attached documents—filed about two years before the ASC—indicate that Gelb had made numerous critical statements in public news sources well before this lawsuit was filed. *See* SAC ¶¶ 7, 56 (describing the Met's "unabated smear campaign against [Netrebko]"). For example, before the commencement of this action, Gelb made statements that Netrebko "chose a side and . . . chose the wrong side," SAC ¶¶ 7 n.9, 56(i) n.28 (February 2023), that "[i]n the case of somebody [like Netrebko] who is so closely associated with Putin, denouncing the war is not enough," *id.* ¶ 56(b) n.20 (March 2022), and that "Netrebko is a close personal ally of Putin, both in her actions and her mindset," *id.* ¶ 56(d) n.2 (June 2022). *See also Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 226 (S.D.N.Y. 1997) ("On a motion to dismiss . . . a court may consider . . . the full text of press releases, magazine articles, analyst's reports, and wire services stories that are referred to or quoted from in the complaint."). In other words, Gelb's 2024 and 2025 comments at issue here reflect a mere continuation of comments he made before Netrebko filed her lawsuit.

Netrebko contends that she has plausibly alleged causality because Gelb's comments were made "in the context of Netrebko's first performance in the U.S. following her commencement of this lawsuit as well as various other facts related to Defendants' own reputation and financial mishaps that provide other explanations for the timing." Opp. at 25 n.7. But this argument merely references events contemporaneous with Gelb's 2024 and 2025 statements; it does not provide a plausible factual narrative linking this lawsuit to Gelb's 2024 and 2025 remarks. Nor does it address the fact that Gelb made statements about Netrebko years in advance of any alleged financial problems the Met was experiencing in 2024. If anything, this argument supports the Met's position that Gelb's comments were made only in response to

public attention concerning Netrebko, not any protected activity. *See* Mem. at 26–27. Therefore, Netrebko has not plausibly alleged that her lawsuit played any role in Gelb's 2024 and 2025 remarks, and her retaliation claims are dismissed.

## CONCLUSION

For the foregoing reasons, the Met's motion to dismiss the ASC under Federal Rule of Civil Procedure 12(b)(6) is GRANTED. Netrebko's claims for post-complaint defamation and retaliation in violation of the NYSHRL and NYCHRL are DISMISSED.

By **October 5, 2026**, Netrebko may seek leave to amend her supplemental complaint. Any motion must be accompanied by (1) a proposed amended complaint; (2) a redline or a description of the changes from the original complaint to the proposed amended complaint; and (3) a memorandum of law explaining how the amendments address the deficiencies described in this order. If Netrebko does not seek leave to amend by that date, or if the Court determines that her proposed amended complaint fails to remedy the deficiencies identified in this order, the Court's dismissal shall be with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 123.

SO ORDERED.

Dated: September 3, 2026
New York, New York

ANALISA TORRES
United States District Judge