**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------- X

| | | |
|---|---|---|
| ANNA NETREBKO,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN OPERA ASSOCIATION, INC. d/b/a THE METROPOLITAN OPERA and PETER GELB, in his professional and individual capacities,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>X | Case No. 23-cv-6857-AT |

**PLAINTIFF ANNA NETREBKO'S MOTION IN SUPPORT OF LEAVE TO FILE <u>SECOND AMENDED SUPPLEMENTAL COMPLAINT</u>**

Julie R. Ulmet
THE LAW OFFICES OF JULIE R. ULMET
417 Grand St., #1804
New York, NY 10002
Tel (646) 396-0055
julie@ulmetlaw.com

Kara L. Gorycki
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500
kgorycki@nmllplaw.com

*Counsel for Plaintiff Anna Netrebko*

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

A. Legal Standard ..... 4

B. Leave to Amend Should be Freely Granted ..... 4

C. The SASC Remedies the Retaliation Deficiencies Identified in the Order and Continuing Protected Opposition Under Newton ..... 5

D. The SASC Pleads Close Temporal Relationships Between Specific Instances of Protected Activity and the Challenged Conduct ..... 6

1. *Diapason Statements*: First Attack on the Lawsuit Following Discovery Demands ..... 6

2. *New York Times Palm Beach Opera Statement*: Criticism of a New Employer Eight Days After Plaintiff's Request for Court Intervention ..... 7

3. June-July 2025 Statements: Attacks on Credibility, Other Cultural Institutions, and the Pending Litigation ..... 7

4. August-September 2025 Royal Opera and Ballet Statements: Continued Criticism as Netrebko Moved to File Supplemental Complaint and the Court Reinstated Her National Origin Discrimination Claim. ..... 8

5. The Retaliatory Statements are Temporally Connected to Netrebko's Protected Activities ..... 9

E. The Allegations Connect Gelb's Statements and Conduct to the Litigation ..... 9

F. Defendants' Retaliatory Statements Were Designed to Impugn Plaintiff and Interfere with her Post-Termination Employment ..... 11

G. Defendants Made the Comments Proactively and with Animus ..... 12

H. The Challenged Conduct is Reasonably Likely to Deter Protected Activity ..... 14

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 3
*Baiguang Han v. Shang Noodle House, Inc.*, No. 20-CV-2266,
2022 U.S. Dist. LEXIS 164066 (E.D.N.Y. Sep. 12, 2022) ... 9
*Banks v. Gen. Motors, LLC.*,
81 F.4th 242 (2d Cir. 2023) ... 8
*Calise v. Casa Redimix Concrete Corp.*,
No. 20 CIV. 7164 (PAE), 2022 U.S. Dist. LEXIS 20962 (S.D.N.Y. Feb. 4, 2022) ... 11
*Edelman v. NYU Langone Health Sys.*,
141 F.4th 28 (2d Cir. 2025) ... 13
*Foman v. Davis*,
371 U.S. 178 (1962) ... 3
*Hughes v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) ... 11
*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ... 3, 4
*Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*,
No. 25-1697-cv, 2026 U.S. App. LEXIS 28893 (2d Cir. Sep. 21, 2026) ... 1, 4, 5, 8, 13, 14
*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ... 3
*Patchenko v. C.B. Dolge Co., Inc.*,
581 F.2d 1052 (2d Cir. 1978) ... 11
*Quaratino v. Tiffany & Co.*,
71 F.3d 58 (2d Cir. 1995) ... 3
*Sherman v. Fivesky, LLC*,
No. 19-CV-8015 (LJL), 2020 U.S. Dist. LEXIS 157998 (S.D.N.Y. Aug. 31, 2020) ... 9
*Wanamaker v. Columbian Rope Co.*,
108 F.3d 462 (2d Cir. 1997) ... 10
*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011) ... 3

## Rules

Fed. R. Civ. P. 12(b)(6) ... 3
Fed. R. Civ. P. 15(a)(2) ... 3
Fed. R. Civ. P. 15(d) ... 3

**INTRODUCTION**

On September 3, 2026, the Court issued an order dismissing Plaintiff Anna Netrebko's Amended Supplemental Complaint. ECF No. 220 (the "Order"). The Order identified discrete pleading deficiencies and expressly authorized Plaintiff to seek leave to amend by October 5, 2026. Order at 15. Plaintiff now seeks leave to file an amended supplemental complaint which remedies the concerns identified by the Court.

Plaintiff's proposed Second Amended Supplemental Complaint (the "SASC") revises the retaliation allegations to identify Plaintiff's ongoing protected participation in this discrimination litigation and other protected activities, and clarifies the temporal proximity of these activities to Defendants' alleged retaliatory acts.[1] Based on the Second Circuit's reasoning in *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, No. 25-1697-cv, 2026 U.S. App. LEXIS 28893 (2d Cir. Sep. 21, 2026), these allegations now properly allege causation under the New York City and State Human Rights Laws.

In *Newton*, the Second Circuit affirmed that "intervening patterns of antagonism or a drumbeat of retaliatory animus" can establish retaliation against an employee who opposes an employer's discriminatory actions by pursuing a lawsuit. *Newton*, 2026 U.S. App. LEXIS 28893, at *34 (internal citations and quotations omitted). This is particularly analogous here. Now identifying Plaintiff's specific litigation-related conduct, the SASC demonstrates a pattern in which Plaintiff's pursuit of her rights through active prosecution of this action has been regularly and promptly met by Defendants' "drumbeat" of disparaging public statements about Plaintiff. The SASC also clarifies that these statements are no mere defense of Defendants' decision to terminate Plaintiff or routine assertion of

[1] The SASC elects not to replead the defamation claim, but clarifies why statements previously alleged to be defamatory should be considered part of Plaintiff's retaliation claim.

their litigation position. Rather, Defendants' statements had gone above and beyond this to disparage Plaintiff's character, criticize her post-termination employers, and denigrate this litigation—even admitting that such comments were made against the advice of the Met's own lawyers. The SASC also alleges that these post-termination statements are a significant departure from the Met's standard protocols following the termination of other employees and artists, even when compared to the termination of another high-profile star in a cloud of controversy.

The SASC adds two new examples to this alleged pattern of retaliatory antagonism: two statements Gelb made in August and September 2025 within weeks of Plaintiff's notice of her intent to file a supplemental complaint, and just after Plaintiff stipulated that she would make no further additions to her proposed supplemental complaint. Astonishingly, these most recent statements were made a full three-and-a-half years after the Met terminated Netrebko. It is not standard or routine for an employer to publicly comment on or disparage a former employee so many years after their separation. In contrast, it would be standard and routine to decline to comment on an employee who is engaged in ongoing litigation, especially one involving laws containing anti-retaliation provisions, but Defendants did not elect this option. Instead, Defendants' 2024 and 2025 public statements about Netrebko can only be understood when viewed together with the rhythm of Plaintiff's protected conduct: as Plaintiff has actively pursued this litigation for the past three years, her efforts have been met by the steady drumbeat of Defendants' retaliatory public statements in response.

Plaintiff respectfully requests leave to file the proposed SASC asserting NYSHRL and NYCHRL retaliation claims.

## BACKGROUND

### A. The Court's September 3, 2026, Order

The Court dismissed Plaintiff's retaliation claims because the Amended Supplemental Complaint ("ASC") identified the August 4, 2023, filing of this action as the only relevant protected activity, placing the first challenged statement approximately nine months later, and because the allegations appeared to be a mere continuation of Defendants' pre-suit public criticisms. Order at 14. The Order expressly authorized Plaintiff to seek leave to amend by October 5, 2026. Order at 15.

### B. The Proposed Amendments

The SASC makes three principal changes. First, it withdraws the post-complaint defamation cause of action while retaining the underlying factual allegations to the extent they bear on Plaintiff's retaliation claims. It also adds two new statements that were made subsequent to Plaintiff's initial request to file a supplemental complaint and provides further examples of Defendants' pattern of retaliatory animus. Second, the SASC particularizes Plaintiff's protected activity during the active prosecution of her discrimination claims, including issuing discovery demands and raising discovery disputes, filing applications with the Court, pursuing depositions, and issuing cease and desist letters in 2024 and 2025. The timing of this particularized activity clarifies that Defendants' retaliatory statements were made in extremely close temporal proximity to these protected activities. Third, the SASC clarifies that Defendants' public statements disparaged Plaintiff in three related ways that were each different from Defendants' pre-suit public statements about Netrebko: they attacked Netrebko's character and credibility, discouraged other opera companies from engaging her, and expressly invoked or attacked her pending discrimination litigation. Fourth, the SASC alleges multiple facts demonstrating that Defendants made these statements through proactive media engagement, not as routine responses to media inquiries. Finally, the SASC alleges that this purposeful negative publicity

about Netrebko differed from the Met's protocol and prior conduct toward prominent artists who separated from their employment with the Met following public controversy.

## ARGUMENT

### A. Legal Standard

Rule 15(d) provides that a court "may, on just terms, permit a party to serve a supplemental pleading" concerning events occurring after the pleading to be supplemented. Fed. R. Civ. P. 15(d). The Second Circuit instructs that "[l]eave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). The same liberal principles govern amendment under Rule 15(a)(2), under which "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015); *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011).

Leave may be denied for undue delay, bad faith, undue prejudice, repeated failure to cure, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Futility asks whether the proposed amendment would fail to cure the identified defect or fail to state a claim under Rule 12(b)(6). *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). In conducting that analysis, the Court accepts the proposed pleading's nonconclusory factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *Id. See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Leave to Amend Should be Freely Granted

Here, there is no undue delay, bad faith, or unfair prejudice. Plaintiff moves within the period the Court expressly provided for amendment. Order at 15. The SASC narrows rather than expands the case by withdrawing the supplemental defamation claim, adds no new parties, and asserts no new causes of action. The two additional retaliatory statements – published in an August 28, 2025, article in *The Observer* and a September 2, 2025, episode of the *Slow Newscast* podcast— provide only

further examples of the same pattern of retaliatory conduct in which Defendants are alleged to have engaged.[2] Importantly, certain of the new factual allegations—sworn testimony from the deposition of Peter Gelb and Gillian Brierley—did not exist until months after Plaintiff filed the supplemental complaint in September 2025. The amendment therefore reflects evidence developed in the ordinary course of discovery, not delay or an attempt to introduce an unrelated theory. Any additional discovery necessitated by the amendments will therefore concern a confined set of retaliation issues that the Court itself contemplated could be repleaded and which overlap with certain discovery requests previously served on Defendants in connection with Ms. Netrebko's national origin and gender discrimination claims.

Nor is this a case in which Plaintiff was required to anticipate the precise pleading deficiencies before the Court identified them. *Loreley* emphasizes the "strong preference for resolving disputes on the merits" and cautions against denying a meaningful opportunity to amend before a party has "the benefit of a ruling" identifying the precise defects. 797 F.3d at 190–91. The only substantial question is futility, and the proposed SASC is not futile for the reasons below.

**C. <u>The SASC Remedies the Retaliation Deficiencies Identified in the Order and Continuing Protected Opposition Under Newton</u>**

Just last month, the Second Circuit decided *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, No. 25-1697-cv, 2026 U.S. App. LEXIS 28893 (2d Cir. Sep. 21, 2026). The Second Circuit clarified that protected opposition includes "other statements made, activities pursued, or positions taken by a plaintiff during the course of [a] discrimination lawsuit" where the activity or statements constitute continued opposition to allegedly unlawful employment practices. 2026 U.S. App. LEXIS

[2] Notably, Plaintiff stipulated on August 28, 2025, that she would make no further edits to her proposed supplemental complaint, so these statements were not included in the pleading that the Court considered in issuing the Order. (ECF Doc. 116 (proposed briefing schedule); ECF Doc. 117 (briefing schedule ordered by Court)).

28893, at *25. *Newton* identifies participation in litigation events such as depositions, settlement proceedings, trial, and appeal as examples of post-filing conduct capable of constituting continued opposition under the city and state law. *Id*.

The SASC now alleges substantially more protected activity than the ASC alleged. The SASC alleges that throughout 2024 and 2025, Plaintiff actively pursued claims that Defendants discriminated against her in violation of the New York State and City Human Rights Laws ("NYSHRL" and "NYCHRL," respectively). She challenged deficiencies in Defendants' discovery responses, sought the production of documents and communications from Gelb and other Met personnel concerning the conduct at issue, sought judicial intervention concerning Defendants' ESI collection and production, served a Rule 30(b)(6) deposition notice, and scheduled Gelb's deposition, among other things. SASC ¶¶ 29–40.

The SASC alleges that these litigation activities communicated continued opposition to the discrimination challenged in her lawsuit. These activities are described in more detail below in the context of how each act of protected activity was quickly met with an act of retaliatory animus by Defendants.

### D. <u>The SASC Pleads Close Temporal Relationships Between Specific Instances of Protected Activity and the Challenged Conduct</u>

The SASC alleges repeated instances in which challenged retaliatory conduct closely followed specific protected litigation activity.

#### 1. ***Diapason Statements*: First Attack on the Lawsuit Following Discovery Demands**

On May 5, 2024, Plaintiff challenged deficiencies in Defendants' discovery responses and demanded that by May 13 Defendants produce multiple categories of documents and communications from Gelb and other Met employees. SASC ¶¶ 6(a)-(c). On May 13, *Diapason* published an interview in which, after the interviewer raised the Met's treatment of Russian artists and Netrebko, Gelb

responded by referencing this lawsuit, stating that Netrebko had filed suit against the Met "and against me personally," asserting that the action had "no chance of succeeding," and predicting that "she will lose." *Id.* ¶ 6(a). This statement falls within the SASC's litigation-focused theme and was published on the very deadline Plaintiff had set for the production of Gelb and the Met's outstanding discovery obligations. SASC ¶¶ 26(a)-(b).

**2. *New York Times Palm Beach Opera Statement*: Criticism of a New Employer Eight Days After Plaintiff's Request for Court Intervention**

On July 23, 2024, Plaintiff sought the Court's intervention concerning Defendants' asserted delays in collecting and reviewing ESI. *Id.* ¶ 27; ECF No. 59. Eight days later, on July 31, the *New York Times* published Gelb's criticism of Palm Beach Opera's decision to engage Plaintiff for what would be her first United States performance since the Met ended its relationship with her. SASC ¶ 7(a). Gelb said that the Palm Beach Opera had made an "unfortunate decision" to engage Netrebko and described Netrebko's statements calling for peace and an end to the war as "disingenuous." *Id.* The statement therefore combined two themes alleged in the SASC: public criticism of another opera company for engaging Netrebko and disparaging Netrebko's character by impugning her credibility.

**3. June-July 2025 Statements: Attacks on Credibility, Other Cultural Institutions, and the Pending Litigation**

Between June 6 and June 23, 2025, Plaintiff challenged Defendants' production, demanded collection of Gelb's text and WhatsApp communications, served a Rule 30(b)(6) notice, scheduled Gelb's deposition, and again sought judicial intervention concerning Defendants' ESI production. SASC ¶ 29(a). Gelb's challenged statements then appeared in *Ukrinform* on June 26, *LB.ua* on June 28, and *Der Standard* on July 13. *Id.* ¶¶ 8-10. In those interviews, Gelb portrayed Netrebko's anti-war position as belated and insincere; stated that her statements were made only to obtain "a way back" to the Met or "other opera companies"; criticized cultural institutions that did not share the Met's approach as "extremely naive or dangerously insincere"; and, in *LB.ua*, discussed this

discrimination lawsuit, the fact that Netrebko had sued him personally, and his refusal to compromise. *Id*. ¶¶ 8-10, 14-16, 28(b). These statements implicate all three themes pleaded in the SASC and followed Plaintiff's active prosecution of discovery matters in this litigation by just days or weeks.

**4. August-September 2025 Royal Opera and Ballet Statements: Continued Criticism as Netrebko Moved to File Supplemental Complaint and the Court Reinstated Her National Origin Discrimination Claim.**

On July 24, Plaintiff sought leave to file a supplemental complaint, and on July 30 the Court reinstated Plaintiff's national-origin discrimination claims. SASC ¶ 29(a). Approximately one month later, Gelb commented to *The Observer* about Netrebko's return to London's Royal Opera and Ballet (the "Royal Opera") for the first time after Russia's 2022 invasion of Ukraine and reasserted the Met's contrary position. In particular, he stated, "I am certainly not going to tell the Royal Opera House what to do, . . . I do feel strongly about the position the Met has taken … I can look myself in the mirror and feel I've done the right thing." *Id.*, at ¶ 29(b). He went on to state more broadly that "art has to be used as a weapon for good" and cultural institutions should participate in that fight. *Id*. ¶ 11. On September 2, in the *Slow Newscast* podcast episode "The Diva and the Dictator," about Netrebko's return to the Royal Opera, Gelb explained that after the invasion, the Met "cut all relations with the Russian government and with any Russian artist who I felt was supporting Putin" because "you can't have cultural exchange with a country that is trying to kill millions of people." When asked about Netrebko specifically, Gelb acknowledged that he had "spoken extensively about [his] feelings about her, and it's well documented, what I've said about her," even though he had "been warned repeatedly by my lawyers to not talk about it, since we're in litigation with her." He then added immediately after, "if people do the right things, they should be forgiven," implying that Netrebko was not such a person. *Id*. ¶ 12. These comments continued the SASC's themes of discouraging institutions from engaging Netrebko, suggest that those cultural institutions should join the Met in using culture as a weapon, and expressly connected Gelb's public commentary to the pending litigation.

### 5. The Retaliatory Statements are Temporally Connected to Netrebko's Protected Activities

*Newton* rejects a rigid bright-line rule for temporal proximity and explains that several weeks to several months may support causation depending on the circumstances, and "[w]here temporal proximity is not the only evidence that bears on a causal connection, we have recognized that the lapse in time between the protected activity and adverse action can be longer." 2026 U.S. App. LEXIS 28893, at *33-34, *quoting Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277-78 (2d Cir. 2023). Here, the SASC alleges a repeated sequence now measured in days and weeks: a May 13, 2024 statement made on the same deadline as Plaintiff gave for the production of disputed discovery; the July 21, 2024 comments eight days after Plaintiff sought judicial intervention in a discovery dispute; three June-July 2025 interviews following Netrebko's intensive discovery activity directed at Gelb and Met leadership and another request for judicial intervention; and August-September 2025 statements made within a month of Plaintiff's request to file a supplemental complaint and the Court's partial granting of Netrebko's motion for reconsideration that reinstated Netrebko's claim for national-origin discrimination. These events are also contextualized by facts demonstrating retaliatory animus.

## E. <u>The Allegations Connect Gelb's Statements and Conduct to the Litigation</u>

In addition to temporal proximity, the SASC shows that Gelb's statements explicitly referenced this litigation in a manner that disparaged Netrebko's maintenance of this discrimination lawsuit and impugned her character, credibility, and employability. In May 2024, Gelb emphasized that Plaintiff had sued not only the Met but him "personally," declared that the case had "no chance of succeeding," and predicted that Plaintiff "will lose." SASC ¶ 6(a). In June 2025, he again emphasized that the pending action was against both the Met and him personally. *Id.* ¶ 9. Those allegations are materially different from a circumstance in which an employer merely answers a routine question about a former employee or pending litigation: the SASC alleges that Gelb

proactively discussed the protected litigation together with assertions that Netrebko was insincere and criticism of institutions that had announced their renewed relationship with her. His references to the lawsuit were not mere responses to questions from reporters or statements of the Met's defenses to ongoing litigation. Instead, these unsolicited and harmful statements demonstrate the animus that Gelb directed at Ms. Netrebko's opposition to the Met's policies.

Gelb publicly acknowledged the connection between his commentary and the litigation. In the *Slow Newscast* interview, when asked about Netrebko, Gelb stated, "I've spoken extensively about my feelings about her, and it's well documented, what I've said about her, and I've also been warned repeatedly by my lawyers to not talk about it, since we're in litigation with her, but, you know, I think, in general, you know, if people do the right things, they should be forgiven" – implying that she had not done "the right things" so the Met had not "forgiven" her. SASC ¶¶ 12. Read in context with the Met's continuing refusal to reengage Netrebko and Gelb's criticism of other institutions that did, the statement demonstrates that Gelb's commentary was related to the litigation.

In the Second Circuit, disseminating the fact that an employee sued their employer within the relevant employment community can be considered unlawful retaliatory blacklisting. *Baiguang Han v. Shang Noodle House, Inc.*, 2022 U.S. Dist. LEXIS 164066, at *18 (E.D.N.Y. Sep. 12, 2022) (circulating a message telling other employers in the industry not to hire someone because he "sued under the employment law" could be "disastrous" to future employment prospects and supported retaliatory intent). *See also Sherman v. Fivesky, LLC*, 2020 U.S. Dist. LEXIS 157998, at *14 (S.D.N.Y. Aug. 31, 2020) (retaliatory acts include "blacklist[ing] the former employee, wrongfully refus[ing] to write a recommendation to prospective employers, or sull[ying] the plaintiff's reputation") (*quoting Wanamaker v. Columbian Rope Co*., 108 F.3d 462, 466 (2d Cir. 1997)).

These allegations supply additional circumstantial evidence of retaliatory intent and

causation: express references to the protected legal action, emphasis on Gelb's personal status as a defendant, acknowledgment of the consideration (and rejection) of repeated legal advice not to discuss Plaintiff due to the ongoing litigation and continued public commentary on Netrebko's character and credibility thereafter.

### F. <u>Defendants' Retaliatory Statements Were Designed to Impugn Plaintiff and Interfere with her Post-Termination Employment</u>

The SASC also directly addresses the Court's conclusion that the prior allegations appeared to describe a "mere continuation" of Gelb's pre-suit criticism. Order at 14. The post-suit statements now addressed Plaintiff's credibility, the judgment of institutions willing to employ her, and her ability to regain work elsewhere while she was litigating discrimination claims against Defendants.

The SASC clarifies that the later statements were not a mere defense of the Met's termination decision but also criticized other institutions for engaging Netrebko, thus interfering with Netrebko's efforts to secure post-termination employment. In July 2024, Gelb publicly disparaged the Palm Beach Opera's "unfortunate decision" to engage Plaintiff. SASC ¶ 22(a). In June 2025, Gelb connected his account of Plaintiff's conduct to whether she should obtain "a way back" not only to the Met but to "other opera companies." *Id.* ¶ 19(b). In July 2025, Gelb told reporters that artists who support Putin should not be engaged and described arts officials who did not share this approach as "extremely naive or dangerously insincere." *Id.* ¶ 10. And in August 2025, commenting on Netrebko's return to the Royal Opera, Gelb contrasted that institution's decision with the Met's position while explaining that art should be "weaponised" and that "cultural leaders and cultural institutions have to be part of that fight." *Id.* ¶ 11. These allegations plausibly frame Gelb's statements as messages to other cultural institutions about whom they should employ, not merely retrospective explanations for the Met's 2022 decision.

Allegations interfering with a former employee's post-suit employment opportunities is

considered retaliatory in the Second Circuit. *See Calise v. Casa Redimix Concrete Corp*., 2022 U.S. Dist. LEXIS 20962, at *15 (S.D.N.Y. Feb. 4, 2022) ("As courts in this Circuit have recognized, blacklisting, or interfering with future employment opportunities, can constitute an adverse employment action."); *Patchenko v. C.B. Dolge Co., Inc*., 581 F.2d 1052, 1054–55 (2d Cir. 1978) ("plaintiffs may be able to state a claim for retaliation ... if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation"); *Hughes v. Twenty-First Century Fox, Inc*., 304 F. Supp. 3d 429, 448 (S.D.N.Y. 2018) ("The ability to 'blacklist' a former employee, and thus foreclose future employment possibilities, is but one example of an employer's power to punish a former employee") (internal citation omitted).

**G. <u>Defendants Made the Comments Proactively and with Animus</u>**

The SASC further pleads facts addressing the alternative explanation identified in the Order—that Gelb was simply responding to renewed public attention concerning Plaintiff. See Order at 14–15. The SASC alleges that the Retaliatory Statements were not mere responses to general press inquiries on matters of public interest. SASC, ¶ 30(a). Rather, the Met's commentary was sought concerning the particular context of Netrebko's employment prospects returning after years of cancelled, lost, or deferred opportunities following harm to her reputation from the Met's public termination of her employment, and the Met consented for Gelb to be interviewed or provide these statements. At all times it was possible and would have been customary for the Met to decline to comment on Netrebko, especially in the context of ongoing litigation. *Id*., at ¶ 30(b). The Met, with an annual budget of approximately $300 million, has a robust staff of communications professionals and engages public relations companies to advise on handling press and publicity. *Id*., at ¶ 30(c).

In fact, Gelb admitted in sworn testimony that he affirmatively and proactively supplied a *New York Times* reporter with facts, material, and sources for an article about Netrebko's "downfall."

*Id.*, at ¶ 30(d). Gelb did not contribute to this reporting simply to publicly defend the Met's actions or state its official defense to ongoing litigation but instead admitted that these actions were deliberately targeted at Netrebko. *Id.* He testified that he participated in the reporting because he thought "it was important for the public to understand where Ms. Netrebko stood." *Id.* In particular, between March 30 and March 31, 2022, Gelb sent emails and text messages to *New York Times* reporter Javier Hernandez providing links, documents, and sources. *Id.*, at ¶ 30(e). In texts to Hernandez on March 30 Gelb explained that he was texting and emailing him past news articles on Netrebko, including "several other unpleasant items." *Id.* The following day Hernandez asked Gelb if he could provide connections to sources for a longer piece on Netrebko's "downfall" and Gelb provided Hernandez with a list of sources. *Id.*

While Plaintiff has not yet received discovery from Defendants that includes communications from the period when the Retaliatory Statements in the SASC were made, there is no reason to believe that Gelb's affirmative and proactive participation in prior media reports about Netrebko did not continue in this fashion. *Id.*, at ¶ 30(f). For example, Gelb affirmatively and proactively decided to participate as an on-the-record interviewee in the September 2025 *Slow Newscast* podcast episode, "The Diva and the Dictator." *Id.*, at ¶ 30(g). This podcast focused entirely on Netrebko's return to the Royal Opera and Gelb certainly could have declined to participate. *Id.* In fact, Netrebko and her representatives declined to participate in this very episode, citing the ongoing litigation. Instead, Gelb actively participated in the podcast, providing an on-the-record interview and sharing his negative commentary about Netrebko and her lawsuit. *Id.*

The Met's proactive media strategy demonstrates retaliatory animus for an additional reason. *Newton* instructs that an employer's conduct may be retaliatory where it is "a departure from company protocol and done to humiliate" the employee. *Newton*, 2026 U.S. App. LEXIS 28893, at *35. Here,

the SASC alleges that the Retaliatory Statements departed from company protocol because the Met has not previously issued negative or disparaging statements about terminated artists after their separation from the Met. SASC, ¶ 31. For example, in September 2019, another prominent opera singer, Plácido Domingo, separated from the Met following public reporting of credible accusations that he had sexually harassed female artists at the Met. *Id*. After the Met published the announcement of Domingo's agreed-upon withdrawal from performances, which included a statement from Domingo denying the women's accounts, the Met did not issue any public criticism of Domingo or contribute to negative reporting about him. *Id*.

**H. <u>The Challenged Conduct is Reasonably Likely to Deter Protected Activity</u>**

The SASC also plausibly alleges the deterrence component of retaliation. Under the NYSHRL and NYCHRL standards, a plaintiff must allege protected opposition followed by conduct "reasonably likely to deter a person from engaging in such action." *Edelman v. NYU Langone Health Sys*., 141 F.4th 28, 45 (2d Cir. 2025). The SASC alleges public statements by the leader and public face of Plaintiff's former employer that attacked Plaintiff's character and credibility, criticized other cultural institutions for engaging her, and expressly invoked her discrimination litigation. SASC ¶¶ 6-12, 13–24, 30-31. These public statements were sustained over a period of years. Under *Newton*, they demonstrate a clear "pattern of antagonism" and a "drumbeat of retaliatory animus." *Newton* at *34 (internal citations and quotations omitted).

The SASC further alleges that the statements were disseminated through major United States and international media; that they were directed at Plaintiff's present and prospective professional opportunities; and that they caused reputational harm, discouraged other opera companies and arts institutions from contracting with her, encouraged protests, and caused emotional harm. *Id*. ¶¶ 32-36. Accepting the allegations as true, public conduct by a former employer that threatens a plaintiff's ability to obtain work elsewhere while she pursues discrimination claims is certainly capable of

deterring protected activity by other employees. Such interference with a former employee's attempts to obtain post-termination employment is especially concerning given the obligation of an employment discrimination plaintiff to mitigate their damages by seeking new work. When viewed in light of the power held by Gelb personally and the Met as an institution, the deterrent effect is amplified. Importantly, at the time of the termination, Netrebko was the Met's "star performer at the time," in Gelb's own words.[3] Certainly, an aspiring artist in a more precarious professional position would be deterred from raising any complaints against the Met's unlawful actions upon seeing the harm inflicted on someone of Netrebko's stature and prominence – especially when that employer continues to publicly disparage a terminated employee's character years after their employment ended.

The SASC's allegations must be taken as true and all reasonable inferences drawn in Plaintiff's favor at this stage. *See Newton*, 2026 U.S. App. LEXIS 28893, at *26. Considered together, they plausibly support an inference that Plaintiff's continued pursuit of her discrimination claims played at least some role in Gelb's challenged conduct. That is all the NYSHRL and NYCHRL require at the pleading stage. Accordingly, the proposed SASC cures the causation deficiency identified in the Court's September 3 Order, and amendment of the retaliation claims is not futile.

## **CONCLUSION**

Plaintiff respectfully requests that the Court grant Plaintiff leave to file the Second Amended Supplemental Complaint.

Dated: New York, NY
October 5, 2026

[3] *LB.ua* interview, p. 5.

Respectfully submitted,

/s/ Julie R. Ulmet
Julie R. Ulmet, Esq.
THE LAW OFFICES OF JULIE R. ULMET
417 Grand St., #1804
New York, NY 10002
(646) 396-0055
julie@ulmetlaw.com

and

Kara L. Gorycki
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500
kgorycki@nmllplaw.com

*Counsel for Plaintiff Anna Netrebko*

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing Memorandum in Support of Plaintiff's Motion for Leave to File Second Amended Supplemental Complaint on counsel for Defendants via filing and service by ECF and by email.

Dated: October 5, 2026

/s/ Julie R. Ulmet
Julie R. Ulmet